UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MATTHEW R. GRANT, individually,　　)
as *Next Friend* to C.L.G. and as　　　)
*Next Friend* to C.M.G., and on behalf of　)
all others similarly situated,　　　　)
　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
and　　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
STOP MISSOURI CORRUPTION, LLC,　)
dba　　　　　　　　　　　　　)　　Case No.
www.StopMissouriCorruption.com　　)
　　　　　　　　　　　　　　)
　　　　　　*Plaintiffs*,　　　　)
　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
BRUCE F. HILTON,　　　　　　　)
MARY W. GREAVES,　　　　　　)
JOHN FENLEY,　　　　　　　　)
RIENKER, HAMILTON & FENLEY, LLC )
STATE OF MISSOURI, including its　　)
OFFICE OF CHIEF DISCIPLINARY　)
COUNSEL, COMMISSION ON　　　)
RETIREMENT, REMOVAL AND　　)
DISCIPLINE OF JUDGES, and the　　)
ST. LOUIS COUNTY FAMILY COURT, )
MAIA BRODIE, individually and d/b/a　)
BRODIE LAW,　　　　　　　　)
LAWRENCE GILLESPIE,　　　　　)
GILLESPIE HETLAGE & COUGHLIN )
LLC,　　　　　　　　　　　　)
REBECCA A. COPELAND,　　　　)
STACI THOMAS,　　　　　　　)
SARAH M. GRANT,　　　　　　)
MATHEW G. EILERTS,　　　　　)
GROWE EISEN KARLEN EILERTS,　)
LLC,　　　　　　　　　　　　)
CON CURRAN COULTER,　　　　)
THE COULTER LAW GROUP, LLC　)
d/b/a COULTER GOLDBERGER, LLC,　)
　　　　　　　　　　　　　　)
and　　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
CO-CONSPIRATORS 1-100,　　　　)

1

|   |   |
|---|---|
| *Defendants*. | ) |
|   | ) |

**INDIVIDUAL,**
**CLASS ACTION,**
**CIVIL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS**
**(RICO) ACT (18 U.S.C. § 1964),**
**CIVIL RIGHTS ACT (18 U.S.C. § 1983), AND**
**OTHER CAUSES OF ACTION**
**COMPLAINT**

Plaintiff Matthew R. Grant ("Plaintiff" or "Plaintiff MRG" or "Father"), individually, and on behalf of, and as *Next Friend* for his minor child C.L.G. ("Plaintiff C.L.G.), and on behalf of, and as *Next Friend* for his minor child C.M.G. ("Plaintiff C.M.G.) (collectively the "Children"), and on behalf of all others similarly situated (the "Comprehensive Class" or "Class" and "subclasses"), and Plaintiff Stop Missouri Corruption, LLC ("Plaintiff LLC") (collectively "Plaintiffs"), for their Individual, Class Action, Civil Racketeer Influenced and Corrupt Organizations (RICO) Act (18 U.S.C. § 1964), Civil Rights Act (18 U.S.C. § 1983), and Other Causes of Action Complaint ("Complaint") against the named Defendants and those to be added in the future, state as follows:

## 1. PRELIMINARY STATEMENT

Plaintiff, Matthew R. Grant is the father of two teenage boys, ages 14 and 16, and he lost *all* custody and *all* visitation rights last March when he exposed the corruption that exists in the St. Louis Family Court in the 21st Circuit Court of the State of Missouri for St. Louis County, Missouri ("St. Louis Family Court"), to the Missouri Court of Appeals for the Eastern District of Missouri ("Court of Appeals") and then the Missouri Supreme Court ("Supreme Court"). Just recently, Plaintiff has regained *1 night per week*, to spend with these young men. This 1 night, that will soon be removed, is the only time that these young men have with their father during critical years in their lives, when sons need their father the most.

Critically, before the underlying case was filed, Plaintiff has had at least 50/50 joint legal and physical custody (~15 nights a month) since the day the children were born.

As may be most relevant to the motives of the defendants in this case, Plaintiff is also a Missouri licensed attorney with background that brings credibility to his claims unlike in any case ever brought before.  Plaintiff is not just any attorney, but a litigator, a courtroom lawyer, who practiced for 21 years at a huge law firm that his one of the 100 largest in the United States.  His skills led to him being named a Partner in that well-known law firm, and there Plaintiff learned the Republican political network and inner workings that are behind the very conduct at issue in this case.  It is Plaintiff's credibility, and his evidence, that has led to this case receiving attention from the Missouri Supreme Court unlike any before.

Now, because Plaintiff would not recant and disavow his truthful claims of criminal corruption involving the parties in his case during his June 23-24, 2025 trial, the Guardian *Ad Litem,* Defendant John Fenley, has recommended taking that 1 night each week away and cutting it by half.  This is retaliation for Plaintiff's exposure of the corrupt scheme to everyone Plaintiff can think of that can help, including the United States Department of Justice ("DOJ").   As discussed below, the very Assistant United States Attorney that used to work with Plaintiff at a huge local law firm has refused to even respond to Plaintiff's complaint.  This lawsuit will present evidence from many others that have personally met with agents with the Federal Bureau of Investigation ("FBI"), year after year, only to encounter the same refusal to intervene and stop this criminal activity.

Recently, Plaintiff recorded a phone call from Defendant and Guardian *Ad Litem* John Fenley that took place on June 2, 2025.  In that recording that will be introduced into evidence in this case, Defendant Fenley attempted to extort Plaintiff via coercion and trade him custody of his

children if he agreed to disavow and recant his claims of criminal corruption. Plaintiff refused and instead submitted that recording to the Missouri Supreme Court and, again, to the DOJ, is in ongoing efforts to end the criminal organization that rules the Family Court.

In retaliation for Plaintiff, a victim, continuing to pursue criminal prosecution of all involved, disbarment of the lawyers and judges and removal of the judge and commissioner from the bench in St. Louis County, the RICO defendants in this case retaliated in violation of federal law.

Now, instead of the 4 overnights per month Plaintiff has now, Defendant Fenley is recommending *only 2 overnights per month* from now until each child turns 18 years of age. It is shameful, it is criminal and it is a violation of Plaintiff and his children's Due Process Rights. Plaintiff largely focuses on Defendant Fenley as he was appointed to specifically speak for the children and purse their best interests and instead, he betrayed them. The other Defendants include the judge, Defendant Hilton, the prior Commissioner, Defendant Mary W. Greaves, the children's own mother, Defendant Rebecca A. Copeland, the mother's lawyer, Defendant Maia Brodie, and 2 relatives of the minor children that joined the criminal conspiracy along with the mother and that betrayed the minor children as well, Defendant Sarah M. Grant and Defendant Staci Thomas.

This case also includes Defendant Sarah M. Grant's lawyer, Defendant Lawrence Gillespie, who just so happens to be Defendant and Judge Hilton's former law partner. The corruption that has reared its head in this case goes back to the years when those two criminals practiced together, and even longer. Defendant Gillespie feels so protected that he admitted to being a part of the RICO enterprise and warned him: "you have no idea what you are involved in." To the contrary, Plaintiff had figured out by then the world of corruption within which he now resided.

This case also involves the lawyers and law firms that Plaintiff hired to represent and protect him in the family court litigation, and instead, they failed at every opportunity and engaged in at least legal malpractice.

Critically important, on March 4, 2025, almost one year into the underlying litigation, the Missouri Supreme Court heard Plaintiff's screams and cries for help and it issued a ***momentous*** order, *sua sponte*, which means - all on its own - in Plaintiff's case, and this Court should take note of that important action.  The allegations of criminal corruption in this case are true as so many who have touched family law in Clayton, Missouri already know.

This all began back on March 13, 2024, almost exactly ***17 months ago***, when the Mother of Plaintiff's children, Defendant Rebecca A. Copeland, began a family court process that would morph into a RICO nightmare.  Importantly, when Defendant Copeland filed the underlying matter, she sought *no long-term change* to the Parenting Plan regarding custody or even child support.  That quickly changed when Mother, and her two co-conspirators, Defendant Staci Thomas and Defendant Sarah Grant learned from the mother's attorney, Defendant Maia Brodie, that child support would not increase.  Plaintiff obtained their text messages and they are evidence in this Complaint.  Instead of more money for the Defendant Copeland, the situation would flip and using Missouri's calculator for child support, it determined that child support needed to be paid by the Mother, Rebecca A. Copeland, to Father, Matthew R. Grant.

The Defendants had no concern as they had already agreed to join and/or "associate" with a long-standing RICO criminal organization and enterprise that exists in the St. Louis County Family Court.  Defendant Rebecca A. Copeland found just the right lawyer, Defendant Maia Brodie, just the right Guardian *Ad Litem*, Defendant John Fenley, and most important, just the right Commissioner, Defendant Mary Greaves.

In a string of *non*-coincidental bad luck, after Plaintiff caught Defendant Greaves in *ex parte* judicial communication with Defendant Maia Brodie, Defendant Greaves recused and Plaintiff ended up before the top crook and co-conspirator in the St. Louis County Courthouse, the Presiding Judge, Defendant Bruce F. Hilton.

To make matters worse, Plaintiff hired a colleague that had been a member of the same huge law firm where Plaintiff worked for 21 years and was a litigation partner. That Defendant, Defendant Mat G. Eilerts, and the co-counsel he recommended, Defendant C. Curran Coulter, engaged in at least malpractice, that is simple enough to prove.

The allegations in this Complaint seem *unbelievable*. They admittedly do. There can be no doubt about it.

Admittedly, many reasonable people simply having heard Plaintiff's general allegations, *without more*, might very well conclude that Plaintiff falls into only one of two categories:

> 1) Plaintiff is suffering from an extreme mental situation such as delusional paranoia, or
>
> 2) Plaintiff has somehow found himself in the largest criminal courthouse **corruption** scheme in the history of the State of Missouri.

Most, immediately believe that Plaintiff is mentally troubled and falls into Category #1, and that Plaintiff needs psychological assistance. Unfortunately, as far too many Missouri parents know, Plaintiff is more than sane, he speaks truthful facts that he can prove, and he now tackles those that have created and run the criminal enterprise that falls in Category #2.

As many know, the most amicable of child custody disputes far too often drag on for months and years longer than necessary. This, sadly, is often intentional. There are limitless

Facebook groups and YouTube accounts, etc. that address the corruption that no one has been able to stop.

But, important to recognize, there are many cases where a parent is issued a ruling, a ruling they thought was unfair and that they did not like, but in which the law *was* fairly applied, and the ruling *was* properly handed down. In those cases, the law was applied fairly and one parent is just upset with the outcome. This lawsuit is ***not*** about one of those cases and is ***not*** about one of those situations.

### A. The Racketeering Organization's Longstanding RICO Conduct in St. Louis County:

Plaintiff's allegations are not new. Many others have bravely but unsuccessfully attempted to end the criminal RICO conduct at issue in this case through lawsuits. RICO is short for the federal law passed by Congress call the Civil Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1964). However, despite these prior victims' best efforts, they did not succeed and their cases did not proceed. However, no one has properly alleged and asserted what Plaintiff will prove in this case, violations of the RICO Act.

To date, the Judges, Commissioners and Guardians *Ad Litem* have been shield by the defense of immunity or determinations that pleadings were inadequate. But, no one is immune from claims for involvement in the RICO enterprise that Plaintiff reveals in this case. Also, Plaintiff, a lawyer, has made sure that he has drafted a civil RICO complaint with more facts than are necessary. In addition, Plaintiff has filed class action claims to represent all those other victims that cannot practically afford or otherwise pursue this corruption on their own. Importantly, Plaintiff has specialized in the successful defense of multi-million dollar class actions, so that part of this case is something Plaintiff can handle as a putative class representative as well.

4921-3441-1030, v. 1

Additionally, no prior party was deemed to have plead enough facts to satisfy the exceptions to the immunity under the additional cause of action that Plaintiff brings, a violation of the Civil Rights Act (18 U.S.C. § 1983). A prior St. Louis County Presiding Judge was caught allegedly doing his part to assist the RICO enterprise and he was alleged to have engaged in *ex parte* communications with an entire group of Guardians *Ad Litem.* The email that Presiding Judge sent will be evidence in this case and it includes his admission in it that he was not ethically allowed to send it. As the Court can see, this RICO organization has no fear of consequences.

After those and other allegations surfaced, it led to 31 recusals from 31 different St. Louis County and Missouri Court of Appeal judges[2] . The Presiding Judge in that case managed to quietly <u>retire</u> from the bench in August 2021, purportedly to take a new position in a *one-year* leadership program at University of Notre Dame.[3] The Guardian *Ad Litem* that was the defendant in that related litigation, just so happens to have been the mediator in this case. She is notorious for her role in the RICO organization.

The mainstream press coverage has been lacking for reasons that Plaintiff will explain. Plaintiff himself was interviewed for 4 hours by a huge journal-type publication in St. Louis that targets businesses and law firms and it went nowhere despite the investigative reporter's knowledge of the ongoing situation and excitement to have someone like Plaintiff, a lawyer, who was finally willing to publicly put his name behind the allegations and exposure of the corruption.

---

[2] https://pjmedia.com/megan-fox/2021/06/18/st-louis-county-circuit-court-presiding-judge-michael-burton-resigns-n1455181

[3] https://pjmedia.com/megan-fox/2021/08/06/st-louis-media-finally-breaks-its-wall-of-silence-on-massive-judicial-scandal-but-still-manages-to-water-it-down-n1467498

The misconduct in the St. Louis County Courthouse dates back more than 10 years.  In 2015, the United States Department of Justice (DOJ) investigated the same St. Louis Family Court.  In the DOJ's Summary of Findings, that agency stated, and these are quotes:

- We have reason to believe that the St. Louis County Family Court fails to ensure that children appearing for juvenile justice proceedings receive adequate due process, as required under the Fourteenth Amendment of the Constitution.

- We also have reason to believe that the St. Louis County Family Court engages in conduct that violates the constitutional guarantee of Equal Protection under the law.

- We have reason to believe that the St. Louis County Family Court fails to ensure that children appearing for juvenile justice proceedings receive adequate due process, as required under the Fourteenth Amendment of the Constitution.

- We also have reason to believe that the St. Louis County Family Court engages in conduct that violates the constitutional guarantee of Equal Protection under the law.

https://www.justice.gov/d9/press-releases/attachments/2015/07/31/7.31.15_st._louis_county_family_court_findings_report.pdf

Some time has passed since the DOJ's July 21, 2015 investigation and report, and despite Plaintiff's best efforts, the DOJ has not yet returned to investigate the constitutional disaster that now breeds in the courtrooms of the St. Louis Family Court.  Plaintiff has repeatedly contacted an Assistant United States Attorney with whom he used to work and, to date, not even a reply email or a phone call.

Many that hear the allegations made in this Complaint will believe that Plaintiff must be some "conspiracy theorist," afraid of aliens arriving on our flat earth, and someone who sits at home with aluminum foil wrapped around his head.  Quite to the contrary, Plaintiff is a completely sane, rather boring attorney and father of 2 teen boys who has found himself in the wrong place at the wrong time.  He has underwent a mental evaluation in the underlying case and passed with flying colors.  Plaintiff's mind is so clear and methodical that neither the judge, the Guardian *Ad Litem* nor the Mother of the children at issue have asked him to undergo another.  Instead, it is the

Mother, Defendant Copeland, who hides from a mental evaluation and Defendant Hilton refuses to order one to take place, as is normally commonplace.

While Plaintiff has his full wits about him, this situation started when he relapsed into alcoholism. There is no doubt about that. He went to rehab and returned sober and has been proven sober every day since. This marathon of corruption began back in March 2024, and Plaintiff is proven to not have had a drink since March 17, 2024. Yep, proven sober three times each day for almost 17 months and his still does not have his children back.

The word "conspiracy" has gained a connotation of fantasy, or a situation not based in fact, as opposed to the truth. In reality, the word "conspiracy" is a legal term used to describe the precise sort of illicit collusion and coordination adopted by many of the Defendants in this case and many others that are involved with the St. Louis County Family Court.

Here, the "conspirators" and "co-conspirators," as they are properly legally described, are all liable for the conduct of one another because they all knowingly joined and have participated in the same illegal racketeering scheme with the same shared goals, objectives and a common purpose – including theft of money by deception – through the St. Louis Family Court. These criminals use a standard pattern and practice to deceive, defraud and victimize unlucky parents caught in their web. What is shocking is how some of these individuals have been appointed by Governors to positions of public trust, like the Circuit Court Judge at issue here, to pull off these crimes for years and years.

Plaintiff will introduce an email into evidence in which several co-conspirators, 2 lawyers in the specific case that Plaintiff will present and the Guardian *Ad Litem* – all members of the same RICO enterprise at issue in this case - engage in email exchange dated September 18, 2017. In that email exchange, the parent-victim in that case hired a corrupt lawyer and that same lawyer

colluded with opposing counsel and the Guardian *Ad Litem* and stated the following about his/her own client:



"Buying future litigation!"  The evidence of longstanding corruption in the St. Louis Family Court is simply overwhelming.

Plaintiff will also present testimony from the fact witnesses from an earlier case involving another Presiding Judge, and witnesses from many other cases as well.  There is a long line of fact witnesses to this corruption, the difficulty is determining how many can realistically be called at trial.

But now, just a few years after that former Presiding Judge's *timely* retirement, the organized crime and corruption is revealed once again, with another Presiding Judge at the helm, this time it is Defendant Bruce F. Hilton who sits atop the St. Louis County Courthouse.

As for the prior efforts to expose this RICO organized crime, this Court and others need only look at few of the prior cases to see that this RICO organization has been ongoing for years. There are countless news reports, websites, along with Facebook groups and YouTube videos that abound.  Each is attempting to accomplish what Plaintiff continues to pursue here, accountability and an end to the corruption and the criminal enterprise's use of St. Louis County's children to engage in theft by deception.

Just a few examples are:

**Press Coverage:**

- https://pjmedia.com/megan-fox/2021/05/17/missouri-family-court-corruption-investigation-complete-catalog-n1447471

- https://michaelvolpe.substack.com/p/the-evolution-of-the-st-louis-county

**Websites:**

- https://mofamcourtexposed.com

- www.StopMissouriCorruption.com (Co-Plaintiff's site)

- www.LitigantOnTheLoose.com

- www.stlfamilycourtcorruption.com

- www.michaelvolpe.substack.com

- https://mycasewithbriandunlop.mofamcourtexposed.com/

**Facebook Groups:**

- Stop Missouri Corruption (Plaintiff - Coming Soon!)

- Litigant On The Loose

- Family Court Fraud Warrior Project

- Best Interests Advocates

- Meg Stand (Stand with Meg)

**Podcast:**

- https://podcasts.apple.com/us/podcast/st-louis-family-court-corruption/id1644895683

**YouTube Videos:**

- https://www.youtube.com/watch?v=z_Re_bX118k

- https://youtu.be/w7vhEAF9onM

- https://youtu.be/veWG_WFExnI

- https://www.youtube.com/watch?v=JPtj94IjUDM

  - Title: "John Fenley In The St. Louis County Family Court Corruption"

This case addresses the fact that in far too many family court cases, children, such as the two minors and co-plaintiffs in this case, are used as bargaining chips to drive up legal fees and Guardian *Ad Litem* costs to then force one-sided and unfair settlements. When a parent doesn't settle, that is when the RICO enterprise springs into action. This case will present the evidence from parents utterly traumatized by the damage done by this group of criminals.

Here, despite St. Louis County Presiding Judge, Defendant Bruce F. Hilton's instruction to Plaintiff to settle on the mother's unfair terms, he continually refuses. Instead, Plaintiff chose to expose these crooks for what they are. Plaintiff is a lawyer and a litigator who has handled cases all over the country, and he knows corruption when he sees it. Plaintiff does not need counsel to risk their career to assist him in prosecuting this case. Plaintiff has already paid a heavy price and more will follow this filing.

As discussed below, Plaintiff now believes that he is precisely the *right* person, in the in the *right* place, at the *right* time, willing to sacrifice everything, and uniquely and professionally skilled to be able to, as a *pro se* Missouri licensed attorney and litigant, end the corruption that has caused devastation in so many Missourians' lives.

Plaintiff is doing this all on his own, for now.

13

Here, the Guardian *Ad Litem*, Defendant John Fenley, lied to the children and Plaintiff when he promised a return to 50/50 joint physical and legal custody.  Over and over again he lied to them, moving the goalposts just as is the Racketeering's pattern used time and time again. Before trial, Defendant Fenley, the court-appointed Guardian *Ad Litem* in Plaintiff's case made an outright and unabashed attempt to *extort* Plaintiff via coercion into recanting and disavowing his claims of corruption.  He offered a *quid pro quo*: disavow your claims of corruption and you can have your children back.  Plaintiff recorded the entire conversation.  It is bone chilling to hear.  It is evidence in this case.

Plaintiff exposed this corruption to the Missouri Court of Appeals, and he lost his children completely *just 24 hours later*.  Plaintiff has continued and has exposed this corruption to the Missouri Court of Appeals and the Missouri Supreme Court, all the while Plaintiff has continued to pass facial recognition breathalyzer tests, 3 times per day, just as he has done since April, 2024. Specifically, Plaintiff has taken and passed **over 1,500 breathalyzer tests** between April 28, 2024 and the present.  There is not now, nor was there ever, any reason to not return Plaintiff's children to him 50% of the time when he returned from a rehab facility in April 2024 and proved his continued and ongoing sobriety.

The children were not returned to Plaintiff and not out of concern for their well-being, but instead because that would defeat the purpose of the RICO enterprise's common goal.  More specifically, Plaintiff did very well in his career, he worked at a huge law firm, and he saved quite a bit of money, all but gone now.  The RICO enterprise selected Plaintiff to squeeze for cash and the RICO Defendants pulled out every tool of corruption in their toolbox.

In June 2025, after having been delayed over and over again, Defendant Hilton finally gave Plaintiff *some* custody of his children back.  One overnight per week.  That was and is the

14

unsupported Order that was in place when Plaintiff headed into a trial with a corrupt judge that should have recused months earlier, and who ignored the Missouri Supreme Court's assignment of a retired judge to oversee Defendant Hilton's conduct. When Plaintiff was testifying during his 2-day trial and when he *refused* to apologize to Defendant Hilton and everyone else involved in the courtroom for exposing them for the crooks that they are, he was punished once again.

Can you imagine a parent being asked to apologize to the trial judge for exposing that judge for being corrupt? While knowing that that same judge would decide whether that same parent and accuser would ever see their children again. There can be *no greater violation* of the Due Process Rights guaranteed by the 5th Amendment of the United States Constitution (no one shall be "deprived of life, liberty or property without due process of law"). While the United States Constitution is federal in nature, it protects citizens of states as well. That concept is critical in this case as this federal court must intervene now that no one else will. When corruption runs rampant there is no other choice. The foxes are guarding the henhouses in at least the 21st Circuit Court of the State of Missouri.

Again, Plaintiff has his children 1 overnight per week. That's it. That equates to 48 overnights a year as opposed to the ~182 nights out of 365 nights a year that Plaintiff has had since the children were born. At trial there was zero evidence presented to support the 4 overnights per month restriction. In fact, in an obvious attempt to place evidence on the record hoping the Court of Appeals would feel obligated to deem credible the mother, Defendant Copeland engaged in repeated perjury during trial to attempt to salvage her false claims and false testimony.

For example, as a last ditch effort to attempt to create some evidence of a risk of harm from Plaintiff, Defendant Copeland remarkably testified that Plaintiff had forced her to engage in sexual acts in exchange for child support checks as recent as 2018. That defamatory claim is flat out

perjury as proven by the fact that Defendant Copeland never mentioned it during any of her three (3) deposition sessions *spanning more than 10 hours*. Nor did Defendant Brodie, mother's attorney, ever examine Plaintiff about it when he was on the stand on February 7, 2024. The mother's attorney never even took Plaintiff's deposition. It wasn't needed as the fix was in.

The perjury was so blatant that on July 23, 2025, Plaintiff filed a Motion asking Defendant Hilton for a *written criminal referral* of Defendant Copeland's perjury to the St. Louis County Prosecuting Attorney, Lisa Melissa Price Smith. The evidence of perjury will litter a *truthful* trial transcript.[5]

Recall that Plaintiff rejected the extortion via coercion attempt from the Guardian *Ad Litem*, Defendant Fenley, who had promised the children he was recommending a transition back to 50/50 custody during the entire case. Well Defendant Fenley took out his revenge for Plaintiff's refusal to submit to the extortion and coercion and instead exposing it. These criminals want evidence to show reasonable doubt if they are ever criminally prosecuted. Plaintiff held firm and stated over and over again that he his allegations are truthful, his pleadings are truthful, as is required by the ethical rules governing each Missouri lawyer. It is Defendant Brodie who signed and filed so many false pleadings, each time an act of federal wire fraud, a "predicate" crime for a RICO cause of action.

Plaintiff is astute on the RICO Act's scope and each and every false filing in furtherance of the RICO conspiracy's common goal made by Defendant Brodie, signed by Defendant Copeland, each false filing by Guardian *Ad Litem* John Fenley, and each fraudulent Order signed by Defendant Mary W. Greaves and later Defendant Hilton, each is another independent predicate

---

[5] As detailed in this Complaint, Defendant Hilton directed his court reporter to manipulate the January 21, 2025, hearing transcript in the underlying matter. The trial transcript was just recently received, and Plaintiff has not yet had a chance to review it for accuracy.

act of wire fraud resulting in Plaintiff's right to damages and injunctive relief under the RICO Act itself.

The Defendants have been shortsighted as no parent-lawyer has yet pursued them for their actual *criminal* conduct. It is not the negligence of the criminals that Plaintiff pursues. Oh no, it is the ongoing racketeering, the wire fraud, obstruction of justice, the victim tampering and many other RICO predicate acts. It is also the bribery and money laundering that Plaintiff intends to prove once he obtains access to these criminals' bank and tax records. Plaintiff finally has these criminals in a corner that no immunity defense can extract them from. The predicate acts and RICO violations are plentiful and Plaintiff will be proving each and every one.

Plaintiff is no first year lawyer, he was trained by the best and brightest and he has won some of the biggest cases in this state. He successfully defended a conglomeration of federal cases sent to District Judge Henry Autrey in this very court. Plaintiff also second chair and litigated a first of its kind $80 million medical monitoring class action in Jackson County state court. Plaintiff is capable and ready to tackle these behemoths in the St. Louis County Courthouse. It is a true David versus Golliath battle and we all know how that one ended. Here, hopefully the same result will follow.

It is because Plaintiff will not recant and disavow his truthful claims of criminal conduct before and during trial in June 23rd and 24th, 2025, that corrupt Guardian *Ad Litem* and Defendant John Fenley acted on behalf of the corruption RICO enterprise when he lashed out with a whip of retaliation on July 11, 2025. On June 2, 2025, Defendant Fenley attempted to extort and coerce Plaintiff in a recorded phone case in which he offered to trade custody of the minor children for Plaintiff's agreement to drop and affirmatively disavow his allegations of criminal conduct. That recording will be placed into evidence.

Having lied to the co-plaintiff children C.L.G. and C.M.G. for over a year, Defendant Fenley did the unthinkable, but sadly predictable thing, and he actually recommended that Plaintiff **go backwards** and **lose time** with the very minor children he had promised would return to joint 50/50 custody with their father.   Again, he recommended 2 overnights per month, just 24 overnights per year, instead of the 182 per year that Plaintiff has had with his children since they were born.  Pure criminal retaliation.  One of many violations of Plaintiff and his children's Due Process Rights.

The minor children are clueless to all of this activity, including their mother's lies, because Defendant Hilton issued an unconstitutional gag order prohibiting Plaintiff from speaking to his own children about his case in any way.  The gag order is to protect the lies and deception, because if it was known by the children they would confront their mother about her lies to their faces and they revolt and engage in a mutiny.  Plaintiff will present a fact witness in another case where a parent is prohibited from posting on social media.  All of this is a violate of the right to free speech and all Missouri's possess under the United States Constitution.

"Fifty-Fifty, fair and square" was the testimony from the oldest minor child and co-Plaintiff C.L.G. when he was asked what result he wanted for final custody.  Same thing for the younger minor child.  They have no idea how they have been lied to by their "Guardian" *Ad Litem* and what terrible custody plan Defendant Hilton plans to order.

The intentional, criminal RICO Act violations of Defendant Fenley will shock this Court's conscious.  It is he who was court-appointed to speak for the minor children and co-plaintiffs in this case and demand their best interests be protected.  Instead, that soulless human being chose to act on behalf of the RICO enterprise and he punished Plaintiff in the harshest way he could, by helping to take Plaintiff's children, his wards, away from their own father.

18

In addition to the perjury about demands for sexual favors, Defendant Copeland falsely testified out of nowhere at trial that Plaintiff might *murder* or harm his own children if he was not awarded 50/50 joint custody. Again, that claim was never mentioned in the 10 hours that Defendant Copeland was asked to list every problem and risk she associates with the children's father, Plaintiff. .

Murder his own children?

That claim had never been uttered until Defendant Copeland was caught in so many lies during trial that she, Defendant Brodie and Defendant Fenley were grasping for a way to place evidence on the record to keep the children away from their father in more retaliation and punishment. This case was filed in March 2024, and not once was that horrid claim ever made in the case. Now all of a sudden the father who had his children almost throughout the nightmarish 16 months of the underlying case, except from when Defendant Hilton took them completely away as retribution, not at any point in time during those months and months did Defendant Copeland or her lawyer Defendant Brodie suggest that Plaintiff might harm his own children. If that were true, Defendant Hilton would have snatched those children away in a split second. Perjury. Perjury, over and over again. Simply unbelievable tales. Keep reading the actual allegations in this Complaint to see how extreme the lengths were that these despicable criminals went, all in the quest of stealing money and the desperate attempt to keep Plaintiff quiet and then retaliate against him.

This all come together as it was time for trial and Plaintiff had routinely exposed the RICO enterprise and its corruption to the Court of Appeals and the Missouri Supreme Court. Plaintiff had complained so much to those with power in Jefferson City that the Missouri Supreme Court recruited a retired *Democrat* judge to oversee *Republican* Judge Defendant Hilton and the

monstrosity of injustice that Defendant Hilton dispensed in this case. That is why Defendant Hilton is refusing to recuse and why Defendant Hilton refuses to allow the Senior Judge appointed by the Missouri Supreme Court to rule on Plaintiff's most recent 2 motions seeking Defendant Hilton's removal from the bench in his case.

This is a political war, don't be fooled to believe anything else. There are corrupt *Republicans* at issue in this case, not all of them but enough, the RICO Defendants in this case and the other corrupt *Republicans* that Plaintiff will uncover and prove, all have the backing of the corrupt *Republican* St. Louis Powerbrokers that put these individuals on the bench and that are making the moves in this situation now.

Plaintiff knows exactly what is happening and it is intensifying now because Plaintiff intends to *prove where the stolen money leads*. See, that is the real problem for the RICO enterprise. Both the corrupt St. Louis *Republican* Powerbrokers and Plaintiff know where the trail of money leads and the RICO members are tasked to do everything in their power to stop that result.

It will not only shock this Court, it will shock the foundation of Missouri's entire justice system to see what has actually happened in St. Louis County Family Court. Judges and Commissioners don't violate their oaths and risk jail time for free, and those in power that put them in their positions demand a financial tribute to be sure. Plaintiff has attended enough campaign fundraisers in the wealthiest of homes in St. Louis County to know exactly what is going on here.

Welcome to Missouri politics, Plaintiff has observed it from within one of the 100 largest law firms in the country for decades, and now he has the chance to expose it (ethically) and lay it bare for all to see.

20

Plaintiff emphasizes that the St. Louis County Courthouse is ***not*** too big to fail. It has already failed, for years and years. It must be rebuilt on a foundation of fairness and justice and that involves the difficult task of removing corrupt judges and commissioners.

Restoring constitutional protections to St. Louis County will require a massive effort, this Complaint is just the first of many, very difficult steps that will be required to end the corruption and cleanse the 21st Circuit Courthouse.

This is ***the lawsuit*** *that Plaintiff promised* back on January 13, 2025, in footnote 4 of his filing, that Defendant Greaves falsely described as a threat:

> [4] The exposure of Ms. Brodie and Ms. Copeland to criminal prosecution is patently obvious. While not obvious to some, the exposure of Commissioner Greaves to similar criminal prosecution is well-established. *See, e.g., O'Shea v. Littleton*, 414 U.S. 488, 680 (1974) ("On the contrary, the judicially

> fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress . . . .') (citation omitted).

This Complaint has been in the works since April 2025. Finally, it is time to commence the process of *actual* justice.

This is not some knee-jerk reaction to a final judgment as one hasn't even been issued yet. This filing was planned long ago like every other step taken, methodically, in a mission for justice. Plaintiff will not relent and this lawsuit is yet another example how he will see this to the end as he seeks to put an end to corruption not only for his own children but for all the others that have already been victims and those future victims that lie ahead.

An important part of how this pattern of organized crime works, is that the judges and commissioners enter Orders prohibiting the parents from telling the children anything about the case. The children in this case think they are headed back to 50/50 joint physical custody, at a time when Defendant Hilton is poised to take them away completely or close thereto. Their own Mother has demanded that they only see their father *1 hour per week, supervised, in the courthouse*

and the children have no idea what their evil mother is doing.  The unconstitutional Gag Orders in this case stop children from learning what both parents are actually doing and they are prohibiting from expressing their own desires in the litigation throughout the process.  The Defendant Fenley almost had a heart attack when he thought the children had read their mother's deposition transcript.  Can you imagine that?  Fear that children will learn what their mother and/or father said under oath.

Here, the children testified "50/50 fair and square" when asked at trial what they wanted.  The Guardian Ad Litem threw them under the bus and did not even ask the Court to appoint them their own counsel to assert their position and desires.  The Guardian *Ad Litem* standards require:

> The guardian ad litem should make a diligent effort to ensure that the child understands the nature of the proceedings, <u>the placement or services that may result, and the possibility of future modifications in placement or services.</u>

https://www.courts.mo.gov/file.jsp?id=63973 (emphasis added).

The co-plaintiff children here have no idea that they have been lied to by Guardian *Ad Litem* and Defendant Fenley, and they have no idea of the crushing Order that is forthcoming.

Even worse, the same Guardian *Ad Litem* standards state that

> If the guardian ad litem determines there is conflict between advocating for the best interests of the child and representation of the child's preferences, the guardian ad litem shall continue to perform as the guardian ad litem for the child and may request that *the court appoint another lawyer to represent the child's preferences*.

*Id.*

Here, Defendant Fenley has no desire for the children's preferences to have any impact, as proven by the fact that he has never requested the children be appointed their own lawyer to advance their own interests.  Plaintiff is requesting again for the recusal and removal of Defendant Hilton for cause, and also the appointment of a lawyer for the minor children.[6]  If it is possible,

---

[6] Plaintiff filed these motions on August 5, 2025.

Defendant Hilton will surely deny these efforts once as he has always done.  This is the pattern of the organized crime in the St. Louis County Court, keep everything in-house, and keep everything hidden.  Keep courtrooms closed to the public, and forbid any recordings of proceedings that might reveal what the judges and commissioners actually state and do in court hearings.

Unfortunately, this sort of organized crime and corrupt behavior is not limited to the State of Missouri.  From 2003 through 2008, two judges in the State of Pennsylvania used children for money. That scandal is referred to as "Kids for Cash."[7]  The corrupt judges there received bribes for sending juveniles to private facilities when they should have returned home.

The press coverage of that case was immense as the 2 state court judges and received *17.5 and 28 year prison sentences*.  The primary cause of action that ended that corruption is precisely the lead cause of action in this case – RICO.  That Kids for Cash scandal involved a civil class action and also action by the Pennsylvania state legislature which passed, and the Pennsylvania Governor signed a law that established an Interbranch Commission to investigate the corruption in Luzerne County, Pennsylvania.[8]

In this case, Plaintiff seeks to follow the precedent set by in the Kids for Cash case in Luzerne County to put an end to the corruption in St. Louis County, Missouri.  Here, Missouri has its own ***Clayton* Kids for Cash**.  Despite Plaintiff's screaming to the heavens for all to hear that the corruption is real and can be proven, the corruption still continues.  As discussed below, the Missouri Supreme Court heard Plaintiff's screams but Defendant Hilton ignored the state's highest court's order after he first hid it from Plaintiff for 3 weeks.

---

[7] https://en.wikipedia.org/wiki/Kids_for_cash_scandal

[8] https://web.archive.org/web/20090902182032/http://news.prnewswire.com/DisplayReleaseContent.aspx?ACCT=ind_focus.story&STORY=%2Fwww%2Fstory%2F08-07-2009%2F0005074011&EDATE=

This case presents an urgent and immediate issue that this federal court should address now, there is no time to delay.  The state court case and any appeal will not address any of the issues involved here.  There will be no ruling whether or not Defendant Hilton, Defendant Fenley, Defendant Brodie, and the other RICO Defendants are criminals.  This case is extraordinary and unique, and the children of St. Louis County demand this Court's consideration of Plaintiff's evidence, it demands the discovery process and litigation of the merits of Plaintiff's claims.  The Defendants will fight this litigation from moving forward with all that they have, but the law applicable to the issues in this case is against them – 100%.

St. Louis County is not unfamiliar with corruption.  While innocent until proven guilty, St. Louis County Executive Sam Page was just recently indicted for *corruption*.  The Missouri Attorney General released a statement in which he stated:

- "I conducted this investigation into Sam Page's alleged misuse of public funds because **the people of St. Louis County deserve accountability, not corruption**," and

- "Public officials must follow the law, and my Office will work to ensure that they always do."

https://ago.mo.gov/attorney-general-bailey-secures-felony-indictment-against-st-louis-county-executive-sam-page/ (emphasis added).

The Missouri Attorney General's comments are right-on and they apply here more than anywhere.  Plaintiff hopes that the Missouri Attorney General does not turn a blind eye to the corruption in this case as everyone else has for so many years.  The Missouri Attorney General is a *Republican* and Sam Page is a *Democrat*, the relevance of that fact in this case will be clear as judge and commissioner at issue in this case, here Defendant Bruce F. Hilton is a *Republican* Governor appointee.  Plaintiff will show that it *Defendant Maia Brodie's husband* who sat on the

commission that successfully nominated Defendant Hilton for the position of Circuit Judge. He also unsuccessfully nominated Defendant Greaves as well.

What many Missouri and St. Louis residents forget is that it was only 5 years ago that a former *St. Louis County* Executive, Steve Stenger, a Democrat, was sentenced to serve 46 months in federal prison and, among other things, pay a total of at least $380,00.00 as fine/restitution. Corruption. Corruption is much too common in St. Louis County.

On August 9, 2019, the United States Department of Justice (DOJ) released a public statement regarding the criminal conspiracy involved in that case.

In that statement, the DOJ, and the fact that this is the DOJ is important, noted:

> "Public Service" is a public trust, said Assistant U.S. Attorney Hal Goldsmith. "Through his illegal pay to play scheme aimed at filling his own political coffers, the former County Executive shattered that trust."[9]

Plaintiff could not agree more with the statement above that Public Service and Public Trust are paramount. Even more, Plaintiff believes that judges that sit in Missouri state courts are among those that are *loaned* the largest amount of Public Trust imaginable. That Trust is indeed a loan that can and should be foreclosed upon when the Public Trust is violated. Missouri circuit judges, associate circuit judges, and circuit court commissioners are trusted to make rulings on the most important matters. Setting aside the very important criminal matters the judges handle, here, these judges *and* commissioners rule in family law cases involving the best interests of Missouri's most vulnerable residents - children.

The same type of corruption that took down St. Louis County Executive Steve Stenger is alive and well in the St. Louis County Courthouse. The Courthouse is literally next to the building

---

[9] https://www.justice.gov/usao-edmo/pr/former-st-louis-county-executive-seven-v-stenger-sentenced-federal-prison-pay-play

that hold the office of St. Louis County Executive. Money. Power. Here, St. Louis County Judges, Commissioners and Guardians *Ad Litem* harm children and parents on a daily basis and it must stop.

The application of the law should be blind to political affiliation but Plaintiff will prove to this Court how St. Louis politics actually works and how a corrupt subset of the *Missouri Republican party* has placed lawyers, judges and commissioners in all the right places to perpetuate the corruption at issue in this case.[10]

Here, Plaintiff has knowingly sacrificed his time with his children and, more importantly, their time with him, to not surrender but to fight for the greater good. If Plaintiff, a Missouri licensed attorney and litigation specialist who worked at one of the 100 largest firms in the country does not step up to end this madness, who else can and will. Plaintiff is taking on an unknown subset of the Missouri *Republican Party* and an unknown number of judges that have been involved or that have looked the other way.

Now, ~17 months after the underlying family court case was filed, Plaintiff is still losing valuable time for doing what was right - for exposing the well-known corruption within the 21st Circuit of the State of Missouri located in Clayton, Missouri. Again, before he was caught in the web of corruption, Plaintiff had 50/50 joint physical and legal custody. The time his children have lost with their father can never be remedied. Here, in this case, the best the law allows is for Plaintiff to pursue injunctive relief to change the court system and monetary damages. Prison sentences are what are appropriate, and maybe this lawsuit will finally spur criminal prosecution.[11]

---

[10] Importantly, Plaintiff notes that he has voted straight *Republican* tickets since the age of 18. This case has no underlying political motives. Quite to the contrary, Plaintiff is shocked to learn what a portion of the political party he has supported has done.

[11] It will likely take a *Democrat* President appointed United States Attorney in the St. Louis Office of the Department of Justice to finally obtain criminal prosecution of these *Republican* criminals.

Through their corrupt and criminal enterprise and use of coercion and extortion, under threat of denying parental rights and presence in their children's lives, these co-conspirators steal and extort money and personal benefit, including excessive attorneys' fees, excessive Guardian *Ad Litem* fees and extended representation for, among other things, money, and the creation of leverage and power among local political networks. Within these shadow networks of *Republican* politics and power is where the injustice also acts as not only actual but also political currency that they use without transparency or oversight, without ensuring any Due Process, or even effective appeal.

**B.  The Corrupt Enterprise and its Pattern of Racketeering:**

The criminal corruption that Plaintiff attacks in this litigation is not present in every single STL County Family Court case, only those cases involving at least four things. For the corruption scheme to work, any given case requires typically:

1)  Two corrupt lawyers representing both sides (or at least a negligent lawyer on one side), although *pro se* parties are favored,

2)  A corrupt judge or court commissioner,

3)  A corrupt Guardian *Ad Litem,* and

4)  Court staff that are willing to participate or at least look the other way.

When these four factors merge, they form a toxic combination that has been used in many cases to withhold child custody to coerce a trade for money and power. The combination is created where possible with changes of judge as a matter of right, if the random court assignments don't otherwise allow it. Under Missouri law, corrupt lawyers can take a change of judge as a matter of right to leave a potentially fair and honorable judge's courtroom and seek out the much more profitable courtroom of judge or commissioner that is "in on the scheme."

These same corrupt lawyers practice in cases with *legitimate* family law lawyers, and in those situations, they tend to play by the rules and the cases proceed as they should. However, this litigation addresses those situations where the four components discussed above have come together in a perfect storm. That storm has battered Plaintiff for **more than 17 months now** and it has no end in sight.

The corruption at issue in this case has struck hard and has used intentional and targeted attacks to create emotional distress. That is part of the organization's strategy, to attempt to mentally break each targeted parent. The pattern and tactics in place and used time and time again include, as is the case here, stalking, harassment, wire-tapping and illegal computer access. Here, the additional goal of this intimidation was to show Plaintiff how much power and extreme abilities the corrupt enterprise has so that Plaintiff would hopefully surrender and settle. The corrupt organization's tactics are often done in plain sight; that is the plan after all, for Plaintiff to see what they can do. Fortunately, Plaintiff has the evidence of this activity and knows the identity of many of individuals that the corrupt organization uses to instill this fear and intimidation.

Plaintiff will be present the sworn testimony of *at least* **2 other Missouri licensed attorneys** that will confirm that Plaintiff's allegations are true and that the criminal racketeering organization exists, it permeates the St. Louis Family Courthouse and it wreaks havoc upon almost so many families that it touches.

Plaintiff's allegations are scandalous and controversial to say the least. Plaintiff was interviewed by a local journal publication focused on St. Louis businesses and according to its investigative reporter, there are many more attorneys that have sought to anonymously expose this same criminal enterprise. That reporter stated that none, similar to Plaintiff, would volunteer to place their name out in the public behind the allegations.

28

Plaintiff immediately volunteered to put his name out in the public and even offered a picture for the story to hopefully be printed on the front page. Unfortunately, Plaintiff's story was never published for reasons that will become clear. That publication has gone eerily silent as the last communication was that the editor would make the final call. Exposing Republicans in Missouri is a dangerous task and many are not up to it. Thankfully, others before Plaintiff had the courage to plow ahead just like Plaintiff does here.

C. **This Case Must Be Assigned to a Democrat Appointee United States District Judge:**

Through his career experiences, Plaintiff knows exactly how the corrupt arm of the Missouri *Republican* Party accomplished this scheme and he will prove it at trial. Because this case attacks the same *Republican* powerbrokers that have the influence to appoint not only state, but also federal judges, Plaintiff intends to request a United States District Court Judge appointed by a *Democrat* President, if that becomes necessary. This is not as unusual as it seems for this specific situation.

Here, in this very case, the Missouri Supreme Court has already appointed a retired, *Democrat* Circuit Judge to come out of retirement and oversee Defendant Judge Hilton in the role of Senior Judge the underlying Family Court case. Defendant Hilton is a *Republican* Circuit Judge, appointed by *Republican* former Governor Eric Greitens. The manner in which he was appointed is not well understood by many but Plaintiff will make that process clear and demonstrate how it is used to place corrupt lawyers in the position of judges.

What is most important about the Missouri Supreme Court Order is that the Missouri Supreme Court entered it *sua sponte*, meaning 'on its own,' without Plaintiff even filing a single Motion with that court asking for it.



The appointed *Democrat* Senior Judge, T. Lynn Brown, is retired, and possibly, the Missouri Supreme Court determined he is immune from the political and other pressures that abound in this matter. Out of all of the approximately **1.49 million cases** pending (or resolved) in every courthouse in the State of Missouri, the Missouri Supreme Court chose Plaintiff's case to jump in and take action.[12] That's right, the Missouri Supreme Court's choice to take *sua sponte* action is literally 1 in 1.49 million. The Supreme Court's Order was and is "***momentous***." This sort of Order based upon these allegations has never happened in the history of the State of Missouri.

---

[12] 2024 Executive Report available at:  https://www.courts.mo.gov/file.jsp?id=8303

4921-3441-1030, v. 1

This is the federal court system's chance to finally address the criminal and unconstitutional activity that plagues the St. Louis County Family Court.

Shockingly, *Republican* Judge, Defendant Hilton knew how important the March 4, 2025 Missouri Supreme Order was so he **_hid it_** from Plaintiff **for *23 days*** and only disclosed it on March 27, 2024, **_after_** Plaintiff filed his initial appellate court filings here in the Court of Appeals in St. Louis, Missouri.  The excuse for not filing the Order that was received and file-stamped in the St. Louis County Courthouse?  Defendant Hilton and his division clerk now claim it was a "clerical error."  The story fails to pass the straight-face test.  No one believes that a Republican judge who is advised that allegations of his corruption has led the State's highest court to appoint a retired Democrat judge to oversee his actions would then figuratively place it in a desk drawer and forget about it.  As discussed below, the mere fact that the Order was concealed required the immediate recusal of Defendant Hilton.

When Plaintiff filed his first Petition for Writ in the Court of Appeals, he sought to disqualify the entire Missouri Court of Appeals because Defendant Hilton stated in open court that the Court of Appeals would go out of its way to protect him or at least intentionally drag this case out until his children were 18 years of age.  He was stating that similar political appointments would be his savior and protect him.

We will see if that allegation is true, but it indisputably creates an appearance of impropriety for any judge on that court as it was unknown to whom the filing would be assigned. The Missouri Court of Appeals assigned Plaintiff's filing to a panel of 2 Republicans and 2 Democrats.  The 2 Democrats disagreed that they could not hear the case but, correctly, the 2 *Republican* appointees **_both recused_**.

Judicial Canon 2-2.11 which is an ethical rule for Judges states on Recusal: "A judge shall recuse himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned …."

That is the most important issue for this Court to consider. Recusal is not limited to situations of actual prejudice or bias. The standard has been interpreted by the Missouri Supreme Court as: "when 'a reasonable person would have factual grounds to find an appearance of impropriety and doubt the impartiality of the court.'"

It no longer matters if the Missouri Court of Appeals should have recused entirely because the issue that is pervasive in this case is the fact that Defendant Hilton refuses to recuse in the state court case. The same Judicial Canon applies in this case and the judges of this federal court should recuse, if necessary, so that this case is ultimately assigned to a judge appointed by a Democrat President. As many may know, the President does not appoint a federal judge by happenstance, they are recommended by the local party powerbrokers in charge. Here, the same exact *Republican* Powerbrokers that assembled the corrupt criminal enterprise in St. Louis Family Court, move within the same group that makes appointment recommendations to *Republican* Presidents.

Plaintiff makes no allegation that any federal judge in this case is involved in or condones the St. Louis Family Court organized crime, but Missourians deserve a judge that is free from *any* possible conflict of interest or *any* appearance of impropriety. The Missouri Supreme Court appointed a retired *Democrat* for a reason and this Court should follow its lead. The integrity of the judicial system rests on rulings from a judge that no one can suggest has any connection to the RICO organization at issue in this case. That is exactly why Rule 2-2.11 exists, for these situations. The Missouri Supreme Court and Court of Appeals also saw it, and this Court should see it as well.

**D.** **This Is Time And This Is *The Case* For Change:**

Simply stated, this is ***the*** case. This is the case that will hopefully stop the corruption once and for all. The Missouri Supreme Court already intervened once *without being asked* but it has not yet completed the job. It will take years for the underlying case to reach a judgment and meander through the appellate court system and, even then, the Missouri Supreme Court has limited powers, if it elects to hear Plaintiff's case. None of the appellate issues before the Missouri Court of Appeals or the Missouri Supreme Court will decide any issue in this case. No rulings on the conduct of the parties in this case, criminal in nature and outside the scope of their claimed immunity, will have any impact on the state court litigation. This court should not abstain from addressing RICO conduct.

One would think that the federal authorities, the Department of Justice and the FBI would have addressed this matter. Anyone who thought that would be wrong. As this case will show, just as Plaintiff made enough noise to be heard by the Missouri Supreme Court in Jefferson City, Missouri, he emailed directly an Assistant United States Attorney with whom he used to work at one of the 100 largest law firms in the United States of America. Plaintiff did not just send the DOJ just one email, but thirteen (13) emails from January 13, 2025 to June 27, 2025, each attaching evidence and updates.

The response from those federal authorities that are entrusted to pursue criminals like these? Silence.

This case will hopefully reveal whether the Department of Justice (DOJ) has a massive investigation underway like the one that caught the 2 state court judges in Pennsylvania for RICO violations in the "Kids for Cash" case, or maybe there is another explanation.[13]   It is certainly an

---

[13] As discussed below *ad nauseam*, Plaintiff does not allege that all judges and politicians appointed by a Republican administration, whether a state court judge, a federal district court judge, or a United States

oddity that unlike the Missouri Supreme Court that took *sua sponte* action, the DOJ has not even replied to a single one of Plaintiff's many email attaching evidence, nor has it asked him to come in for a single interview.

Regardless, Plaintiff has found the way to hold these criminals accountable using the very same statute that DOJ should be enforcing – RICO. Congress was wise and it included the right for private parties to bring a civil RICO action on their own. Here, Plaintiff need not wait and see if the DOJ and FBI will ever do their jobs.

Not only did Defendant Hilton hide the Missouri Supreme Court Order appointing Senior Judge, T. Lynn Brown, surely appointed by the Missouri Supreme Court to oust Defendant Hilton, Defendant Hilton now refuses to allow that same appointed Senior Judge to rule on Plaintiff's motions. It is a ***usurpation of power***. Defendant Hilton simply does not care what the Missouri Supreme Court has ordered as he will do anything to keep the corruption at issue in this case within the walls of the St. Louis County Courthouse for as long as he can.

Defendant Hilton knows precisely what will happen if an honest, fair, impartial judge gets her or his hands on Plaintiff's case. It for this reason that Defendant Hilton refuses to recuse from the St. Louis Family Court case as he continues to protect the RICO enterprise that appointed him to the bench.[14]

---

Attorney, are involved. This case addresses the *bad apples in the bunch* and that are rotten and the stench of which can be smelled from miles away. Unfortunately, those bad apples have been appointed to strategic positions in this state and that has kept them being exposed and held accountable for the atrocities they have committed.

[14] Plaintiff waives any legal issue that might be decided in a state court appeal that would otherwise cause abstention in this case.

The law is clear that when a judge is challenged for cause, whether actual bias or an appearance of impropriety, the case must immediately stop. No judge can issue orders adverse to the party that is seeking that judge's removal. But here, that is exactly what happened.

As soon as Plaintiff made his first Motion for Change of Judge against Defendant Commissioner Greaves, for her hatred and bias in this case. That Motion was based upon Defendant Fenley stating that she "hated" Plaintiff in front of witnesses. Defendant Greaves ignored the law and retaliated against Plaintiff. But how she did it is mind-blowing.

Defendant Greaves engaged in *ex parte* communication with Defendant Maia Brodie, the mother, Defendant Rebecca A. Copeland's attorney in the family court case, and she entered several orders *after* the Motion to Disqualify/Change of Judge was made.

Not only is that a huge red flag, Defendant Greaves entered those orders with *no motions pending* at all! Defendant Greaves went out of her way to do Defendant Brodie and her client Defendant Copeland an enormous favor, and she allowed them to amend their pleadings to fix a fatal defect weeks after the deadline for amendments had passed, discovery had closed, and the original trial date was approaching.

But there is even more, the most damning proof, Defendant Thomas had been deposed in the case on November 27, 2024, and she had been caught in perjury. Defendant Thomas attempted to change her testimony after the deposition and after she listened to a secret recording that she had made during her testimony.

It was the questioning of Defendant Thomas that led her, Defendant Brodie and Defendant Copeland to realize that no one ever formally asked Plaintiff if he had surveillance footage of Defendant Thomas, Defendant Copeland or even Defendant S. Grant, Plaintiff's own sister, trespassing in his home.

As this Court may guess, the other *sua sponte* order that Defendant Greaves issued allowed Defendant Brodie and Defendant Copeland to serve more discovery, after discovery was closed and the trial date was 8 days away.

Believing it didn't matter how it appeared and that they would be protected, Defendant Brodie somehow knew about the unexpected and *sua sponte* Order and **within a few hours**, her office served discovery on Plaintiff seeking …. surveillance evidence of the Defendants at his home or elsewhere!

That led to Plaintiff filing a Supplement to his prior motion to disqualify Defendant Greaves on January 7, 2025, and less than 24 hours later, guess what, Defendant Brodie's associate, a Fact Witness, withdrew from the underlying case and quit Defendant Brodie's law firm. Next, on January 13, 2025, Plaintiff filed the Motion for Sanctions discussed earlier in which he noted that Defendant Brodie and Defendant Greaves had criminal liability. Defendant Greaves then immediately recused from the case.

The led to a hearing before Defendant Hilton in which he lied and tricked Plaintiff into consenting to him as his trial judge instead of a transfer to the Missouri Supreme Court as his Plaintiff's motion demanded. Plaintiff fell for it hook line and sinker, and this nightmare has unfolded ever since.

Even in light of the Missouri Supreme Court Order that he hid for 23 days, and instead of recusing due to an appearance of impropriety, Defendant Hilton hangs on for dear life and hopes, just as he has promised in open court, that the Missouri Court of Appeals will protect him or at least drag this process out so that the 14 and 16 year old young men at issue in this matter both have turned 18 years of age. Those were his exact promises and threats, made from the bench. So far everything Defendant has promised has unfortunately come true. It seems the long state court

appellate process will be required to have a chance of obtaining what will be only partial relief that will address none of the issues that are now before this Court.[15]

It is an utter travesty and an attack on the fundamental concepts that lay the foundation for our nation's justice system. Defendant Hilton knows that he has been caught, and now he is taking every step to avoid the consequences and he is retaliating and punishing Plaintiff at every opportunity. Surely, Defendant Hilton will lash out once again when he learns of this filing. That is expected and Plaintiff knows that is part of his ongoing sacrifice.

Below, this Court and other readers will find an explanation of the sheer **magnitude** of that *sua sponte* Missouri Supreme Court Order. Readers will come to learn how an illicit *subset* of Missouri Republican politics actually works and how it has led to the criminal enterprise at issue in this case. Plaintiff will explain and prove that the *husband* of the lawyer for the children's mother in this case, Defendant Maia Brodie, just so happened to have sat on the very judicial commission panel that nominated Defendant Hilton to the then-sitting Republican Governor for appointment to the bench in St. Louis County.[16] Defendant Hilton was a corrupt private family court lawyer before he was appointed to be a circuit judge. There are no coincidences in this case.

If that is not enough coincidence for you, Defendant Brodie's *husband* also sat on the judicial commission panel that unsuccessfully nominated Defendant Mary W. Greaves for a Circuit Judge position.[17] Defendant Greaves, would later be appointed by the judges of the St.

---

[15] The most likely scenario, if there is a favorable ruling, is that the Missouri Court of Appeals will send the St. Louis Family Court case back down via remand for a new judge. Start over. As Defendant Judge Hilton promised, the young men in this case will be much older than 18 by the time the second version of the St. Louis County Family Court case is litigated, if any favorable ruling is even obtained.

[16] https://www.courts.mo.gov/page.jsp?id=111533

[17] https://www.courts.mo.gov/pressrel.nsf/fa1bcbaea6d7c117862567670079a321/7cf14b421db6130b8625 7de400645026?OpenDocument

Louis County Courthouse to be a Commissioner in the Family Court.[18]  The same Defendant Greaves is who recused in the St. Louis County Family Court matter due to being caught engaging in *ex parte* judicial communication with – again - Defendant Maia Brodie.

Plaintiff has the unique background to explain and prove how all of these facts are intertwined.  It is no secret that Plaintiff's former law partner at an AM Law 100 firm represented Governor Greitens on his way out of the Governor's mansion.  It is also notable that another of Plaintiff's former law partners sat on the very same judicial commission panel with Defendant Brodie's *husband*, the panel that successfully nominated Defendant Hilton for Circuit Judge.  As noted, the same AM Law 100 law firm is publicly known to have represented future client, Governor Greitens, who appointed Defendant Hilton to the bench on June 1, 2017.[19]  Plaintiff knows so much more than he is ethically allowed to discuss.

Plaintiff knows how the system works and in this case it will be exposed for all Missourians to see.  And here the biggest thing about this case, at its end, Plaintiff is confident he will be able to follow the money stolen from parents not only to the corrupt commissioners and judges, but further up, to those that appointed them to the bench or their designated campaign coffers.  Yes, this case is much bigger than might first appear and it appears huge.

Through discovery, including subpoenas, Plaintiff will seek to gather cell phone records, bank records, and tax records, and he will connect the dots for all Missourians to see.  Again, Plaintiff already knows where the money went, he just needs to prove it in court.

This RICO criminal enterprise is good, but the demands of justice are better.

---

[18] Plaintiff does *not* allege that any judicial officer not named in this Complaint is involved in any improper conduct.  To the contrary, it is likely the power of persuasion that the RICO enterprise wields that has impacted so many decisions regarding the St. Louis Family Court.

[19] https://stlcountycourts.com/services/judicial-administration/

With that brief description of this litigation, Plaintiff now points out another oddity. Defendant Brodie, who has the busy husband handling judicial nominations, and Defendant Brodie who engaged in *ex parte* judicial communications with Defendant Greaves in the underlying case before she recused, just so happens to be a "Special Representative" of the Missouri Supreme Court's Office of Chief Disciplinary Counsel (OCDC). That office is the police force that purports to investigate lawyers, Guardians *Ad litem* and court commissioners. Defendant Brodie's service in that role and her ability to impact how reports of misconduct are handled for the St. Louis area is no coincidence either. Not one bit. Hopefully, this Court is starting to put the puzzle pieces together.

Just as Defendant Presiding Judge Bruce F. Hilton, the top Judge in St. Louis County, has the ability to keep allegations of St. Louis County Family Court misconduct and claims of bias within *his* courthouse and out of public view, Defendant Brodie acts as another line of defense to filter and stop ethical complaints regarding the RICO enterprise in this case from reaching and progressing through the OCDC for further investigation. Very strategically placed, she is. This case will also address statewide policies within the OCDC that shield criminal violators from investigation. That policy must be changed.

In this case, Plaintiff began communicating with the OCDC office in Jefferson City by phone back on December 31, 2024. That call was followed by a litany of submissions and even the telephonic confirmation by the OCDC that they could see the filings in Plaintiff's child custody case. Plaintiff sent the OCDC filings and recordings of phone calls and the like. While it seems that Defendant Brodie is protected by many in the OCDC, there appears to be at least one mole that funneled the truth to *at least* Democrat appointee Chief Justice Mary Russell of the Missouri Supreme Court.

It is no coincidence that Defendant Hilton entered a Temporary Restraining Order *just 24 hours after Plaintiff's appellate court filing*, in which Defendant Hilton took Plaintiff's children away from him entirely. Retaliation. Swift and harsh. This case involves plenty of it and it continues to this day.

**E. Plaintiff's Wife And Step-Son Are Now Targets:**

Now, the criminal enterprise seeks to use the St. Charles County Family Court to retaliate against Plaintiff as they attempt to take away his right to be have normal access to *his own stepson*. You read that right. Defendant Copeland and Defendant Brodie colluded to create false evidence to assist in that criminal endeavor in another county's courthouse. The CO-CONSPIRATOR and lawyer for the party in the St. Charles County case just so happens to have "convinced" another *Republican* judge to disqualify Plaintiff from serving as *pro bono* (free) counsel for his own wife.

The Motion for Temporary Restraining Order filed in that case has been denied once, by but it is now set before a new judge, Associate Circuit Judge Chrum, and it is set for hearing later this month. The war on corruption that Plaintiff has declared continues to come at a very heavy cost to not only Plaintiff but also his wife and his stepson.

This filing is the fulfillment of the *promise* Plaintiff made back in January 2025. There was no threat, only a promise. A promise now fulfilled. A promise to bring justice back to the St. Louis County Family Court.

This case involves Plaintiff's children who have been severely harmed by the Defendants in this case. These minor children have been harmed and their Due Process Rights violated. They are Co-Plaintiffs with their father. Plaintiff brings claims on his children's behalf against their own Mother, Defendant Rebecca A. Copeland, their own Guardian *Ad Litem* Defendant John Fenley and others. This case will address the rights of minors to sue their Guardians *Ad Litem*

when they are victims of their criminal conduct that also violates their constitutional rights.  There is no immunity defense for that.

Defendant Copeland and other Defendants in this case she was already colluding with joined or "associated with" the existing criminal RICO enterprise through her counsel Defendant Brodie and she agreed to pursue an illegal plan to take the children's father away from them for money.  Money.  Nothing more nothing less.

This isn't a theory.  Plaintiff has the very text message where Defendant Staci Thomas, Plaintiff's own first cousin, suggested that Defendant Copeland change her strategy and pursue *full custody*, something she **never requested** when she filed the underlying St. Louis County lawsuit:



Plaintiff's own sister, Defendant Sarah Grant associated with the RICO enterprise as well and she played many critical roles including breaking and entering Plaintiff's home and engaging

in burglary. Defendant S. Grant produced the photographs she took documenting Plaintiff's website passwords and other information such as pictures of prescription medications. All of this to gather evidence for the underlying family court case.

Another set of Defendants caught red-handed. The custody case took an even more drastic turn when Defendant Copeland and Defendant Brodie learned that Missouri's Form 14 required Defendant Copeland *to pay Plaintiff* child support going forward.

Of course, Defendant Hilton has ignored all of this evidence because he is part of the very same criminal enterprise that uses these tactics to steal money and take children away from parents for no legitimate reason.

The text from Defendant Staci Thomas to Defendant Rebecca Copeland was the result of Defendant Copeland's sharing of the legal analysis and conclusion of her own attorney, Defendant Brodie, that she could obtain *no more* child support as-is. That is call *waiver* of attorney-client privilege and Defendant Copeland waived that privilege over and over again. This litigation will seek to discover all of the communications between those 2 co-conspirators. Not only has any privileged been waived, but no privilege exists when the "crime-fraud" exception applies as it does in this case.

### F. This Case Is Also A Class Action and includes Defendant State of Missouri and Entities Therein.

This case is also brought as a class action. Plaintiff has spent his career in state and federal court, often litigating class action cases and he knows precisely how pursue them because he has successfully defeated them. Plaintiff has defeated a *multi-hundred million dollar* class action case on behalf of huge local corporation *in this very courthouse*.

As noted earlier, Plaintiff is just one of so many other victims. This Court need only at the severe cost paid by Plaintiff for what he has done so far. Others, non-lawyers, have no chance to

proceed on their own. Federal Rule of Civil Procedure 23 fits this case perfectly and provides a procedural manner to obtain relief for all the other victims of this same RICO enterprise. In order to ensure it can be certified, Plaintiff is pursuing an "opt-in" class and subclasses for liability only and injunctive relief only. Federal law recognizes that in these situations damages only trials can follow, if liability is found.

Plaintiff has named the State of Missouri as a Defendant in this case. It is the State of Missouri that has been on notice of this criminal conduct and violations of Due Process and that has done nothing. This federal court has the power to order the state to fix what is broken in the manner this court directs, and demand a report back to determine the state's compliance.

The State of Missouri is a defendant in this case. The State is ultimately responsible for ensuring that Missouri's citizens are provided Due Process under the Constitution of the United States. The State of Missouri may have sovereign immunity from a lawsuit seeking an award of damages, but the law allows a lawsuit to move forward that seeks only injunctive relief.

Indeed, federal courts are empowered to issue injunctive relief to correct the wrongs within a state court when due process rights are being violated. The Supremacy Clause will be at issue in this case. Here, Plaintiff seeks two kinds of injunctions. First, the State of Missouri must be prohibited from allowing further criminal activity and depravation of Due Process within the 21st Circuit Court.

Second, a federal court can enter what is called a "mandatory injunction" which is one that can compel the State of Missouri to take specific, affirmative actions. That is key to Plaintiff's mission for justice. The State of Missouri must be compelled to dismantle the criminal enterprise and reestablish justice in St. Louis County's Family Court.

The Civil Rights Act at issue in this case was passed by the United States Congress to empower federal courts to protect the constitutional rights of citizens of this country.  Initially, it was the unfair treatment of minorities by police officers and later it was desegregation.  Here, this federal court is being called upon not to put an end to segregation based upon race, but now it must be used to put an end to the unlawful, unconstitutional segregation of parents from their children all in the criminal pursuit for money and power that takes place daily in the St. Louis County Family Court.  Plaintiff calls upon this federal court to enforce the Due Process Clause(s) of the United States Constitution against state-level officers acting under color of law, and the State of Missouri itself.  Indeed, it is the duty of this nation's federal courts to intervene when a state, its entities, and its offices fail to protect its citizens.  Citizens of the State of Missouri are, more importantly, citizens of the United States of America.

A federal court has the ability to issue similar injunctions against the individuals in this case.  There is no doubt that Defendant Hilton and Defendant Greaves must be prohibited from serving on any bench and be prohibited from practicing law in any manner.  Their violation of the United States Constitution and the Civil Rights Act gives this federal court the power to act on its own and stop Defendant Hilton and Defendant Greaves from further action from the bench or even the practice of law in any manner.

### G. **Plaintiff Founded Co-Plaintiff Stop Missouri Corruption, LLC dba www.StopMissouriCorruption.com**

This case involves Plaintiff Stop Missouri Corruption, LLC dba www.StopMissouriCorruption.com.  That entity was created by Plaintiff back on April 14, 2025 to tackle this criminal conduct on behalf of others now and in the future.  Again, Plaintiff and his children are just 3 of so many victims of the criminal enterprise at issue in this case.

44

This is not a one-time project for Plaintiff, this is a mission for change. Helping all of the victims that have suffered will take years and resources and Plaintiff hopes that his LLC can be financially self-supporting as a tax-exempt organization in the years to come.

As for now, www.StopMissouriCorruption.com is the library of all of the redacted filings from Plaintiff's state court case that the RICO defendants do not want Missourian's to see. Each is downloadable in .pdf format. Plaintiff's sharing of filings (properly redacted) has outraged the RICO Defendants in this case. As such, Plaintiff feels obligated to proceed and take his efforts "up a notch" to a full website. The website will also endeavor to serve as a hub and connection point for all of the other very worthwhile websites and efforts already underway.

This co-plaintiff seeks no award of monetary damages in this matter but it does join in the demands for injunctive relief and change.

**H. Plaintiff's Former Counsel Of Record:**

This case also involves Plaintiff's former lawyers and their law firms: Defendant Mathew G. Eilerts, Defendant Growe Eisen Karlen Eilerts, Defendant C. Curran Coulter and Defendant The Coulter Law Group, LLC d/b/a Coulter Goldberger, LLC.

Plaintiff is no family law attorney and he hired Defendant Eilerts and his firm as they were supposed specialists and they were former law partners at what is now one of the 100 largest firms in the nation ("AM Law 100").

This lawsuit pursues claims of legal malpractice (professional negligence) against these lawyers and law firms, who are vicariously liable, due to their repeated failure to properly represent him in the underlying matter. The failures include the absurd recommendations that Plaintiff consent to the very Orders and take and fail to take other actions that have led to the current situation. The details of the malpractice that took place will astound all that follow and observe.

## I.    **The Pre-Litigation Conspiracy:**

As referenced above, Plaintiff became a victim long before the family court lawsuit was filed in March 2024.  Defendants Rebecca Copeland, Staci Thomas and Sarah Grant began their violations of the law back in at least early December, 2023.  Recall that Plaintiff has struggled with alcoholism and the end of November was one such time, it preceded Plaintiff's successful participation in a 6 week Intensive Outpatient Program at Harris House located in St. Charles, Missouri.

Before Plaintiff enrolled at Harris House, his own sister Defendant Sarah Grant broke into his home and gathered evidence for the lawsuit that was ultimately filed.  Plaintiff was in a hospital at the time.  This is undisputed because Defendant S. Grant produced some of the pictures, the ones she didn't delete, of when she broke into Plaintiff's home.  She rifled through his personal papers, photographed website passwords and photographed Plaintiff and his wife's prescription bottles.  Defendant Grant is a Registered Nurse and she knew what she was doing was wrong. Again, she hired Defendant Hilton's former law partner, Defendant Gillespie, a co-conspirator from way back, to protect her from the consequences of her actions.  Defendant Gillespie played his part when he made up a false excuse to stop a deposition before it even began, and then on-cue, he arranged for an order from his old law partner, and Defendant S. Grant's deposition took place at the Courthouse, in Defendant Hilton's courtroom.  It worked as planned as Defendant Hilton just so happened to be available to rule on objections and he refused to allow Plaintiff to ask Defendant Grant about trespassing in his home which is a classic credibility issue admissible for all witnesses.  The RICO conspiracy worked quite well once again.

The Town and Country, Missouri Police Department tried to interview Defendant Sarah Grant but she refused thereby invoking her rights under the Fifth Amendment.

Defendant Staci Thomas is the worst relative of all. She false accused Plaintiff of poisoning her dog, a claim she later abandoned, and when Plaintiff hit rock bottom in his relapse into alcoholism and was having thoughts of being better off dead, Defendant Thomas made a specific effort to pull Plaintiff and the minor children's health insurance before Plaintiff had a chance to make it to rehab. Horrific. The evidence will show that it was her intent that Plaintiff commit suicide. It is diabolical and difficult to type, but it is entirely true. Earlier, Defendant Thomas provided the group of criminals with instructions on how to continue to trespass and enter his home when Plaintiff was not home:

> **Staci Rohn Thomas**
>
> He's not home, but he has a new Ring camera!
>
> **Staci Rohn Thomas**
>
> And I just want to make sure I have it right. That's the boy's home 50% of the time until a judge says otherwise. But the boys can't go to their own home, to which they have a key, and get their belongings?
>
> **Staci Rohn Thomas**
>
> FYI. The Ring is turned to the driveway. To avoid it, you would need to park on the street just before the house, then walk through the yard. Just saying.

At trial, Defendant Hilton refused to allow Plaintiff to cross-examine Defendant Thomas about her effort to pull his health insurance when he needed it the most. More protection for all members of the RICO enterprise, old and new.

**J. Preliminary Statement Conclusion:**

For those that Plaintiff has named as defendants, and he will add more to this litigation in the future, Plaintiff brings the ***reckoning*** that they deserve, and that justice requires. Pursuing this

matter is now mission and there is no limitation on what Plaintiff will spend and do to stop this corruption.

This case will surely be appealed to the Eighth Circuit Court of Appeals by at least one party, there is no doubt. This litigation will take years. That is fine. Plaintiff is patient and he will see this through. If the RICO enterprise hasn't figured it out yet, Plaintiff will not surrender as they have demanded.

With this same strategic patience, Plaintiff has spent months gathering the information and evidence to make this and his prior filings. This lawsuit is *not* some knee-jerk reaction to negative rulings by a father in a custody dispute. Instead, this lawsuit is *the very filing* that Plaintiff *promised* to everyone in the family court matter back in January 2025 before he even discovered and exposed the full extent of this corruption. Notably, the judgments will non-dischargeable in any bankruptcy filing(s) so Plaintiff intends to pursue and legally collect from these criminals for the rest of their days.

Again, the Missouri Courts belong to the Missouri's citizens. It is time to reclaim at least the one located at 105 South Central in Clayton, Missouri.

## **FORMAL ALLEGATIONS**

Plaintiff Matthew R. Grant, individually ("Plaintiff MRG"), and as Next Friend to C.L.G. and as Next Friend to C.M.G., and on behalf of all others similarly situated, and Plaintiff Stop Missouri Corruption, LLC ("Plaintiff LLC") and against Defendants Bruce Hilton, individually ("Defendant Hilton"), Defendant Mary W. Greaves individually ("Defendant Greaves"), Defendant John Fenley, individually ("Defendant Fenley"), Defendant Reinker, Hamilton & Fenley, LLC ("Defendant RHF"), Defendant State of Missouri, including its Office of Chief Disciplinary Counsel and Commission on Retirement, Removal and Discipline (collectively

"Defendant Missouri"), Defendant Maia Brodie, individually and d/b/a Brodie Law ("Defendant Brodie"), Defendant Rebecca A. Copeland ("Defendant Copeland"), Defendant Sarah M. Grant ("Defendant S. Grant"), Defendant Lawrence Gillespie ("Defendant Gillespie"), Defendant Gillespie Hetlage & Coughlin, LLC ("Defendant GHC"), Defendant Staci Thomas ("Defendant S. Thomas"), and Defendants Co-Conspirators 1-100, Defendant Mathew G. Eilerts ("Defendant Eilerts"), Defendant Growe Eisen Karlen Eilerts LLC ("Defendant Growe Eisen Firm"), Defendant Con Curran Coulter ("Defendant Coulter"), Defendant The Coulter Law Group LLC d/b/a Coulter Goldberger LLC ("Defendant Coulter Law Group"), and allege as follows:

## **THE PARTIES**

**Plaintiffs:**

1. Plaintiff Matthew R. Grant ("Plaintiff MRG") is citizen of the State of Missouri and is a resident of St. Louis County, Missouri.[21]

2. Plaintiff, as *Next Friend* of Plaintiff C.L.G., is a minor child that is a citizen of the State of Missouri and is a resident of St. Louis County, Missouri.

3. Plaintiff C.L.G. is one of the two minor children at issue in the St. Louis Family Court Case with Case No. 12SL-DR03959-02. Plaintiff C.L.G. is 16 years old at the time of this filing.

4. Plaintiff, as *Next Friend* of Plaintiff C.M.G., is a minor child that is a citizen of the State of Missouri and is a resident of St. Louis County, Missouri.

5. Plaintiff C.M.G. is one of the two minor children at issue in the St. Louis Family Court Case with Case No. 12SL-DR03959-02. Plaintiff C.M.G. is 14 years old at the time of this filing.

---

[21] Plaintiff has formed Stop Missouri Corruption, LLC in order to pursue and expose the corruption detailed herein both now and in the future. *See* www.StopMissouriCorruption.com.

6. Plaintiff Stop Missouri Corruption, LLC ("Plaintiff LLC") is a Missouri Limited Liability Company registered within the State of Missouri. Plaintiff is the sole member of Plaintiff LLC.

7. Plaintiff MRG created Plaintiff LLC in April 2025 in order to pursue and expose the corruption detailed herein both now and in the future. *See* www.StopMissouriCorruption.com.

8. Plaintiff also created Plaintiff LLC in order to facilitate the protection of other victims of the criminal enterprise at issue in this litigation, both now and in the future.

9. Stop Missouri Corruption, LLC is an advocacy group with standing to protect the interests of Missourian's impacted by the RICO criminal conduct and Civil Rights Act violations at issue in this case.

**RICO/Civil Rights/Intentional Tort Defendants:**

10. Defendant Bruce Hilton is a citizen of the State of Missouri and is a resident of St Louis County, Missouri. Defendant Hilton is the Presiding Judge of the 21st Circuit Court of the State of Missouri, is currently assigned to Division 13, and is currently, administratively assigned Case No. 12SL-DR03959-02.

11. Defendant Bruce Hilton is being sued in his personal and individual capacity, and not in his capacity as a judge within the 21st Circuit of the State of Missouri.

12. Defendant Hilton is not immune for his personal and individual liability for his violations of the Constitutions of the United States of America and the State of Missouri, and/or his participation in a criminal enterprise and/or his violations of Title IX of the Organized Crime Control Act of 1970 otherwise known as the Racketeer Influenced and Corrupt Organizations Act ("RICO") and his violations of the Civil Rights Act.

4921-3441-1030, v. 1

13. Defendant Hilton is an active member of the RICO conspiracy and enterprise alleged herein.

14. Defendant Mary W. Greaves is a citizen of the State of Missouri and is a resident of St. Louis County, Missouri.

15. Defendant Mary Greaves is a Commissioner within the 21st Circuit Court of the State of Missouri.  Defendant Greaves is currently assigned to Division 65 of St. Louis County's Family Court and was previously assigned Case No. 12SL-DR03959-02 until her own Order of Recusal dated January 13, 2025, that she entered in response to Plaintiff's Motion to Disqualify her for Cause.

16. Defendant Mary W. Greaves is being sued in her personal and individual capacity, and not in her capacity as a Commissioner within the 21st Circuit of the State of Missouri.

17. Defendant Greaves is not immune for her personal and individual liability for her violations of the Constitutions of the United States of America and the State of Missouri, and/or her participation in a criminal enterprise and/or her violations of Title IX of the Organized Crime Control Act of 1970 otherwise known as the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and her violations of the Civil Rights Act.

18. Defendant Greaves is an active member of the RICO conspiracy and enterprise alleged herein.

19. Defendant John R. Fenley is a citizen of the State of Missouri.  Upon information and belief, Defendant Fenley is a resident of St. County, Missouri.

20. Defendant John Fenley is the Guardian *Ad Litem* in 21st Circuit Court Case No. 12SL-DR03959-02.

21. Defendant Fenley is being sued in his personal and individual capacity, and not in his capacity as a Guardian *Ad Litem.*

22. Defendant Fenley is not immune for his personal and individual liability for his violations of the Constitutions of the United States of America and the State of Missouri, and/or his participation in a criminal enterprise and/or his violations of Title IX of the Organized Crime Control Act of 1970 otherwise known as the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Civil Rights Act.

23. Defendant Fenley is an active member of the RICO conspiracy and enterprise alleged herein.

24. Defendant Reinker, Hamilton & Fenley, LLC ("Defendant RHF") is a limited liability company organized under the laws of the State of Missouri.

25. Defendant RHF is a law firm and its members are Randall J. Reinker, Robert N. Hamilton and John R. Fenley.

26. Defendant RHF is an active member of the RICO conspiracy and enterprise alleged herein.

27. Defendant State of Missouri is a State within the United States of America.

28. Defendant State of Missouri includes Office Of Chief Disciplinary Counsel, Commission On Retirement, Removal And Discipline Of Judges, and The St. Louis County Family Court (collectively "State of Missouri).

29. The Missouri Secretary of State is Denny Hoskins, with an office located at 600 West Main Street Jefferson City, Missouri 65101.

30. Defendant State of Missouri is not immune from its violations, through its officers and employees, of the Constitutions of the United States of America and the State of Missouri, or their violations of the Civil Rights Act (35 U.S.C. § 1983) and/or the officers' and/or

employees' participation in a criminal enterprise and/or their violations of Title IX of the Organized Crime Control Act of 1970 otherwise known as the Racketeer Influenced and Corrupt Organizations Act ("RICO"), to the extent the claims relating to those violations seek only injunctive relief.

31. Defendant State of Missouri, including its Missouri Supreme Court Office of Chief Disciplinary Counsel and its Judicial Commission on Retirement, Removal and Discipline, had subjective knowledge of the underlying facts demonstrating Civil Rights Act violations by those under its umbrella of authority and consciously chose to take no action.

32. Per *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny, the State of Missouri is a proper defendant in this matter.

33. Defendant State of Missouri is a proper defendant in this matter even absent the assertion of *Monell.*

34. Plaintiffs do not seek monetary damages from the State of Missouri, just injunctive relief

35. Defendant Maia Brodie ("Defendant Brodie") is a citizen of the State of Missouri and is a resident of St. Louis County, Missouri.

36. Defendant Brodie practices law as a sole proprietor and doing business as Brodie Law.

37. Defendant Brodie is a Special Representative for the Missouri Supreme Court's Office of Chief Disciplinary Counsel ("OCDC").

38. While extremely relevant, Ms. Brodie only being sued in her personal capacity and not in relation to her position as Special Representative for the OCDC.

39. Defendant Brodie is an active member of the RICO conspiracy and enterprise alleged herein.

40. Defendant Rebecca A. Copeland ("Defendant Copeland") is a citizen of the State of Missouri and is a resident of St. Louis County, Missouri.

41. Defendant Copeland is an active member of the RICO conspiracy and enterprise alleged herein.

42. Defendant Staci Thomas ("Defendant S. Thomas") is a citizen of the State of Missouri and is a resident of St. Louis County, Missouri.

43. Defendant S. Thomas is an active member of the RICO conspiracy and enterprise alleged herein.

44. Defendant Sarah M. Grant ("Defendant S. Grant") is a citizen of the State of Missouri and is a resident of St. Louis County, Missouri.

45. Defendant S. Grant is an active member of the RICO conspiracy and enterprise alleged herein.

46. Defendant Lawrence G. Gillespie ("Defendant Gillespie") is a citizen of the State of Missouri and is a resident of St. Louis County, Missouri.

47. Defendant Gillespie is an active member of the RICO conspiracy and enterprise alleged herein.

48. Defendant Gillespie, Hetlage & Coughlin, LLC ("Defendant GHC") is a limited liability company organized under the laws of the State of Missouri.

49. Upon information and belief, the members of Gillespie Hetlage & Coughlin, LLC are Lawrence G. Gillespie, W. Laird Hetlage and Richard Coughlin.

50. Defendant GHC is an active member of the RICO conspiracy and enterprise alleged herein.

51. Defendants, Co-Conspirators 1-100, are members of the RICO conspiracy and enterprise as detailed in this Complaint. Plaintiff intends to seek the addition of one or more

defendants from Co-Conspirators 1-100 on or before the deadline for joinder of additional parties.

**Negligence/Professional Malpractice Defendants:**

52. Defendant Mathew G. Eilerts ("Defendant Eilerts") is a citizen of the State of Missouri and is a resident of St. Louis County, Missouri.

53. Defendant Growe Eisen Karlen Eilerts LLC ("Defendant Growe Eisen Firm") is a limited liability company organized under the laws of the State of Missouri.

54. Defendant Growe Eisen Firm's members are Gary A. Growe, Richard Eisen, Christopher Karlen and Mathew Eilerts.

55. Defendant Eilerts and Defendant Growe Eisen Firm were retained as counsel by Plaintiff to represent him the 21st Circuit Court Case No. 12SL-DR03959-02.

56. Defendant Eilerts and Defendant Growe Eisen Firm's representation of Plaintiff ceased on January 21, 2025.

57. Defendant Con Curran Coulter ("Defendant Coulter") is a citizen of the State of Missouri and is a resident of St. Louis County, Missouri.

58. Defendant The Coulter Law Group LLC d/b/a Coulter Goldberger LLC ("Defendant Coulter Law Group") is a limited liability company organized under the laws of the State of Missouri.

59. Defendant Coulter Law Group's sole member is Con Curran Coulter.

60. Defendant Coulter and Defendant Coulter Law Group were retained as counsel by Plaintiff to represent him the 21st Circuit Court Case No. 12SL-DR03959-02.

61. Defendant Coulter and Defendant Coulter Law Group's representation of Plaintiff MRG ceased on January 7, 2025.

## JURISDICTION AND VENUE

62. This Court has original subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331, in that, Plaintiffs' claims and civil actions arise under the Constitution and laws of the United States of America.

63. This Court has original subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1964(a), in that, some or all of Plaintiffs' claims and civil actions arise under RICO Act.

64. This Court has original subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1983, in that, some or all of Plaintiffs' claims allege that Defendants have deprived Plaintiffs of rights, privileges, and immunities secured by the Constitution of the United States of American and the laws of the United States as codified by the United States Congress.  This court should not abstain from immediately hearing this matter.

65. The Court has supplemental jurisdiction over Plaintiffs' other claims, not included in the original subject matter jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), as they are so related to the existing claims in this action that they form part of the same case or controversy.

66. Venue for the initial filing of this matter is proper in this Court pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732, as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## CLASS ACTION DEFENDANTS AND
## CLASS AND SUBCLASS DEFINITIONS

*(Defendant Bruce Hilton, Defendant Mary Greaves,*
*Defendant John Fenley, Defendant RHF, Defendant Maia Brodie,*
*Defendant Gillespie, Defendant GHC, Defendant Growe Eisen, Defendant Mat Eilerts,*
*Defendant C. Curran Coulter, Defendant Coulter Family Law Group*
*and Defendant the State of Missouri)*

67. Plaintiff, in addition to himself as an individual, as the sole member of Plaintiff LLC, and as *Next Friend* to Plaintiffs C.M.G. and C.L.G., also brings this Complaint as a putative class representative, and on behalf of a class of similarly situated individuals that have been involved in any matter involving Child Custody in St. Louis County Family Court within the 21st Circuit Court of the State of Missouri and that have been a victim of the RICO enterprise and its violations of the RICO Act and/or Civil Rights Act (the "Comprehensive Class" as defined in more detail herein).

68. The putative Comprehensive Class expressly includes putative class members that are citizens of States other than Missouri.

69. The putative Comprehensive Class expressly includes minor children class members that are citizens of States other than Missouri.

70. Plaintiff's request for alternative and/or subclass wide relief, for now, is directed at the following Defendants only: Defendant Bruce Hilton, Defendant Mary Greaves, Defendant Maia Brodie, Defendant John Fenley, Defendant RHF, Defendant Gillespie, Defendant GHC, Defendant Growe Eisen Firm, Defendant Mat Eilerts, Defendant C. Curran Coulter, Defendant Coulter Family Law Group, and Defendant State of Missouri ("the Class Defendants").

71. Due to the nature of the almost identical St. Louis Family Court liability and negligence issues implicated in this matter, a class action is appropriate in this matter because:

- The class is so numerous that joinder of all members is impracticable.

- There are questions or law or fact common to the class.

- Plaintiff's claims are typical of the claims of the class.

- Plaintiff will fairly and adequately protect the interests of the class.

72. Additionally, certification of this matter as a class action is superior and appropriate because:

- Prosecuting separate actions by individual class members would create a risk of:

  o Inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; and

  o Adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

73. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff requests that this Court certify an "opt-in" class of similarly situated individuals for the Comprehensive Class and all Subclasses.

74. Pursuant to Rule 23(b)(3), Plaintiff additionally and, in the alternative, requests that this Court certify an "injunctive relief only" Comprehensive Class and Subclasses.

75. Class injunctive relief in this matter is appropriate because the Class Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class(es) as a whole.

76. Pursuant to Rule 23, Plaintiff intends to move this Court to certify the putative Comprehensive Class and Subclass(es) to address the issue of civil liability only, expressly excluding damages.

77. Plaintiff requests that, following any verdict or other finding in favor of the opt-in Comprehensive Class or any opt-in Subclass(es) on the issue of liability, this Court order damages-only trials for each Class or Subclass member(s).

78. The scope and time for all Class or Subclass members shall be "within the last 4 years."

79. Plaintiff requests that this Court determine the tolling impact of this filing, the date of class notice, and the specific date that begins the 4 year period for class membership.

80. Plaintiff seeks certification of an opt-in "Comprehensive Class" as follows:

> All individuals over the age of 18 that were parties in a St. Louis Family Court matter filed in the 21st Circuit Court of the State of Missouri and in which the parties were adversely impacted by the RICO enterprise alleged in this case. This definition excludes all judges, commissioners, or other court personnel.

81. Additionally, and in the alternative, Plaintiff seeks certification of the following putative opt-in subclasses:

> Motion for Change of Judge for Cause Subclass:

> All individuals over the age of 18 that were parties in a St. Louis Family Court matter in which he/she filed a Motion for Change of Judge of *for Cause* pursuant to Mo. R. Civ. P. 51.05 and that were adversely impacted by the RICO enterprise alleged in this case. This subclass excludes all judges, commissioners, or other court personnel.

Bruce Hilton Subclass:

> All individuals over the age of 18 that were parties in a St. Louis Family Court matter in which Child Custody was at issue and in which Defendant Presiding Judge Bruce Hilton was the assigned judge, that that were adversely impacted by the RICO enterprise alleged in this case. This subclass excludes all judges, commissioners, or other court personnel.

Mary W. Greaves Subclass:

> All individuals over the age of 18 that were parties in a St. Louis Family Court matter in which Child Custody was at issue and in which Defendant Commissioner Greaves was the assigned Commissioner, that were adversely impacted by the RICO enterprise alleged in this case. This subclass excludes all judges, commissioners, or other court personnel.

The Guardian *Ad Litem* Subclass:

> All individuals over the age of 18 that were parties in a St. Louis Family Court matter in which Child Custody was at issue and in which they were adversely impacted by a Guardian *Ad Litem* that was involved in RICO enterprise alleged in this case. This subclass excludes all judges, commissioners, or other court personnel.

John Fenley GAL Subclass:

> All individuals over the age of 18 that were parties in a St. Louis Family Court matter in which Child Custody was at issue in which John Fenley was appointed Guardian *Ad Litem*. This subclass excludes all judges, commissioners, or other court personnel.

The RHF Opposing Counsel Subclass:

> All individuals over the age of 18 that were parties in a St. Louis Family Court matter in which Child Custody was at issue in which any attorney of the firm RHF was an opposing party's counsel. This subclass excludes all judges, commissioners, or other court personnel.

Maia Brodie Opposing Counsel Subclass:

> All individuals over the age of 18 that were parties in a St. Louis Family Court matter in which Child Custody was at issue, and in which Maia Brodie was an opposing party's counsel. This subclass excludes all judges, commissioners, or other court personnel.

Mat Eilerts Client Subclass:

> All individuals over the age of 18 that were parties in a St. Louis Family Court matter in which Child Custody was at issue, and in which such individual(s) were represented by Mat G. Eilerts and that were adversely impacted by the RICO enterprise alleged in this case. This subclass excludes all judges, commissioners, or other court personnel.

Growe Eisen Firm Client Subclass:

> All individuals over the age of 18 that were parties in a St. Louis Family Court matter in which Child Custody was at issue, and any member of the law firm Growe Eisen Karlen Eilerts entered her or his appearance on the individual(s)' behalf, and that were adversely impacted by the RICO enterprise alleged in this case.  This subclass excludes all judges, commissioners, or other court personnel.

C. Curran Coulter Client Subclass:

> All individuals over the age of 18 that were parties in a St. Louis Family Court matter in which Child Custody was at issue, and in which the individual(s) were represented by C. Curran Coulter, and that were adversely impacted by the RICO enterprise alleged in this case. This subclass excludes all judges, commissioners, or other court personnel.

Coulter Family Law Group Client Subclass:

> All individuals over the age of 18 that were parties in a St. Louis Family Court matter in which Child Custody was at issue, and any member of the law firm Coulter Family Law Group d/b/a Coulter Goldberger, LLC entered her or his appearance on the individual(s)' behalf, and that were adversely impacted by the RICO enterprise alleged in this case. This subclass excludes all judges, commissioners, or other court personnel.

82. As noted above, the class period for each putative class and/or putative subclass shall be the last 4 years.

83. The foregoing Comprehensive and Subclass definitions are subject to revision, addition and subtraction, throughout this litigation, as allowed by the Court.

## ALLEGATIONS COMMON TO ALL COUNTS

### A. GENERAL BACKGROUND

84. Plaintiff re-alleges and incorporates by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

85. Plaintiff is a citizen of the State of Missouri and a resident of St. Louis County, Missouri.

86. Plaintiff is the Petitioner in a child support and child custody matter pending before the 21st Circuit Court for the State of Missouri, Case No. 12-SL03959-02 ("the STL County Family Court Matter" or the "underlying matter").

87. Plaintiff is the father of two minor children, Plaintiffs C.L.G. and C.M.G.

88. Plaintiff is *Next Friend* to Co-Plaintiff C.L.G. who is 16 years old.

89. Plaintiff is *Next Friend* to Co-Plaintiff C.M.G. who is 14 years old.

90. Defendant Rebecca A. Copeland is the mother of the children C.L.G. and C.M.G.

91. Defendant Rebecca A. Copeland is a party and is the Defendant in the STL County Family Court matter.

92. Prior to the March 2024 filing of the STL County Family Court matter by Defendant Copeland, Plaintiff had 50/50 joint physical and joint legal custody of his children C.L.G. and C.M.G.

## THE LITIGATION RICO CONSPIRACY:[22]

93. Long before the underlying litigation was commenced, a RICO enterprise has existed involving an ongoing criminal racketeering scheme in which corrupt St. Louis County Family Court Judges, Commissioners, Guardians *Ad Litem* and a pool of corrupt family law lawyers intentionally delay child custody and child support matters in order to intentionally inflate attorney, Guardian *Ad Litem*, and therapist fees, and obtain unfair, coerced and extorted monetary settlements.

94. The conspiracy and corruption is accomplished through the assistance or willful blindness of court personnel, and it is actively assisted by outside court reporters as will detailed herein.

95. This Complaint address a longstanding racketeering criminal organization and Family Court enterprise and its various associates', members' and co-conspirators' violations of at least the following RICO (18 U.S.C. § 1964) predicate crimes:

   a. Aiding and Abetting

      • 18 U.S.C. § 2

   b. Accessory After the Fact

      • 18 U.S.C. § 3

   c. Wire Fraud

      • 18 U.S.C. § 1343

   d. Honest Services Fraud

---

[22] The conspiracy between Defendant Copeland, Defendant Staci Thomas and Defendant Sarah Grant is detailed in the allegations later in this Complaint.

- 18 U.S.C. § 1346

e.   Attempt and Conspiracy

- 18 U.S.C. § 1349

f.   Obstruction of Justice

- 18 U.S.C. § 1503

g.   Obstruction of Criminal Investigations

- 18 U.S. Code § 1510

h.   Tampering with a Witness, Victim, or Informant Influencing or threatening a witness, victim, or informant to alter their testimony.

- 18 U.S.C. § 1512(b)

i.   Retaliating Against a Witness, Victim, or Informant

- 18 U.S.C. § 1513

96. The RICO Defendants are "persons" under the RICO statute and the St. Louis Family Court Corruption Organization is the "enterprise."

97. The evidence will show that all RICO Defendants are members of the enterprise or have associated with the enterprise.

98. Based upon the most recent information available and investigation, the total number of associates and members of the enterprise is more than 70 but less than 100.

99. By way of example, on September 18, 2017, several members, CO-CONSPIRATORS #1 - #4, of the same RICO enterprise that exists today engaged in the following exchange detailing their strategy for "buying" future litigation.

100.    The RICO members' plan was to perpetuate and create more and more litigation when none was necessary to steal money from parents:

**From** [redacted]
**Sent:** Monday, September 18, 2017 3:11 PM
**To:** [redacted]
**Subject:** [redacted]

All:

From my perspective, we have the October 13th TRO date and subsequent trial dates in November. How wedded are you to the trial dates? It is important that [redacted] get evaluated since we are buying future litigation. Thoughts? The alternative is [redacted] who is also a PhD and does a large volume of child evaluations for St. Louis County Juvenile Court.

101.    "*Buying future litigation*" is part of the pattern and practice utilized by the RICO enterprise and its members to criminally line their own pockets at the expense of St. Louis County's children and parents.

102.    The email pasted above was provided by FACT WITNESS #1 who will testify at the trial of this matter and detail how he or she was victimized in the St. Louis Family Court by the same, longstanding RICO organization at issue here that continues to victimize Plaintiff and his minor children, Co-Plaintiffs C.M.G. and C.L.G. in the underlying matter.

103.    In fact, one of the co-conspirators, CO-CONSPIRATOR #1, referenced above was not only involved in FACT WITNESS #1's case back in 2017, he or she is involved in the underlying St. Louis Family Court matter at issue in this Complaint.

104.    The author and recipients of the September 18, 2017 email above, and their conduct reflected and alleged above, constitutes at least Wire Fraud, Attempt and Conspiracy, and Obstruction of Justice, all RICO predicates, in violation of 18 U.S.C. §§ 1343, 1349 and 1503.

105.    Plaintiff will present the testimony of several other FACT WITNESSES, at least also FACT WITNESSES #2, #3, and #4, to confirm the same corrupt RICO enterprise victimized them each using the same pattern.

106.    Plaintiff will present the testimony of several FACT WITNESSES that personally contacted and submitted reports to the St. Louis Office of the Federal Bureau of Investigation ("FBI").

107.    The FBI is an agency that works under the authority of the United States Department of Justice ("DOJ").

108.    As alleged below and herein, Plaintiff personally reported the corruption in this case involving Defendant Greaves, Defendant Hilton, Defendant Brodie and Defendant Fenley, among others, to the St. Louis office of the United States Attorney's office.

109.    Plaintiff's reporting was made via email to an Assistant United States Attorney ("AUSA") and Missouri licensed attorney with whom Plaintiff used to work at a huge local law firm that is one of the 100 largest in the United States.

110.    At least one FACT WITNESS also involved in reporting the corruption at issue in this case is also a Missouri licensed attorney.

111.    In one recorded conversation between another FACT WITNESS and an FBI Special Agent that Plaintiff will present at trial, that FACT WITNESS reported the conduct at issue in this case to a Special Agent of the FBI.

112.    The recording and conversation took place on February 23, 2021.

113.    The Special Agent confirmed consultation with a U.S. Attorney and the joint decision to not move forward.

114.    In most instances, the FBI claimed that the corruption reported to the FBI was a "state issue."

115.    Plaintiff will present evidence showing that the total number of instances in which the corruption and the corrupt enterprise at issue in this case was reported to the FBI exceeds twenty-five (25).

116.    As will be explained later in this Complaint, each false and misleading email, electronic filing, and phone call in furtherance of the corrupt scheme in each case, including those in the underlying case was and is an act of at least Wire Fraud, Attempt and Conspiracy, and Obstruction of Justice, all RICO predicates, in violation of 18 U.S.C. §§ 1343, 1349 and 1503.

117.    Plaintiff will present evidence from several FACT WITNESSES that the State of Missouri, including its Missouri Supreme Court Office of Chief Disciplinary Counsel and Laura E. Elsbury, Chief Disciplinary Counsel, (collectively "OCDC") and its Commission on Retirement, Removal, and Discipline had actual and subjective knowledge of the Civil Rights Act violations in this case and willfully failed to take action.

118.    The State of Missouri, the OCDC, and its Commission on Retirement, Removal and Discipline are subject to, among other things, a *Monell* claim and theory of liability under 18 U.S.C. § 1983.

119.    The State of Missouri, the OCDC, and its Commission on Retirement, Removal and Discipline showed deliberate indifference to the known violations and known risk of ongoing procedural and substantive Due Process Violations in the St. Louis Family

Court.

120.     The action and inaction of the State of Missouri and its OCDC and its Commission on Retirement, Removal prove not only a complete indifference but also edicts and acts that fairly represent its official policy (*e.g.,* they turned a blind eye).

121.     The action and inaction of the OCDC, and its Commission on Retirement, Removal is the moving force (or here non-moving force) behind the federal violations of the Civil Rights Act – at least Due Process - alleged in this Complaint.

122.     In this case alone, Plaintiff has already proven that the legal standard applied by the OCDC is unconstitutionally and intentionally inflated so that violators necessarily and intentionally escape the OCDC's grasp.

123.     Specifically, in a letter dated February 24, 2025, Plaintiff received one of several written responses to his many complaints to the OCDC.

124.     Each response from the OCDC to date has been either a delay tactic or misdirection to criminal authorities.

125.     In the February 24, 2025 letter, the OCDC disclosed its and the State of Missouri's *official policy* for investigation of Missouri licensed attorneys, Commissioners and Guardians *Ad Litem*.

126.     The official policy that is actionable and must be changed is that the OCDC will not investigate any lawyer, Commissioner or Guardian *Ad Litem* that has acted in an unethical manner if the allegations include criminal conduct ***unless*** the alleged conduct is results in criminal charges.

127.     The Missouri Supreme Court has held that the standard for OCDC recommended

discipline is merely a preponderance of the evidence and not beyond a reasonable doubt.

128.     The State of Missouri's OCDC's inaction and official policy intentionally protects

those that lawyers, Commissioners, and Guardians *Ad Litem*, that violate the Missouri

Rules of Professional Conduct and the Missouri Rules of Judicial Conduct but that

manage to avoid being charged.

129.     The State of Missouri's OCDC's *official policy* necessarily allows any corrupt

lawyer, Commissioner, Guardian *Ad Litem*, or lawyer that evades, through collusion or

otherwise, being charged with what the OCDC determines to be an alleged crime, from

accountability.

130.     Plaintiff brings this case against the State of Missouri and seeks, among other things,

injunctive relief from this federal court to require that the State of Missouri and its OCDC

change its policy to include *not exclude* from consideration complaints to the OCDC that

it deems to be criminal in nature and not being accompanied by a preceding criminal

charge.

131.     Plaintiff also requests mandatory injunctive relief requiring the OCDC and

Missouri's Office of Retirement, Discipline and Removal to investigate not only the

defendants named in this Complaint but also all other judges, Commissioners and court

staff currently assigned to the St. Louis Family Court.

132.     The Missouri legislature created the Missouri Family Court system when it enacted

RSMo. § 487.010.

133.     Plaintiff requests mandatory injunctive relief requiring all judges of the 21st Circuit

of the State of Missouri, en banc, to consider the removal of some or all of the Family

Court Judges and/or Commissioners pursuant to R RSMo. § 487.010(5).

134.     FACT WITNESS #1 will also testify and present documentary evidence proving that Defendant Bruce Hilton engaged in illegal *ex parte* communications in his or her earlier case while he was a sitting 21st Circuit Court judge.

135.     Plaintiff retained his Defendant Eilerts and his law firm Defendant Growe Eisen firm on March 7, 2024 as he was aware that he was heading to rehab and that things needed to be resolved with Defendant Copeland proactively.

136.     At the time, Plaintiff voluntarily allowed Defendant Copeland to have custody of the Children while Petitioner planned his rehab attendance and treatment.

137.     On March 9, 2024, Defendant Copeland's prior counsel, FACT WITNESS #5, made contact with Defendant Eilerts, attorney and member of Defendant Growe Eisen Firm, and she opened a dialogue with Defendant Eilerts concerning a *non-court* resolution of Plaintiff's relapse into alcoholism.

138.     Defendant Eilerts failed to respond in a timely manner and that failure resulted in litigation and a TRO that could have been avoided entirely.

139.     After March 9, 2024, Plaintiff instructed Defendant Eilerts, of Defendant Growe Eisen Firm, to work out a non-court resolution with FACT WITNESS #5 and Defendant Copeland, as Plaintiff had already decided to enroll in rehab and he had already allowed Defendant Copeland to have custody of the minor children, C.M.G. and C.L.G., on Plaintiff's days of custody under the Parenting Plan.

140.     Defendant Eilerts failed to timely respond to FACT WITNESS #5 which resulted in the underlying case and litigation.

141.    On March 10, 2024, Defendant Copeland, Defendant Thomas and Defendant S. Grant were continuing their collusion and civil conspiracy that began long before the underlying litigation.

142.    Specifically, on March 10, 2024, Defendant Staci Thomas, Plaintiff's own first cousin, directed and colluded with Defendant S. Grant, via text message, to attempt to illegally access Plaintiff's personal medical information using his unknown password:



143.    Not just once, just Defendant S. Thomas doubled down on her demand and instructed:



144.    Right on que, Defendant S. Grant sent a text to Plaintiff in an unsuccessful attempt to obtain his password under the guise of helping him locate a rehab facility:

145.    When the attempt to fraudulently obtain Plaintiff's password failed, Defendant Thomas suggests to Defendant S. Grant again:



Now he's back to: where have you picked? Game time is over

"nothing yet. Can't do that without your insurance info..."

146.    Defendant S. Grant also sent this text message:

3/11/2024 8:08:14 PM

You're to get me you insurance login. Sign what?

147.    As noted herein, the fraudulent solicitation via wire was far from the first time

Defendant S. Thomas, Defendant S. Grant and Defendant Copeland violated the civil and

criminal laws to inflict intentional harm on Plaintiff.

148.    On March 11, 2024, Defendant S. Thomas, Defendant S. Grant and Defendant

Copeland confirmed what will be alleged in more detail below, the illegal access of

Plaintiff's medical records by Defendant S. Grant, a Registered Nurse:

I am not sure, but I thought he may have said that's when he tried a place and got kicked out during the admissions process.

Rebecca Copeland

That kinda stuff I don't know about.

Rebecca Copeland

Like I won't know much bout hospital stuff or much bout any rehab or anything that he may have tried. Suicide, etc.

Staci Rohn Thomas

That's Sarah's purview! It takes a village to rehab a man...

149.    Also on March 11, 2024 at 10:22 a.m., one day after Defendant Thomas, Defendant

S. Grant and Defendant Copeland were unsuccessful at obtaining Plaintiff's login

password, and when Plaintiff had hit rock bottom and was having suicidal thoughts,

Defendant Thomas sent an email to the health insurance provider for not only Plaintiff, Plaintiff's wife and Plaintiff's step-children, but also the minor children in this case in an evil and malicious attempt to pull Plaintiff's health insurance.

150.    Defendant Thomas' email falsely claimed that Plaintiff and his wife, at the time, were not domestic partners.

151.    Defendant Thomas, Plaintiff's first cousin, had such inexplicable and extreme criminal intent to harm that she sent this text:

dress":"+13146 ███████ ody":"We need this guy out of your life.", name":"Rebecca

152.    Defendant Thomas actions throughout this nightmare were pure evil and malicious.

153.    The actions of Defendant Thomas constitutes at least, Wire Fraud and Tortious Interference with Plaintiff and the minor children and Co-Plaintiff's health insurance contract with the insurance provider, and it is also Wire Fraud, a RICO predicate, in violation of 18 U.S.C. § 1343.

154.    Defendant Thomas' tortious interference alleged above was malicious and intentional and Defendant Thomas acted with malice or with deliberate and flagrant disregard for the safety of others.

155.    After Defendant Thomas submitted the false allegation of fraud, the health insurance benefits of Plaintiff and the minor children Co-Plaintiffs were wrongfully terminated as a result of her false reporting.

156.    On August 23, 2024 at 2:56 p.m., not knowing that Defendant Thomas' intentional fraud and tortious interference had worked, and despite being advised by Defendant

Brodie that there was no reason to believe there was Domestic Partner fraud on April 16, 2024, Defendant Copeland nevertheless made yet another attempt to cancel Plaintiff and Co-Plaintiff C.M.G. and C.L.G.'s health insurance when she sent an email to the same health insurer that Defendant Thomas contacted in an effort to *cancel her own children's health insurance* and that of Plaintiff.

157.    Later, on April 16, 2024, Defendant waived attorney client privilege and informed her of the following which she shared with Defendant Thomas and Defendant S. Grant:



4/16/2024 12:59:57 PM

Rebecca Copeland

I have access to nothing.
Talked to Maia today. Mostly b/c Matts being PIA bout these phone calls.
Asked bout the insurance & domestic partner coverage & she's like "all insurance companies are different & some allow it". I kept trying to tell her I thought they doing illegally, but she def didn't seem to care.
So I guess I'll need to contact Aetna & found out what their domestic partner coverage entails.
Maia also told me not to be surprised if court allows Matt supervised visits after Mondays hearing. Not many. But some.  Which isn't what John told me. She's supposed to talk to John before the hearing & lmk what's up so I don't have surprises. I told her - I can't handle surprises.

158.    On March 12, 2024, the day after her tortious email to Plaintiff and his children's health insurer, Defendant Thomas continued her barrage of criminal behavior and assisted her co-conspirators Defendant Copeland and Defendant Grant, with specific instructions on how to still trespass on Plaintiff's property to break and enter into his home for the purpose of invasion of privacy and burglary, as they did so many times before, even though there was a new Ring camera installed to prohibit that very conduct from continuing:

159.    As will be alleged herein, the Town and Country Police Department investigated all

3 of these individuals, with Defendant Grant invoking her 5th Amendment Rights by

refusing an interview.

160.    On March 12, 2024, the underlying case officially began when Defendant Rebecca

A. Copeland, after FACT WITNESS #5 having heard nothing from Defendant Eilerts,

filed the underlying matter in response to a temporary situation in which she knew that

Petitioner had relapsed in his otherwise successful battle with the disease of alcoholism.

161.    Critically important, in her Motion to Modify, filed when Plaintiff had hit rock

bottom, Defendant Copeland *still* acknowledged Plaintiff was a great father as she sought

*no change* in the parties' 50/50 joint physical and joint legal custody arrangement under

the Parenting Plan and merely sought the following relief on her Motion to Modify:

162.    Defendant Copeland knew that Plaintiff was a more than competent co-parent who actually handled everything, as opposed to her, for the minor children C.M.G. and C.L.G. since they were born.

163.    Plaintiff registered the minor children for all school and sports activities, handled dental and optometrist and other appointments, and he served as both of their respective Cub Scout Den Leaders.

164.    On July 23, 2024, during her deposition, Defendant was unable to provide the last name of the minor children's dentist.

165.    When the time came to change her tune, and attempt to prove that Plaintiff was an incompetent father, she faced an impossible challenge.

166.    As alleged below, Defendant Copeland provided false and perjurious testimony over and over as directed by her lawyer Defendant Brodie, a longtime RICO enterprise member, to falsely claim under oath that Plaintiff was not a competent co-parent.

167.    Defendant Copeland's attorney, FACT WITNESS #5, notified Defendant Eilerts, of Defendant Growe Eisen Firm, that she would be seeking a Temporary Restraining Order on March 13, 2024.

168.    Despite being on notice of the Temporary Restraining Order hearing, Defendant Eilerts failed to appear and thereby failed to exercise the degree of care, skill, and learning in representing Plaintiff that is ordinarily exercised by other attorneys under the same or similar situations.[24]

---

[24] For the sake of brevity, Plaintiff does not recite the standard for malpractice on each and every act of malpractice that occurred.

169.     As a proximate cause of Defendant Eilerts' failures, an overbroad and overly

restrictive Temporary Restraining Order was entered that prohibited, among other things,

Plaintiff from having any contact whatsoever with the minor children, including text

messaging.

170.     Defendant Eilerts lied and falsely told Plaintiff that he was not made aware of the

hearing on the TRO by Defendant's counsel.

171.     Defendant Eilerts' statement was an attempt to hide and conceal his actual

conduct/misconduct.

172.     Defendant Eilerts' actions and inactions alleged above prove that he failed to

exercise the degree of care, skill, and learning in representing Plaintiff that is ordinarily

exercised by other attorneys under the same or similar situations.[25]

173.     Plaintiff later suggested a Motion for Sanctions be filed against Defendant

Copeland's prior counsel of record, FACT WITNESS #5, as she purportedly did not

provide notice as required by Mo.R.Civ.Pro. 92.02(a) and Defendant Eilerts vigorously

refused and dissuaded Plaintiff from the idea.

174.     Defendant Eilerts dissuaded Plaintiff from the Motion for Sanctions as it would have

revealed his false assertion and the fact that he had notice of the TRO hearing and failed

to appear.

---

[25] Plaintiff is aware that his legal malpractice claim will require a narrow waiver of the attorney/client privilege that attaches to his and Mr. Eilerts and Mr. Coulter's communications.  Plaintiff hereby moves pursuant to FED.R.CIV.P. 26(c) for a Protective Order that ensures that such communications, when disclosed, are not shared with the other parties or their counsel.

175.   Defendant Eilerts' actions above reflect that he failed to exercise the degree of care, skill, and learning in representing Plaintiff that is ordinarily exercised by other attorneys under the same or similar situations

176.   On March 15, 2024, Defendant Copeland's prior counsel filed a Motion for Change of Judge as a matter of right.

177.   On or about March 17, 2024, Defendant Copeland retained Defendant Maia Brodie to substitute as counsel of record in the underlying case.

178.   On March 18, 2024, Defendant Brodie entered her appearance on behalf of Defendant Copeland in the underlying matter.

179.   During her communications with Defendant Brodie that fall under the crime-fraud exception to the attorney-client privilege, Defendant Copeland learned of Defendant Brodie's ability to violate court rules and obtain relief to which she was not entitled, and she disclosed nature and common purpose of the RICO organization that had an aligned interest with Defendant Copeland.

180.   On April 5, 2024, after Defendant Copeland learned that Plaintiff was stuck before Defendant Greaves, and she had more time to learn the scope of Defendant Brodie's improper and illegal influence and abilities, Defendant Copeland bragged to the rest of her team Defendant Thomas and Defendant Grant (e.g., "us"):

> Rebecca Copeland
> OH!  N she also said they can't change the judge again. So they're stuck w/ this new one. Which is GREAT for us!

181.   As proven by their actions as alleged herein, Defendant Copeland, Defendant

Thomas and Defendant S. Grant joined the RICO enterprise and participated in its pattern and practices to jointly attempt to victimize Plaintiff, at the cost of him and, more importantly, the minor children.

182.    As alleged herein, Defendant Copeland, Defendant S. Grant and Defendant Thomas joined and/or associated with the RICO enterprise and repeatedly engaged in Wire Fraud, Attempt and Conspiracy, and Obstruction of Justice, all RICO predicates, in violation of 18 U.S.C. §§ 1343, 1349 and 1503.

183.    On March 19, 2024, Defendant S. Thomas took express joy in her tortious interference and ability to be relentless attacking Plaintiff's wife's employment and Plaintiff and his children's health insurance that she sent her co-conspirator Defendant S. Grant a .GIF, but she accidently sent it to Plaintiff's wife:





184.    In the underlying matter, no later than March 28, 2024, the TRO entered in

Defendant Eilerts' absence expired by Rule, 92.02(a)(5) and operation of law as it was

limited to fifteen (15) days in duration.

    • The April 3, 2024 Order below incorrectly referenced the wrong date.

185.    Defendant Eilerts failed to advise Plaintiff that the TRO had expired on March 28,

2024, and that Plaintiff had the right to communicate as he desired with his minor

children.

186.    By failing to update Plaintiff on the TRO expiration, Defendant Eilerts failed to

exercise the degree of care, skill, and learning in representing Plaintiff that is ordinarily

exercised by other attorneys under the same or similar situations

187.    On April 1, 2024, counsel for Defendant Copeland, FACT WITNESS #5,

mistakenly thinking the TRO expired that day, emailed Defendant Eilerts and advised

him of her position on behalf her client and that she would seek reinstatement of the TRO

on April 3, 2024.

188.    Counsel for Defendant Copeland also advised Defendant Eilerts where she would appear and seek reinstatement of the then-expired TRO.

189.    Despite notice of the appearance, Defendant Eilerts failed to appear and allowed Defendant Copeland's counsel to obtain an *ex parte* reinstatement of the TRO without a demand for a hearing as was required by the Missouri Rules of Civil Procedure.

190.    By failing to appear and oppose the reinstatement of the TRO, and otherwise demand a TRO hearing, Defendant Eilerts failed to exercise the degree of care, skill, and learning in representing Plaintiff that is ordinarily exercised by other attorneys under the same or similar situations.

191.    Defendant Copeland possessed no evidence that Plaintiff would support a TRO on April 3, 2024, when Plaintiff was in an out of state rehab, sober, and Plaintiff never made any improper communications with the minor children that might support a "no contact" TRO.

192.    Text messages are necessarily documented and there would have been a record of any all text message communications between Plaintiff and his minor children.

193.    Defendant Eilerts' failure to appear to make these arguments and otherwise advocate Plaintiff's position, now for a second time, caused emotional distress and other damage to Plaintiff as he was prohibited from any contact with his own children, despite being checked into an alcohol rehabilitation facility ("rehab") and proven sober for more than 2 weeks.

194.    These actions and inactions by Defendant Eilerts constitute his failure to exercise the degree of care, skill, and learning in representing Plaintiff that is ordinarily exercised by

other attorneys under the same or similar situations.

195.   Plaintiff began the voluntary use of Soberlink on April 22, 2024, a full week before the April 25, 2024 meeting with Guardian *Ad Litem* Defendant Fenley, and the April 29, 2024 hearing.

196.   Plaintiff passed 3 facial recognition breathalyzer tests each day between April 22nd and April 29th, 2024, the next court hearing date.

197.   The Soberlink tests followed Plaintiff's residency at inpatient rehab in which he was tested and monitored to ensure that no alcohol was consumed.

198.   Plaintiff passed all alcohol testing while at the rehab facility.

199.   On April 25, 2024, at 11:00 a.m., Plaintiff met with Defendant Fenley who had been appointed at the Guardian Ad Litem in the underlying matter.

200.   Plaintiff advised Defendant Fenley that Defendant Copeland was likely to lie and create a false scenario just like she did when she previously coached and directed the children to claim abuse in October 2018.

201.   Plaintiff also advised Defendant Fenley that Defendant Copeland was a manipulator and he offered to produce the November 15, 2019, hair follicle drug test that he underwent upon return from his first rehabilitation facility to prove that he had gone to such a length proactively in preparation for a false claim that Plaintiff was a drug user.

202.   The hair follicle test referenced above had a cost of approximately $500.00.

203.   Plaintiff explained to Defendant Fenley that Defendant Copeland would lie if necessary and that he underwent a hair follicle test as a proactive step in case Defendant Copeland engaged in the illegal activities and misrepresentations that she has in the

underlying case.

204.    The 2019 testing facility Plaintiff chose was at the recommendation of Defendant

Eilerts and is the same used by the St. Louis County Family Court for court-ordered drug

testing such as in the underlying matter in this case:



205.    Plaintiff also advised Defendant Fenley that he was interviewed by a Department of

Social Services (DSS) representative when Defendant Copeland had coached the co-

Plaintiff minor children to lie at school and claim abuse.

206.    Plaintiff advised Defendant Fenley that the DSS representative who interviewed

Plaintiff told him that she had concluded the children had been coached to falsify the

allegations.

207. The DSS representation stated that the 2 minor children's descriptions were almost verbatim identical which indicated coaching.

208. To be clear, Plaintiff has never struck either of the children and he did not raise them with the use of "spankings."

209. Plaintiff requested that Defendant Fenley obtain the DSS report that he believed would at least show that Plaintiff had never struck either of the children.

210. During that April 25, 2024, meeting is the first time Defendant intentionally lied about a return to 50/50 custody.

211. On April 29, 2024, Defendant Brodie appeared before Defendant Greaves, and obtained an Order for entry on the court docket via wire (case.net) and that appearance and Order were intended to, and did accomplish the goals of an existing and an ongoing criminal racketeering scheme in which corrupt St. Louis County Family Court Judges, Commissioners, Guardians *Ad Litem* and a pool of corrupt family law lawyers intentionally delay child custody and child support matters in order to intentionally inflate attorney, Guardian *Ad Litem*, and therapist fees, and obtain unfair, coerced and extorted monetary settlements.

212. Defendant Brodie and Defendant Greaves' conduct as alleged above constitutes at least Wire Fraud, Attempt and Conspiracy, and Obstruction of Justice, all RICO predicates, in violation of 18 U.S.C. §§ 1343, 1349 and 1503.

213. It is notable that Defendant Brodie's husband was a member of the judicial commission that unsuccessfully nominated Defendant Greaves for a circuit court judicial

opening back in 2015.

214.  It is even more notable that Defendant Brodie's husband was a member of the judicial commission that *successfully* nominated Defendant Hilton for the circuit court position that he currently holds.

215.  Upon information and belief, the discovery process, including emails and cell phone records, in this case will show that Defendant Brodie and Defendant Greaves routinely engaged in *ex parte* communication in various cases before Plaintiff's case.

216.  As is alleged later in this Complaint in more detail, Plaintiff caught Defendant Brodie and Defendant Greaves in *ex parte* communications on December 9, 2024.

217.  Defendant Greaves issued an Order via wire that was the result of the illegal *ex parte* communications to assist Defendant Brodie and Defendant Copeland in their common goal to protect Defendant Copeland and Defendant Thomas from proof of their perjury and/or criminal conduct.

218.  Defendant Greaves issued a litany of other orders to protect Defendant Copeland, Defendant Brodie, and Defendant Thomas with criminal intent and in order to assist them and the RICO enterprise via this pattern and practice.

219.  Defendant Brodie and Defendant Greaves' conduct as alleged above constitutes at least Obstruction of Justice and Wire Fraud, both RICO predicates, in violation of 18 U.S.C. §§ 1503 and 1343.

220.  On April 29, 2024, Defendant Eilerts appeared before Defendant Greaves and, without consent or authority, entered into a consent order that limited Plaintiff to only *supervised* visits to take place only 2 times per week for a period of 4 hours each.

Plaintiff was ordered to pay the cost of the supervisor(s).

221.    By failing to file a Motion to Dissolve the TRO or otherwise demand a hearing,

Defendant deprived Plaintiff of the opportunity to argue that he was documented to have

been sober for almost month and half, was proving sobriety daily, and was never

alleged to have done anything improper while sober and argue that Plaintiff was entitled

to his normal, 50/50 custody as mandated by the Parenting Plan.

222.    On April 29, 2024, Defendant Greaves scheduled a Preliminary Injunction hearing

to take place on June 12, 2024, at 1:30 p.m. in Division 65.

223.    Defendant Greaves intentionally scheduled the hearing as far out as reasonably

possible in order to assist and accomplish the RICO enterprise.

224.    Defendant Greaves' conduct as alleged above is part of a pattern and practice

utilized by the RICO enterprise.

225.    As alleged below and herein, Defendant Copeland engaged in ongoing defamation

on January 24, 2025 when she called in a false kidnapping threat to the minor children's

school district relating to Plaintiff.

226.    Unfortunately for Defendant Copeland, as soon as Plaintiff saw the alert and the

intent to check the minor children out of school, he reported the situation directly to

Defendant Hilton and Defendant Fenley via email, having no idea that both individuals

were involved in that particular RICO scheme.

227.    On May 1st, 2nd and 3rd, without the physical presence of their father in their lives,

Co-Plaintiff minor C.M.G. acted out, began instigating fights at school and was

suspended, 1 day in-school, 2-days out of school:

| | | | SUA | | SUA | | SUA | SUA | | SUA |
|---|---|---|---|---|---|---|---|---|---|---|
| 05/03/2024 Even | | | | | | | | | | |
| *Description:* Suspended Absent | | | | | | | | | | |
| 05/02/2024 Odd | SUA | | SUA | | SUA | | SUA | SUA | | |
| *Description:* Suspended Absent | | | | | | | | | | |
| 05/01/2024 8 Period | IS | IS | IS | IS | IS | IS | | IS | IS | |
| *Description:* In School Suspension | | | | | | | | | | |

228.    Around this same time, minor child C.L.G. came home to respondent's home after a party barely able to function from ingesting THC.

229.    Minor child C.L.G. was comatose on Respondent's couch for 3 days before deemed it appropriate to take him to a local urgent care.

230.    This information was only learned by Plaintiff because he closely review the text message productions of Defendant S. Grant and S. Thomas.

231.    Specifically, Plaintiff learned through his review of the text messages produced on June 7, 2024, that Co-Plaintiff and minor child C.L.G. had undergone a drug test at Urgent Care.

232.    Once discovered, Plaintiff drove to the Urgent Care at issue and requested to inspect his minor child's medical records for that visit.

233.    The Urgent Care facility *refused* to provide any information because Defendant Copeland had insisted that the facility deny any requests from Plaintiff, C.L.G.'s father, to learn anything.

234.    Plaintiff contacted Defendant Fenley and he refused to provide any information and he actually somehow agreed that Plaintiff should not have access to C.L.G.'s drug test records!

235.    Defendant Fenley stated he was "doing what C.L.G. wants."

236.    Plaintiff inquired if Defendant Fenley would take the same position if C.L.G. had

been arrested and did not want his father to know.

237.    Defendant Fenley dodged the question and refused to answer.

238.    Defendant Fenley refused to cooperate in providing Plaintiff access to the information because it reflected poorly on Defendant Copeland.

239.    On May 22, 2024, after Defendant Eilerts had served discovery on behalf of Plaintiff relating to the children's medical records, Defendant Fenley actually filed a Motion to Quash.

240.    Concealing evidence of poor parenting by the favored parent, is a pattern and practice for the RICO enterprise to protect the chosen parent and to take all actions necessary to create a trial court record that such parent provides superior parenting than the victim parent.

241.    The pattern and practice regarding the concealment of Defendant Copeland's poor parenting took place several additional times in the underlying case as will be alleged below.

242.    Plaintiff will present testimony at trial from FACT WITNESSES #1 through #5 that will confirm that this is a pattern that has been ongoing for years.

243.    As of May 20, 2024, Defendant Copeland's filings in the underlying matter sought *no change* in long-term custody.

244.    On or before May 21, 2024, Plaintiff disclosed his financial information and documentation in the underlying matter via his attorney Defendant Eilerts.

245.    On or before the May 21, 2024 text was sent at 10:42:50 A.M., Defendant Brodie reviewed Plaintiff's financial disclosures and communicated to Defendant Copeland that

she could not obtain an increase in child support.

246.    On May 21, 2024, at 10:42:50 A.M., Defendant Copeland and Defendant Thomas

exchanged the following text messages resulting from Defendant Copeland's waiver of

the privilege associated with the legal conclusion of her counsel Defendant Brodie and

they stated:



247.    Beginning on May 21, 2024, Defendant Copeland never turned back from his illegal

and harmful mission to seek sole physical custody of the minor children, Co-Plaintiff

C.M.G and Co-Plaintiff C.L.G. in the underlying case for no reason other than monetary

gain.

248.    Defendant Copeland's decision to seek sole custody for monetary gain was directly

adverse to the interests of Co-Plaintiffs C.M.G. and C.L.G., and they have and continue

to suffer actual damages as a result, some of which they are currently unaware.

249.    Defendant Copeland and Defendant Thomas's conduct as alleged above constitutes

at least Wire Fraud, Attempt and Conspiracy, and Obstruction of Justice, all RICO predicates, in violation of 18 U.S.C. §§ 1343, 1349 and 1503.

250.    On or after May 21, 2024, Defendant Brodie agreed to use the RICO enterprise to accomplish Defendant Copeland's goal which was aligned with the RICO enterprise's ongoing and common goal of using custody of children to engage in theft of money from parents.

251.    On May 29, 2024, Defendant Eilerts issued subpoenas and Notices of Deposition for the deposition of Defendant S. Grant and Defendant S. Thomas to take place on June 10, 2024.

252.    The subpoenas compelled Defendant Grant and Defendant Thomas to produce, among other things, video and audio recording of Plaintiff and all text messages and emails relating to Plaintiff in any way.

253.    On June 7, 2024, Defendant Gillespie, counsel for Defendant S. Grant, delivered approximately 507 incriminating pages of documents to Defendant Eilerts in purported compliance with the subpoena.

- Defendant Sarah Grant does not seem to understand that she possesses a claim for legal malpractice against Defendant Gillespie and Defendant GHC for Defendant Gillespie's release of the incriminating evidence that assisted in the criminal investigation into Defendant Sarah Grant by the Town and Country Police Department and her invocation of her Fifth Amendment right against self-incrimination. Plaintiff shares that information as the money to be collected there can help pay down the future judgment Plaintiff will be obtaining against Defendant Sarah Grant.

254.    Defendant S. Grant intentionally manipulated the document production, and she omitted production of a video recording that she possessed of Plaintiff.

255.     Defendant S. Grant continues to withhold the recording because it was taken illegally, in Plaintiff's master bedroom without his knowledge and in violation of RSMo. § 542.402 which criminalizes the act of Wire Tapping.

256.     Defendant S. Grant's conduct alleged above constitutes at least Obstruction of Justice, Attempt and Conspiracy, and Theft or Alteration of Record or Process, all RICO predicates, in violation of 18 U.S.C. §§ 1503, 1343 and 1506.

257.     The documents produced by Defendant S. Grant through her counsel prove that she trespassed in Plaintiff's home and engaged in an invasion of his privacy.

258.     Defendant Gillespie knowingly and intentionally assisted Defendant S. Grant in her illegal inaction and action of refusing to produce a copy of the video and/or audio recording(s).

259.     Defendant Gillespie's conduct alleged above constitutes at least Obstruction of Justice and Theft or Alteration of Record or Process, both RICO predicates, in violation of 18 U.S.C. §§ 1503 and 1506.

260.     The photographs of Plaintiff's and his wife's medications were HIPAA violations, as known to Defendant S. Grant as she has been trained in HIPAA as a Missouri board licensed Registered Nurse.

261.     Plaintiff provided CO-CONSPIRATOR #5, large local hospital network and Defendant S. Grant's employer, with copies of exemplar photographs produced by their Registered Nurse employee, and placed that entity on actual notice of several of hers, and therefore its HIPAA violations.

262.     As alleged below, Defendant S. Grant's employer, an enormous local hospital, CO-

CONSPIRATOR #5, aided and abetted Defendant S. Grant's RICO conduct and other criminal activities when it refused to produce identifying information of those who have accessed Plaintiff's medical records through its computer network(s).

263.    CO-CONSPIRATOR #5 has retained a St. Louis law firm to resist production of any incriminating records.

264.    During the same time that Defendant S. Grant was trespassing in Plaintiff's home and violating HIPAA through her illegal photography, Defendant S. Grant violated HIPAA once again when she caused another enormous hospital, CO-CONSPIRATOR #6, to provide her with HIPAA protected information relating to Plaintiff and his stay at its facility.

265.    CO-CONSPIRATOR #6 was served with a subpoena for information regarding access to Plaintiff's information and also specifically requesting a copy of the consent and authorization form he signed upon admission.

266.    CO-CONSPIRATOR #6 is withholding the consent and authorization form because Plaintiff expressly noted on his admission consent form that Defendant S. Grant was not to receive any information regarding Plaintiff.

267.    This second hospital, CO-CONSPIRATOR #6, that itself violated HIPAA, hired its own St. Louis law firm and continues to refuse to produce any documentation, including the authorization and consent form that Plaintiff filled out upon his admission into its facility.

268.    Both hospitals, CO-CONSPIRATORS #5 and #6, have received demands from Plaintiff and are on notice that Plaintiff will assert one or more civil actions against them.

4921-3441-1030, v. 1

269.     The conduct of CO-CONSPIRATORS #5 and #6, constitutes aiding and abetting and/or accessory after the fact, both RICO predicates, in violation of 18 U.S.C. §§ 2 and 3.

270.     On June 10, 2024, Defendant Copeland, Defendant S. Grant and Defendant S. Thomas all appeared at the office of Defendant Eilerts for their depositions.

271.     On June 10, 2024, Defendant Staci Thomas appeared and produced approximately 204 pages of text messages.

272.     Defendant Thomas manipulated her production in several ways.

   a.   First, Defendant Thomas intentionally used a program to make the texts almost illegible as the author and substance.

   b.   Second, Defendant Thomas deleted and/or edited several text message entries.

273.     Defendant Thomas destroyed the audio and/or video files that were in her possession and later engaged in perjury when she later denied in her deposition to having ever possessed any:

> I have plenty of video from Saturday and Sunday nights to show his state of mind. It actually does belong in court. Right now, I just want to make sure he's okay.

274.     Defendant Thomas' conduct as alleged had nothing to do making sure he was okay and it constitutes at least Obstruction of Justice and Theft or Alteration of Record or Process, both RICO predicates, in violation of 18 U.S.C. §§ 1503 and 1506.

275.     On June 10, 2024, during the deposition of Defendant Copeland, Defendant

Copeland, Defendant Brodie and Defendant Fenley engaged in yet another of the RICO enterprise's pattern of false and intentional misrepresentations.

276. Those Defendants purported to reach an agreement that would obviate the need for any further deposition testimony and any need for a Preliminary Injunction Hearing.

277. Defendant Fenley personally made false misrepresentations to Plaintiff and stated that an agreement had been reached whereby Plaintiff could switch to *unsupervised* visits once 3 conditions were met.

278. Defendant Fenley, Defendant Brodie and Defendant Copeland's conduct on June 10, 2024, constitutes at least Obstruction of Justice in violation of 18 U.S.C. § 1503.

279. The three requirements were the removal of all firearms from Plaintiff's home, Plaintiff's passing of 7-Panel hair follicle drug test, and the Defendant Fenley's satisfactory review of certain medical records.

280. The "deal" was never legitimate and is consistent with others used in the pattern and practice of the RICO enterprise to delay and drag out litigation.

281. Had Plaintiff not agreed to the deal ("agreement"), he could have had a hearing 2 days later wherein no evidence would have been presented to justify any restriction on Plaintiff's custody of his children other than continued use of Soberlink that Plaintiff has offered all along.

282. Defendant Eilerts instructed Plaintiff to take the "agreement" and forego the Preliminary Injunction hearing set in just 2 days.

283. Defendant Eilerts failed to document the terms of the agreement in any way.

284. These actions and inactions by Defendant Eilerts constitute his failure to exercise the

degree of care, skill, and learning in representing Plaintiff that is ordinarily exercised by other attorneys under the same or similar situations.

285.    When the test results came back, the guns were removed and Defendant Fenley had reviewed the records, he first claimed that Defendant Copeland and her counsel had reneged on the agreement.

286.    When pressed, Defendant Fenley stated that there was no "agreement" that he could move to enforce and that he understood that the deposition was adjourned so that more discovery could be taken and the Preliminary Injunction continued for the same reason.

287.    Defendant Fenley's intentional conduct and false statements constitute Obstruction of Justice, a RICO predicate, in violation of 18 U.S.C. § 1503.

288.    Defendant Brodie and Defendant Copeland's participation in the criminal ploy constitutes Obstruction of Justice, a RICO predicate, as well.

289.    On June 11, 2024, the very next day, Plaintiff underwent the 7-Panel drug test at the Court's preferred facility and passed 100%:



290.    On June 12, 2024, Defendant Eilerts appeared with Defendant Brodie and Defendant Fenley who intentionally requested a delayed date, and all three entered into a consent order that continued the TRO, and reset the Preliminary Injunction for August 5, 2024.

291.    Defendant Brodie and Defendant Fenley's actions on June 12, 2024, as alleged above constitute at least at least Wire Fraud, Attempt and Conspiracy, and Obstruction of Justice, all RICO predicates, in violation of 18 U.S.C. §§ 1343, 1349 and 1503.

292.    At no time did Defendant Eilerts seek or obtain authority from Plaintiff to consent to such an incomplete Order.

293.    Defendant Eilerts appeared before Defendant Greaves and failed to memorialize the parties' agreement in any way.

294.    Defendant Eilerts' failure to obtain consent, or to document or even reference the

parties' agreement to transition to unsupervised visits after the 3 conditions were met constitutes his failure to exercise the degree of care, skill, and learning in representing Plaintiff that is ordinarily exercised by other attorneys under the same or similar situations.

295.    Defendant Brodie and Defendant Fenley's knowingly false and misleading execution and submission of the June 12, 2024, Consent Order was an aspect of the RICO corruption's pattern and their actions constitutes at least Wire Fraud, Attempt and Conspiracy, and Obstruction of Justice, all RICO predicates, in violation of 18 U.S.C. §§ 1343, 1349 and 1503.

296.    Defendant John Fenley visited Plaintiff's home to confirm that the firearms were removed and during that visit Plaintiff offered for his wife to meet Defendant Fenley for an interview.

297.    Defendant Fenley rejected the suggestion as he had already determined that the reliable parenting proved by Plaintiff's wife would not impact the plan of the RICO enterprise to drag the underlying matter out longer than necessary in the ongoing effort to engage in theft by deception.

298.    Plaintiff finally confronted Defendant Fenley by phone, Defendant Fenley expressed an intentionally false and different recollection of the agreement altogether and denied its existence.

299.    When pressed about the June 12, 2024, Preliminary Injunction hearing being continued due to the agreement, Defendant Fenley falsely stated that he recalled the hearing was continued because more discovery was needed.

300.    Defendant Fenley's conduct alleged above constitutes at least Wire Fraud, Attempt and Conspiracy, and Obstruction of Justice, all RICO predicates, in violation of 18 U.S.C. §§ 1343, 1349 and 1503.

301.    Plaintiff advised Defendant Eilerts of Defendant Fenley's refusal to recall and enforce the agreement and Defendant Eilerts took no action such as filing a Motion to Enforce or Motion to Vacate and Set Aside the improper and continuing TRO.

302.    Defendant Eilerts' inaction when he learned of Defendant Fenley's "memory loss" constitutes his failure to exercise the degree of care, skill, and learning in representing Plaintiff that is ordinarily exercised by other attorneys under the same or similar situations.

303.    On July 10, 2024, Plaintiff entered his appearance to handle the deposition of Defendant Staci Thomas as she had claimed a conflict since the Growe Eisen Firm represented her in her divorce.

304.    Plaintiff and Defendant Eilerts agreed that Plaintiff's role would be limited to that purpose and later involved assisting in drafting.

305.    As no time did Plaintiff agree that Defendant Eilerts was no longer responsible for continuing as the sole trial and family law lawyer in the case, as evidence by Defendant Eilerts' continuing handling of all filings and hearings thereafter and up until December 2, 2024.

306.    On August 5, 2024, the parties appeared for the Preliminary Injunction hearing.

307.    By this time, Defendant Fenley had promised both Plaintiff and co-Plaintiffs C.M.G. and C.L.G. that he intended to recommend 50/50 custody before or when school started

4921-3441-1030, v. 1

later in August.

308.    Defendant Fenley's statements were intentionally false as he knew that the RICO enterprise's pattern and practice was to disallow Plaintiff his children for much longer and at a much higher cost.

309.    On August 5, 2024, Plaintiff had been proven sober since March 17, 2024, more than 4 ½ months and he continued to test via the facial recognition breathalyzer at least 3 times per day.

310.    All supervised visits were unremarkable with no complaints from either of the supervisors.

311.    Commissioner Greaves took the bench on August 5, 2024, and in collusion with Defendant Brodie she stated that more medical records were needed to proceed.

312.    Defendant Greaves' ruling was pre-textual and knowingly false and it was her assistance and participation in the RICO enterprise's pattern and practice and common goal of delaying the progress of Plaintiff's custody of the Co-Plaintiffs and minor children.

313.    When Plaintiff forced Defendant Eilerts to push to move forward with the hearing, Defendant Greaves refused and verbally admonished Plaintiff and indicated that he would not only lose, but the loss would make it more difficult to succeed at trial.

314.    Defendant Greaves statements were made in bad-faith and solely for the purpose of furthering the RICO enterprise's goal of prolonged and unnecessarily expensive litigation to benefit the co-conspirators involved.

315.    Defendant Eilerts directed Plaintiff to not insist on moving forward with a hearing in

which Defendant Copeland had the heavy burden of proof.

316.    Despite proven constant sobriety via facial recognition breathalyzer and attendance

at rehab since March 17, 2024, and despite that amounted to more than 4 months of

continual sobriety, Plaintiff was still not allowed a single overnight with his minor

children.

317.    On August 5, 2024, Defendant Eilerts recommended and directed Plaintiff to sign

the consent order described above that provided no overnight custody, and very limited

unsupervised visits, the unsupervised visits agreed to start in June instead of moving

forward with the Preliminary Injunction hearing.

318.    Defendant Eilerts' direction and his failure to recommend and/or demand a full

Preliminary Injunction hearing constitutes his failure to exercise the degree of care, skill,

and learning in representing Plaintiff that is ordinarily exercised by other attorneys under

the same or similar situations.

319.    The August 5, 2024 Consent Order provided that Defendant Copeland was to

execute passport renewal applications for the minor children no later than November 1,

2024:

> 12. Petitioner and Respondent will work together to renew the children's passports by
> November 1, 2024. As ordered in the parties' parenting plan, Petitioner shall provide one
> of the minor children's passports, whether it is valid or expired, to Respondent within
> five (5) days of the entry of this Order.

320.    As alleged below, Defendant Copeland has still refused to execute the passport

application, despite a Motion to Compel and an Order compelling compliance, and most

notably, Defendant Hilton has blatantly refused to enforce the original order or the Order granting Plaintiff's Motion to Compel.

321.    The August 5, 2024 consent Order also included the following language that was included in bad faith:

> 16. Entering into this Consent Order does not preclude Respondent from returning to the Court to seek a Temporary Restraining Order nor does it preclude Petitioner seeking expanded custody time from the Court.

322.    Below the language above:

> SO ORDERED: _Mary Greaves_    DATE: _8/5/2024_

323.    When Defendant Greaves entered the August 5, 2024, Order, she had no intent to enforce any provision against Defendant Copeland and she had no intent and knew she would not allow Plaintiff to "seek expanded custody" as the Order stated.

324.    On August 13, 2024, minor child C.L.G. was out past legal curfew and was involved in a vehicle accident.

325.    When the child, Co-Plaintiff C.L.G., returned home from the accident, he found his mother unresponsive on the couch.

326.    Minor child and Co-Plaintiff C.L.G., as he testified at trial in the underlying matter, was forced to treat his wounds himself and use a band aid.

327.    When minor child C.L.G. arrived at Plaintiff's home the next day, he requested that his father, Plaintiff, treat the wound.

101

328.    It is Plaintiff, the children's father, that was sought out and that actually used hydrogen peroxide, Neosporin, medical gauze and medical tape to treat the significant wound:



329.    Defendant Copeland committed perjury in her deposition when she falsely testified under oath that she was awake and that she used a spray, white gauze and tape to dress the wound.

330.    In her deposition, Defendant Copeland also testified that the wound was actually "just like three little scrapes."

331.    The evidence in this matter will show that Defendant Copeland abuses and combines Xanax and alcohol.

332.    In one instance, Defendant Copeland was unable to drive to pick up minor child C.L.G. from YMCA summer camp in the afternoon because she started new "sleeping pills" which were Xanax.

333.    Notably, Defendant Hilton continues to refuse to order either a Mental Evaluation or

a Drug Test of Defendant Copeland.

334.     Defendant Hilton's refusal is an intentional act in furtherance of the common goal of

the RICO enterprise to protect the favored parent from adverse evidence and

consequences.

335.     On August 14, 2024, Plaintiff advised Defendant Fenley of the August 13, 2024,

undisclosed vehicle accident that took place involving minor child C.L.G.

336.     Defendant Fenley feigned outrage but he intentionally took no action in furtherance

of the RICO enterprise's pattern and practice of protecting the favored parent during a

case involving their corruption that was and is victimizing the other parent.

337.     On September 26, 2024, in light of Defendant Fenley's unfulfilled promise of a

progression to overnight custody and a plan for 50/50 custody by the end of the calendar

year, Defendant Eilerts, on behalf of Plaintiff, filed a Motion To Amend Consent Order

Dated August 5, 2024.

338.     That Motion cited and relied upon Defendant Greaves' own language and refused to

allow Plaintiff to seek "expanded custody time from the Court" as promised.

339.     On October 2, 2024, the parties again appeared before Defendant Greaves.

340.     At this point in time, Defendant Fenley had switched his intentionally false

representations regarding the custody transition and he falsely stated to Plaintiff that

50/50 custody would return by the end of the calendar year.

341.     Plaintiff later learned from the minor children and Co-Plaintiffs that Defendant

Fenley had made the same promise to them both.

342.     Defendant Fenley's statements to Plaintiff and the Co-Plaintiff minor children were

intentionally false and were part of the pattern and practice of the RICO enterprise and intended perpetuate the common goal of the enterprise.

343.    During the October 2, 2024 hearing, Defendant Greaves refused to honor the language of her own prior order and did *not* allow Plaintiff to seek "expanded custody time from the court."

344.    Defendant Greaves' refusal to consider Plaintiff's Motion and request for expanded custody time is a pattern used by the RICO enterprise and scheme to drag out family court matters and to steal money from parents through unnecessary attorneys' fees, guardian ad litem fees, therapist fees, and obtain unfair, coerced and extorted monetary settlements.

345.    During the October 2, 2024 hearing, Defendant Eilerts recommended that Plaintiff, once again, sign a consent Order that was restrictive and did not allow 50/50 custody.

346.    The October 2, 2024 Consent Order is the broadest order Plaintiff ever obtained in the underlying matter and it only allowed for 1 overnight per week, 1 five hour visit per week, and 1 four hour visit every other Sunday.

347.    On October 8, 2024, Plaintiff sent Defendant Fenley and email in which he placed him on actual notice that minor child C.L.G. had attended a high school party at a home where parents were present and alcohol was allowed on premise and to be consumed by the parents and owners of the home and at which LSD was present.

348.    Plaintiff contacted Defendant Fenley because Defendant Copeland refused to even address the matter with Plaintiff and refused a proposal for a group communication with the minor children's friend group's parents.

349.     Plaintiff advised Defendant Fenley, as he had advised Defendant Copeland, that the parents and owners of the home had met attendees' parents at the front door to falsely communicate that they would be chaperoning the party to ensure nothing untoward would take place.

350.     **Defendant Fenley is a Guardian *Ad Litem*** and his duties involve protecting and acting in the best interests of minor children.

351.     As noted herein, Defendant Fenley, in reality, is nothing more than a criminal willing to disregard the best interests of minor children to steal money for himself and that RICO enterprise in which he is a member.

352.     Plaintiff proposed that he would contact the local police department at the next party, Halloween, and have the police address the situation and the parents who were so brazenly violating the law and endangering the lives of the minor child.

353.     Plaintiff was shocked with Defendant Fenley refused and prohibited Plaintiff from contacting the police and he knowingly allowed that party and others to continue even in light of the actual knowledge that he possessed about what was happening involving minor children.

354.     Defendant Fenley's sole motive in not addressing the "chaperoned" minor alcohol parties was to protect Defendant Copeland from scrutiny and from criticism of her terrible parenting.

355.     On November 7, 2024, the Defendant Brodie, Defendant Fenley, Defendant Eilerts appeared at a hearing.  Plaintiff was also present.

356.     During that hearing, Defendant Greaves granted a Motion to Compel and ordered

Defendant Copeland to comply with the passport provision.

357.     During that hearing, Defendant Greaves shockingly granted Defendant Brodie and Defendant Copeland's Motion to Quash a subpoena served on Defendant Copeland's credit union seeking financial records.

358.     Defendant Greaves granted the Motion to Quash in its entirety, in bad faith, refusing to allow Plaintiff to obtain a single bank record in a case involving child support and his allegations of money being transferred and hidden by Defendant Copeland.

359.     Defendant Greaves' order granting the Motion to Quash was a typical pattern and was entered in furtherance of the RICO enterprise's goal to protect the favored parent in custody litigation in which the enterprise had determined to victimize the other parent.

360.     Defendant Brodie also moved to Quash a subpoena served on the minor children's school district for their attendance records and argued:

> 6.     For the reasons set forth herein, the Subpoena requests documents that are not relevant to the subject matter involved in the pending litigation and are not reasonably calculated to lead to the discovery of admissible evidence.

361.     Defendant Fenley did not oppose the Motion to Quash as he should have as he knew what Defendant Brodie knew, the records would demonstrate truancy while in Defendant Copeland's custody.

362.     The Motion to Quash, the Defendant Greaves would have granted if given he chance was part of pattern of RICO conduct, was not filed in good faith and was an effort to hide the undisputed fact that the minor children in this case missed ***more than 1,130 periods of school*** while in Defendant Copeland's custody.

363.    Defendant Hilton would later refuse to allow the admission a summary of those records into evidence at trial and Defendant Brodie objected to the school district's willingness to produce a witness at trial to authenticate the records at issue.

364.    Defendant Copeland's poor parenting and school transportation is well known as reflected by this March 4, 2024 text messages between Defendant S. Grant and Defendant Thomas:

> She needs to take the kids to school. Should I message her that?
>
> She needs to be a perfect parent right now

> The kids should have gone to school in my opinion and picked up/not ridden bus to his house. School absence doesn't bode well if you're trying to show that your end is the better end right now.

365.    On November 19, 2024, Plaintiff, Defendant Eilerts, Defendant Copeland, Defendant Brodie, and Defendant Fenley participated in a mediation with well-known CO-CONSPIRATOR #1.

366.    This same CO-CONSPIRATOR is the subject of the testimony of one or more FACT WITNESSES that Plaintiff will present at trial.

367.    During the mediation, consistent with the RICO enterprise's pattern of conduct, Defendant Copeland and Defendant Brodie *offered Petitioner 50/50 custody less 2 days per month* (roughly 12 instead of 14), demanded sole legal custody, and demanded a trial on child support calculations and attorneys' fees issues.

368.    Only a fool would allow Defendant Copeland to have sole legal custody of the minor

children and decisions on their best interests.

369.   Defendant Copeland shortly after this mediation attempted to push Co-Plaintiff

minor child C.L.G. into enrolling into vocational technical school solely because she has

save no money, zero dollars, for the minor children's college educations.

370.   It was only Plaintiff's forced meeting with the high school guidance counselor that

shut down this RICO pattern and practice that was also not opposed by Defendant Fenley

as his part of the RICO enterprise pattern.

371.   On custody, Defendant Fenley indicated that he would agree to whatever custody

agreement the parties reached.

372.   Defendant Copeland and Defendant Brodie's custody offer is ***objective evidence and
proof*** that all claims that followed by Defendant Copeland in the underlying litigation

that Plaintiff was a danger were and are false and part of the pattern used by the RICO

enterprise to steal money.

373.   Defendant Fenley's agreement to any custody agreement the parties reached in

November 2024, including up to 50/50 less 2 days per month is ***objective evidence and
proof*** that his July 11, 2025, recommended Parenting Plan including only ***2 overnights
per month*** and 2 visits per month is nothing more than retaliation and part of the pattern

used by the RICO enterprise.

374.   The mediator and CO-CONSPIRATOR actively facilitated this arrangement as was

a pattern for the RICO enterprise.

375.   Plaintiff refused the settlement offer and demanded 50/50 custody but stipulated to a

child support calculation using the overnights proposed by Defendant Copeland and

Defendant Brodie so that Defendant Copeland could obtain the positive financial impact she clearly sought.

376. During the mediation, Plaintiff made the mistake of ***confidentially*** telling the CO-CONSPIRATOR mediator that he felt strong on his demand for 50/50 custody, as discovery was about to close, trial was less than a month away, and Defendant Brodie and Defendant Copeland had fatal flaw in their pleadings.

377. Importantly, Plaintiff did *not* disclose that Defendant Copeland failed to amend her pleadings to seek a change to long-term custody and also child support.

378. During this time, Defendant Fenley noted that Defendant Greaves "hated" him a statement Plaintiff and Defendant Eilerts agreed was finally objective evidence of bias or the appearance of impropriety requiring Defendant Greaves' recusal or removal.

379. On November 27, 2024, Defendant Thomas was deposed in the underlying matter.

380. During her deposition, Defendant Thomas engaged in perjury in violation of not only RSMo. § 575.040, but also she engaged in *at least* Obstruction of Justice, a RICO predicate, in violation of 18 U.S.C. § 1503.

381. Defendant Thomas knowingly and falsely testified that:

   a. She deemed Plaintiff a danger;

   b. Plaintiff had attempted to poison her dog;[26]

   c. That she had not discussed anything with Defendant Brodie before the deposition other than "fashion"; and

---

[26] This is important as detailed in later allegations regarding breaking and entering Plaintiff's vehicle.

      d.  That she had not been present in Plaintiff's home on December 2nd or 3rd, 2024.

382.    During the deposition, Defendant Thomas secretly recorded the session so that she

could listen afterwards and change her testimony, as needed.

383.    During the deposition, despite allegedly having no idea that Defendant Thomas was

secretly recording, Defendant Brodie cautioned Defendant Thomas from pulling her

phone out of her pursue as she knew it would show the recording activity:

> Q. Will you pull up your cell phone and see if you have this message?
> MS. BRODIE:
> You can't force her to open up a cell phone and look at it. Staci, this is up to you.
> THE WITNESS: Oh, yeah, no.
> MS. BRODIE:
> You're representing yourself, but --
> THE WITNESS: Well, it's easy enough for me to look.
> MS. BRODIE:
> <u>You shouldn't do that. He can look at what you're doing on your cell phone, so...</u>

Staci Thomas Depo. pp. 58:22-59:9.

384.    Importantly, during the deposition, Defendant Thomas engaged in perjury and did

not disclose her Gmail email address when asked.

385.    At no time during or at the end of Defendant Thomas' deposition did Defendant

Coulter mark a single document that was used, even the document(s) newly produced by

Defendant Thomas, as an Exhibit for future use at trial or to otherwise authenticate them.

386.    Defendant Thomas produced new documents that had never before been seen and

Defendant Coulter still failed to mark those pages as deposition Exhibits.

387.    Defendant Coulter's actions and inactions relating to the deposition of Defendant

Thomas reflects his failure to exercise the degree of care, skill, and learning in

representing Plaintiff that is ordinarily exercised by other attorneys under the same or

similar situations.

388.    When Plaintiff received the transcript for Defendant Thomas' deposition, the

transcript had been manipulated to now include the disclosure of Defendant Thomas'

Gmail address that was only discovered because it was used to email Plaintiff's health

insurer.

389.    On January 27, 2025, Plaintiff sent an email to the deposition court reporter, CO-

CONSPIRATOR #7, and asked for a copy of the audio recording from Defendant

Thomas' deposition, and this was her email response:

> Hi there:
>
> We have to keep our transcripts for seven years, but we don't
> keep the audio files.  Even if we did, they are considered work
> product and we don't have to produce them.

390.    CO-CONSPIRATOR #7's claim is false.

391.    CO-CONSPIRATOR #7 is still obligated to have retained the sound recording and

there is no work product objection.  *See* Missouri Certified Court Reporters Manual &

Form Book, Court Operating Rule 8.04.7

392.    Plaintiff noted to Defendant Eilerts that CO-CONSPIRATOR #7's deposition

charges were unreasonably high and now it seems obvious as to why.

393.    CO-CONSPIRATOR #7's refusal to provide and active concealment of the sound

recording is pattern used by the RICO enterprise to conceal illegal actions taken to

protect, among others, fact witnesses that have joined the enterprise and are assisting in

the victimization of one parent.

394.    The evening after the day of the deposition, Defendant Thomas listened to the audio

recording and compared it to the evidence in the possession of Plaintiff and changed her

testimony via email to Defendant Coulter.

> 6.    For the reasons set forth herein, the Subpoena requests documents that are not
> relevant to the subject matter involved in the pending litigation and are not reasonably calculated
> to lead to the discovery of admissible evidence.

395.    At a status conference set on December 2, 2024, approached, Plaintiff approached

Defendant Eilerts and Defendant Coulter regarding the need to move to disqualify

Defendant Greaves for bias and/or appearance of impropriety.

396.    Once a Protective Order is entered in this present filing/matter segregating Plaintiff's

attorney-client privileged communications from the documents accessible to the other

Defendants in this case, this Court will see why Defendant Eilerts did not move to

disqualify Defendant Greaves and the direct involvement of Defendant Growe Eisen

Firm management.

397.    Plaintiff had at least one phone call with Defendant Eilerts where one of his named

partners secretly attended via speaker.

398.    Importantly, Defendant Fenley had his own duty to the minor children to file his

own Motion to Disqualify whenever he reached the impression of "hatred" that he shared

on November 19, 2024.

399.    As alleged above, Defendant Fenley's actions are part of the pattern used by the

RICO enterprise to perpetuate these crimes on St. Louis County parents and children.

400.    Defendant S. Grant's deposition was to have taken place on December 4, 2024.

401.    Before the deposition began, Defendant Gillespie conjured a false and bad faith basis to walk out of the deposition before it began.

402.    Defendant Gillespie's actions in prohibiting the deposition were in furtherance of RICO enterprise's plan and was a pattern and practice to prolong family law cases.

403.    Defendant Gillespie later obtained an Order setting Defendant S. Grant's deposition to take place at the St. Louis County Courthouse.

404.    Defendant Gillespie obtained the Order from Defendant Hilton.

405.    Defendant Gillespie and Defendant Hilton were named law partners who worked together for 12 years, from 1989 to 2001.

406.    When the deposition of Defendant S. Grant finally took place at the Courthouse on June 13, 2025, it was set for Defendant Hilton's courtroom and he was conveniently available to assist Co-Conspirator, Defendant Gillespie during the deposition.

407.    Defendant Hilton refused to allow Plaintiff to examine Defendant Sarah Grant regarding her credibility as a witness and refused to allow Plaintiff to ask her any questions about her breaking and entering and trespassing in Plaintiff's home as alleged herein.

408.    Defendant Sarah Grant did admit to having Plaintiff's wine collection that she stole from his house when he was not home.

409.    Plaintiff would like to sell it but Defendant Sarah Grant deems it hers.

410.    Defendant Hilton's rulings were made in bad faith and were solely intended to protect other RICO enterprise members, newly joined members and new associates, such as Defendant S. Grant from any negative repercussions in the St. Louis Family Court.

411.    Defendant Hilton continued his illegal behavior during the trial in the underlying matter when he refused to allow Plaintiff to cross-examine Defendant Thomas about her interference with Plaintiff and Co-Plaintiff's health insurance policy.

412.    After the deposition of Defendant Sarah Grant was completed, Defendant Gillespie actually stole the deposition exhibits and refused to respond and give them back when asked.

413.    FACT WITNESS #9 will be called at trial to confirm that the exhibits were taken before she was able to pack up the materials and leave the courtroom.

414.    Defendant Gillespie and Defendant Hilton's actions as alleged above constitute at least Attempt and Conspiracy, and Obstruction of Justice, both RICO predicates, in violation of 18 U.S.C. §§ 1343, 1349 and 1503.

415.    At some point in time after the mediation and November 27, 2024, deposition of Defendant Greaves made a huge mistake that outed the RICO conspiracy in this case for the first most obvious time.

416.    At this time, neither Defendant Thomas nor Defendant Copeland knew if Plaintiff had home video surveillance to prove that Defendant Thomas and Defendant had lied in their deposition.

417.    Defendant Brodie had never previously realized that she never served discovery asking Plaintiff to produce his video evidence in this case.

418.    Importantly, the discovery deadline had passed on November 25, 2024.

419.    Trial was set for December 17, 2024.

420.    Despite Plaintiff, not his counsel, moving to disqualify her for bias, Defendant

Greaves acted before the motion could be ruled upon and entered a *sua sponte* Order dated December 9, 2025.

421. The fact that the December 9th Order was entered *sua sponte* is critical.

422. Defendant Greaves had been asked by none one to do anything.

423. But, nonetheless, Defendant Greaves issued an Order all on her own.

424. That Order allowed two critical things.

425. First, it allowed the parties to amend their pleadings, after the close of discovery and 8 days before trial.

426. Second, the Order reopened discovery until December 17, 2004.

427. That Order was the result of *ex parte* communication.

428. The very technical error that Plaintiff generally and *confidentially* mentioned to the mediator and CO-CONSPIRATOR, was magically corrected by the very amendment allowed, *sua sponte*, by Defendant Greaves.

429. Next, once the new discovery period opened, the one that no one supposedly expected, Defendant Brodie served discovery within hours the same day seeking, nothing other than the very surveillance footage that she had forgotten to investigate:

> 9.    Please state whether there has been any surveillance or any investigation of Rebecca Copeland, Sarah Grant, Staci Thomas, and Christine Tinker, either individually or within a group, including but not limited to photographs, video recordings, voice recordings, text messages, or emails.
>
> **PETITIONER'S ANSWER:**
>
> **RESPONDENT'S ANSWER:**
>
> None exist.

430.     The *ex parte* communication could not have been more obvious.

431.     Defendant Eilerts actually brought the Amendment of Pleadings issue to Plaintiff's

attention, the *ex parte* was clear as day.

432.     During this time frame, Plaintiff was working on his written Motion to Disqualify

Defendant Greaves.

433.     Both Defendant Eilerts and Defendant Coulter provided guidance, input and edits to

the various versions of the brief.

434.     However, neither Defendant Eilerts nor Defendant Coulter, who both represented

Plaintiff, advised Plaintiff that the draft Motion cited the incorrect Rule and not the

correct statute.

435.     Plaintiff made Defendant Eilerts and Defendant Coulter aware that he was primarily

a federal court practitioner and that he specifically relied upon them for all state court

issues.

436.     Both Defendant Eilerts and Defendant Coulter, refused to place their signature block

on the Motion to Disqualify despite providing substantive guidance and legal advice

throughout the month of December on the issue.

437.     When Plaintiff, Defendant Eilerts and Defendant Coulter finalized the motion that

was overseen by Defendant Eilerts and Defendant Coulter, Defendant Coulter

recommended that Plaintiff wait to file the Motion so that Defendant Hilton would hear it

as he was taking over as Presiding Judge on January 1, 2025.

438.     Plaintiff relied upon the advice of counsel and did not rush to file his Motion to

Disqualify.

439.   These actions and inactions by Defendant Eilerts and Defendant Coulter constitute the failure to exercise the degree of care, skill, and learning in representing Plaintiff that is ordinarily exercised by other attorneys under the same or similar situations.

440.   Plaintiff did attempt to file his Motion to Disqualify on December 23, 2024.

441.   CO-CONSPIRATOR #8, a member of Defendant Greaves' staff, rejected the filing for contrived reasons.

442.   Plaintiff finally *submitted* an acceptable Motion to Disqualify Defendant Greaves on December 24, 2024.

443.   At the time it was submitted, if it was accepted by CO-CONSPIRATOR #8, the Motion to Disqualify would have been assigned to and under the jurisdiction of the 2024 Presiding Judge Ott.

444.   CO-CONSPIRATOR #8 intentionally refused to accept the December 24, 2024 filing until January 3, 2025 in an express and intentional effort to ensure that the Motion to Disqualify would be heard by Defendant Hilton.

445.   The refusal to accept Plaintiff's December 24, 2024 filing, is a pattern used by the RICO enterprise to further the common goal of, among other things, theft by deception.

446.   On December 31, 2024, Defendant Coulter and Defendant Coulter Family Law Group moved to withdraw from the underlying case.

447.   Once a Protective Order is entered segregating Plaintiff's attorney-client privileged communications from access by the other Defendants, the Court will see the details as to why these former counsel of record withdrew.

448.   Defendant Coulter and Defendant Coulter Family Law Group as alleged above

reflects their failure to exercise the degree of care, skill, and learning in representing Plaintiff that is ordinarily exercised by other attorneys under the same or similar situations.

449.    As of December 31, 2024, Defendant Eilerts and Defendant Growe Eisen Firm were still counsel of record.

450.    On January 7, 2025, at 1:08 p.m., Plaintiff filed his Supplement to his Motion to Disqualify Defendant Greaves in which he laid out the evidence of the *ex parte* communications.

451.    On January 8, 2025 at 11:35 a.m., less than 24 hours later Defendant Brodie's law firm associate, FACT WITNESS #7, quit Defendant Brodie's law firm.

452.    Specifically, Defendant Brodie, not FACT WITNESS #7, filed a Memorandum that stated:

> **MEMORANDUM OF WITHDRAWAL**
>
> COM█████████Carthen, and having left her previous firm, provides notice to the Court and all parties of her withdrawal of her appearance in the above-captioned matter as co-counsel for Respondent, Rebecca Copeland, who remains represented by counsel of record.

453.    On January 13, 2025, Plaintiff filed a Motion for Sanctions against Defendant Brodie and Defendant Copeland.

454.    In that Motion for Sanctions, Plaintiff made it clear that he eventually file suit against both Defendant Greaves and Defendant Brodie:

> [3] Commissioner Greaves' involvement in a broad, criminal conspiracy to intentionally utilize *ex parte* judicial communications eliminates any judicial immunity defense she might hope to have against civil claims relating to her conduct.

[4] The exposure of Ms. Brodie and Ms. Copeland to criminal prosecution is patently obvious. While not obvious to some, the exposure of Commissioner Greaves to similar criminal prosecution is well-established. *See, e.g., O'Shea v. Littleton*, 414 U.S. 488, 680 (1974) ("On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress . . . .') (citation omitted).

12.    While it is true that Petitioner will likely pursue civil liability and damages from those named in this Motion for Sanctions *and others*, his financial ability to do so has been financially hamstrung by the actions of Respondent and her counsel.[8]

455.    On January 13, 2025, Defendant Greaves recused from the underlying case.

456.    On January 13, 2025, Defendant Eilerts and Defendant Growe Eisen Firm, Plaintiff's only counsel of record, filed a Motion to Withdraw from the underlying case.

457.    Defendant Eilerts and Defendant Growe Eisen Firm's actions alleged above reflects their failure to exercise the degree of care, skill, and learning in representing Plaintiff that is ordinarily exercised by other attorneys under the same or similar situations.

458.    Following Defendant Greaves' recusal, this matter was internally and improperly reassigned to FACT WITNESS #8.

459.    On January 8, 2025, in light of the unethical cesspool within which Plaintiff found himself in the 21st Circuit's Family Court, and also the procedural defects in that administrative assignment, Petitioner filed a second Motion for Change of Judge and requested a transfer of this matter to the Missouri Supreme Court for its assignment of a new trial judge from outside the 21st Circuit.

460.    As required by Rule, Plaintiff set the hearing on his Motion for Change of Judge and for transfer to the Missouri Supreme Court to take place on February 7, 2025.

461.    On January 20, 2025, Defendant Greaves had recused, FACT WITNESS #8 had

119

been assigned, and Plaintiff had filed a Motion for Change of Judge from that jurist, <u>set for hearing on February 7, 2025</u>.

462.    January 21, 2025 was to be the day for the hearing on Petitioner's Motion to DQ Defendant Greaves, but she recused and Plaintiff cancelled that hearing.

463.    Therefore, the only Motion that was ripe for a ruling was the Motion to Withdraw filed by Defendant Eilerts and the Defendant Growe Eisen Firm.

464.    But Plaintiff filed a consent to that Motion for reasons that will be relevant later.

465.    As such, no hearing on the Motion to Withdraw was necessary.

466.    As a *complete surprise*, Defendant Hilton's staff individual, CO-CONSPIRATOR #8, confirmed that Defendant Hilton intended for the January 21, 2025, hearing to go forward supposedly regarding only Defendant Eilerts and Defendant Growe Eisen Firm's Motion to Withdraw.

467.    Plaintiff was dumfounded but it all makes sense now.

468.    No later than February 4, 2025, Plaintiff learned that he was being intimidated by the RICO enterprise through its pattern of following Plaintiff's vehicle and illegally accessing his iPhone, tablet, laptop and the laptop of a third party, FACT WITNESS #10.

469.    FACT WITNESS #10 is a former general counsel for a large local corporation, he or she has FBI clearance and credentials, and has trained FBI agents at its facility in Quantico, Virginia.

470.    FACT WITNESS #10 will testify that he personally observed Plaintiff being followed and surveilled on separate occasions and at several locations.

471.    Plaintiff was followed on at least the following dates:

- February 4, 2025;

- February 9, 2025;

- February 17, 2025;

472.    The following is still frame from the video footage Plaintiff captured on February 17, 2025:



473.    Plaintiff's home is on right after the turn in the still frame above.

474.    The same vehicle was in the middle of the street on another occasion Plaintiff's ability to pass safely.

475.    The facts alleged above are just a few of the examples of the harassment and intimidation the RICO enterprise inflicted upon Plaintiff in an effort to make him reconsider pressing forward with exposure of the RICO enterprise at issue in this case.

476.    Upon information and belief, the RICO enterprise utilized and utilizes the services

of CO-CONSPIRATOR #9 to conduct its surveillance, intimidation and illegal access to electronics.

477.    CO-CONSPIRATOR #9 is a Licensed Investigator in the State of Missouri.

478.    Upon information and belief, CO-CONSPIRATOR #9 subcontracted or utilized the services of several others to create a surveillance team that sought to intimidate and harass Plaintiff for more than a month.

479.    Plaintiff has extensive photographic evidence of the vehicles used to follow, harass and intimidate him.

480.    Next, upon information and belief, the RICO enterprise utilized and utilizes the computer forensic services of CO-CONSPIRATOR #10.

481.    CO-CONSPIRATOR #10 is a Certified Computer Examiner.

482.    In this matter, Plaintiff voluntarily provided his iPhone and tablet to CO-CONSPIRATOR #10 under contrived circumstances and CO-CONSPIRATOR #10 wiped the iPhone and tablet clean of any traces of illegal access.

483.    The RICO enterprise in this case also illegally accessed the laptop of FACT WITNESS #10 and that laptop is now securely stored at this point in time.

484.    The RICO enterprise's access to Plaintiff's and FACT WITNESS #9's computers may be difficult to believe and, as such, Plaintiff discloses just a small portion of the evidence he will produce at trial, including this photograph of FACT WITNESS #10's laptop taken on February 23, 2025, at 3:00 p.m.:



485.    The following photograph was taken of Plaintiff's laptop, not tablet, on April 26,

2025, at 11:12 a.m.:



486.    Another individual, FACT WITNESS #11, will testify at trial and confirm that

Plaintiff was followed in his vehicle.

487.    The full extent of the harassment and intimidation techniques used by the RICO

enterprise will be proven at trial and it is simply astounding.

488.    Defendant Hilton and the CO-CONSPIRATORS and the RICO enterprise hatched a

new plan in light of Defendant Greaves' being caught in *ex parte* judicial communication

and her recusal.

489.    Plaintiff believed that he finally had found the opportunity to appear and obtain an

audience with a judge that he thought could finally transfer this case to the Missouri

Supreme Court <u>at the February 7, 2025 hearing</u>.

490.    What happened next was theatre and corruption on full display at its best.

491.    When the hearing began, Defendant Hilton intentionally and falsely behaved as if he

was the *savior* for Petitioner and his children.

492.    Defendant Hilton ***chastised*** Defendant Eilerts for his refusing to sign Petitioner's

*pro se* Motion to Disqualify Defendant Greaves and the Supplement thereto.

493.    Defendant Hilton ***chastised*** Defendant Eilerts for his malpractice in not moving to

dissolve the TRO in this case as soon as Petitioner returned from rehab.

494.    Defendant Hilton noted that Petitioner had been using a Soberlink breathalyzer but

still did not have his children.

495.    Defendant Hilton ***chastised*** Guardian *Ad Litem* Defendant Fenley for not speaking

up for the children who Defendant Hilton stated repeatedly had "**suffered**."

496.    Defendant Hilton stated that Petitioner had "**suffered**" as well.

497.    Defendant Hilton abruptly asked if Defendant Brodie had anything to say for herself to which she answered in the negative.

498.    Defendant Hilton went so far as to have read at least Plaintiff's financials before the hearing, and he even commented on Plaintiff's high monthly mortgage payment and child support amount compared to his meager income.

499.    Defendant Hilton falsely signaled that he was there to help.

500.    Just allow him to keep the case, Defendant Hilton said.

501.    Consent to his jurisdiction and drop his demand for transfer to the Missouri Supreme Court.

502.    Defendant Hilton also refused to even rule on the Motion and sent Plaintiff home to think "real hard" about consenting to him as his trial judge.

503.    It was all an act and part of the pattern used by the RICO enterprise to conceal the activities of the St. Louis Family Court from the outside.

504.    The hearing *went **_so well_*** that Plaintiff ordered a copy of the hearing recording and transcript the next morning at 11:38 a.m.

505.    Plaintiff used the opportunity to disclose to the entire courtroom that he had reported all of them the United States Department of Justice (the St. Louis U.S. Attorney's Office), and also the OCDC with whom he was communicating.

506.    That disclosure is important because the Department of Justice is a criminal investigator and all retaliation Plaintiff has received since that date constitutes, among other things, Obstruction of Criminal Investigations and Retaliating Against a Witness, Victim, or Informant, both RICO predicates, in violation of 18 U.S. Code §§ 1510 and

1513.

507.    Unfortunately, Defendant Hilton's performance worked.

508.    Plaintiff foolishly fell for Defendant Hilton's act, hook line and sinker.

509.    The Order entered was false as the matter was not taken under advisement as Defendant Hilton directed Petitioner to write.

510.    The matter was awaiting Plaintiff's decision as to whether he would consent to Defendant Hilton as was his plan all along.

511.    As Defendant Hilton planned and requested that Plaintiff do next, the day after the hearing, Plaintiff filed the two (2) pleadings that changed the course of his children's future forever – he consented to corrupt Defendant Hilton as the trial judge in this case.

512.    The moment that happened, as the fix was in, everything became immediately worse and the nightmare got even worse.

513.    As a prelude to what was to come and that Plaintiff did not understand at the time, Guardian *Ad Litem* Defendant Fenley stated that he would have a Motion to present regarding the children's safety on Friday afternoon – January 24, 2025.

514.    That was a mistaken reference to a plan the RICO enterprise and members had already made.

515.    On January 24, 2025, just ***three days*** after Defendant Hilton's performance, while Plaintiff was working on his Motion to Discharge Guardian *Ad Litem* Defendant, he received notice from his oldest child, C.L.G.'s school that the children's mother, Defendant Copeland, had reported a "safety issue" and that she advised the school that she was taking the children out of school at noon.



516.    Upon learning this extremely troubling information, Plaintiff reached the only conclusion that made sense.

517.    Defendant Copeland had just essentially lost the case 3 days earlier; her lawyer Defendant Brodie and the Guardian *Ad Litem* Defendant Fenley had been caught in corruption by new judge Defendant Hilton.

518.    Plaintiff assumed the worst; that Defendant Copeland was planning to take the children out of school to abscond with them to somewhere unknown, or worse.

519.    As an immediate response, Plaintiff sent an email to Defendant Hilton's staff, CO-CONSPIRATOR #8, copying Defendant John Fenley, having no idea if he was involved in the plan, which he was, and he made a plea for help.

520.    It turns out the "safety alert" was a trap and an effort to literally frame Plaintiff for attempted kidnapping.

521.    Plaintiff had no intention to check minor C.L.G. out of school, he is no kidnapper.

522.    Plaintiff forwarded the email he sent to Defendant Hilton and Defendant Fenley to minor child C.L.G.'s high school counselor.

523.    In his January 24, 205, Motion to Discharge, Plaintiff noted Defendant Fenley's extreme failures and fraudulent conduct that amount to *criminal a*ctions.

524. Plaintiff openly stated in pleadings dating back to January 13, 2025, that he hopes all of the individuals involved, and their souls, find their way to Hell, he compared them to Humpty Dumpties, and he stated that they were on a bus with a One-Way destination of the City of Reasonable Doubt with Population Zero among many other hyperbolic comments:

> a. As will be discussed below, it is the criminal defense attorneys that are driving the bus now.
>
> b. These crooks handed over the wheel and are sitting in the back shaking. Some of the best criminal defense attorneys in St. Louis are providing privileged guidance now. But not all of these crooks hired the best.
>
> > i. Again, the only destination for their bus of corruption is the glorious City of Reasonable Doubt.
> >
> > > 1. Its population? 0.
> >
> > ii. Will they reach their destination? Nope.[9]

> 22. If there is hell, Mr. Fenley has his ticket already printed and it is waiting for him!

> a. All of the corrupt individuals in this case should reread Dante's Alighieri's *Inferno*.[8]

> ---
> [8] https://en.wikipedia.org/wiki/Inferno_(Dante) None of these individuals need waste their time and continue to read *Purgatorio* and *Paradiso* within the Divine Comedy. Save your time sinners! They clearly don't even grasp the first step of Repentance and no absolution will save them.

525. Plaintiff included the following in his January 24, 2025 Motion to Discharge the

Defendant Fenley.

> 36. It is just now that the criminals are starting to see that there is absolutely nothing, nothing they can do to stop the *tsunami of justice* coming their way.
>
> 37. Now, Petitioner has the joy of sprinkling *tidbits of truth* here and there about what he has already done.
>
> 38. Petitioner is not the fool here. Oh no. No he isn't.
>
> 39. Did these criminals pick the wrong lawyer and father to mess with? The readers can be the judge and jury on that one.
>
> 40. Petitioner's vengeance strikes with precision, and it *Strikes true*.

526.    As Plaintiff would later point out to Defendant Fenley in the recoding he has of when Defendant Fenley attempted to extort and coerce Plaintiff to trade custody of his children for disavowing his allegations of corruption and criminal conduct, despite these sorts of filings dating back to January 13, 2025, ***no one has sought a mental evaluation of Plaintiff.***

527.    The reason no one has requested a Mental Evaluation of Plaintiff in the underlying matter because Plaintiff is most certainly sane.

528.    These criminals have been caught by a parent who is lawyer and a well-trained one at that, and now their focus has been retaliation and desperate attempts to avoid being held to account for their actions.

529.    Notably, Plaintiff *did* underwent a voluntary Mental Evaluation in the underlying case in August 2024, and he *passed* with flying colors.

530.    On January 21, 2024, while in the hallway outside the common entrance to Division 13's chambers, Defendant Hilton alerted Plaintiff to the truth. He was just too naïve to

hear it.

531.    Just last week, Defendant Hilton and CO-CONSPIRATOR #8 refused to accept

Plaintiff's Motion for Change of Judge for Cause for filing.

532.    After waiting 3 days, the Motion was finally accepted only because Plaintiff sent an

email **copying** Missouri Supreme Court Judge Mary Russell, who signed the March 4,

2025, *sua sponte* Order, and a representative of the Missouri Commission for Retirement,

Removal and Discipline.

533.    After Plaintiff consented to his jurisdiction, Defendant Hilton made sure that

Plaintiff understood one thing:  Judge Hilton used to be ***a family law practitioner*** before

taking the bench.  That is precisely what he said.

534.    He topped off the comment with one of his signature winks.

535.    On January 28, 2025, Plaintiff appeared in Division 13 *by appointment* to present his

*ex parte* Motion for TRO to Defendant Hilton.

536.    Defendant Hilton was believed to be Petitioner's savior at this point in time, Plaintiff

was unsure.

537.    In his *ex parte* TRO, Plaintiff included the following:

> a.  In light of what has happened, Petitioner ***formally moves and requests*** that his
>
> consent to Division 13 **be placed on hold** for the time being.[15]

538.    Defendant Hilton refused to even accept the ex parte TRO filing and stated that

Plaintiff "had an adequate remedy at law."

539.    On January 30, 2025, just 9 days after Defendant Hilton promised that he would end

Petitioner and his children's **suffering** and 2 days after he told Plaintiff that he had an adequate remedy at law Plaintiff filed his Motion to Vacate the October 2, 2024, Consent Order and for Modification of the December 2017 Judgment in this matter ("Motion to Vacate").

540.    In that Motion, Plaintiff laid out the Missouri precedent that supported an immediate correction of the injustice that had been done in this case.

541.    It seemed to Plaintiff to be the very solution that Defendant Hilton implied he should present for filing – an adequate remedy at law.

542.    In that Motion, Plaintiff noted that Rule 74.06(e) is intended to allow the court to prevent the injustice that Plaintiff and his minor children had underwent up to that point.

543.    On February 7, 2025, Plaintiff arrived to briefly argue the law and recap his Motion to Vacate.

544.    Upon arrival, it was clear that Defendant Hilton had changed his tune.

545.    Defendant Hilton was no longer Plaintiff and his children's savior; he was now their enemy.

546.    For no reason whatsoever other than maybe provide an opportunity for cross examination, Defendant Hilton forced Petitioner to take the stand and present live testimony on his Motion to Vacate.

547.    Plaintiff noted over and over again that the Motion was verified and, if forced, he could simply read it into the record.

548.    Judge Hilton asked if Petitioner had witnesses, experts, etc.

549.    What is most telling is that Defendant Hilton asked Plaintiff to explain *why the*

*Defendant was a danger to the children*.

550.   Petitioner obliged but Judge Hilton, with a sleight of hand, had flipped the script.

551.   The only issue before the Court was whether Plaintiff should have been and should be further enjoined from exercising his normal 50/50 joint physical custody detailed in the Parenting Plan and that had existed prior to Plaintiff's relapse and before he started what was then ***11 months of proven sobriety***.

552.   Plaintiff acted cool and pretended not to know exactly what was going on.

553.   Instead, he noted that he would appeal a denial.

554.   Defendant Hilton then made the critical threat and promise that the Missouri Court of Appeals would protect him.

555.   Defendant Hilton was no longer hiding that he was a criminal.

556.   Defendant Hilton did not suggest that the law was on his side.

557.   Defendant Hilton suggested that enough judges on the Missouri Court of Appeals were in on the same RICO corruption that Plaintiff had no chance of success.

558.   As Plaintiff later noted to the Court of Appeals, he has no idea whether the statement was truthful or just a bluff.

559.   But, in any event he asked for the Court of Appeals to recuse and transfer his March 27, 2025, Petition for Writ to the Missouri Supreme Court for ruling.

560.   Backing up, waiting for Defendant Hilton to issue a ruling after the February 7, 2025, hearing on the Motion to Vacate.

561.   It soon became clear that none was coming.

562.   Defendant Hilton was burning time awaiting trial.

563.     There was a hearing set on February 28, 2025.

564.     Plaintiff has no interest is letting Defendant Hilton take a whack at him at that hearing.

565.     As such, Plaintiff prepared and filed a Motion for Change of Judge for Cause before Defendant Hilton on February 27, 2025.

566.     He cleaned it up and re-filed it on the morning of February 28, 2025.

567.     Despite the change of Judge filing, Defendant Hilton nonetheless proceeded and entered Ordered adverse to Plaintiff.

568.     Then, the most shocking and momentous thing happened, that Plaintiff would not learn about until more than 3 weeks later.

569.     Unbeknownst to Plaintiff, the Missouri Supreme Court was watching, and **it issued a *sua sponte* Order appointing a retired Democrat Circuit Judge as Senior Judge to Plaintiff's case:**

*(remainder of page left intentionally blank)*



570.    Not just any Senior Judge, a retired *Democrat* Circuit Judge with no conflict of interest or potential connection to the *Republican* RICO corruption that Plaintiff has exposed.

571.    It is momentous and monumental.

572.    What is more significant is that Defendant Hilton **hid that Order from Plaintiff for 23 days!**

573.    CO-CONSPIRATOR #8 later claimed responsibility for the once-in-a-lifetime *sua*

*sponte* Missouri Supreme Court Order's failure to appear on the docket.

574.    It was a "clerical error" CO-CONSPIRATOR #8 falsely stated.

575.    Note that CO-CONSPIRATOR #8 is the same individual that refused to accept Plaintiff's Motion for Change of Cause the week before this filing until the email copying, among others, Judge Russell was sent.

576.    Not knowing the Missouri Supreme Court's *sua sponte* Order *even existed* for those 3 weeks, and with no movement, Plaintiff prepared and filed the Petition for Writ with the Missouri Court of Appeals referenced above.

577.    Just 24 hours *after Plaintiff filed that Petition for Writ,* CO-CONSPIRATOR #8 published the Missouri Supreme Court Order on the case docket.

578.    Also, just 24 hours *after Plaintiff filed that Petition for Writ*, Defendant Fenley, Defendant Brodie, Defendant Copeland and Defendant Hilton colluded and entered an *ex parte* TRO *taking Plaintiff's children away* from him completely.

579.    The basis for the Motion for TRO was that Plaintiff had relapsed and was in a detox or rehab.

580.    Defendant Brodie and Defendant Copeland who both signed the Motion for TRO knew that was a lie as they received Plaintiff's 100% passing breathalyzer results on the days leading up to and on the day of the hearing on *ex parte* TRO:



581. Defendant Fenley had the same results and Defendant Hilton knew that Plaintiff was monitored at least 3 times a day.

582. Again, till this very day, Plaintiff has passed every single, 100% of the breathalyzer tests – *more than 1,600 of them* from *April 22, 2024, to present*.

583. The *ex parte* TRO was nothing more than retaliation for Plaintiff exposing the RICO enterprise and corruption in this case to the Missouri Court of Appeals.

584. As alleged above, this retaliation is at least Obstruction of Justice, Obstruction of Criminal Investigations and Retaliating Against a Witness, Victim, or Informant, both RICO predicates, in violation of 18 U.S. Code §§ 1503, 1510 and 1513.

585. Defendant Copeland had another illegal trick up her sleeves.

586. On April 3, 2025, again knowing that Plaintiff was 100% proven sober, and knowing he was out of the country, Defendant Copeland called in a wellness check to the Wentzville, Missouri Police Department.

587. Wentzville, Missouri is where Plaintiff's wife maintains her pre-marriage home with her 3 children.

588. Defendant Copeland also called and made a wellness check call to the Town & Country, Missouri police, the city where Plaintiff resides.

589. The calls were a setup and Plaintiff will present the recording of the Wentzville call at trial.

590. Plaintiff's wife just so happens to be involved in a contempt proceeding she filed *against her son's father,* FACT WITNESS #12 and likely future named CO-CONSPIRATOR, in St. Charles County.

591.    As yet another act of retaliation for Plaintiff's actions to bring down the RICO enterprise in this case, Defendant Copeland told FACT WITNESS #12 about the wellness call.

592.    And just like that, FACT WITNESS #12 and his lawyer CO-CONSPIRATOR #12, and good friend of Defendant Brodie, filed a Motion for TRO *against Plaintiff* in St. Charles County in a case in which Plaintiff is *not even a party*.

593.    The primary evidence supporting the Motion for TRO – which was denied:

> a.  To the best of Father's knowledge and belief, police have reported to Mother's home on multiple occasions as a result of Mr. Grant's behavior.
>
> b.  Police have been called repeatedly to perform welfare checks on Mr. Grant;

594.    Counsel for FACT WITNESS #9, who are CO-CONSPIRATORS #11 and #12, issued a subpoena to the Wentzville Police Department because they knew what evidence had been created for them to find, and the Police produced the very false and contrived Wellness Check documentation and recording that *at least* Defendant Copeland put into place.

595.    Upon information and belief, a review of the communications between Defendant Copeland and Defendant Brodie will prove that at least Defendant Brodie and CO-CONSPIRATOR #11 were involved in this illegal report and act in furtherance of the plan to protect the RICO enterprise and retaliate against Plaintiff for having the nerve to think he can stop the corruption that has been running like a well-oiled machine for years and years.

596.    As alleged above, Defendant Copeland perjured herself during the June 23-24, 2025, trial in the underlying matter when she *denied* she told FACT WITNESS #12 about the wellness check.

597.    Importantly, FACT WITNESS #12 was deposed on July 17, 2025, after the June trial, and that individual admitted that Defendant Copeland was the source of his knowledge about the wellness check:



598.    The TRO was denied by one judge in St. Charles County, Missouri and now CO-CONSPIRATOR #11 and his lawyer CO-CONSPIRATOR #12 are attempting to obtain a Preliminary Injunction against Plaintiff, a non-party, before a new judge obtained via a general reassignment of multiple cases.

599.    On May 21, 2025, in the underlying case, Plaintiff still was prohibited from *any* custody or visits with the minor children as a result of the March 27, 2025, *ex parte* TRO that ultimately transitioned into a Preliminary Injunction.

600.    On May 21, 2025, Plaintiff, while in Defendant Hilton's courtroom, made an oral Motion to Dissolve the Preliminary Injunction.

601.    On May 26, 2025, Plaintiff filed a written memorialization and supplementation to that oral Motion.

602.    In the Motion to Dissolve the Preliminary Injunction, Plaintiff proved that the regardless of the criminal nature and retaliatory intent behind the Preliminary Injunction it could not continue.

603.    Plaintiff produced proof of his ongoing 100% passing breathalyzer tests and even 2 passing hair follicle tests, one of which was court ordered, to disprove any out of left field claim of drug use.

604.    Notably, Defendant Hilton denied Defendant Fenley's January 2025 Motion for a Drug Test.

605.    Defendant Hilton denied that Motion for Drug Test because he knew it would be negative but more importantly, Plaintiff volunteered to take it but asked that Defendant Copeland be ordered to take one as well.

606.    Defendant Copeland is a known abuser of at least Xanax and alcohol, mixed together.

607.    Defendant Hilton allowed Plaintiff to set his Motion to Vacate the Preliminary Injunction for hearing on the next date selected for another hearing in the case, and when Plaintiff appeared to argue his motion on the date given by the Court, Defendant Hilton refused to hear it now claiming that it required a "testimonial hearing" which was a knowingly false statement made in furtherance of the common goal of Defendant Hilton and the RICO enterprise.

608.    Intentional and unwarranted delay is a reoccurring pattern used by the RICO

enterprise and its members.

609.     The refusal of Defendant Hilton to hear Plaintiff's Motion to Dissolve the

Preliminary Injunction was more retaliation for Plaintiff's exposure of the corruption in

the underlying case.

610.     When Defendant Hilton finally allowed the testimonial hearing to go forward, he

actually claimed that he *could not interpret* the drug test results that he had ordered and

that an expert witness was needed.

611.     Defendant Hilton actually made that ruling from the bench.

612.     The Presiding Judge of the 21st Circuit Court of the State of Missouri held that he

could not interpret the drug test results that he ordered!

613.     Here they are so this Court can see how they are written in some alien language or

chemistry lingo that no judge could understand:



614. Plaintiff explained to Defendant Hilton that if expert testimony is needed for the use of drug tests, there would be a parade of drug using parents headed to the St. Louis Family Court now with a basis to demand their children back since the Court had no expert to interpret their failing drug tests.

615. Plaintiff even offered to *recruit an incoming third grader* to interpret the test results for him.

616. Plaintiff is long past pretending Defendant Hilton, like Defendant Greaves, is anything other than a criminal in a black robe.

617. The acts alleged above, are just more actions of Defendant Hilton in furtherance of

the RICO enterprise using the same pattern of retaliation and they constitute violations of a litany of RICO predicates.

618.     On June 2, 2025, Defendant Fenley attempted to extort Plaintiff through coercion in a telephone call and offered to trade Plaintiff custody of his children in exchange for Plaintiff disavowing his claim of corruption and criminal activity.

619.     Plaintiff recorded the ~26 minute conversation and it is shocking to hear.

620.     Plaintiff will introduce the recording into evidence at trial.

621.     Defendant Fenley's actions are at least attempted extortion by coercion, a RICO predicate under 18 U.S.C. § 1951, and also a violation of various Missouri criminal statutes.

622.     As this Court knows, the RICO Defendants' violations of Missouri criminal statutes carrying a punishment of more than 1 year are also each RICO predicates.

623.     For the sake of brevity, Plaintiff will not cite and reference each relevant Missouri state criminal statute that the RICO Defendants violated.

624.     After the June 2, 2025, date of Defendant Fenley's telephone attempted extortion by coercion, that Plaintiff rejected, Defendant Hilton did finally rule on the Motion to Vacate and Dissolve the Preliminary Injunction.

625.     On June 16, 2025, Defendant Hilton punished Plaintiff for not accepting the extortion offer and he "Granted" Plaintiff's motion but only only awarded Plaintiff 1 overnight per week.

626.     Defendant Hilton took away the Wednesday and every other Sunday visits and they are now gone forever as punishment.

627.    Defendant Hilton did even go back to the very schedule in place immediately before the *ex parte* TRO that led to the Preliminary Injunction.

628.    It is shameful.

629.    Defendant Hilton did not just punish Plaintiff, he punished Plaintiff's children who want to see their father 50% of the time.

630.    It is part of the ongoing corruption.

631.    It is unconstitutional and it is a denial of Due Process.

632.    Before trial began on June 23, 2025, Plaintiff moved for Defendant to Recuse.

633.    Of course he did not.

634.    Defendant Hilton's plan and effort to continue to protect the RICO enterprise and his fellow members did not allow turning back.

635.    During trial, Plaintiff was cross-examined and asked to apologize to Defendant Hilton, Defendant Fenley and everyone else in the Courtroom.

636.    Defendant Hilton's actions were a blatant violation of Plaintiff and his children's Due Process Rights.

637.    Plaintiff was faced with the choice to stand firm on the truth and know that the trial judge would take his children and hammer him on child support, or recant and disavow his criminal allegations.

638.    Plaintiff held firm and stated once again that every single statement and allegation is true.

639.    During trial, Defendant Copeland engaged in perjury on several occasions in an effort to create a false trial record that support Defendant Hilton's final judgment when

4921-3441-1030, v. 1

challenged on appeal.

640.    Defendant Copeland falsely testified Plaintiff refused to provide child support checks to her unless she provided sexual services.

641.    Defendant Copeland testified that she told that false story and statement (published) to 2 third parties.

642.    On June 26, 2025, after trial, and knowing the final and harshest of punishments was headed his way, Plaintiff published the following on Facebook:

643.    On June 29, 2025, Defendant Fenley sent the following email:



644.    On July 11, 2025, Defendant Fenley was able to retaliate for the Facebook post and he did his final part in the RICO enterprise's plan, he filed a recommendation that Plaintiff *only have his children 2 overnights a month* and *2 visits on the other two weeks*.

645.    Defendant Fenley recommended a judgment and custody *harsher* than the one in existence on the first day of trial.

646.    Defendant Fenley is recommending sole physical custody with minor visits to the

parent that sacrificed her children's best interests for money.

647.    Defendant Fenley is recommending sole legal custody to the mother who didn't

know her children's dentist's last name and who tried to divert her child to vocational

technical school so that she didn't have to worry about the bigger expense of college.

648.    Plaintiff will present as evidence in this matter this recording that Plaintiff made of

Defendant Copeland's July 3, 2025, phone call berating minor child C.L.G. for inquiring

about his hailed out and defective car that Defendant Copeland just bought a few weeks

prior:

---

**Minor Child CLG:**

Dad was saying is that, okay, so what ▇▇▇ sons chase, he had something he had something similar, and they had they just totaled his totaled his they just decided to total his car because hit his car, like the hail damage was going to cost more to the fix than what his car was actually worth. So they just they told his car and just gave him a check. And so what Dad[sic] was saying is that it might be smart to take it in for an estimate at one of the one of the body shops was like, like recommended and then get an estimate if it would like get an estimate about the hail damage before we pay the sales tax because what he was saying is that we don't want to pay the sales tax, and then then total, like totaled my car and then I have to pay a sales tax again on a different car.

**Respondent Rebecca A. Copeland:**

First of all, I told your dad to **STAY THE FUCK OUT** of the car. Okay, but please. I don't. I don't like you guys having this conversation because I don't know what he's trying to do. So they total your car and then what, ▇▇▇, you still your house $10,000 Well, it's not like they don't get my money back. They would write me a check. I's gonna give you The insurance, right? The insurance company give you your money back. They' give you $10,000 back. They're gonna total your car and give you what they think it's worth, what I promise you. be $10,000. Well, yeah. All right, well, I'm just like, either way, because your dad wants to take you to go get on the damage, he wants to pay for it, then you do that you don't do anything. You don't do anything. I don't. This is ridiculous. He needs to stay out of this. put no money towards the car. This is none of his business. Okay, I mean, he was literally just trying to give me some advice. I didn't even do anything. All I did was call our insurance companies., your advice, okay? So his advice is to get damage. See if they your car and give you a check and then what? I mean, I don't really know. Yeah, there to plan after that. Yeah, I don't need it to see when that comes. I mean, I mean, I really don't see the problem in going just doing getting it out of the way. Of course you don't. Your dad wants to take you to go on the

---

4921-3441-1030, v. 1

damage, then go get a **FUCKING ESTIMATE** on the damage. And if your dad
wants to pay for it, then your dad can pay for it. And then if you only get a few
thousand dollars or whatever for your car for being totaled or whatever it's going
to do, so they total your car out ▊ that goes toage. I mean, you can still drive
your car. But if you're not gonna be able to get insurance on the car, then what are
you gonna do? drive a car without insurance? They're gonna total your car, and
you're not gonna guil ticket insurances and they'll never be able to sell it. If that's
what if that's what your dad is saying. It makes. That's not what he was saying. He
was saying it's a possibility. Cause either way, either way, it has to happen at
some point. It does make more sense to do it before. I'd have to pay the sales tax.
happen at some point. I've held image all over my car.

You know what, ▊ You know what? I'm gonna take that car and I'm gonna
**FUCKING SELL IT** because I **FUCKING SICK** of being the one who did
everything for you, everything. And your dad, what? Since they're manipulating
you and gets to say whatever you want? No. So you know what? You're right.
We're not gonna pay sales tax on it. We're gonna **FUCKING SELL IT**. And your
dad wants to buy you a car, he can find you a car.

649.    That tirade of profanity is from the parent that Defendant Fenley claims to believe
should really have sole legal and physically custody.  Atrocious.

650.    On August 2, 2025, Plaintiff finally received a letter from the Missouri Commission
on Retirement, Removal and Discipline.

651.    That is the same Commission that rejected Plaintiff's May 30, 2025, official
complaint and supporting documentation for being too long.

652.    Time will tell but the letter from the Commission is nothing more than a CYA
maneuver as its allowance of this corruption to continue has now been exposed.

653.    There is a new Chief Judge of the Missouri Court of Appeals.

654.    Only time will tell, if it is ever revealed, the truthful reason that the Commission is
now finally investigating.

655.    As alleged above, Plaintiff filed a Motion for Change of Judge for Cause on August
5, 2025.

656.    It was only accepted for filing on August 8, 2025, because Plaintiff sent the email demanding as much and copying Missouri Supreme Court Judge Russell and the representative for the Commission on Retirement, Removal and Discipline.

657.    This Complaint has been in the works since April 2025, and now is the time to act.

658.    Defendant Hilton will still not recuse as he can't, that would expedite the final outcome.

659.    This Complaint is already long enough, and Plaintiff could fill another 50 pages with allegations and evidence of the RICO violations and the violations of Due Process but this will have to be enough for now.

660.    Plaintiff submits this Complaint, including its Class Action request to this Court to seek the assistance from this Court that the United States Attorney, Department of Justice, the Federal Bureau of Investigation and State of Missouri refuse to provide.

661.    This Complaint is needed and it is urgent to protect not only the minor children in the underlying case, but it is also *required* to protect the other minor children currently being victimized in the St. Louis Family Court and those that will follow.

662.    Justice.  Plaintiff seeks justice from this Court.

## COUNT I

### CIVIL RICO VIOLATIONS
### (18 U.S.C. § 1964(c) et. seq.)

*(Defendants:  Bruce Hilton, Mary Greaves, John Fenley, RHF, Maia Brodie, Staci Thomas, Sarah Grant, Lawrence Gillespie, GHC and the State of Missouri)*

663.    Plaintiff and Co-Plaintiff C.L.G. and C.M.G., and Co-Plaintiff Stop Missouri Corruption, LLC, reallege and incorporate by reference all of the allegations of the

Preliminary Statement and the preceding paragraphs of this Complaint as if set forth fully herein.

664.     As alleged in more detail herein, all RICO Defendants named in this Complaint have engaged in racketeering and conspiracy and membership in or association with a long-standing criminal enterprise within the St. Louis Family Court.

665.     The RICO Defendants and the RICO enterprise are separate, and the enterprise exists in the St. Louis County Family Court.

666.     The RICO Defendants and the RICO enterprise use a pattern of racketeering activity as alleged in this Complaint.

667.     The RICO predicates are alleged herein and include:

     a.    Aiding and Abetting

- 18 U.S.C. § 2

     b.    Accessory After the Fact

- 18 U.S.C. § 3

     c.    Wire Fraud

- 18 U.S.C. § 1343

     d.    Honest Services Fraud

- 18 U.S.C. § 1346

     e.    Attempt and Conspiracy

- 18 U.S.C. § 1349

     f.    Obstruction of Justice

- 18 U.S.C. § 1503

g.     Obstruction of Criminal Investigations

-     18 U.S. Code § 1510

h.     Tampering with a Witness, Victim, or Informant Influencing or threatening a witness, victim, or informant to alter their testimony.

-     18 U.S.C. § 1512(b)

i.     Retaliating Against a Witness, Victim, or Informant

-     18 U.S.C. § 1513

j.     Violations of a litany of Missouri state criminal statutes that carry sentences of 1 year of incarceration or longer, such as:

668.     The RICO Defendants, the RICO enterprise, and the pattern are all connected as alleged in this Complaint.

669.     Plaintiff and the putative class and subclass members have been financially harmed through the fraudulent theft of their money in the form of excessive attorneys' fees, therapist fees, coerced settlements and other strategies as alleged in this Complaint.

670.     The putative class, including specifically Plaintiff, have been specifically harmed as the RICO enterprise and racketeering has significantly impacted their and Plaintiff's ability to work.  For Plaintiff that equates to his lack of ability to practice law in the manner he would like, past, present and future.

671.     Plaintiff, on behalf of himself and the Class and Subclasses, seeks an award of compensatory damages against all RICO Defendants, except for the State of Missouri.

672.     Plaintiff, on behalf of himself and the Class and Subclasses, seeks an award of treble damages as provided for in 18 U.S.C. § 1964(c).

673.     Plaintiff on behalf of himself and the Class and Subclasses seeks an award of attorneys' fees.  Here, Plaintiff requests that his attorneys' fees be calculated at his average

hourly rate collected 2024 for all of time Plaintiff has spent and will spend on this matter and any attorneys' fees he may incur in the future.

WHEREFORE, Plaintiff and as *Next Friend* for C.L.G. and C.M.G. requests, on behalf of themselves and the Class and Subclasses, that this Court enter a judgment in his favor and against RICO Defendants, jointly and severally, for compensatory damages, treble damages, pre-judgment interest, and the award of attorneys' fees and costs that have been and will be incurred in this matter, and for such other and further relief that this Court deems just and appropriate.

<u>**COUNT II**</u>

**CIVIL RIGHTS ACT**
**(18 U.S.C. § 1983 et. seq.)**

*(Defendants Bruce Hilton, Mary Greaves, John Fenley, and the State of Missouri)*

674.    Plaintiff and Co-Plaintiffs C.L.G. and C.M.G., and Co-Plaintiff Stop Missouri Corruption, LLC, reallege and incorporate by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

675.    Plaintiff asserts this cause of action against Defendants Bruce Hilton, Mary Greaves, John Fenley, and the State of Missouri ("Civil Rights Defendants").

676.    As detailed herein, the Civil Rights Defendants each acted under the color of law as part of their involvement in and/or allowance of the RICO criminal enterprise and its included violation of Civil Rights.

677.    The Civil Rights Defendants, jointly and severally, violated Plaintiff and Co-Plaintiffs C.M. G. and C.L.G.'s Due Process and other rights, including a their Freedom of Speech, and the Due Process and other rights of the Class and Subclass, as alleged in this Complaint.

4921-3441-1030, v. 1

678.     Defendant Hilton and Defendant Greaves' actions were taken outside the scope of their roles and are outside any judicial immunity.

679.     Defendant Fenley's actions were taken outside the scope of his role as a Guardian Ad Litem and are outside any qualified immunity.

680.     Additionally, Defendant Hilton, Defendant Greaves and the State of Missouri have violated Plaintiff's and Co-Plaintiff's C.L.G. and C.M.G.'s Freedom Of Speech as guaranteed by the 1st Amendment of the Constitution of the United States.

681.     As detailed herein, the Civil Rights Defendants have violated Plaintiff and Co-Plaintiffs C.M. G. and C.L.G.'s rights, and the rights of the Class and Subclass, to Due Process, both procedurally and substantively, as guaranteed by the 14th Amendment of the Constitution of the United States.

682.     Plaintiff, Co-Plaintiffs, the Class and Subclass, were deprived of the Civil Rights alleged herein.

683.     Plaintiff, on behalf of himself and the Class and Subclasses, seeks an award of compensatory damages against all RICO Defendants, except for the State of Missouri.

684.     Plaintiff, on behalf of himself and the Class and Subclasses, seeks an award of treble damages as provided for in 18 U.S.C. § 1988(b).

685.     Plaintiff and Co-Plaintiffs C.L.G. and C.M.G., on behalf of themselves and the Class and Subclasses seeks an award of attorneys' fees.  Here, Plaintiff requests that his attorneys' fees be calculated at his average hourly rate collected 2024 for all time Plaintiff has spent and will spend on this matter and any attorneys' fees he may incur in the future.

686.     Plaintiff and Co-Plaintiffs C.L.G. and C.M.G., and Co-Plaintiff Stop Missouri Corruption LLC, seek mandatory and prohibitory injunctive relief.

4921-3441-1030, v. 1

WHEREFORE, Plaintiff and as *Next Friend* for Co-Plaintiff C.L.G. and C.M.G., and Co-Plaintiff Stop Missouri Corruption, LLC, on behalf of themselves and the Class and Subclasses, that this Court enter a judgment in his favor and against the Civil Rights Defendants, jointly and severally, for compensatory damages, punitive damages, pre-judgment interest, and the award of attorneys' fees and costs that have been and will be incurred in this matter, and for such other and further relief that this Court deems just and appropriate.

## COUNT III

### FRAUD – INTENTIONAL MISREPRESENTATION

*(Defendants: Maia Brodie, Rebecca Copeland, Staci Thomas, Sarah Grant, Lawrence Gillespie and GHC)*

687.     Plaintiff and Co-Plaintiffs C.L.G. and C.M.G. reallege and incorporate by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

688.     These Defendants named in this Court, or others with which they acted in concert and for which they are responsible for their actions, made false material statements of fact.

689.     These Defendants made these knowingly false statements with the intent that Plaintiff, and Co-Plaintiff's, would be deceived.

690.     As a result of these Defendants' fraudulent conduct, false material statements of fact Plaintiff and Co-Plaintiff haves been damaged in an amount to be proven at trial.

691.     Because these actions were the result of gross negligence and/or were willful and wanton conduct, these Defendants are liable to Plaintiff and Co-Plaintiffs C.L.G. and C.M.G., for punitive and exemplary damages and their attorneys' fees and costs that have been and will be incurred in this matter.

692.     Plaintiff seeks mandatory and prohibitory injunctive relief.

4921-3441-1030, v. 1

WHEREFORE, Plaintiff, individually and as *Next Friend* for Co-Plaintiff's C.L.G and C.M.G. requests that this Court enter a judgment in their its favor and against these Defendants listed in this Count, finding the liable for fraudulent misrepresentation of material fact and granting Plaintiff and Co-Plaintiffs the remedies of compensatory damages, punitive damages, pre-judgment interest, and their attorneys' fees and costs that have been and will be incurred in this matter, and for such other and further relief that this Court deems just and appropriate.

## COUNT IV

### FRAUD – INTENTIONAL OMISSION OF MATERIAL FACT

*(Defendants Maia Brodie, Rebecca Copeland, Staci Thomas and Sarah Grant)*

693.     Plaintiff and Co-Plaintiffs C.L.G. and C.M.G. realleges and incorporates by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

694.     These Defendants named in this Court or others with which they acted in concert and for which they are responsible for their actions, omitted material statements of fact.

695.     These Defendants made these omissions of material fact with the intent that Plaintiff, and Co-Plaintiffs, would be deceived.

696.     As a result of these Defendants' fraudulent conduct and omission of statements of material fact, Plaintiff and Co-Plaintiffs have been damaged in an amount to be proven at trial.

697.     Because these actions were the result of gross negligence and/or were willful and wanton conduct, these Defendants are liable to Plaintiff and Co-Plaintiffs C.L.G. and C.M.G., for punitive and exemplary damages and their attorneys' fees and costs that have been and will be incurred in this matter.

4921-3441-1030, v. 1

698.        Plaintiff seeks mandatory and prohibitory injunctive relief.

WHEREFORE, Plaintiff, individually and as *Next Friend* for Co-Plaintiff's C.L.G and C.M.G. requests that this Court enter a judgment in their its favor and against these Defendants listed in this Count, finding the liable for fraudulent omission of material fact and granting Plaintiff and Co-Plaintiffs the remedies of compensatory damages, punitive damages, pre-judgment interest, and their attorneys' fees and costs that have been and will be incurred in this matter, and for such other and further relief that this Court deems just and appropriate.

## COUNT V

## TRESPASS

*(Defendants: Rebecca Copeland, Staci Thomas and Sarah Grant)*

699.        Plaintiff realleges and incorporates by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

700.        Defendants made unauthorized entry into Plaintiff's real property and home.

701.        Plaintiff had the legal right to possess the real property and Plaintiff's home thereupon.

702.        Defendants had intent to enter Plaintiff's real property and home without authorization.

703.        Defendants had intent to commit harm, including burglary and invasion of privacy, and gathering evidence for future litigation.

704.        Plaintiff was harmed by Defendants' trespass in his home.

705.        Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

Because these actions were the result of gross negligence and/or were willful and wanton conduct, these Defendants are liable to Plaintiff for punitive and exemplary damages and his attorneys' fees and costs that have been and will be incurred in this matter.

WHEREFORE, Plaintiff requests that this Court enter a judgment in their its favor and against these Defendants listed in this Count, finding the liable for trespass and granting Plaintiff the remedies of compensatory damages, punitive damages, pre-judgment interest, and his attorneys' fees and costs that have been and will be incurred in this matter, and for such other and further relief that this Court deems just and appropriate.

## COUNT VI

## INVASION OF PRIVACY

*(Defendants Maia Brodie, Sarah Grant, Staci Thomas and Rebecca Copeland)*

706.     Plaintiff realleges and incorporates by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

707.     Through their unauthorized and intentional intrusion into Plaintiff's home, iPhone, tablet and laptop, and making surreptitious recordings of Plaintiff in his bedroom, Defendants Maia Brodie, Rebecca Copeland, Staci Thomas and Sarah Grant, in a manner offensive to a reasonable person, Defendants caused financial and other harm, including emotional distress to Plaintiff.

708.     Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

709.     Because these actions were the result of gross negligence and/or were willful and wanton conduct, these Defendants are liable to Plaintiff for punitive and exemplary

damages and his attorneys' fees and costs that have been and will be incurred in this matter.

WHEREFORE, Plaintiff requests that this Court enter a judgment in his favor and against these Defendants listed in this Count, finding the liable for invasion of privacy and granting Plaintiff the remedies of compensatory damages, punitive damages, pre-judgment interest, and his attorneys' fees and costs that have been and will be incurred in this matter, and for such other and further relief that this Court deems just and appropriate.

<u>**COUNT VII**</u>

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

*(Defendants Maia Brodie, Sarah Grant, Staci Thomas and Rebecca Copeland)*

710.    Plaintiff realleges and incorporates by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

711.    As alleged in this Complaint, these Defendants have acted with intent, reckless disregard, extreme and outrageous conduct.

712.    Defendants' actions have caused severe emotional distress to Plaintiff.

713.    Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

714.    Because these actions were the result of gross negligence and/or were willful and wanton conduct, these Defendants are liable to Plaintiff for punitive and exemplary damages and his attorneys' fees and costs that have been and will be incurred in this matter.

WHEREFORE, Plaintiff requests that this Court enter a judgment in his favor and against these Defendants listed in this Count, finding the liable for intentional infliction of emotional

distress and granting Plaintiff the remedies of compensatory damages, punitive damages, pre-judgment interest, and his attorneys' fees and costs that have been and will be incurred in this matter, and for such other and further relief that this Court deems just and appropriate.

## COUNT VIII

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

*(Defendants Maia Brodie, Sarah Grant, Staci Thomas and Rebecca Copeland)*

715.    Plaintiff realleges and incorporates by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

716.    As alleged in this Complaint, these Defendants knew of the risk of foreseeable emotional distress to Plaintiff if they proceeded with their actions.

717.    Plaintiff's factual situation involving his children placed him in zone of danger.

718.    Despite this knowledge, these Defendants proceeded in their actions in a manner that did cause severe emotional distress to Plaintiff.

719.    Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

720.    Because these actions were the result of gross negligence and/or were willful and wanton conduct, these Defendants are liable to Plaintiff for punitive and exemplary damages and his attorneys' fees and costs that have been and will be incurred in this matter.

WHEREFORE, Plaintiff requests that this Court enter a judgment in his favor and against these Defendants listed in this Count, finding the liable for intentional infliction of emotional distress and granting Plaintiff the remedies of compensatory damages, punitive damages, pre-

judgment interest, and his attorneys' fees and costs that have been and will be incurred in this matter, and for such other and further relief that this Court deems just and appropriate.

## COUNT IX

### DEFAMATION *PER SE*
*(Defendant Rebecca Copeland)*

721.    Plaintiff realleges and incorporates by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

722.    Defendant Copeland made at least one false statement of fact regarding Plaintiff.

723.    The false statement of fact was that Plaintiff coerced and refused to provide child support checks to Defendant Copeland unless she provided sexual favor(s).

724.    The false statement is so outrageous and offensive that it is *per se* defamatory.

725.    Defendant published her false statement of fact to at least 2 third parties.

726.    Defendant Copeland knew the statement to be false when she made it and her actions are beyond negligent, they are intentional and willful.

727.    Defendant Copeland's false statement has caused damage to Plaintiff, including but not limited to emotional distress.

728.    Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

729.    Because Defendant Copeland's actions were the result of gross negligence and/or were willful and wanton conduct, Defendant Copeland is liable to Plaintiff for punitive and exemplary damages and his attorneys' fees and costs that have been and will be incurred in this matter.

WHEREFORE, Plaintiff requests that this Court enter a judgment in his favor and against Defendant Staci Thomas finding her liable for tortious interference with contract and granting him the remedies of compensatory damages, punitive damages, pre-judgment interest, and his attorneys' fees and costs that have been and will be incurred in this matter, and for such other and further relief that this Court deems just and appropriate.

## COUNT X

### DEFAMATION
*(Defendant Rebecca Copeland)*

730.  Plaintiff realleges and incorporates by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

731.  Defendant Copeland made at least one false statement of fact regarding Plaintiff.

732.  The false statement of fact was that Plaintiff coerced and refused to provide child support checks to Defendant Copeland unless she provided sexual favor(s).

733.  The false statement is so outrageous and offensive that it is objectively damaging and defamatory.

734.  Defendant published her false statement of fact to at least 2 third parties.

735.  Defendant Copeland knew the statement to be false when she made it and her actions at least negligent.

736.  Defendant Copeland's false statement has caused damage to Plaintiff, including but not limited to emotional distress.

737.  Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

4921-3441-1030, v. 1

## COUNT X

### ALLIENATION OF PARENT/CHILD AFFECTION
*(Defendants Maia Brodie, Rebecca Copeland, Staci Thomas, and Sarah Grant)*

738.    Plaintiff and Co-Plaintiffs C.L.G. and C.M.G. reallege and incorporate by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

739.    Defendants engaged in a pattern of wrongful conduct.

740.    Plaintiff lost the affections or consortium of his children.

741.    Co-Plaintiff C.L.G and C.M.G. lost the affections and consortium of their father.

742.    The Defendants' conduct as alleged herein caused Plaintiff and Co-Plaintiff's C.L.G. and C.M.G.'s losses.

743.    Plaintiff and Co-Plaintiffs C.L.G and C.M.G. are entitled to compensatory damages in an amount to be proven at trial.

744.    Because these actions were the result of gross negligence and/or were willful and wanton conduct, these Defendants are liable to Plaintiff and Co-Plaintiffs C.L.G. and C.M.G. for punitive and exemplary damages and his attorneys' fees and costs that have been and will be incurred in this matter.

WHEREFORE, Plaintiff and Co-Plaintiffs C.L.G. and C.M.G. requests that this Court enter a judgment in their favor and against these Defendants finding them liable for alienation of Parent/Child Affection and granting them the remedies of compensatory damages, punitive damages, pre-judgment interest, and his attorneys' fees and costs that have been and will be incurred in this matter, and for such other and further relief that this Court deems just and appropriate.

## COUNT XII

### TORITIOUS INTERFERENCE WITH CONTRACT
*(Defendant Staci Thomas)*

745.     Plaintiff and Co-Plaintiffs C.L.G. and C.M.G. reallege and incorporate by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

746.     Plaintiff and Co-Plaintiff's C.L.G. and C.M.G. had a contract for domestic partner and dependent health insurance coverage.

747.     Defendant Staci Thomas knew of that insurance coverage.

748.     Defendant Staci Thomas intentionally and improperly interfered with that contract.

749.     As a result of Defendant Staci Thomas' actions, the contract was breached.

750.     Defendant Thomas' conduct as alleged herein caused Plaintiff harm and damage.

751.     Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

752.     Because Defendant Thomas' actions were the result of gross negligence and/or were willful and wanton conduct, Defendant Thomas is liable to Plaintiff for punitive and exemplary damages and his attorneys' fees and costs that have been and will be incurred in this matter.

WHEREFORE, Plaintiff requests that this Court enter a judgment in his favor and against Defendant Staci Thomas finding her liable for tortious interference with contract and granting him the remedies of compensatory damages, punitive damages, pre-judgment interest, and his attorneys' fees and costs that have been and will be incurred in this matter, and for such other and further relief that this Court deems just and appropriate.

## COUNT XIII

**CONVERSION**
*(Defendant S. Grant)*

753.    Plaintiff realleges and incorporates by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

754.    Plaintiff owned and extensive wine collection.

755.    The wine collection included vertical vintages of Opus One and Silver Oak.

756.    Defendant Sarah Grant trespassed in Plaintiff's home and removed the wine collection without permission or authority.  This included the removal of 2 completely full wine refrigerators.

757.    Defendant Sarah Grant further removed the extensive wine collection that Plaintiff stored in his basement.

758.    Defendant Sarah Grant thereby exercised dominion and control of Plaintiff's property that interfered with Plaintiff's right to sell his wine collection and wine refrigerators, or otherwise put them to whatever purpose he would like.

759.    Plaintiff first learned that his cause of action accrued during her June 20, 2025 deposition wherein she was asked under oath where Plaintiff's property was located.

760.    Despite being under oath and no valid objection being made, Defendant Sarah Grant refused to answer the question.

761.    Plaintiff now knows that Defendant Sarah Grant consider his property hers.

762.    Plaintiff has been damaged by Defendant's taking of his property as alleged herein.

763.    Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

4921-3441-1030, v. 1

764.    Because Defendant Sarah Grant's actions were the result of gross negligence and/or were willful and wanton conduct, Defendant Sarah Grant is liable to Plaintiff for punitive and exemplary damages and his attorneys' fees and costs that have been and will be incurred in this matter.

WHEREFORE, Plaintiff requests that this Court enter a judgment in his favor and against Defendant Sarah Grant finding her liable for conversion and granting him the remedies of compensatory damages, punitive damages, pre-judgment interest, and his attorneys' fees and costs that have been and will be incurred in this matter, and for such other and further relief that this Court deems just and appropriate.

## COUNT XIV

### NEGLIGENCE - PROFESSIONAL MALPRACTICE
*(Individual and Class)*

*(Defendants Growe Eisen Firm, Mat G. Eilerts,*
*Coulter Law Group, and Con Curran Coulter)*

765.    Plaintiff, individually and on behalf of the Class and Subclasses, realleges and incorporates by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

766.    Plaintiff retained Defendant Growe Eisen Firm, Mat G. Eilerts, Coulter Law Group to provide specialized legal advice for the underlying family law matter, and they, therefore had lawyer-client relationships.

767.    Defendant Growe Eisen Firm is vicariously liable for the malpractice and negligence of Defendant Mat G. Eilerts.

768.    Defendant Coulter Law Group is vicariously liable for the malpractice and negligence of Defendant C. Curran Coulter.

769.     As alleged in this Complaint, Defendant Growe Eisen Firm, Mat G. Eilerts, Coulter Law Group breached their duty of care owed to Plaintiff.

770.     Plaintiff has suffered damages as a result of these Defendants' breaches of duty of care.

771.     Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

WHEREFORE, Plaintiff requests that this Court enter a judgment in his favor and against Defendant Growe Eisen Firm, Defendant Mat G. Eilerts, Defendant Coulter Law Group, and Defendant Con Curran Coulter, joint and severally liable negligence and granting him the remedies of compensatory damages, pre-judgment interest, and his attorneys' fees and costs that have been and will be incurred in this matter, and for such other and further relief that this Court deems just and appropriate.

## COUNT XV

### UNJUST ENRICHMENT
*(Individual(s) and Class)*

*(Defendants: Maia Brodie, Rebecca Copeland, Staci Thomas, Sarah Grant, Lawrence Gillespie, GHC, Growe Eisen Firm, Mat G. Eilerts, Coulter Law Group, and Con Curran Coulter)*

772.     Plaintiff, individually, as *Next Friend* for Co-Plaintiffs C.L.G. and C.M.G., and on behalf of the Class and Subclasses, realleges and incorporates by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

773.     As alleged in this Complaint, Plaintiff and Co-Plaintiff C.L.G. and C.M.G. conferred and each of these Defendants otherwise received a benefit as a result of the underlying matter.

4921-3441-1030, v. 1

774.     The benefits that Defendants received were at Plaintiff and Co-Plaintiff C.L.G. and C.M.G.'s expense.

775.     It would be unjust and inequitable to allow these Defendants to retain any benefits they received.

## REQUEST FOR INJUNCTIVE RELIEF

776.     Plaintiff, individually, as *Next Friend* for Co-Plaintiffs C.L.G. and C.M.G., and on behalf of the Class and Subclasses, and Co-Plaintiff Stop Missouri Corruption, LLC reallege and incorporate by reference all of the allegations in the Preliminary Statement, and all of the preceding paragraphs of this Complaint as if set forth fully herein.

777.     This Complaint presents a situation to this federal court unlike any situation before.

778.     This Court must step in and enforce the United States Constitution's guarantees of Due Process and Freedom of Speech.

779.     As alleged here, this Complaint presents allegations of criminal conduct.

780.     Plaintiff has only included but a taste of the evidence he possesses.

781.     This case does present any issues that will be resolved on appeal at the state court level.

782.     To the extent this Court believes a discrete issue will require abstention, Plaintiff expressly waives and retracts it.

783.     This case does not present any issues that any criminal authorities intend to pursue.

784.     This case involves judicial and political corruption from bottom to top.

785.     The evidence to date indicates this corruption is limited to a corrupt arm of the *Missouri* Republican Party.

4921-3441-1030, v. 1

786.     By no means are all Republican judicial and other appointees alleged to be involved.

787.     Plaintiff presents this Court with both the Cancer and the Scalpel.

788.     The Cancer, while pervasive, is limited to the St. Louis Family Court, and it can be removed.

789.     It is time to remove this Cancer and let the scar that will be left behind begin to heal.

790.     It is time to protect the Children of St. Louis County, Missouri.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Matthew R. Grant, as Next Friend for C.L.G., on behalf of the Class and Subclass, and Co-Plaintiff Stop Missouri Corruption, LLC, respectfully request that the Court enter judgment in their favor, and against Defendants, granting the following relief:

A.   Entry of a judgment (Count I - Civil RICO) against the named Defendants, jointly and severally, and in the favor of Plaintiff(s) and awarding Plaintiff(s) compensatory damages, and treble damages;

   a.   There is no request for an award of damages from the State of Missouri;

B.   Entry of a judgment (Count II - Civil Rights Act) against the named Defendants, jointly and severally, and in the favor of Plaintiff(s) and awarding Plaintiff(s) compensatory damages, and treble damages;

   a.   There is no request for an award of damages from the State of Missouri;

C.   Entry of a judgment (Count III – Fraudulent Misrepresentation of Material Fact) against the named Defendants, jointly and severally, and in favor of Plaintiff(s) and and awarding Plaintiff(s) compensatory damages, and treble damages;

D.   Entry of a judgment (Count IV – Fraudulent Omission of Material Fact) against the named Defendants, jointly and severally, and in favor of Plaintiff(s) and and awarding Plaintiff(s) compensatory damages, and treble damages;

E. Entry of a judgment (Count V - Trespass) against the named Defendants, jointly and severally, and in favor of Plaintiff(s) and awarding Plaintiff(s) compensatory damages, and treble damages;

F. Entry of a judgment (Count VI – Invasion of Privacy) against the named Defendants, jointly and severally, and in favor of Plaintiff(s) and awarding Plaintiff(s) compensatory damages, and treble damages;

G. Entry of a judgment (Count VII – Intentional Infliction of Emotional Distress) against the named Defendants, jointly and severally, and in favor of Plaintiff(s) and awarding Plaintiff(s) compensatory damages, and treble damages;

H. Entry of a judgment (Count VIII – Negligent Infliction of Emotional Distress) against the named Defendants, jointly and severally, and in favor of Plaintiff(s) and awarding Plaintiff(s) compensatory damages;

I. Entry of a judgment (Count IX – Defamation *Per Se*) against the named Defendant, \ and in favor of Plaintiff and awarding Plaintiff compensatory damages, and treble damages;

J. Entry of a judgment (Count X – Defamation) against the named Defendant, \ and in favor of Plaintiff and awarding Plaintiff compensatory damages, and treble damages;

K. Entry of a judgment (Count XI – Alienation of Parent/Child Affection) against the named Defendants, jointly and severally, and in favor of Plaintiff(s) and awarding Plaintiff(s) compensatory damages, and treble damages;

L. Entry of a judgment (Count XII – Tortious Interference with Contract) against the named Defendant and in favor of Plaintiff(s) and awarding Plaintiff(s) compensatory damages, and treble damages;

M. Entry of a judgment (Count XIII - Conversion) against the named Defendants, jointly and severally, and in favor of Plaintiff(s) and awarding Plaintiff(s) compensatory damages, and treble damages;

N. Entry of a judgment (Count XIV – Negligence – Professional Malpractice) against the named Defendants, jointly and severally, and in favor of Plaintiff(s) and awarding Plaintiff(s) compensatory damages;

O. Entry of a judgment (Count XV – Unjust Enrichment) against the named Defendants, jointly and severally, and in favor of Plaintiff(s) and awarding Plaintiff(s) compensatory damages;

4921-3441-1030, v. 1

P.  Entry of a Preliminary and Permanent Injunction prohibiting the continued violation of Plaintiff(s) United States Constitution, Missouri common law and other rights;

Q.  Entry of an award to Plaintiff and Co-Plaintiffs C.L.G. punitive and exemplary damages, where applicable;

R.  Entry of an award of Plaintiff's attorneys' fees;

S.  Entry of an award of Plaintiffs' costs;

T.  Entry of an award of pre-judgment interest; and

U.  Entry of an Order granting to Plaintiffs such further relief that the Court deems just and proper.

## PRAYER FOR CLASS RELIEF

WHEREFORE, Plaintiff Matthew R. Grant, individually and on behalf of all others similarly situated, requests that when Plaintiff moves for Class Certification, this Court certify the Comprehensive Class and Subclasses and provide a trial on the issues of liability.  In the event of a finding of liability, Plaintiff requests that this Court order damages-only trials for each class member.

Plaintiff Matthew R. Grant, individually and on behalf of all others similarly situated, requests that this Court grant such other relief as the Court deems just and proper.

Respectfully submitted,

_____/s/Matthew R. Grant___
Matthew R. Grant, #MO50312
GRANT FIRM LLC
701 Market Street, PMB 1709
St. Louis, MO 63131
T: (314) 255-7760
Email:  mattgrant.stl@gmail.com

4921-3441-1030, v. 1

**SERVE:**

Bruce Hilton
██████████████
Kirkwood, MO  63122

Mary W. Greaves
████████████
St. Louis, MO  63122

John Fenley
Reinker Hamiton Fenley LLC
2016 S Big Bend Blvd
Saint Louis, MO 63117

Reinker Hamiton Fenley LLC
Registered Agent: Randall J. Reinker
2016 S Big Bend Blvd
Saint Louis, MO 63117

State of Missouri
c/o Missouri Attorney General's Office
Andrew Bailey
207 W. High St.
P.O. Box 899
Jefferson City, MO 65102

Maia Brodie
9 Manderleigh Estate
St. Louis, MO  63131

Rebecca A. Copeland
914 Brookvale Terrace
Ballwin, MO 63021

Staci Thomas
1730 Mason Knoll Rd.
St. Louis, MO  63131

Sarah M. Grant
17051 Cambury Lane
Grover, MO  63040

Lawrence Gillespie
120 South Central Ave
Suite 650
Clayton, MO 63105

Gillespie Hetlage & Coughlin
Registered Agent:  Lawrence Gillespie
120 South Central Ave
Suite 650
Clayton, MO 63105

Mat G. Eilerts
120 S. Central
Suite 150
St. Louis, MO 63105

Growe Eisen Karlen Eilerts, LLC
Registered Agent:  Gary A. Growe
120 S. Central
Suite 150
St. Louis, MO 63105

Con Curran Coulter
14171 Parliament Dr.
Chesterfield, MO 63017

The Coulter Law Group LLC d/b/a
Coulter Goldberger LLC
Registered Agent:  Con Curran Coulter
130 S Bemiston Ave
Suite 400
St. Louis, MO 63105