IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS

TWENTY-FIRST JUDICIAL CIRCUIT

Division No. 13

The Honorable Richard Zerr, Presiding

In Re the Matter of:

```
MATTHEW R. GRANT,          )
                           )
         PETITIONER,       )
                           )
         vs.               )CAUSE NO. 12SL-DR03959-02
                           )
C.M.G., et al.,            )
                           )
         RESPONDENTS.      )
```

PETITIONER APPEARS PRO SE

ON BEHALF OF RESPONDENT COPELAND:
BRODIE LAW
MS. MAIA BRODIE
8909 Ladue Road
Clayton MO 63105


GUARDIAN AD LITEM:
JOHN FENLEY
ATTORNEY AT LAW
2016 S. Big Bend Blvd.
St. Louis MO 63117


MOTION HEARING

AUGUST 27,2025




Reported By:
Rhonda J. Laurentius, CCR, RPR
Official Court Reporter
Twenty-First Judicial Circuit

1            THE COURT:  We're on the record in

2    St. Louis County, Missouri on the matter of Matthew

3    Grant vs CMG, et al.  Cause Number is

4    1211SL-DRO3952-02 [sic].  This is Richard Zerr, I'm

5    a senior judge appearing today by order of the

6    Supreme Court.

7            What's before the Court today is review

8     by myself as a outside judge of a motion to

9     disqualify the assigned judge in this case, Judge

10    Hilton, for cause pursuant to statute.  And that's

11    what I will do today.  We are dealing with 509.09

12    I believe is the operative statute.

13            So, first of all, partywise, I know Ms.

14    Brody from the years when I was in family court.

15    I don't know if I know Mr. --

16            MR. FENLEY:  Fenley.

17            THE COURT:  -- Fenley.  I don't think I

18    know you.  And obviously, Mr. Grant, I don't know

19    you.

20            MR. GRANT:  Yes.

21            THE COURT:  So for your benefit, Mr.

22    Grant primarily, and Mr. Fenley also, I'm a senior

23    judge which means I retired a few years ago.  I

24    was a judge in St. Charles County.  I was on the

25    bench for 20 years in St. Charles County.  I know

1    that you're -- some of the folks on how people

2    become judges.  So I was elected in St. Charles

3    County.  And interestingly enough, I was elected

4    to a judgeship in two separate times.  For eight

5    years I was an associate circuit judge in St.

6    Charles.  At that point in time I was elected as a

7    Democratic candidate.  Later I was elected as a

8    circuit judge for 12 years.  At that point in time

9    I was elected as a Republican candidate.  So I

10   have been on both of the party lists in the past.

11   I am no longer affiliated with the parties these

12   days since I'm no longer in a political position.

13   I've not been appointed to anything by anybody in

14   the political arena.

15          During the time I was on the bench as a

16   circuit judge, for six years I was the

17   administrative judge of the family court, so I

18   tried family court cases exclusively for that

19   six-year period.  For the last six years I was

20   assigned to general civil/criminal trials.  I did

21   mostly jury trials in criminal cases during that

22   six-year period.

23          During the time that I was on the bench

24   I was not only doing the normal things that I do,

25   but I also was assigned from time to time to hear

1    cases on the Court of Appeals as a special judge.

2    And I was also assigned on one occasion to hear a

3    case on the Supreme Court as a special judge.

4            Since the time of my retirement I been

5    actively assigned by the Supreme Court all around

6    the State of Missouri hearing cases.  I am

7    currently assigned by the Supreme Court to hear

8    cases in Franklin County, Gasconade County, Osage

9    County, Warren County, Montgomery County, Audrain

10   County, Reynolds County, Lincoln County, and now

11   here.  I get very few assignments, interestingly

12   enough, in St. Charles County; although, about two

13   weeks ago I tried a four-day murder case in St.

14   Charles County.  So I'm still trying some

15   significant cases around the State.

16           I have recently completed my annual

17   education for which I once again am certified as a

18   family court judge.  So I am appropriate to be

19   involved in a family court case; although, this

20   has only limited family court application for my

21   purpose in the case.  So that's who I am, just so

22   you know, and that's my background.

23           The decision that's going to happen

24   today is going to be somewhat binary.  My role is

25   simply to deal with this case in the setting of

1    the motion to disqualify.  I'm not here to rule on

2    anything else in the case or take any other

3    actions.  After I'm done hearing the case and when

4    I make the ruling in the case I believe it will

5    either be one where I will believe the motion to

6    disqualify is well-taken and I will determine that

7    Judge Hilton should be disqualified and the

8    Supreme Court will appoint a new judge to hear the

9    case, or I'll determine the motion is not

10   well-taken and Judge Hilton will continue on.  I

11   believe that's the only -- about the only two

12   outcomes that we can have from this case at this

13   point in time.

14         I've read everything that you filed so

15   far with the exception - And I think I read most

16   of it now this morning - of the thing you filed

17   yesterday or today.  I've read the attachment to

18   your petition which included a petition that you

19   filed in federal court.  I read that from start to

20   finish, which was long reading, but I did read it

21   all.  So I think I'm pretty well-versed with the

22   allegations that are being made.  And now is your

23   opportunity to present any proof or evidence that

24   you have that the allegations you made in the

25   petition are true.

```
 1                    So everybody ready to go?

 2                    MR. GRANT:  Yes, Your Honor.

 3                    THE COURT:  Okay.  Go ahead, you can

 4        start.

 5                    MR. GRANT:  Thank you, Your Honor.

 6                    First, before we jump in, I wanted to

 7        tee up for the Court that I do believe that my

 8        motion raises two issues.  I do agree with you

 9        that the primary issue is disqualification for

10        cause, and bias and prejudice I do believe I

11        raise.  And I do believe Your Honor has

12        jurisdiction and power to rule on the motion to

13        recuse, whether or not Judge Hilton should have

14        recused, which is obviously a separate standard

15        under Rule 2-2-11 -- 2-2.11 under the rules of the

16        canons of rules of judicial conduct.

17                    THE COURT:  I've kind of seen that

18        you've invoked both of those, but it seems to me

19        that that consideration is one for Judge Hilton to

20        make and that's to be judged by the Commission on

21        Discipline, Retirement, and Removal if they don't

22        think they've recused theirselves appropriately.

23        I'm not sure I can recuse him.  I can disqualify

24        him, I agree with that.  I'm not sure I can force

25        him to recuse himself if he doesn't want to.
```

1    That's where the commission gets involved if that
2    was done inappropriately.
3                    MR. GRANT:  I believe the Court of
4    Appeals can rule that he should have recused is my
5    argument, so I just wanted to preserve that for
6    appeal.
7                    THE COURT:  Okay, I understand.
8                    MR. GRANT:  And thank you, Your Honor.
9    And thank you for -- First of all, I'm impressed
10   that you read all the papers.
11                   THE COURT:  I read them all.
12                   MR. GRANT:  I'm quite verbose and I
13   appreciate all your preparation.
14                   So getting right down to the motion to
15   disqualify.  Obviously the standard is to prove
16   bias or prejudice.  However, I want to start with
17   the general concept that's well recognized in the
18   case law in Missouri, which is the
19   disqualification of judges the courts of law errs
20   on the side of disqualification.  I'm not
21   suggesting that there doesn't have to be evidence,
22   but here on any close call it should be resolved
23   in favor of disqualification of Judge Hilton, and
24   it's because the courts favor public trust in all
25   rulings.  And if you've read my federal court

1     filing and the briefings in this case obviously

2     I've raised very serious allegations that go to

3     the heart of Judge Hilton's behavior in this case.

4          And I'll jump right in then with that

5     background, which is the first interaction that I

6     had with Judge Hilton was on January 21st of 2025.

7     And he entered the courtroom and had apparently

8     read my financials, which I was shocked to hear,

9     and had came in as a savior for me purportedly

10    from the bench.

11         First of all, the hearing was -- which

12    shockingly was not supposed to take place.  The

13    only thing that was set for hearing was the motion

14    to withdraw by one of my former two counsel, so I

15    was surprised to hear that Judge Hilton wanted to

16    go forward with the hearing.  So we showed up, the

17    motion to withdraw was ruled on, but this is what

18    I'm going to tell you happened first.  But then I

19    had a motion to disqualify that was set for

20    hearing on February 7th.  I wasn't even prepared

21    to argue it.  It wasn't noticed for hearing.

22         So Judge Hilton entered the courtroom

23    and made this prepared speech which was,

24    Mr. Grant, you've suffered - This is the phrase

25    I'll never forget - you've suffered, your children

```
1    have suffered, I'm here to help you.  And he
2    chastised everyone in this room and in act -- an
3    act -- in a Hollywood-type performance, which is
4    he held up the order and yelled at -- Well Mr.
5    Eilerts had departed the room, but looked at me
6    and said, you know -- or, Mr. Fenley, how could
7    you allow this to go on this long.  And said,
8    Mr. Grant, why did you sign this consent order.
9    And I said my lawyer.  And he was like, This is
10   outrageous, your kids have suffered, you have
11   suffered, just consent to me.  And I said, No,
12   Your Honor.  I said this case -- there's an
13   appearance of impropriety and I said, Honestly the
14   way this case has proceeded within the St. Louis
15   Family Court I don't want anything to do with this
16   courthouse.  I said, I'm an officer of the Court
17   and I'm just offended of what has happened here.
18   And I do believe that should go into Your Honor's
19   analysis of my credibility.
20            I do believe -- I don't believe that
21   you should necessarily take what I say as true
22   just because of that, but I do believe -- Just
23   briefly to go on a tangent, the actions I've taken
24   in the four writs and the federal court pleading
25   this is not some sort of ruse for me to suggest
```

1    that I just don't like this judge.  I mean, I
2    started turning these people in to the OCDC on
3    December 31st.  And we'll get to my evidence that
4    I turned them into the U.S. Attorney's Office in
5    February.

6          But so at the hearing what I now have
7    figured out what happened is Judge Hilton was
8    trying to conceal and contain the corruption
9    within the Twenty-First Circuit within the
10   Twenty-First Circuit.  So when he said as the
11   presiding judge -- That's what I never
12   anticipated, as the presiding judge that he would
13   offer to take the case.  It made no sense to me.
14   I was there.  It was a pretty straight-forward
15   motion.  If the motion was to be granted, it was
16   to be transferred to the Missouri Supreme Court.
17   It was very straight-forward.

18         The fact that the docket and all the
19   surrounding circumstances I'll talk about this
20   morning prove without a doubt that my version of
21   events are true.  The fact that he didn't rule
22   that day proves what I'm telling you is true.  He
23   sent me home because I said, No, I want to go to
24   the Supreme Court, I want a different judge.  And
25   he said, No, Mr. Grant, I'm not allowing you, I'm

1    not ruling on your motion today, you need to go
2    home and think about this, you want to consent to
3    me.  And he made it sound like -- And this is what
4    I surmise, which is what he wanted me to surmise,
5    is he was going to hand out justice himself.
6    Because I had a motion for sanctions pending
7    against Ms. Brody, and I had a motion against the
8    Respondent.  And at this time I'm trying to think
9    if I had a motion against Mr. Fenley or not.  I
10   believe I did.  Or I know I had taken -- asserted
11   very strong claims against him.

12          But it was deception, straight-forward,
13   no doubt about it.  He deceived me into consenting
14   to this Court's jurisdiction of the -- I'm sorry,
15   when I say this court I'm referring to Division 13
16   of the Twenty-First Circuit Court, State of
17   Missouri.  And I didn't know any better.  I fell
18   for it hook, line, and sinker, as I put in all my
19   pleadings as to what happened.  And I walked out
20   of that courtroom that day thinking that this
21   nightmare was over.

22          And I have as evidence, Your Honor, I'm
23   going to start with -- I expected to have an Elmo
24   here today.  I apologize, I didn't even think.  I
25   have copies though.  And may I approach Your Honor

1     and hand you copies?

2                THE COURT:  You may.

3                MR. GRANT:  Okay, thank you.

4                THE COURT:  We going to designate this

5     as an exhibit?

6                MR. GRANT:  Yes, I was going to.  For

7     now I was hoping to mark it for identification as

8     Exhibit 1.

9                THE COURT:  Okay.

10               MR. GRANT:  So what we have here, Your

11    Honor, is the hearing took place on January 21st.

12    As I said, I walked out of there thinking that I

13    had definitely won, that this -- finally the

14    nightmare was over and all I had to do was decide

15    as to whether I wanted a judge from out-state -

16    or, I'm sorry, that's what Judge Hilton suggested

17    would be the result - whether I wanted to go to

18    the Supreme Court and have uncertainty, which is

19    what Judge Hilton suggested, or I could stick with

20    certainty with Judge Hilton and he would drop the

21    hammer, so to say, on this because it was his

22    court, he was the presiding judge, and he was

23    going to clean it up.  Which is in my pleadings is

24    I was misled by my prior counsel to suggest that

25    Judge Hilton was the savior that he purported to

1    be, which now I know is untrue.

2              But nevertheless, this document is

3    important because it's contemporaneous

4    communication sent by me to the Respondent, my

5    children's mother, on which -- This is where I

6    start.  And I don't pull any punches.  You'll see

7    the evidence that's presented in this case.  At

8    this point in time my children have been taken

9    from me since March of '24.  We're now in the end

10   of January '24.  I have blown in a breathalyzer

11   three times a day or more ever since I returned to

12   rehab.  I was sober in rehab obviously in March,

13   returned in April blowing in a breathalyzer three

14   times to five times a day, and at this point in

15   time I still had my kids overnight one night a

16   week.  It's outrageous.

17             So at this point I'm extremely

18   frustrated with the system, extremely frustrated.

19   And I finally thought I had won.  And so, like I

20   said, this is criminal behavior.  This is what I

21   have exposed as criminal behavior.  And that's why

22   it says:  You need to focus on hiring a criminal

23   defense lawyer ASAP.  Don't worry about my

24   sobriety.  No one has any concerns about that

25   including you.  Give Maia a call and ask her how

1    yesterday went.

2            So this was sent, what is it, it's

3    August, roughly seven months ago.  But anyway, it

4    was sent within 24 hours of the hearing.  This is

5    proof in and of itself of what my version of

6    events is true, because what I'm saying is you

7    lost, you need a criminal defense lawyer because

8    you're going to jail.  Which I have not -- That is

9    my goal here, for all of these people to go to

10   jail.  Obviously I cannot control that.  I have no

11   prosecutorial authority.  But that is just one

12   communication on the 22nd.

13           Then we have a communication on the 23rd

14   which I'll mark -- Well first let me hand it to

15   you and the other parties in the courtroom.

16           THE COURT:  Thank you.

17           MR. GRANT:  Here we have the next day.

18   Now we have January 23rd and I believe --

19           THE COURT:  Exhibit 2?  You going to

20   call this two?

21           MR. GRANT:  Oh, I'm sorry, Exhibit 2?

22           THE COURT:  Is that what you're going

23   to call it?

24           MR. GRANT:  Thank you.  Yes, totally

25   threw me off.  Yes, I can mark this for

1    identification, Your Honor, as Exhibit 2.

2              THE COURT:  Thank you.

3              MR. GRANT:  Thank you.  That threw me

4    off.

5              Exhibit 2 which has been marked for

6    identification is dated January 23, 24 hours

7    later.  I didn't know -- Do you want to swear me

8    in?  I'm happy to.  I'm providing testimony as far

9    as I'm concerned.

10             THE COURT:  Well, I can do that if

11   that's what you want to do.

12             MR. GRANT:  Well, I just want it to be

13   clear on the record what I am saying is sworn

14   testimony.

15             THE COURT:  Okay, then we probably

16   should do that.  Any objection to him testifying

17   in the narrative?

18             MS. BRODY:  I may, Your Honor.  I don't

19   know how it's going to go.  For now I understand

20   that he's his own counsel.

21             THE COURT:  Okay.

22             MR. FENLEY:  I have no objection for

23   the time being, Your Honor.

24                       MATTHEW GRANT,

25   having been sworn, testified as follows:

1          THE COURT:  In light of testifying in

2     the narrative, and since this has now become an

3     evidentiary issue, always keep in mind if there's

4     an objection made please stop talking so I can

5     deal with the objection.

6          MR. GRANT:  Absolutely, Your Honor.

7          THE COURT:  You may continue.

8          MR. GRANT:  Thank you.  And just now,

9     to make the record clear, I want to clarify that

10    every factual statement that I made prior to being

11    sworn in is truthful and I swear to that under the

12    penalties of perjury.

13         THE COURT:  Thank you.

14         MR. GRANT:  Picking back up to this

15    message.  And I assume Your Honor knows what Our

16    Family Wizard is.  So -- I hate to say that, but

17    just in case.

18         On January 23rd, one day later, I sent

19    another message, but I'll give you some background

20    here.  What I did is I sent an e-mail to the two

21    individuals in this room, which is Mr. Fenley, the

22    guardian ad litem for the children, and Ms. Brody,

23    the counsel for Ms. Copeland.  And I'm referencing

24    that in the first sentence where I say:  As you

25    will hear if you have not already, I am demanding

1    to go to fifty-fifty immediately with me keeping

2    the boys this weekend.  You should think carefully

3    about your response, as it will have an important,

4    long-term impact on you in many ways, including,

5    but not limited to your rights with regard to the

6    boys.  And that's the key word there is your

7    rights.

8           They tried to convert this into some

9    sort of threat, and it is not a threat at all.

10   What it is saying here - And there's a plethora of

11   evidence in the record - which is this is my

12   children's mother.  She honestly, candidly, she's

13   a terrible person but she's still my kids' mother.

14   So I encouraged her time and time again to get a

15   criminal defense lawyer.  And what I'm saying here

16   is do the right thing.  That's what I told all

17   these people is to stop this charade and this act

18   and to do the right thing and we'll get this

19   courthouse back on track and get the family court

20   serving justice again.  I know that's obviously

21   not going to happen voluntarily.

22          But the point here is consistent with

23   my message on the 22nd, now on the 23rd I'm

24   following up and saying I'm demanding fifty-fifty.

25   It's because I had thought I had won the hearing

```
 1    on January 21st.  It's consistent.  And the only
 2    version of events that fits this -- these
 3    communications that is consistent with what I'm
 4    telling you, which I guess I should point out is
 5    not in the transcript from January 21st.
 6              I'm being outright up-front, that
 7    transcript was doctored and it was manipulated.
 8    Absolutely.  I put it in the federal complaint.
 9    And I believe the court reporter here today is the
10    one who took it down, I'm not sure.
11              MS. BRODY:  I would object, Your Honor.
12    Those are facts not in the record, and it is also
13    without foundation.
14              MR. GRANT:  I'm testifying to personal
15    knowledge.
16              MS. BRODY:  There is no foundation.
17    Objection.
18              THE COURT:  So I think what I'm hearing
19    is it's your belief that the transcript is
20    doctored but you have no way to document that in
21    any way.  In other words, there's not a transcript
22    that is on a tape recording that's been made or
23    anything of that nature, it's your recollection
24    this is not what was said at the hearing.
25              MR. GRANT:  Your Honor, yes.  It comes
```

1    down to my credibility.  And that's why this

2    evidence is so important, because the transcript's

3    not -- I can prove to you the transcript's not

4    true because of all the circumstantial evidence.

5    And let me jump forward a bit.

6            You'll see in the court record - I

7    think Your Honor can take judicial notice of the

8    docket - that prior to trial I asked Judge Hilton

9    -- I filed a motion to allow me to hire my own

10   court reporter, a certified court reporter, and a

11   certified videographer to come in for trial at my

12   cost to create a separate transcript so this

13   didn't happen again.  And it sure did, it happened

14   again.  I have the trial transcript and they

15   changed it.

16           Now let's tackle the issue that may be

17   popping in your head; is this man insane.  I'm not

18   insane.  I'm purely sane.  I underwent a mental

19   evaluation last summer.  I see a therapist.  I

20   have my therapist's notes.  They subpoenaed my

21   therapist.  They didn't call my therapist to the

22   stand.  After all this came out in January and I

23   started calling - Sorry - and I started making

24   these criminal allegations - This is the most

25   telling thing of anything - neither Judge Hilton,

1    nor any of the parties have had the thought.  I'll

2    explain to you why.  None of them have asked for

3    me to undergo a mental evaluation because I will

4    pass with flying colors like --

5              MS. BRODY:  Objection.  No foundation.

6              THE COURT:  Again -- Once again, I

7    understand your opinion is that you're competent

8    and you believe other people would testify to

9    that, but they're not here to testify.

10             MR. GRANT:  That's my testimony.  Is it

11   that they're not allowed?

12             THE COURT:  Exactly.  So you can't tell

13   me what they would say.  You're a lawyer, you

14   understand that you can't tell me what they would

15   say.  That's hearsay.

16             MR. GRANT:  It's my belief.

17             THE COURT:  I understand it's your

18   belief, but you can't tell me what someone else

19   would say about you.

20             MR. GRANT:  You're correct.  I'm sorry.

21   Let me move to withdraw my testimony on that.

22   Sorry, I misphrased it.  My testimony, my

23   narrative testimony is I believe that the parties

24   have intentionally avoided requesting a mental

25   evaluation because they're afraid of what the

1    results would be.  We'll never know.

2              MS. BRODY:  I'm gonna object.  It's

3    hearsay.  He doesn't know what the parties thought

4    or intended.

5              THE COURT:  You kind of waver back

6    between presenting facts and presenting argument.

7    You understand it's okay for you to present facts,

8    but don't interweave those with arguments as to

9    why something is the case, okay.

10             MR. GRANT:  Okay.  This is a hearing so

11   I didn't know where oral argument fits in.

12             THE COURT:  Well it's simpler since

13   you're testifying in the narrative.  And it's

14   always a little untidy for people to be able to

15   object timely.  If you'd keep it to the facts now

16   we can argue later.

17             MR. GRANT:  Okay, thank you, Your

18   Honor.

19             So I just want to point out as a fact

20   that I did request a court reporter and a

21   videographer.  That motion was denied.  And my

22   motion stated that if there's nothing to hide why

23   would you not grant the motion.  It made no sense.

24   Obviously it was going to be at my cost.  And I

25   wanted -- From a factual perspective there's never

1    been a request that I undergo a mental evaluation.

2    I believe that my briefing speaks for itself as to

3    whether or not I'm sane.  I believe that my

4    170-page complaint that Your Honor apparently read

5    speaks for itself.

6              This is not some conspiracy theory.

7    I'm not a lawyer in a basement with a wall with

8    red yarn who's coming up with all this nonsense.

9    This is all real.  That's why this is happening to

10    me, because I know it's real.  And we're going to

11    get -- And Your Honor is obviously going to have

12    to make a determination on that.  But I just want

13    to point out from a factual basis no one has asked

14    for a mental evaluation.

15              Moving forward to -- Also, no one has

16    disputed -- When I filed the motion for sanctions

17    -- And I started filing Mr. Fenley -- and I filed

18    pleadings asserting that Ms. Brody and Mr. Fenley

19    were engaged in criminal behavior.  They've never

20    filed anything with the Court taking issue with

21    that until recently.  Just recently there was a

22    motion for sanctions filed after I had posted Mr.

23    Fenley's phone call, which we'll get to, in which

24    he offered to trade me custody for dropping my

25    allegations.

1              MR. FENLEY:  Your Honor, I'm going to

2       object, as that goes way beyond what was actually

3       in the phone call, it would speak for itself, and

4       his version of events is 100 percent

5       wholeheartedly different than what actually

6       occurred on that phone call.

7              MR. GRANT:  I do agree it will speak

8       for itself.

9              THE COURT:  Do you have the phone call

10      recorded?

11             MR. GRANT:  I do.  It was admitted at

12      trial.

13             MR. FENLEY:  It was not admitted at

14      trial.

15             MR. GRANT:  Was it not?

16             MR. FENLEY:  No, it was not.  It was

17      recorded without my knowledge which I think is a

18      violation of the professional rules.  I understand

19      he's a party to it so I'm not saying it's

20      criminal.  But attorney to attorney, I believe

21      that that is a violation of the rules when one

22      attorney is talking about his client which is

23      himself.  So I wholeheartedly object to anything

24      that is in that phone call.  It was never admitted

25      into evidence.  And it is completely inaccurate in

1     terms of what he is saying.  If anything he's the

2     one trying to force me into something as if

3     vice-versa.

4             MR. GRANT:  Your Honor, it was admitted

5     into evidence at a preliminary injunction hearing.

6     He's right.  He caught me on a technicality.  It

7     is in evidence, and he knows it, and he's afraid

8     of it.

9             MR. FENLEY:  He referenced -- We had no

10    further hearings after the phone call was made is

11    my recollection.  I could be wrong.  But he tried

12    to admit a transcript that was filed with the

13    pleading.  He never actually admitted the phone

14    call.

15            MR. GRANT:  Yes, I did.  Judge Hilton

16    suggested it might have been AI.  And that's why I

17    initially tried to avoid admitting it.  I can put

18    Mr. Fenley on the stand 'cause that's what --

19            MR. FENLEY:  Maybe the court reporter

20    would tell us but I don't think you trust her.

21            MR. GRANT:  I'll call a witness, Your

22    Honor.

23            THE COURT:  That would be fine.  You

24    should do that.  Because if we don't have the

25    recording that you want to present then it's your

```
 1    statement of what you said is on it, and that's
 2    the situation where it becomes a little bit
 3    cloudy.
 4              MR. GRANT:  And I do have it for this
 5    very reason.
 6              THE COURT:  Okay.
 7              MR. GRANT:  But nevertheless, to circle
 8    back, the reason I mention that is all of this is
 9    kind of after the fact.  Once I exposed what was
10    going on is the only time that anyone has taken
11    issue with it.  And there's your proof that
12    everything I'm saying is true.  All along everyone
13    has set here and almost - what's the word - almost
14    mocked me for the fact that I could do nothing to
15    defend myself, that I was stuck in this courthouse
16    or in this courtroom and that I was stuck with
17    whatever ruling was going to be made against me.
18    And we'll get to the retaliation that Judge Hilton
19    has taken upon me in various occasions.  But
20    finally --
21              MS. BRODY:  Your Honor, I object.  That
22    is his opinion.  That is not any evidence before
23    this Court.
24              THE COURT:  Again, if you would stick
25    just to the evidence.  Just please let's stick
```

```
 1    right now to the evidence and we'll do the

 2    argument as to what it means later on, okay.

 3              MR. GRANT:  Thank you.

 4              From a factual perspective, moving

 5    forward, on January 24th I was at home and

 6    received notice that there was a safety alert at

 7    my children's school.  And I sent an e-mail.  I

 8    won't talk about what the e-mail said 'cause she's

 9    going to object.  But I will just say I alerted

10    the Court that I was terribly concerned for my

11    children's safety.  Again, consistent with I had

12    just won the case, it was my belief that Judge

13    Hilton had just alerted me that he was my -- that

14    he was my savior and he was here to save -- he was

15    here to fix things for me.  And reality was it was

16    some sort of ploy.  I don't know what -- Well, I

17    won't even speculate at this point.

18              MS. BRODY:  Your Honor, again, I'm

19    gonna object.  Those are facts not in evidence.

20    His feelings are not evidence before this Court

21    for any basis or foundation for the Court to

22    disqualify Judge Hilton.

23              THE COURT:  Again, please give me the

24    facts.

25              MR. GRANT:  Thank you, Your Honor.
```

1            So from a factual statement, I did

2     communicate with Ms. Gipson who's here in the

3     courtroom today.  I copied Mr. Fenley to make sure

4     there was no ex parte communication.  I omitted

5     Ms. Brody because her client was at issue in the

6     communication because I was terribly afraid for

7     the safety of my children.

8            When I learned that the judge was not

9     going to receive my communication I drove here.  I

10    sent an e-mail.  I think I said -- Well, I drove

11    here myself and I demanded to see Judge Hilton.

12    Now I didn't talk to him about any substance.  I'm

13    sure someone's going to argue that was ex parte

14    communication.  Whatever.  There's e-mails where I

15    say I don't care.  And I don't care, because I was

16    afraid for my children's lives.  And all I said to

17    Judge Hilton was, Hey, I just need you to read

18    this e-mail.  That's all I said.  And he did come

19    out into the hallway and that's when he told me --

20    that's -- Here's the fact.  He told me at that

21    time:  Mr. Grant --

22            MS. BRODY:  I object, Your Honor.

23    That's hearsay.  Anything that Judge Hilton said

24    in a hallway is hearsay.

25            MR. GRANT:  He's a party opponent.

```
 1                 THE COURT:  He's really not a party.
 2      This is a little bit of a unique situation.  He's
 3      not a party, he's the judge on the case.  He's
 4      certainly capable of being called.  If you want to
 5      call him and come in and testify we can have that.
 6                 MR. GRANT:  Oh, I will.  I actually was
 7      wondering if I was supposed to drop a subpoena on
 8      him or not.
 9                 So, in any event, I left that encounter
10      with Judge Hilton learning for the first time ever
11      that he was a family lawyer before he was on the
12      bench.  I had never known that.  And if I had
13      known that I would have never consented to the
14      jurisdiction.  And I also left that encounter with
15      that information knowing that I had been tricked,
16      knowing --
17                 MS. BRODY:  Object again to facts not
18      in evidence.  These are assumptions and opinions
19      made by him, and these are not facts presented to
20      substantiate the foundation of a motion to
21      disqualify.
22                 THE COURT:  Once again, the facts you
23      need to present to me are evidence of bias,
24      evidence of prejudice that relate to things that
25      did not happen within the case itself.  And that's
```

1     where you have to be.  How you felt about

2     something is not where the issues in this case

3     lie.  They lie in what Judge Hilton did and what

4     the legal effect of that would be to demonstrate

5     bias or prejudice.

6             MR. GRANT:  The extra-judicial source

7     was that I left with clear -- my interpretation,

8     which is a fact --

9             THE COURT:  Your interpretation is not

10    a fact.  Your interpretation is an interpretation.

11    A fact is what was said.

12            MR. GRANT:  Well, okay, I'll call Judge

13    Hilton then.

14            THE COURT:  Okay.

15            MR. GRANT:  Nevertheless, okay, the

16    factual testimony I will provide is all of the

17    extra-judicial bias and prejudice is the

18    corruption that pervades this courthouse.

19            MR. FENLEY:  Your Honor, again I'm

20    gonna object that there's absolutely no proof of

21    corruption in the courthouse.  He keeps alleging

22    it but he has yet to provide one fact that any

23    judge who has heard anything of any corruption, or

24    in any of his pleadings.

25            THE COURT:  So once again, I've read

1       your pleadings.  I know you believe that
2       corruption is pervasive in the courthouse.  This
3       is an opportunity where if you think that affects
4       Judge Hilton there's a lot of ways you can play
5       that with respect to the future there will be an
6       issue in your federal lawsuit, maybe an issue in
7       other things.  Today the issues are things that
8       affect Judge Hilton's ability to hear the case -
9       That's what we have to focus on - and things that
10      involve bias or prejudice.  Not what your opinions
11      are but the actual facts that exist --
12                MR. GRANT:  Right.
13                THE COURT:  -- that you can document.
14                MR. GRANT:  Just to clarify, the facts
15      are, as I believe the evidence shows, he's a
16      member and/or an associate of the criminal
17      enterprise which is at issue in the complaint.  So
18      I will go forward and just give you factual
19      evidence of that.
20                MS. BRODY:  I object and move to
21      strike.  Once again, it is an opinion not based on
22      any facts.
23                THE COURT:  Once again, give me the
24      facts, not your opinion, that he's a member.  I
25      mean, show me what facts support that he is

1   somehow biased or prejudiced against you.

2              MR. GRANT:  Okay, I appeared on

3   January 28th by appointment for -- to argue an ex

4   parte TRO and asked Judge Hilton to grant it.  And

5   I asked that if it was denied it still be placed

6   on the court record.  And I left -- I made that

7   very clear.  And I left the courthouse with

8   nothing on the court record and the motion was

9   denied.

10             THE COURT:  That was this year,

11  January 28th, '25?

12             MR. GRANT:  Yes.  And I did present

13  that to Judge Hilton personally.  It was off the

14  record.

15             Moving forward then to February 7th and

16  -- A factual statement.  This is very important.

17  In my motion for TRO I state I withdraw my consent

18  to Division 13 which I had provided under -- which

19  -- under -- under what -- I had withdrawn the

20  consent that I had previously provided.  I'll

21  provide you the factual reason for that.

22             The reason is because based upon the

23  events that took place in this courthouse on

24  January 24th I had -- I had -- was all but

25  convinced that I made a huge mistake and that I

1      was -- that my consent, if it could in any way be

2      withdrawn it should have been.  And it's in my

3      pleadings.  And I would ask the Court to take

4      judicial notice of my pleadings and my motion.  I

5      said I would like to stay or withdraw my consent.

6      And that is proof of fact as to what happened on

7      the 24th that we'll get to.

8              And then so if we move forward to the

9      -- to February 7th, that's when factually I

10     observed and learned that in fact Judge Hilton was

11     part of the RICO corruption.  I don't mean to call

12     it RICO corruption.  Basically -- Let me switch

13     gears.

14             I learned on February 7th undoubtedly

15     that Judge Hilton was prejudiced and biased

16     against me.  I learned that because of the manner

17     in which the hearing proceeded.  I was called to

18     the stand and asked -- The motion, I should

19     clarify, was the motion to vacate the consent

20     order that had kept me from my children.  Based

21     upon prior representations from -- without getting

22     into them, with Judge Hilton, it was my

23     understanding that all I had to do was ask to

24     withdraw the consent order that kept me from my

25     children, which made sense to me.  The only reason

1    I didn't have my kids is I signed a consent order

2    based upon the advice of counsel.  So I appeared

3    at the motion to vacate and withdraw that consent

4    order, and as soon as I walked in - This is a fact

5    - I could tell from Judge Hilton's mannerisms and

6    his initial response to me to demand --

7              MS. BRODY:  Objection.  What he's able

8    to discern from a mannerism is not a fact, it is

9    an opinion.

10             MR. GRANT:  It's an observation.

11             MS. BRODY:  It's an opinion.

12             THE COURT:  I'm going to overrule that

13   objection at this point in time.  Continue on with

14   what was said or done, not what you thought you

15   saw from body language.

16             MR. GRANT:  Okay.  Based upon his

17   statements, which I won't replicate or reiterate,

18   but based upon his statements I knew that --

19             THE COURT:  Well the statements is what

20   we need to hear.  You need to present evidence.

21   You can't say you knew from what somebody said and

22   then repeating it.  You need to tell me what was

23   said that caused you to believe that Judge Hilton

24   is biased or prejudiced against you.  I need to

25   hear what those statements are, not what your

1    opinion of them were.

2              MR. GRANT:  He made me get on the stand

3    which is fine, but then the entire hearing was:

4    Mr. Grant, tell me why she's a bad mother.  And I

5    pointed out:  Judge Hilton, this is about -- this

6    is a consent order and the issue is whether I am a

7    danger to my children, it doesn't matter whether

8    or not she's a good mother or not.  He flipped the

9    entire burden of proof on me.  And I stated to him

10   - This is my statement to him - I said:  Judge

11   Hilton, where is the judge that I met that was in

12   this courtroom on January 21st.  And, Judge Zerr,

13   I said this to him.  I said:  Go get him.  Is he

14   in the hallway.  Because I was irate because he

15   had flipped.  That is the moment -- I never stood

16   in front of an -- in front of a judge in a black

17   robe that I knew to -- I don't even know what word

18   you want me to use here because I struggle with

19   decorum and how I address the Court and address

20   Judge Hilton in light of what he's done.  But

21   never in my life have I been so offended as a

22   lawyer to have a judge sit there and openly just

23   flaunt the law.

24             MS. BRODY:  Your Honor, I'm gonna

25   object.

1          THE COURT:  Right.  You have filed as

2     exhibit to your most recent supplement the

3     transcript of the proceedings on January 21st.

4          MR. GRANT:  Correct.

5          THE COURT:  Do you have a transcript of

6     the proceedings on February 7th?

7          MR. GRANT:  No.  I tried to order it

8     and I been unable to obtain it.

9          THE COURT:  So you made a request?

10         MR. GRANT:  Yes, I have.  Twice.

11         THE COURT:  Do you have a copy of those

12    requests?

13         MR. GRANT:  I did not -- I can file a

14    supplement but I did not bring that today, no.  I

15    absolutely tried to order it, and I was told on

16    the second time that I hadn't asked before when in

17    fact if you scroll down it was in the e-mail

18    trail.

19         THE COURT:  So what are you indicating

20    the response was?

21         MR. GRANT:  There was no response.  I

22    was ignored.

23         THE COURT:  You were just ignored?

24         MR. GRANT:  Yeah, because you can't do

25    anything without paying in advance, so I said how

1    much does this cost, and again I was ignored just

2    like I was the first time.  That's how they, you

3    know --

4            THE COURT:  So you've given me a number

5    of copies of our Family Wizard and things like

6    that.  You don't have a copy of your efforts to

7    get the transcript of this proceeding that you're

8    claiming Judge Hilton was --

9            MR. GRANT:  I did not anticipate the

10   fact of -- I brought the 21st transcript by the

11   way.  I was planning to mark that as an exhibit.

12           THE COURT:  You've already filed it so

13   I see it.  I've already read it.

14           MR. GRANT:  Yeah, okay.  But, no, I

15   didn't think to go -- 'Cause that doesn't directly

16   involve Judge Hilton I didn't think to bring that

17   evidence as to --

18           THE COURT:  Well what's it involve if

19   it doesn't involve Judge Hilton?

20           MR. GRANT:  Indirectly it does because

21   it's communication between me and the court

22   reporter, not with the Court, not with Judge

23   Hilton.

24           THE COURT:  I'm talking about the

25   transcript itself.  The transcript itself

1    obviously is fundamental to your claim.

2              MR. GRANT:  True.  The fact that I was

3    unable to obtain it I cannot directly prove that

4    Judge Hilton directed to withhold that from me.  I

5    don't have that evidence.

6              THE COURT:  And you can't give me

7    documentation as to when you requested it or

8    whether you agreed to pay a deposit or anything

9    like that?

10             MR. GRANT:  I can but just not at this

11   moment.  I would request leave of court to submit

12   that after the hearing.

13             THE COURT:  I think we can let you do

14   that.

15             MR. GRANT:  Thank you.

16             THE COURT:  Why don't you go on with

17   the facts that you believe --

18             MR. GRANT:  Correct.  So the facts are

19   that the hearing was -- How do I put this.  The

20   hearing was another act of theatre.

21             MS. BRODY:  I'm gonna object.  That is

22   an opinion, not a fact.

23             MR. GRANT:  I withdraw that.

24             THE COURT:  Just tell me what was said.

25             MR. GRANT:  Okay, what was said is

1    Judge Hilton told me -- what I said -- 'cause I

2    had filed a combined motion to vacate, motion to

3    modify judgment -- modification of judgment.  And

4    I had told Judge Hilton that if he denied it I had

5    a right -- immediate right to appeal.  Not

6    necessarily a motion to vacate because you don't

7    have a right to appeal, but the motion to modify

8    the judgment.  And this is critical.  And I said:

9    So if you deny it it's going up on appeal.  And he

10   told --

11             MS. BRODY:  Your Honor, I would object.

12   That is hearsay anything Judge Hilton said.

13             THE COURT:  I'm going to overrule it.

14   You can go ahead and say that.

15             MR. GRANT:  He told me, Mr. Grant, you

16   can go ahead and appeal whatever you want.  He

17   said -- He said, The Court of Appeals is never

18   going to rule in your favor, and I guarantee you

19   they will drag this out until your kids are 18.

20   And I said -- followed up, No, they won't.

21             MR. FENLEY:  Your Honor, I'm gonna

22   object as to what Judge Hilton said in relation

23   there 'cause I believe that is a factual statement

24   that is inaccurate at this point in time and

25   hearsay.

1              THE COURT:  It's certainly hearsay

2      that's made by the Judge.  In a setting like this

3      where you're alleging bias or prejudice I think I

4      have to give the Movant some flexibility in being

5      able to recount statements that were made that

6      might reflect that bias or prejudice even though

7      they are theoretically hearsay and they are made

8      by the person through the allegation of bias or

9      prejudice is directed against.  So I think I have

10     to give it some flexibility.

11              MR. GRANT:  The statement was so

12     impactful and my recollection is so truthful, I'd

13     like to mark as -- for identification Exhibit,

14     well I think we're at 3, which is a motion to

15     disqualify filed for the -- in the Eastern

16     District Court of Appeals.

17              So with regard -- Sorry.  I didn't know

18     if Your Honor wanted to read it.  What I want to

19     point out is there's an affidavit, and the entire

20     -- both bases of my motion was -- were -- was

21     Judge Hilton's statements at that hearing.

22              THE COURT:  Okay, continue.

23              MR. GRANT:  Okay.  So I just, again,

24     contemporaneous proof I believe that these things

25     happened and my version of events, as opposed to

1    what he will say as a denial, for his denial as

2    true.  But that's for Your Honor to determine of

3    course.

4              Again, going back - I'm sorry - on

5    January 24th I have an e-mail that I sent to the

6    United States Attorney's Office in St. Louis.  I

7    worked at Husch Blackwell for 21 years.  One of

8    the individuals I worked with there is now an

9    AUSA.  I'm going to mark for identification as

10   number four, and I'll just hand these out real

11   quickly.  Again, I didn't mean to move on before.

12             So again, really the sentence that I've

13   highlighted on one version is that he just ruled

14   on Tuesday and I'm 100 percent on point - And I

15   apologize for my language - the shit show.  The

16   point of this e-mail is again corroborating

17   evidence that my version of events of what

18   happened on January 21st are absolutely true.

19             I went to the U.S. Attorney's Office,

20   the Department of Justice.  And in fact I made

21   that statement in open court subsequent to this

22   e-mail to put everyone on notice.  And from a

23   factual standpoint I also called OCDC on

24   December 31st to report Mr. Fenley and Ms. Brody.

25   And I've reported them all here I believe.

1    There's an e-mail trail below.  But this is where

2    I was raising the issue of the safety of my

3    children.

4              But Mr. Wiseman is a former associate

5    at Husch Blackwell.  I don't know one way or the

6    other if he made it to partner before he went

7    in-house -- or not in-house but became a AUSA.  I

8    believe he became AUSA under my former partner

9    Jeff Jensen.  I know Mr. Wiseman and that's why I

10   reached out to him and sent him this information.

11   So again, this is corroborating evidence I believe

12   that shows that my version of events on the 21st

13   are in fact true.

14             So if we move back to evidence of bias,

15   extra-judicial influence and actions, we can move

16   quickly to the 27th and 28th.  So after the 7th

17   and the hearing in which led to ultimately the

18   affidavit in front of the Court of Appeals.  And

19   which, to be clear, they ruled that I did not

20   prove actual bias, which is true.  They didn't --

21   Two judges recused I will note in light of that

22   filing.  After that filing I guess it's

23   speculation if they're connected.  But the two

24   Republican judges recused, the two Democrats

25   stayed on the panel.  So I think that's

1     noteworthy.

2              So what we have here is on the -- So

3     Judge Hilton had taken under consideration my

4     motion to vacate and set aside the consent order.

5     That was the only thing keeping myself from my

6     children.  So we're now in February.  I hadn't had

7     a drink since March of the prior year.  It's

8     almost a year.  And this is all -- We're using

9     facial recognition breathalyzers.  Oh, and I did a

10    hair follicle drug test the summer before, from a

11    factual standpoint, and passed that.  So no one

12    ever alleged that I used drugs.  That's

13    outrageous.

14              But so this whole time -- And the only

15    thing that this court and Judge Hilton were using

16    to hang over my head was this consent order.  So I

17    thought based on Judge Hilton's statements that

18    this was the procedural manner in which he was

19    going to, you know, potentially help me and then

20    validate and vacate that consent order and then

21    allow them if they wanted to move for preliminary

22    injunction they could do so, or even a TRO.  In

23    any event, he took it under advisement on

24    March 27th, and I filed a similar motion on the

25    morning -- I'm sorry, February.  I'll slow down.

```
 1    I tend to talk very fast.  And I apologize for
 2    that to both the court reporter and Your Honor.
 3              On February 27th there was a hearing
 4    set on February 28th.  So I had no ruling.  I had
 5    filed a motion -- I'm sorry.  I had no ruling -- I
 6    was of the opinion -- From a factual standpoint my
 7    opinion was that I knew that I was in a
 8    courtroom --
 9              MS. BRODY:  I'm gonna object to his
10    opinion.
11              THE COURT:  Again, we're not looking
12    for your opinion right now.  Just give me the
13    facts.  You can --
14              MR. GRANT:  Okay, the facts are I filed
15    a motion for change of judge on the 27th of
16    February and I filed a motion for change of judge
17    on the morning of the 28th of February.
18    Immediately on that date, on the 28th, Judge
19    Hilton entered an order denying my motion to
20    vacate and set aside the consent order without
21    explanation, which I'll just leave it at that.
22    That was the first overt act of retaliation on the
23    record.
24              MS. BRODY:  Your Honor, I'm gonna
25    object.  That's another statement of opinion.
```

1      MR. GRANT:  That's what I allege in any

2  event.

3      THE COURT:  Overruled.  Go ahead.

4      MR. GRANT:  But this is where we get to

5  the good stuff, if you will.  Well let me say from

6  a factual standpoint, unbeknownst to me -- Now I

7  mentioned I been calling - Factual statements - I

8  been calling OCDC sending them e-mails more than

9  once a week.  I think I have a total of, I don't

10  know, I think the e-mail to the AUSA was, like, 17

11  times.  And then I ultimately - And we'll get to

12  that - The commission on removal/discipline, they

13  opened a pending investigation into Judge Hilton.

14  I brought a copy of that letter to prove it to you

15  and to introduce into evidence.

16      But unbeknownst to me, the Missouri

17  Supreme Court, of all the cases pending in the

18  entire State of Missouri with no motion, no

19  petition, first -- you know, no extraordinary writ

20  - Well there is a way - but without anyone asking

21  the Missouri Supreme Court to do anything, sua

22  sponte Chief Justice Russell on behalf of the

23  Court issues an order appointing retired circuit

24  judge Terry Lynn Brown as a senior judge to hear

25  the motion that I had filed on the 27th and 28th.

1    That is amazing.  It is astounding.  And to this

2    day I don't believe many people really understand

3    -- well let me back up.  Let me testify factually.

4             Here's -- The key is that I did not

5    learn, that was not published to the docket in

6    this case until after I filed a writ.  That was

7    hidden.  Well, that was concealed from the docket

8    and not published.

9             MS. BRODY:  Your Honor, I'm gonna

10   object.  There is no facts that it was concealed

11   from the docket.

12            MR. GRANT:  I changed my -- Yeah, it

13   was not published.  I changed the wording on that.

14   It was not published to the docket for 23 days.

15   It was not published to the docket until 24 hours

16   after I filed a writ in which the writ alleges

17   corruption.  So, again, I believe the Court of

18   Appeals at least will address that from a recusal

19   standpoint.  At that point in time -- That is

20   absolutely grounds for recusal that the Missouri

21   Supreme Court assigns me -- By the way, it just

22   happens to be a retired democratic appointee or

23   democratic judge.  But in any event, it doesn't

24   matter, there's a senior judge appointed to my

25   case that I didn't ask for and I'm not told about

1    it.

2              So I go spend hours and hours and hours

3    - This is my first writ I've ever filed - and

4    prepare a writ to the Court of Appeals.  And

5    that's what the motion to disqualify you'll see, I

6    handed you, that is within which I filed it.  Now

7    admittedly that writ failed because I just

8    recently learned this whole time I was citing the

9    wrong rule because -- Well I won't get into the

10   reason why.  Nevertheless, the current motion is

11   procedurally correct.  So that prior one was

12   properly denied.  The prior ones.

13             In any event, so, but here's the rub.

14   Or here's -- From a factual standpoint I have

15   evidence.  If I might, Your Honor, just because I

16   would like to make it part of the court record, to

17   mark for identification -- if I could mark -- I

18   handed you the motion to DQ, but if I could mark

19   as exhibit -- or for identification number four is

20   my -- the actual writ, petition for writ filed on

21   March 26th.

22             MR. FENLEY:  So number four is your

23   e-mail.

24             MR. GRANT:  Oh, thank you, John.  Mr.

25   Fenley.  So we'll make this number five.

```
1              THE COURT:  I got an ED filing that's

2     dated March 26th which is Exhibit 3 which it says

3     Respondent's verified motion to disqualify, is

4     that what you're talking about?

5              MR. GRANT:  Yeah, I didn't know what to

6     print out.

7              THE COURT:  Yeah, you marked it as

8     Exhibit 3.

9              MR. GRANT:  Okay.  So I filed my

10    motion, the petition for writ at approximately

11    11 a.m. on the 26th.  Several hours later -- Let

12    me back up.  So this is important.

13              I was terribly concerned for my

14    personal safety.  So I had -- supposed to have my

15    children on the night of the 26th.  So I had sent

16    a note on the 25th to the children's mother that

17    falsely stated that I was going to be out of town

18    for a deposition.  And the response -- Well, and

19    that was not an issue.  That was the only thing

20    that was stated is that I had to be out of town

21    for work.  That was the evening of the 25th.  On

22    the 26th I filed a petition for writ at 11 a.m.

23    At I think 2:17 Mr. Fenley files a motion for

24    therapy and then a motion for something else.

25    Anyway, the Court can take judicial notice I hope
```

1     of the court docket on that.  I have that here in

2     my -- I brought that paperwork with me.

3               In any event, the timing of that is

4     suspicious.  More than suspicious.

5               MS. BRODY:  Your Honor, I'm gonna

6     object that he is now again stating an opinion.  A

7     filing isn't suspicious.

8               MR. GRANT:  I withdraw that statement.

9     I just want to lay out the chronology.  The next

10    day -- And I have the Soberlink results as well.

11    I'll get to those in a second and mark those.  But

12    24 hours after I filed -- Getting to Judge

13    Hilton's actions, 24 hours after I filed my writ

14    he entered -- he granted an ex parte TRO taking my

15    children away from me 100 percent of the time.

16    Now that is the same day that all of a sudden the

17    March -- the motion for -- the order from the

18    Supreme Court shows up on the docket, March 27,

19    2025.  It was a very busy day.  And the point is,

20    is why would -- There's no evidence, and I can't

21    wait to ask Judge Hilton this, but it was ex

22    parte.  That makes no sense.  And then a full TRO

23    was granted the next day.  But it's flat out

24    retaliation.  Your Honor -- I would ask Your Honor

25    to conclude that that was retaliation, bias, and

1    prejudice against me for filing the writ.

2            MS. BRODY:  Your Honor, now we're again

3    entering into argument and I thought he was

4    testifying as a witness.

5            THE COURT:  This is just your

6    testimony.

7            Let me clarify just timingwise what the

8    court file reflects.  The court file reflects that

9    the order appointing Judge Brown was entered by

10   the Supreme Court on March 4, '25.  It shows -- In

11   the court file it shows it being docketed on that

12   same day, on March 4, 2025.  And then your TRO

13   that you're speaking of was filed looks like on

14   March 27th.  I think you indicated that the

15   special senior judge assignment and the TRO were

16   filed the same day, but in fact the special judge

17   assignment order in the court file reflects right

18   now a filing date in the court file of March 3rd

19   -- or March 4th.

20           MR. FENLEY:  Judge, for clarity

21   purposes on that, the filing date is March 4th

22   pursuant to the file stamp from the Supreme Court.

23   It did not make the file, the docketed entries

24   until the 26th or 27th of March.  And I believe it

25   was stated to us from Judge Hilton at that time

1    that there was a clerical error that it didn't get

2    docketed.

3            THE COURT:  Okay.  So apparently when

4    they did docket it they docketed it back to the

5    March 4th date because that's what shows in the --

6            MR. GRANT:  It sure did, Your Honor.

7            MR. FENLEY:  It was docketed to the

8    date that it was signed and the file stamp from

9    the Supreme Court.

10            THE COURT:  Okay, that clarifies the

11    facts in my mind.  Why don't you continue on.

12            MR. GRANT:  Yeah, and it's in my

13    motion.  I filed the e-mail that proves when I

14    received it which was the afternoon of the 27th is

15    when I first learned that there was a senior judge

16    appointed.

17            THE COURT:  Got it.

18            MR. GRANT:  So, but from a timeline

19    perspective -- And let me clarify.  And I

20    apologize if I misspoke.  The 27th of March --

21    There was an ex parte TRO on the 27th of March and

22    there was a full hearing TRO on the 28th of March.

23    I hope I didn't confuse those.  And then the order

24    from the Supreme Court was entered in the system

25    apparently on March 4th but not published to

1    anyone, including myself, until the 27th.  And so
2    that's important, Your Honor, and prejudicial.  I
3    filed a writ that was moot.  And I subsequently
4    point that out to the Missouri Supreme Court and
5    Court of Appeals later, again, in an unsuccessful
6    writ that I filed because I cite the wrong rule
7    again.  It was Rule 51.05 unfortunately.  But
8    nevertheless...

9              So from a factual standpoint that TRO
10   -- And I was severely prejudiced because I
11   actually left the country.  And I make no bones
12   about it, Your Honor.  What I allege and what's in
13   the complaint, in the RICO complaint is very
14   serious allegations.  They are very serious
15   allegations.  And I believe if you read the
16   complaint you'll see the explanation as to why I
17   believe people should listen to me.

18             My office was four doors down from the
19   new Missouri attorney general.  I know, I know my
20   partner -- former partner, Jeff Jensen, was the
21   U.S. attorney.  This gentleman, Derek Wiseman, was
22   AUSA.  They were all within seven doors of my
23   office.  I can't talk about the things that I
24   know.  The individual -- My firm represented Eric
25   Greitens.  And I'm not just casting dispersions

1    that anyone did anything wrong in these contexts.

2    I'm just saying that I know things other people

3    don't know based upon where I worked.  So I hope

4    that my experience, my professional experience

5    brings with it credibility and also unique

6    knowledge as to what I know.  But because of what

7    I know and because of what I knew I was exposing

8    and because I know how high this can lead, as I

9    point out in my RICO filing, and civil -- Everyone

10   seems to get a lot of attention on RICO.  Civil

11   rights act is really my focus.  Due process.

12        But in any event, I left the country,

13   and I drove to Chicago to leave the country

14   because I was literally afraid that I wouldn't get

15   out of St. Louis, that I would be put away for

16   civil commitment or worse.  So in any event, the

17   prejudice to me was that I left the country and

18   therefore missed a hearing on a preliminary - I'm

19   sorry - a motion to hear my first motion for

20   change of judge, which would have been denied

21   because it cited the wrong rule anyway.

22        But the point is I believed, as I put

23   in my Missouri Supreme Court writ, which I believe

24   the Court can take notice of, it's on CaseNet - I

25   didn't think to bring a copy of it - but I believe

1    that March 4th order was fake.  It didn't make any

2    sense to me.  It came down after I had filed a

3    writ in the Missouri Court of Appeals.  And I ran

4    it by another Missouri licensed lawyer.  And

5    without getting into what that individual said,

6    there was a joint conclusion that this made no

7    sense.

8         MS. BRODY:  Your Honor, I'm gonna

9    object to a joint conclusion 'cause it's hearsay

10   of what another person said.

11        MR. GRANT:  I'll withdraw it.  Based

12   upon the consultation with another Missouri lawyer

13   --

14        MS. BRODY:  Same objection, Your Honor.

15   It's still hearsay.

16        THE COURT:  So it's still hearsay.

17   Let's talk about the facts.

18        MR. GRANT:  Okay, the facts are that I

19   was convinced that that was fake, and I was

20   concerned and afraid to return back.  I mean, this

21   -- Back to the United States.  This sounds like

22   it's some sort of movie or John Grisham novel or

23   -- Like I said, the best thing that -- well

24   anyway, this is argument.  You don't want to hear

25   this.  I'll save that for later.  But this is all

1    true.

2              In any event, so then I returned -- So

3    if we can go from a factual standpoint.  So that

4    writ is denied.  Then I returned from -- back to

5    the United States and I file a motion to vacate

6    the TRO and dissolve it - I'm sorry - the

7    preliminary injunction which was entered on

8    April 4th I believe.  And I take the well-founded

9    position that said, Hey, it doesn't matter why

10   that preliminary injunction was entered, it

11   doesn't belong -- it doesn't -- it's not justified

12   today.  That injunctive relief needs to be

13   evaluated on a routine basis.  Or at least it can

14   be.  And I filed that motion before Judge Hilton.

15   And we had come -- I had made an oral motion

16   first.  And we were here in this very courtroom,

17   and Ms. Brody had a motion she was going to set.

18   And you'll see that I set that for hearing on a

19   date certain.  I honestly, I don't have it in

20   front of me but it's in the docket.  It was set

21   for hearing and was agreed upon by the parties

22   that we would appear and I would argue that

23   motion.

24             Well I showed up to appear and argue

25   that motion on the agreed upon date.  And here's

1    prejudice and here's bias; Judge Hilton said, Oh,

2    I'm not going to hear your motion, today is not a

3    testimonial docket, so try again, reset it.  So

4    that's exactly what he did.  So he knew -- When I

5    had a motion, a viable motion he moved the

6    goalpost on me.  And, I don't know, whatever

7    knowledge you want to use.  All I know is it was

8    infuriating because I finally had a motion that I

9    felt he had to grant because -- Oh, and let me

10   back up.

11          The TRO was based upon me being in

12   rehab and being drunk.  All the parties, everyone

13   has access to my Soberlink data.  I never failed a

14   test.  I never failed.  I passed every test, more

15   than 1,500 Soberlink tests since April of 2024.

16   And then they come in here and Judge Hilton grants

17   a TRO based on the belief that -- All I said was I

18   have to leave town because I'm -- I had a

19   deposition, and they enter a TRO claiming I'm in

20   detox and I'm in rehab.  It was a cover story.

21   Well I'm not going to argue.

22          MS. BRODY:  Your Honor, I'm gonna

23   object.  That is assuming facts not in evidence.

24          THE COURT:  Sustained.

25          MR. GRANT:  In any event, what's

```
 1    important that -- for Your Honor to understand is
 2    when I came back I got a hair follicle test which
 3    proved exactly what the other hair follicle test
 4    proved the summer before, no drugs in my system,
 5    100 percent negative.  And we'll get to that.
 6    That's very important.  And it's also important
 7    that Judge Hilton denied Mr. Fenley's request that
 8    I take a hair follicle test in February after I
 9    was making these allegations.  If they thought I
10    was some sort of -- insane and this is all not
11    true and Judge Hilton isn't prejudiced and he
12    isn't biased or Judge Hilton didn't think that he
13    would have granted it.  Well, I'll let Your
14    Honor...  But I just want to make the factual
15    statement that motion was filed by the guardian ad
16    litem and it was denied by the Court.  And it was
17    denied by the Court after I asked the Court to
18    grant it and order both parents, both plaintiff --
19    Petitioner, myself, and Respondent, the mother, to
20    undergo a hair follicle test. From a factual
21    standpoint, Judge Hilton looked at Ms. Brody and
22    then he looked at me and said denied.  I did not
23    see anything other than that.  But those are the
24    facts.
25              So moving forward to the hearing on the
```

```
 1    preliminary injunction and dissolution of that
 2    motion.  Then I show up.  We -- Finally that gets
 3    reset after he pulled the rug out.  Well after it
 4    was not heard on the date that was agreed upon.
 5              THE COURT:  So what was that date?
 6              MR. GRANT:  Umm, boy.
 7              THE COURT:  'Cause the preliminary
 8    injunction was entered on 4/4/25.
 9              MR. GRANT:  June the 2nd I believe.
10    That was the date of the phone call from Mr.
11    Fenley.
12              MR. FENLEY:  That's not accurate.
13              MR. GRANT:  Is that not right?
14    June 2nd?
15              MR. FENLEY:  It might have been the
16    hearing.  That's not when we had the phone call.
17              MR. GRANT:  Okay.  I think June 2nd is
18    the date of the hearing.
19              THE COURT:  And you said you filed a
20    motion to vacate; what day did you file that?
21              MR. GRANT:  May 17th when I also -- I
22    filed that contemporaneously with the motion for
23    change of judge based upon the Supreme Court order
24    being held from the docket.
25              THE COURT:  So I see on the 17th a
```

1     motion for change of judge, a hearing notice for

2     additional GAL fees, and a motion to shorten time.

3     That's what I see filed on 5/17.

4              MR. GRANT:  I think it's 5/17, 5/20.

5              MR. FENLEY:  I believe on 5/21 we then

6     had a hearing on -- I know my motion for fees was

7     granted.  I don't know what else we had set that

8     day.  And that day we set the motion to vacate on

9     June 2nd.  We had a hearing on June 2nd.

10             MR. GRANT:  It was May 20th is the date

11    of the motion to vacate.  I'm sorry.

12             THE COURT:  I see that.  Okay, now I

13    see that.

14             MR. GRANT:  Yeah, I misspoke.  The 17th

15    was the change of judge.

16             THE COURT:  And you say after you filed

17    that motion there was a date agreed to take it up

18    on and Judge Hilton refused to take it up that

19    day, is that what you're telling me?

20             MR. GRANT:  Correct.  There's two

21    hearing dates for my motion to dissolve the

22    preliminary injunction.  The first one didn't take

23    place, the second one did.

24             THE COURT:  Okay.

25             MR. FENLEY:  I believe he tried to take

1    it up on the 21st.  When Judge Hilton did not hear

2    it that day we set it for the 2nd when everyone

3    was in the courtroom.

4            THE COURT:  I'm just looking for a

5    notice for the 21st for your motion.

6            MR. GRANT:  Honestly, Your Honor, I'd

7    have to look at the docket to recreate that.  I

8    can supplement that.

9            THE COURT:  I see a motion to modify

10   filed on the 20th.  Okay.  Why don't you continue

11   on.

12           MR. GRANT:  Okay, sorry.  So when the

13   motion for preliminary injunction -- my motion to

14   dissolve the preliminary injunction takes place,

15   coming from the perspective of bias and prejudice,

16   I presented evidence I went to the hair follicle

17   test facility that this court uses - I don't know

18   about St. Charles County - Asure Test in

19   St. Charles, and it is -- it was pursuant to court

20   order.  And I went out there and I asked -- 'Cause

21   this is another thing.  Discovery's been closed

22   since December 2024.  Judge Hilton, speaking of

23   prejudice and denial, he denied my motion to

24   reopen discovery.  I don't know why he would -- He

25   wouldn't allow me to -- This case didn't go to

1    trial until June 23rd and he wouldn't let me

2    conduct any discovery.  I could be here all day if

3    I tell you all the prejudice and bias that Judge

4    Hilton has exhibited in this case, and that's one

5    example.

6            But back to the -- back to the hearing

7    on the preliminary injunction.  I had a business

8    records affidavit, and I took the stand, as I am

9    doing today, and testified to a narrative.  I also

10   had a business record affidavit from the

11   Soberlink.  And my testimony was that I've never

12   failed a breathalyzer test and I tested negative

13   for drugs.  And it was a 90-day hair follicle

14   test.  So, therefore, we know I was not on drugs

15   when the TRO was entered.  But really the focus

16   was on that moment in time should the preliminary

17   injunction be dissolved.

18           The Judge said, Do you have an expert

19   witness.  And I said, Excuse me.  He said, You

20   need an expert witness to interpret these hair

21   follicle test results.  And from a factual

22   testimony, Your Honor, I almost fell out of my

23   chair.  As an officer of this court I said, It

24   says negative.  And he said, I can't interpret

25   this, you need an expert witness.  And he refused

```
 1    to admit it for the purposes for which it was
 2    offered.  What he said is I will -- And you'll see
 3    a pleading from me that was filed later in this
 4    case prior to trial, because that is the most
 5    overt prejudice and bias I've ever heard in my
 6    life.  A judge who sits -- previously sat in the
 7    family court, as I understand it, and was
 8    previously a family lawyer and who is the
 9    presiding judge sat here from a factual standpoint
10    and said that he couldn't interpret positive
11    versus negative and that I needed to present an
12    expert witness.  I'm blown -- Well, actually it
13    took me awhile to recover at that hearing before I
14    could move forward.  And the same thing for --
15    Anyway, the Soberlink results proved that I hadn't
16    had a drink for, again, never have failed, still
17    passed.
18            So moving forward, when I ultimately
19    get the ruling from Judge Hilton he doesn't --
20    Remember, the status quo when I go to -- when I
21    file my writ was that -- And I don't think I did
22    clarify this, I'm sorry.  I had the kids one night
23    a week - This is pursuant to a consent order - one
24    night a week on Thursdays, one visit on
25    Wednesdays, and one visit every other Sunday.  So
```

1    on my expectation, from a factual standpoint was,

2    and what I asked was let's go back to at least

3    where we were, status quo, because that TRO was

4    entered, regardless of whether it was entered

5    properly or not, you know I'm not using drugs and

6    you know I'm not using alcohol.  Well he doesn't

7    -- His order is, well, no, you can have your kids

8    one day a week only.  And it's just again -- Well

9    I'll save it for argument, the motive behind that

10   order.  But it's clear as to what -- He didn't --

11   He didn't dissolve the preliminary injunction.  He

12   entered a new preliminary injunction limiting my

13   access to my kids to one day a week, one overnight

14   a week until we'll see -- until there's whatever

15   happens next.  Let me stop there.

16            Moving back to the -- now to trial.  I'm

17   trying to do this chronologically obviously, Your

18   Honor.  The first day of trial -- And again, I

19   believe after all of this has happened I made

20   clear on the record that I filed a motion to

21   recuse.  Not a motion to disqualify, motion to

22   recuse.  All of this has happened and Judge Hilton

23   denies it and states he's not -- doesn't have

24   actual bias, which obviously is irrelevant.  But

25   that's his statement.  But in my motion, and I

1    brought here today -- Well I didn't bring it.  I

2    have it in the motion.

3            The trial testimony, by page and line,

4    I attach it, Your Honor, to the Court.  I filed it

5    under seal, or I filed it pursuant to a

6    confidential redacted information sheet because it

7    would take me forever to go through and redact the

8    minor children's names.  But there are two

9    passages that I cite in my supplement.

10           THE COURT:  Tell me where that's at.

11           MR. GRANT:  Yes.  It's in my -- the

12   supplement that I filed yesterday, last evening.

13   Maybe that's the one you haven't seen.  It's

14   titled Fourth Supplement.  Here it is.  I'm sorry.

15   I found it.  The two passages that are relevant -

16   And one is the -- I think the prior supplement -

17   but this one is page 502, lines 20 to 22.  The

18   other is pages 198 to 200 I believe.

19           THE COURT:  Let me get there real

20   quickly.

21           MR. GRANT:  Okay, yeah, I'm sorry, I

22   didn't know.  I apologize.

23           THE COURT:  502 you say?

24           MR. GRANT:  Yes.

25           THE COURT:  Okay, hold on.  Okay, I'm

 1   at 502.  Looks like that is cross examination by

 2   Ms. Brody.

 3            MR. GRANT:  Yes.  It's just --

 4            THE COURT:  502, what line?

 5            MR. GRANT:  -- one example.  Oh, I just

 6   closed my page.  One second.  Sorry, Your Honor.

 7   I believe it was 20 to 22 possibly.  Sorry, I was

 8   trying to pull this up.

 9            THE COURT:  20 to...

10            MR. GRANT:  It says, Do you want to

11   apologize to the Judge.

12            THE COURT:  I see that.  That's

13   line 20.

14            MR. GRANT:  Yeah.  So there's a

15   soliloquy on page 198 -- 199 and 200 that is more

16   directed -- that is Judge Hilton himself.

17            THE COURT:  Hold on.

18            MR. GRANT:  Umm...

19            THE COURT:  Hold on.  Let me get there.

20   Okay, 198.

21            MR. GRANT:  I believe that would be

22   correct, Your Honor.

23            THE COURT:  Okay, I'm there.

24            MR. GRANT:  I will have to pull it up.

25   I apologize.  To be candid, I didn't bring a copy

1    with me it was so voluminous.  It's in my

2    supplement.

3              In any event, there is an exchange in

4    which Judge Hilton berates me for -- I'm trying to

5    explain what my triggers are and he berates me for

6    making excuses during trial.  It's overtly

7    prejudicial and biased.  And there's some

8    back-story to that that's most important that I

9    should have mentioned earlier; that on

10   February 7th off the record - This was actually

11   off the record so I didn't expect to find it in

12   the transcript -  Judge Hilton disclosed that he's

13   an alcoholic, which was interesting and --

14             MS. BRODY:  Your Honor, I'm gonna

15   object.  This is now hearsay on a personal level

16   that Judge Hilton can testify to this

17   off-the-record conversation.

18             THE COURT:  Yeah, I'm going to sustain

19   that objection.

20             MR. GRANT:  Okay.  Well he berated me

21   because I relapsed.  And he was --

22             THE COURT:  Tell me where that's at.  I

23   got the transcript now.  Tell me -- It was -- Him

24   berating you in the transcript, tell me where

25   that's at so I can see that and read what the

1   question was and what the words were.

2            MR. GRANT:  Your Honor -- I apologize,

3   Your Honor.  I'll have to -- I would have to log

4   in through my phone through WiFi to find that

5   particular.  The page -- It's quoted in my filing.

6   If you could go to CaseNet, go to the docket, it's

7   quoted.

8            THE COURT:  It's quoted where?

9            MR. GRANT:  Umm, in the -- what's

10  called the Second Supplement filed yesterday.

11           THE COURT:  Okay.

12           MR. GRANT:  I'm almost positive.  I

13  hope I don't send you on a goose hunt.

14           THE COURT:  First supplement.  So in

15  your what's described as first supplement to the

16  verified application which was filed on

17  August 26th you cite the trial transcript Exhibit

18  A and you cite the following notes which would be

19  at 198, lines 24 through 200, line 12.

20           MR. GRANT:  Correct.

21           THE COURT:  Beginning with:  Do you

22  know what the -- and the triggers for the relapse

23  have been, is that what you're talking about?

24           MR. GRANT:  Yes, Your Honor.

25           THE COURT:  Okay, let me look at that

1    entire thing then.  That's 198.  Okay, so we're at

2    198.  This is questioning by -- It might be your

3    testimony without being questioned.  So 198.

4             MR. GRANT:  I think I'm cross-examining

5    Ms. Grant.

6             THE COURT:  That could be.

7             MR. GRANT:  And he interjects.

8             THE COURT:  Starts at the bottom with

9    the question is:  I'm just trying to establish

10   today on the record - thank you - do you know what

11   any of the triggers have been for my relapse or

12   relapses?  And the answer was:  So you're asking

13   me for any instances since 2019?

14             "QUESTION" -- or "ANSWER:  Yes.  Do

15   you know the cause?

16             "ANSWER:  No.

17             "QUESTION:  Okay, thank you.  Do you

18   know if I've had two hip replacements in 2019?

19   The Court interjects:  How is that relevant?  How

20   is that relevant?  You respond:  Trying to -- Well

21   strike that.

22             "COURT:  It's relevant because that's

23   how you self-medicated?  How is it relevant?

24             "QUESTION:  Yes, that's -- that is

25   exactly what I was trying to get to.

1    "COURT:  Okay.  So this is another
2    excuse for your disease of alcoholism because you
3    decided as a mental health professional and as a
4    psychiatrist/psychologist that you can
5    self-medicate, that that was okay?"  Your answer:
6    No, Your Honor, I'm not -- I'm an alcoholic.  I
7    made terrible decisions.
8             "COURT:  Well let's hear about those
9    instead of excuses, okay.
10            "ANSWER:  Okay.
11            "QUESTION:  Because hip replacement
12   surgery, that's no excuse for your behavior.
13   None.  So let's get something more relevant where
14   you own it, Mr. Grant.
15            "QUESTION:  I own that I have a
16   disease.
17            "COURT:  So far I haven't heard it.
18            "MR. GRANT:  I own it.  Let's make
19   that clear.
20            "COURT:  Well I can't wait to hear
21   about what your plan is for your complete recovery
22   because I haven't heard it yet.
23            "MR. GRANT:  You'll hear about it when
24   I testify, Your Honor.
25            "THE COURT:  Thank you.  Let's move

```
 1   on.
 2              "MR. GRANT:  Okay."
 3              Is that what you wanted me to hear?
 4              MR. GRANT:  Yes, Your Honor.
 5              THE COURT:  Okay.
 6              MR. GRANT:  Yes, I want to point out
 7   that testimony and its consistency with what I
 8   mentioned before that I'll examine Judge Hilton
 9   about is the berating and the reference to me
10   being a psychiatrist/psychologist.  And I was --
11   That testimony and his behavior, that is
12   illustrative of his bias and prejudice and hatred
13   of me honestly.
14              MS. BRODY:  Your Honor, I'm gonna
15   object again.
16              MR. GRANT:  That is argument.  I
17   withdraw it.  I just want to bring that to the
18   Court's attention and want you to take note as to
19   bias and prejudice.
20              THE COURT:  Thank you.
21              MR. GRANT:  Thank you.  And then, yeah,
22   then -- then I mention the other instance that you
23   looked at, Ms. Brody's questioning of me.  There's
24   other instances there but specifically -- And this
25   is for the Court of Appeals, Your Honor, but I
```

```
 1    would point that out as I believe that was a
 2    moment in which the Judge should have stopped
 3    trial, recused, and declared a mistrial to the
 4    extent that's appropriate in a bench trial.
 5              So then moving forward to July 11th --
 6    Oh, we're gonna have to play that recording.  But
 7    after -- Well I can testify to this.
 8              When Mr. Fenley called me he asked to
 9    have a phone call.  It wasn't my idea.  And you
10    can hear the recording as to what was said.  And
11    he offered to quid pro quo trade me my children
12    for custody.
13              MR. FENLEY:  Your Honor, I'm gonna
14    object.  That's hearsay from that conversation
15    now.
16              THE COURT:  I think the tape recording,
17    if you have it, would be the best record of what
18    was said by anyone.
19              MR. GRANT:  Okay, absolutely.  And then
20    I just want -- So fast-forward.  After trial I had
21    my kids one day a week.  And then at trial you can
22    see in the transcript I didn't -- Mr. Fenley and I
23    had a very aggressive exchange.  But I was asked
24    -- That whole apology -- There was a bunch of
25    questions about apologizing and apologizing.  And
```

1    I refused to apologize for pointing out

2    corruption.  And I paid dearly for it when the

3    guardian ad litem on the 11th recommended that I

4    see my kids one day a week.  It's outrageous.  I'm

5    sorry --

6              MS. BRODY:  I'm gonna object.

7              MR. GRANT:  I'm sorry, twice a month.

8              MS. BRODY:  This is not relevant to the

9    motion to disqualify Judge Hilton.

10              MR. GRANT:  It's context, Your Honor.

11              THE COURT:  I'm going to sustain the

12    objection.  Again, we're limiting ourselves right

13    now to what evidence you have of bias or prejudice

14    on Judge Hilton's part that would require this

15    court to recuse him or disqualify him.

16              MR. GRANT:  Fair enough.  Thank you,

17    Your Honor.

18              So then we move forward to the escort

19    order.  And more importantly is August 11th.  On

20    August 11th I filed a federal lawsuit which

21    asserts a putative class, which is obviously

22    different than a class, but with civil RICO, civil

23    rights act claims among others.  And named within

24    that complaint are two defendants, Judge Hilton

25    and Commissioner Greaves.  And pursuant to Rule 4

1    - This is in my pleadings - Rule 4 is the Federal

2    Rules of Civil Procedure, I was provided two

3    options, to have all the defendants either served,

4    hand served and pay for it or to offer -- or

5    request waiver of service, which I think Your

6    Honor knows the procedure on that so I won't go

7    into it.

8            So I elected to do waiver of service

9    via U.S. mail, not certified, not -- just U.S.

10   simple first class mail.  So I did that on the

11   11th as required.  We showed up on the 12th for a

12   hearing, Judge Hilton noted the filing, told me

13   that he had -- stated about e-mailing the Supreme

14   Court and asking for a judge, and then said that

15   -- when asked who did you e-mail he said, I'm not

16   going to tell you, you'll sue them, which I think

17   again is evidence of bias and prejudice because --

18           MS. BRODY:  Your Honor, I'm gonna

19   object to that characterization.

20           THE COURT:  Sustained.

21           MR. GRANT:  Well that was his statement

22   was, You will sue them.  In any event, so he was

23   aware -- The point of bringing that up is he was

24   aware of the lawsuit on the 12th.  And then on the

25   13th if you read his escort order it is the most

1    shining example --

2              MS. BRODY:  Again, Your Honor, this is

3    about to be opinion.

4              MR. GRANT:  Let me back up.  I withdraw

5    it.  Your Honor, if you read the escort order --

6              THE COURT:  I have it in front of me.

7              MR. GRANT:  Okay.  It asserts that

8    service by U.S. mail is some form of harassment,

9    intimidation on a commissioner, that a

10   Twenty-First Circuit commissioner cannot handle

11   and needs to be -- to get the police involved if

12   there's service by mail in a 10 x 13 white

13   envelope that I purchased from WalMart.  It was --

14   I believe Your Honor will conclude, and if you

15   read that, particularly with my response to the

16   escort order, you will see that that entire order

17   was biased, prejudiced, and retaliation.

18             MS. BRODY:  Okay, again, I'm gonna

19   object on the basis that it is opinion.  I think

20   that the escort order speaks for itself, Your

21   Honor.

22             THE COURT:  Sustained.

23             MR. GRANT:  Then just to move forward

24   to this morning, Your Honor.  I've been practicing

25   law for 21 years.  I've never had a complaint

1    filed against me.  I'm sure I have now but I'm not

2    aware of it.  And I had to check in with security

3    and be baby-sat to walk up to this courtroom.  The

4    escort order, it -- it -- it is -- Well, I just

5    want to say that, yeah, I had to wait downstairs

6    and wait to be accompanied to a courtroom.  I'm an

7    officer of the Court, I been practicing for 21

8    years, and the basis was that escort order and the

9    mailing pursuant to federal rule, civil procedure

10   four.

11            And subject to -- I have a recording to

12   play for you, Your Honor.  And I think there was

13   one other thing we were going to look up.

14            THE COURT:  So let me just clarify with

15   you.  You indicated that you elected to have

16   waivers of service mailed out to the parties?

17            MR. GRANT:  Correct.

18            THE COURT:  How does that tie in with

19   this letter?  Was this dropped off by --

20            MR. GRANT:  So --

21            THE COURT:  Was that dropped off by the

22   postal service?

23            MR. GRANT:  Yes.

24            THE COURT:  Okay.

25            MR. GRANT:  It was sent by U.S. mail.

1    And apparently -- I can't speak to how it was

2    dropped off, but if you read the escort order I'll

3    let Your Honor decide if that's consistent with

4    the U.S. mail.  It implies that I -- From a

5    factual standpoint the escort order implies that I

6    personally delivered it or had someone personally

7    deliver it and that it was a suspicious package.

8    Thank God I took a photograph.

9              MR. FENLEY:  And, Your Honor, I think

10   the bigger issue is that it was sent to her home

11   address instead of the courthouse address, where

12   if it was sent to the courthouse - Conjecture - I

13   don't think an escort order would have been

14   entered.  But knowing the home address of a

15   commissioner that he is obviously unhappy with and

16   sending something to I think was the issue.

17             THE COURT:  Okay.

18             MR. GRANT:  Can I --

19             THE COURT:  Sure, you can respond,

20   yeah.

21             MR. GRANT:  I'll address that.  I

22   anticipate that I'm going to get -- I'm going to

23   encounter every defense possible to this federal

24   lawsuit.  And if I mail it -- Pursuant to federal

25   authority you can mail it to their home address.

1    And as a courtesy, as I point out in my response,

2    as a courtesy I redacted Judge Hilton's home

3    address, I redacted Commissioner Greaves' home

4    address.  I didn't have to.  Actually, the burden

5    is for them to ask the Court to redact it.  I had

6    no desire to intimidate anyone.  What I wanted to

7    head off is some argument that if I mailed it to

8    not their home address that they didn't receive it

9    and, therefore, I have to start over from scratch

10   in 30 days.  That was the only reason these things

11   were mailed, pursuant to Rule 4 which is the

12   custom and practice, to everyone's residence.

13            MR. FENLEY:  He sent mine to my office

14   address.

15            MS. BRODY:  And he sent mine to my

16   home, and my home address is not registered with

17   the Missouri Bar.

18            THE COURT:  Okay.

19            MR. GRANT:  I agree, it's not

20   registered with the Missouri Bar.

21            MS. BRODY:  So why didn't you send it

22   to my office?  But you decided to send it where my

23   children live, is that right?

24            MR. GRANT:  I sent it to the home

25   residences that I could find.  That's what you're

1    supposed to do per the rule.

2              THE COURT:  Okay, I think we heard

3    enough about that.  Move on.

4              MR. GRANT:  So, I'm sorry, Judge, I

5    would ask the Court to take a short break and I'll

6    play that recording.  And I'd like to -- We can do

7    it now.  I was going to move for the documents

8    that have been identified, to move them into

9    evidence, and then I have the recording.

10             THE COURT:  Okay, so tell me what

11   documents you'd like to move into evidence.

12             MR. GRANT:  Yes, I think it's 1

13   through 5, but we can take them each one at a

14   time.

15             THE COURT:  What's marked as Exhibit 1

16   is a printout from Our Family Wizard involving a

17   conversation between Mr. Grant and Ms. Copeland

18   which indicates it occurred on January 22nd at

19   3:04 p.m.  Any objection to that?

20             MS. BRODY:  Your Honor, I'm gonna

21   object.  This is not the best evidence.  His own

22   testimony of how he felt on that day is best

23   evidence, not an e-mail that he sent to somebody.

24             MR. GRANT:  This is a trial exhibit.

25             THE COURT:  It will be admitted over

1    the objection.

2              Exhibit 2 is a our Family Wizard

3    message report, conversation between Mr. Grant and

4    Ms. Copeland by e-mail which would indicate being

5    sent on January 23, 2025, at 3:29 p.m.  Any

6    objection to that?

7              MS. BRODY:  No, Your Honor.

8              THE COURT:  It will be admitted.

9    Number 3 is a copy of a verified motion to

10   disqualify the Eastern District Court of Appeals

11   which was filed in the Eastern District, ED 113446

12   apparently filed on March 26, 2025.  Any objection

13   to that?

14             MS. BRODY:  Your Honor, I object on the

15   basis it has multiple attachments.  These were not

16   offered as part of evidence.  If the Court wants

17   to take judicial notice of filings I don't have an

18   objection to that.

19             THE COURT:  I will admit this.  I'll

20   also include with that any additional attachments

21   that may be presented to me.

22             Exhibit 4 is a printout from Gmail of a

23   e-mail communication indicated between the e-mail

24   address mattgrantstl@gmail and

25   derekwiseman@usdoj.gov, indicates a date of

1    January 24, '25 at 1:34 p.m.  It's a chain which

2    includes a copy of an e-mail from Veronica Gipson

3    to Matt Grant on January 24, '25.  It includes

4    another -- appears to be an e-mail from Ms. Gipson

5    and Mr. Grant.  And then also it probably included

6    a PDF of an order.  That's not included, it's just

7    a PDF indication, but I assume this also included

8    the 1.8, an actual PDF attachment, of an awarded

9    date of 1/21/25.  Any objection to this document?

10              MS. BRODY:  Your Honor, I object.  It's

11   hearsay.

12              THE COURT:  It will be admitted over

13   that objection.  And I don't have number five.

14   What's five?

15              MR. GRANT:  Number 5 is the March 26th

16   writ.

17              MR. FENLEY:  I think that's what you

18   called number 3 already.

19              THE COURT:  Yeah, three and five is the

20   same thing.  March 26th, is a verified motion to

21   disqualify, if that's what you're calling a writ.

22   It doesn't call it -- It's not styled writ.  If

23   that's what you're calling a writ that's

24   Exhibit 3.

25              MR. GRANT:  Okay, I'm sorry.  Just, if

1    I can back up.  Maybe I should have -- The escort
2    order is on the docket.  I have a copy.  Do I --
3    Is Your Honor, can you take judicial notice?
4              THE COURT:  I can take notice of that.
5    That's in the file.
6              MR. GRANT:  Okay.  And then I just want
7    to review and see if there's anything that would
8    have been Exhibit 5.  Oh.  One second.  I do have
9    another exhibit.
10             THE COURT:  Okay.
11             MR. FENLEY:  Your Honor, I have an 11
12   a.m. conference in Division 65 this morning.  I
13   didn't anticipate this taking two hours.
14             THE COURT:  Okay.  Maybe you need to
15   tell Division 65 you might be late.
16             MR. GRANT:  Five is open then, right,
17   No. 5?
18             THE COURT:  Five is still open, yes.
19             Okay, Exhibit 5 is the letter from the
20   Commission on Retirement, Removal, and Discipline
21   dated July 31, 2025, to Mr. Grant.  Any objection
22   to this?
23             MS. BRODY:  Your Honor, I would object.
24   There is lack of foundation, as well as this is a
25   -- clearly a hearsay document.

1           THE COURT:  I would agree it's hearsay.

2     I'm going to admit it over the objection.

3           MR. GRANT:  Just to provide context

4     that I think is important for Your Honor, I made

5     my report to the commission on May 30th and the

6     response was it was too long.  And then subsequent

7     activities have happened, and then all of a sudden

8     this arrived in my mailbox so...

9           THE COURT:  Gotcha.  Okay, what else do

10    you have to present?

11          MR. GRANT:  Here, I have the recording

12    right here.

13          THE COURT:  Okay, is it loud enough

14    we're going to be able to play it?

15          MR. GRANT:  It's very loud.

16          THE COURT:  Do you have another copy of

17    it?

18          MR. GRANT:  I do have it electronically

19    and I provided it at trial on a thumb drive.

20    But I can provide it on a thumb drive now too.

21          THE COURT:  I just want you to have

22    that preserved in case the court reporter may need

23    to refer to that.

24          MR. GRANT:  That's what I am struggling

25    with.  I ask for guidance on that.

```
 1              THE COURT:  I'll let you play it now,
 2    and let's call it Exhibit 6, okay.  And then I'm
 3    going to indicate that the reporter is not going
 4    to record that now and if a transcript is
 5    necessary we can take that transcript from that.
 6    Is that okay with you?
 7              THE COURT REPORTER:  Yes, Judge.  Thank
 8    you.
 9              THE COURT:  You can play it now as
10    Exhibit 6.  I'm going to go ahead and admit it.
11              MR. GRANT:  I think John was right.
12    I'm sorry, it's June 3rd, not June 2nd.  Thank you
13    for correcting me, John.
14              (Recording began playing to the Court.)
15              MR. GRANT:  Your Honor, I should have
16    warned you, it's 26 minutes.
17              (Recording was paused.)
18              MR. FENLEY:  Your Honor, I'm gonna
19    object.  I don't know how a conversation between
20    the two of us has any relation to what Judge
21    Hilton thinks of this case or if he's biased or
22    not.
23              THE COURT:  Tell me how this relates to
24    the claim that Judge Hilton is biased.
25              MR. GRANT:  I thought we already
```

1       addressed this.  This is the context in which all
2       of this happened; that Mr. Fenley submitted the
3       motion on the 26th -- yeah, the motion on the 27th
4       and the TRO on the 27th.  All of this interplays
5       together.  The bias and prejudice is reflected in
6       all of this.
7                   THE COURT:  Mr. Fenley's bias perhaps.
8       Where's the bias of Judge Hilton reflected in
9       this?
10                  MR. GRANT:  This goes -- Here, let me
11      rephrase it.  This goes -- If nothing else, it
12      goes to the credibility of me as a witness to
13      prove to you that in fact what I'm saying here is
14      true about this courtroom.
15                  THE COURT:  Well, what I'm struggling
16      with is that you have a number of things going on
17      right now, some of which we're gonna not be able
18      to address in this proceeding.  Your large claim
19      of systematic and deep-rooted fraud and corruption
20      in the Court here, and the approach you're taking
21      by doing a RICO action in federal court has a
22      whole lot of things that need to be addressed for
23      that, some of which this might be very relevant to
24      that.
25                  To what we're on today is simply

1    whether or not Judge Hilton by his acts and deeds

2    has indicated that he cannot provide a fair trial

3    in this case.  Not quite very artfully said but

4    basically that's the concept; whether the bias

5    that he has, if he has any, is so pervasive that

6    he can not provide you with a fair trial.  And in

7    that, any thoughts that the guardian ad litem

8    might have about you aren't necessarily

9    attributable to Judge Hilton.  Mr. Fenley may have

10   a deep set hatred for you, but that doesn't mean

11   that Judge Hilton has that same feeling, even

12   though Mr. Fenley's appointed by the judge.

13           Judges appoint hundreds of people over

14   the course of a year to be guardians in various

15   other roles of the court.  It does not mean -- In

16   fact, the judge does not control how Mr. Fenley

17   undertakes his tasks.  Mr. Fenley's got his own

18   set of guidelines as a guardian ad litem he has to

19   comply with, just like we do as lawyers and

20   judges, and it's up to him to perform his

21   activities within that range of activities.  And

22   if he's not then it would be perhaps I guess at

23   some point in time maybe up to Judge Hilton to

24   remove him if he violates his obligations as a

25   guardian.  But what his thoughts are about you or

1    about what he might talk to you about cannot be

2    attributed to Judge Hilton automatically, which is

3    what you seem to want to do.

4              MR. GRANT:  Thank you, Your Honor.  Two

5    things.  One, you just reminded me why this is

6    relevant.  I moved to disqualify John Fenley after

7    this phone call, presented this to the Court, and

8    Judge Hilton denied it.  And I think you should

9    hear this and hear that if this would have been

10   presented to you you would have bounced and

11   disqualified Mr. Fenley immediately.

12             THE COURT:  And this is before the

13   trial?

14             MR. GRANT:  Yes.

15             THE COURT:  Okay.

16             MR. GRANT:  And just one other

17   formality.  I think you did -- Obviously you got

18   the standard correct.  I would just note that the

19   trial is over and Judge Hilton is the finder of

20   fact so, therefore, the fair trial it's more than

21   that here.  Now it's whether I can get a fair

22   judgment.

23             THE COURT:  But the same applies

24   through the whole process.  It doesn't really

25   change whether we're in a post-hearing or

1    prehearing setting, the same thing applies.

2              So do you want -- Hang on.  Hang on.

3              MR. GRANT:  Oh, I'm sorry.

4              THE COURT:  You want to play this for

5    26 minutes?

6              MR. GRANT:  I would -- I'm happy

7    submitting it.

8              THE COURT:  Can you submit it to me in

9    a thumb drive?

10             MR. GRANT:  Yes.  Yes, Your Honor.

11             THE COURT:  Okay.  Can you submit it on

12   a thumb drive you don't want back?

13             MR. GRANT:  Yes, Your Honor, I can.

14             THE COURT:  I can mail it back to you I

15   guess.

16             Mr. Fenley.

17             MR. FENLEY:  I also think that this

18   kind of -- you know, in terms of discovery and

19   information produced, if this was never produced

20   in discovery or if there was, I mean, potentially

21   privileged conversations that we're having - I

22   don't necessarily think we have privilege but --

23             THE COURT:  Where's the privilege lie?

24             MR. FENLEY:  I think it's with

25   Mr. Grant himself as an attorney representing

1   himself.  And he didn't --

2              THE COURT:  I don't see that's

3   necessarily a fact we can look at.  And I don't

4   think you have any privilege with the --

5              MR. FENLEY:  I have no privilege with

6   him.  I'm don't -- I'm not trying to say --

7              THE COURT:  Nor do you have with your

8   children either because you're not their lawyer.

9   So it is a --

10              MR. GRANT:  That is indicative of why

11   you should listen to the recording.

12              THE COURT:  Okay.

13              MR. FENLEY:  I'm not scared of what's

14   on the recording.  I just think it's a low blow to

15   record a conversation as a professional attorney.

16              THE COURT:  I understand what you're

17   saying.  At this point in time we can do one of

18   two things.  If you think -- Mr. Fenley, if you

19   want me to hear this now so that you can respond

20   to it now that's fine with me, I'll take the time

21   to do it.  If you want him to just give me the

22   thumb drive and I'll listen to it later and you

23   want to then testify in some fashion about the

24   conversation I'll let you do that.  Even though

25   it's not the way we've done it before I'll do it

```
 1    because it will save us some time.  And I'll let
 2    you tell me what you think is on the recording
 3    even though I'll end up hearing it, I can do that.
 4    However, you'd like to do it I'll do that.
 5              MR. FENLEY:  Option two sounds good to
 6    me to save time for all involved.
 7              THE COURT:  Okay.  So I'm going to let
 8    you submit that.  I'm going to admit it as
 9    Exhibit 6.  Give me the thumb drive.  I'll mail it
10    back to you when I'm done.  And when you're done
11    testifying I'm going to let people cross-examine
12    you if they want to.  Then I'm going to let them
13    testify if they want to.  If you want to call
14    Judge Hilton we can do that.  But we just need to
15    start moving along.
16              But what I'd like to do right now is
17    give counsel the opportunity, we'll take about a
18    five-minute recess, go down and chat with the
19    people down the hall and tell them you're going to
20    be late, okay.  Court will be in recess about five
21    minutes.
22              (A brief recess was taken.)
23                                    ***
24              THE COURT:  We're back on the record
25    after a brief break.  We're still in the process
```

```
 1    of your case and your presentation, Mr. Grant.
 2              MR. GRANT:  Yes.  I call the Honorable
 3     Bruce F. Hilton to the stand, please.
 4              THE COURT:  Have Judge Hilton step in.
 5                 HONORABLE BRUCE F. HILTON,
 6    having been sworn, testified as follows:
 7              (The witness hands a document to the
 8     Court and parties.)
 9              THE COURT:  You may proceed.
10              MR. GRANT:  The witness just handed me
11     a case.  I don't know what to do at this moment,
12     this -- if I should be allowed to read it or what.
13              THE COURT:  Well you can ask your
14     questions and you can ask him why he handed you
15     the case.  Go ahead.
16                     DIRECT EXAMINATION
17    BY MR. GRANT:
18         Q.   Is it afternoon?  Good late morning,
19    Your Honor.
20         A.   Morning.
21         Q.   You just handed me a case, is that
22    true?
23         A.   I did.
24         Q.   And what was the purpose?
25         A.   It may be a dispositive of your motion.
```

1        Q.   This motion this morning?

2        A.   Uh-huh.

3        Q.   And what is your belief as to why that

4   is?

5        A.   I believe the holding is since the

6   evidence has been closed and the case is under

7   submission that your application is untimely.

8        Q.   I haven't had a chance to read it but,

9   okay, thank you for that explanation.

10            Judge Hilton, I only have a few

11    questions for you.

12            Isn't it true you told me that you're

13    an alcoholic?

14        A.   That's correct.

15        Q.   Okay.  And isn't it true that you

16   pointed out that you've never relapsed?

17        A.   Correct.

18        Q.   And isn't it true on at least two, if

19   not three occasions you pointed out that I

20   relapsed?

21        A.   Correct.

22        Q.   On -- The first time we met on

23   January 21st in this courtroom, which was

24   originally set for a hearing on Commissioner

25   Greaves, do you recall testifying regarding my

1  financial condition?  Or, I'm sorry, strike that.
2  Do you remember commenting upon my financial
3  records or my financial condition?
4          A.   The only comment would have been that I
5  took judicial notice of the entire contents of this
6  file, including your financials.
7          Q.   Okay.  You did not make any comment
8  about how much child support currently -- I was
9  currently paying compared to my current income?
10         A.   I may have reviewed the underlying
11 judgment to make a determination as to what you
12 were ordered to pay and the request made by the
13 mother of your children for an increase in child
14 support.
15         Q.   Okay.  But my question was do you
16 recall whether you made a comment?
17         A.   I don't.
18         Q.   Okay.  So you didn't or you do not
19 recall?
20         A.   I don't recall.
21         Q.   Okay, thank you.  Do you remember on
22 numerous occasions at that hearing commenting that
23 I had suffered?
24         A.   I may have.
25         Q.   Okay.  So it's a maybe but not a yes?

1           A.   Well, I mean, I don't think there's a

2    factual dispute about what has transpired in your

3    life professionally.  So if I made a comment that

4    you suffered as a result of your disease I may have

5    said that.

6           Q.   Oh, okay.  So thank you for clarifying.

7    So you deny making a comment that I suffered as a

8    result of how these proceedings have played out up

9    to the date of January 21st?

10          A.   I believe that -- I don't recall

11   specifically what I said.  If it was on the record

12   that would be the best evidence.  But I think my

13   comments more directed at your complaint that your

14   children had suffered, not you.

15          Q.   Thank you.  And I'm going to ask you

16   about that next.  Have you had occasion to review

17   the transcript from January 21st?

18          A.   No.

19          Q.   Do you recall any time in the last

20   several months commenting that you believe the

21   comments that you may have made are not on the

22   transcript?

23          A.   No.

24          Q.   Okay.  You deny that?

25          A.   I deny that.

1          Q.   Okay.  With regard -- Did you -- You
2     just referenced it, but did you make comments that
3     my children had suffered?
4          A.   I did.
5          Q.   And did you make -- Let me back up.
6     Did you generally encourage me to consent to your
7     jurisdiction?
8          A.   That was your decision.
9          Q.   So can you read back the question,
10    please?
11              (The last question was read back by the
12    court reporter.)
13          A.   That was your decision.
14              MR. GRANT:  Your Honor, Judge Zerr, can
15     you direct the witness to answer the question.
16              THE COURT:  I think that he's answering
17     the question that it goes to the next part of it;
18     basically it's your decision to make that
19     decision.  What he said to you about that, it
20     still was your ultimate decision to make the
21     decision to consent to this jurisdiction
22     regardless of what words he might have used.
23              MR. GRANT:  Right.
24    BY MR. GRANT:
25          Q.   Judge Hilton, I agree that the law is

1    it was my decision to make.  The question is did

2    you encourage me to exercise my discretion and

3    consent to you?

4          A.   I don't believe so. I offered you an

5    opportunity to have your case heard based on

6    representations that you made that your children

7    had been suffering.  Those were the representations

8    I made.

9          Q.   Did you send me home that day at the

10   end of the hearing to think about whether or not I

11   wanted to consent to your jurisdiction?

12         A.   I think that's correct.

13         Q.   Did you tell me you refused to grant my

14   motion?

15         A.   I don't know.  You've filed so many

16   motions, Mr. Grant, I don't know what motion you're

17   referring to, I apologize.

18         Q.   It was the only motion on the 21st of

19   January which is whether or not the case would be

20   transferred to the Missouri Supreme Court?

21         A.   I don't recall, sorry.

22         Q.   You don't recall whether you refused to

23   grant my motion?

24         A.   Did I not grant your motion?  I think

25   the court file would reflect my rulings.  That

1  would be the best evidence.

2         Q.   Let me follow up then.  Let's lay a

3  foundation.  On the 21st when the hearing concluded

4  there was no ruling on that motion, correct?

5         A.   If you are representing that to me as

6  an officer of the Court I agree.

7         Q.   Okay.  And you have no recollection as

8  to whether you told me that I was to go home and

9  think about it because you refused to grant my

10 motion?

11        A.   I don't recall that.

12        Q.   Okay.  You don't recall it or you know

13 that you didn't say it?

14        A.   It's the same question.

15        Q.   Pardon?

16        A.   I've answered the question.

17        Q.   No, there's a difference between your

18 answer.  Is it you know you didn't say that or you

19 don't recall whether or not you did say it?

20        A.   I don't recall that I said that,

21 Mr. Grant.

22        Q.   Okay.  Do you recall at some point

23 after that hearing that I appeared here in the

24 courthouse and demanded to see you?

25        A.   I do recall that.

1          Q.   Okay.  And do you recall that I wanted
2     you to read an e-mail?
3          A.   I don't recall what you wanted me to
4     do, but I said I wouldn't talk with you because you
5     weren't with the other attorneys of record.
6          Q.   Okay.
7          A.   And I refused to have any ex parte
8     communications with you or anyone else involved in
9     this case.
10         Q.   Do you believe I was attempting to have
11    a substantive communication with you about the
12    case?
13         A.   I believe you were attempting to have
14    an ex parte communication with me.
15         Q.   You don't recall that I was asking you
16    to read an e-mail that - Let me finish - that Ms.
17    Gipson was holding in her inbox?
18         A.   I don't recall.
19         Q.   Okay.  Do you recall on that date
20    telling me that before you were on the bench you
21    were a family law attorney?
22         A.   I recall that.
23         Q.   Do you remember winking at me when you
24    said that?
25         A.   No, I don't recall that.  We're not

1  that close.

2        Q.  I didn't mean to imply that, Judge.

3  You received -- Strike that.  When did you learn of

4  the Missouri Supreme Court's sua sponte order dated

5  March 4th?

6        A.  I don't recall the specific date,

7  Mr. Grant.

8        Q.  Okay.  Can you estimate for us how soon

9  -- with regard to when it was entered, March 4th,

10 your understanding soon you learned of its

11 existence?

12       A.  I received the order because I

13 requested same because you were asking to recuse

14 the entire Twenty-First Judicial Circuit.  So I

15 reached out to the Supreme Court to appoint a

16 senior judge or a judge out of circuit to hear that

17 motion.

18       Q.  So you expected that order?

19       A.  I have no control over the Supreme

20 Court.

21       Q.  Okay.

22       A.  I requested it, they responded, there

23 was a hearing.

24       Q.  Okay.  So when you received the order

25 -- Strike that.  You were in the courtroom when Ms.

1    Gipson stated that it was a clerical error that it

2    was not published to the docket, correct?

3           A.   Correct.

4           Q.   Okay.  So we know that you learned of

5    the order's existence before March 27th when it was

6    published to the docket, right?

7           A.   If that's what the court file reflects,

8    that's correct.

9           Q.   I'll represent to you that it was

10   published by e-mail to the parties on March 27th at

11   approximately 4 p.m.

12          A.   Thank you.

13          Q.   So based upon that representation, Your

14   Honor, between March 4th when it was file stamped -

15   And I'll represent it's file stamped - and

16   March 27th can you tell us at any point in time

17   when you learned of its existence?

18          A.   The minute I received it from the

19   Supreme Court I knew of its existence.

20          Q.   Right.  When was that?

21          A.   I don't recall.

22          Q.   Okay.  And how did you receive it from

23   the Supreme Court?

24          A.   E-mail.

25          Q.   Okay.  Do you read your e-mails daily?

1              A.   No.

2              Q.   How often do you read your e-mails?

3              A.   Depends if I'm on vacation, depends

4    what I have going on.  I try to look at them every

5    other day, every day.  Depends what I've got going

6    on.

7              Q.   So if you were not on vacation the week

8    of March 4th at most it would have been a couple of

9    days?

10             A.   I don't know, I don't recall.

11             Q.   No, I'm -- Do you agree with my

12   interpretation of your testimony that you would

13   have seen that e-mail within a couple of days

14   assuming you weren't on vacation that week?

15             A.   Correct.

16             Q.   Okay.  And what is your understanding

17   of the circumstances to which you learned that that

18   order was not published to the docket?

19             A.   I don't have any independent

20   recollection of that at all.  There's been so many

21   pleadings filed in this case.  My attention was in

22   giving you two days of trial, that was my purpose.

23             Q.   Pardon?

24             A.   My purpose was to honoring the two days

25   we set for trial and having your motion heard

1  before a senior judge.  That was my intention.

2        Q.  Okay.  When did you come to learn that

3  I had filed a petition for writ in the Eastern

4  District Court of Appeals?

5        A.  I received that electronically.  I

6  don't recall the date.  You've filed several writs.

7        Q.  Correct.  I'm talking about the very

8  first one.

9        A.  You probably have a better recollection

10  than I do since you prepared them.

11        Q.  I'll represent to you it was filed on

12  March 26th.

13        A.  I trust your representation.

14        Q.  Thank you, Your Honor.

15            Do you remember, at that point in time

16  were you -- did you know that the order from the

17  Missouri Supreme Court was not published on the

18  docket?

19        A.  No.

20        Q.  Okay.  The next day - Tell me if you

21  recall this or not - there was an ex parte TRO

22  entered that was presented by Ms. Brody.  Do you

23  remember that?

24            MS. BRODY:  Your Honor, I'm gonna

25  object to the characterization.  It was not an ex

1    parte order.  It was set for hearing.  And you
2    received notice.
3              MR. GRANT:  That's the 28th.
4              MS. BRODY:  I applied for a date on the
5    27th.  It was set on the 28th.  It was not an
6    order entered.  It was a notice of hearing.
7         Q.   Judge Hilton, let me strike that.  Let
8    me back up, ask you a different question.
9              In late March -- Strike that.  When you
10   received notice -- I didn't ask you this question.
11   How did you receive notice of the writ?  We talked
12   about the Supreme Court --
13        A.   I've already answered that.  I received
14   notification electronically from the Court of
15   Appeals.
16        Q.   Yeah, okay, so both the Missouri
17   Supreme Court and the writ.
18             Did it occur to you that it was odd
19   that I filed a writ if there was a senior judge
20   appointed?
21        A.   I don't know that I can answer that.  I
22   don't know what odd means to you.
23        Q.   Well if you had appointed -- if you had
24   requested the Missouri Supreme Court enter an order
25   and assign a senior judge to rule on my motion and

1    you saw that I took a writ because no one ruled on

2    my motion and I wanted a ruling on my motion --

3           A.   I don't know what you wanted, the

4    relief you were seeking.

5           Q.   Oh, you didn't read it?

6           A.   No.  The only time I get engaged with

7    that if I have to file a response.

8           Q.   You didn't read that writ?

9           A.   No.

10          Q.   To this day have you read it?

11          A.   No.

12          Q.   How many writs are you named in

13   typically?

14          A.   Well with you, four.

15          Q.   No, I'm saying typically.

16          A.   Typically very seldom.

17          Q.   Okay.  So how many -- Ignore this case

18   existing --

19          A.   That's impossible.

20          Q.   I agree with that.  If this case --

21   Excluding this case, how many times a year are you

22   named as a Respondent in a writ?

23          A.   I been on the bench for eight years and

24   I think maybe four.

25          Q.   Okay.  So every two -- I'm not saying

 1  it would happen every two years, but once every two

 2  years.  So your testimony under oath is you

 3  received notice that you were the Respondent in a

 4  writ, that it only happened four times in your

 5  career, and you didn't read it?

 6        A.   Um-hum, that's correct.

 7        Q.   Is there any reason you didn't read it?

 8        A.   I don't know how it's relevant to this

 9  case but...  If I have to file a response I read

10  it.  Your writs were denied.

11             MR. GRANT:  Your Honor, I move to

12    strike.

13             THE COURT:  I think it's responsive.

14    Next question.

15  BY MR. GRANT:

16        Q.   Were you aware when you entered the TRO

17  that I had passed every single one of my

18  breathalyzer tests?

19        A.   That was the representation that you

20  made.

21        Q.   No, I wasn't -- Just to back up.  The

22  TRO that was entered after the writ I did not

23  appear for, correct?

24        A.   That's right.  We didn't know where you

25  were.

1          Q.   Correct.  Oh, by the way, did you ask
2     either of the parties where I was?
3          A.   It's not my burden to introduce
4     evidence.
5          Q.   I didn't ask you about your burden.  I
6     asked you if you asked.
7          A.   The evidence that was presented
8     suggested there was a problem.
9          Q.   What was the evidence that was
10     presented?
11          A.   That because of your disease there was
12     a concern that you had left either the country and
13     were back in rehab.  And the issue was not just
14     alcohol, it was drugs.
15          Q.   Okay.  And you denied a motion for drug
16     testing in February, one month prior, correct?
17          A.   That is correct.
18          Q.   Okay.  And you saw that I passed a drug
19     test, or you're aware that I passed a drug test the
20     summer prior, correct?
21          A.   I don't know that I received any
22     evidence of that.
23          Q.   I asked if you were aware of it.
24          A.   I'm not aware of it.
25          Q.   Okay.  Did anyone represent to you

1    whether or not they tried to get in touch with me

2    to see if I was in rehab or not?

3         A.   I think the record would probably be

4    the best evidence.  I don't recall.  I think there

5    was representations made by your children's

6    guardian that you had notice of the hearing and

7    that you didn't respond.  That's my recollection.

8         Q.   Oh.  Interesting.  Thank you for that

9    testimony.

10        A.   Since you're the attorney of record you

11   also received notice of it.

12        Q.   Sometime thereafter a preliminary

13   injunction was entered, is that right?

14        A.   If that's what the file reflects, I

15   guess, yes.

16        Q.   Okay.  There's a preliminary injunction

17   in place right now isn't there?

18        A.   Umm, I don't know because I went back

19   to your interim custody order based upon your

20   evidence that you introduced when we had a hearing

21   when you returned.

22        Q.   Okay.

23        A.   And that was the negative drug test

24   that was ordered as part of the TRO order.  So I

25   basically dissolved the TRO and went back to your

1    interim custody order is my recollection.

2         Q.   Okay.  So you believe the TRO was in

3    existence until you entered your order giving me

4    one day a week?

5         A.   I didn't give it to you, you gave it to

6    yourself.  You're the one that entered into that

7    consent interim custody order.  That was not

8    something that I ruled on.

9         Q.   I was talking about your June order,

10   your pretrial order.

11        A.   My June order was based upon me

12   granting the TRO in part and indicating that if you

13   had a negative drug test that you go back to the

14   interim order.

15        Q.   Okay.  So let's talk about that.  So I

16   tried to argue the motion to dissolve the

17   preliminary injunction prior to it actually being

18   argued, isn't that true?

19        A.   I know that you testified in the

20   narrative in support of your motion to set aside

21   the interim order and I denied it.

22        Q.   No, do you remember me appearing on a

23   date that had been noticed and you said this is not

24   an evidentiary -- a testimonial hearing date,

25   you'll have to reset it?  Do you remember that?

1        A.   If you were going to present testimony
2   that's probably accurate.
3        Q.   And if the testimony is just me why
4   would it need to be on a separate hearing date?
5        A.   That's how I handle my docket.
6        Q.   Oh.  Even though there was a court
7   reporter in the room?
8        A.   That's how I handle my docket,
9   Mr. Grant.
10       Q.   Okay.
11       A.   I have more than one case.
12       Q.   Yes, thank you, Your Honor.
13            Moving forward to the -- Ultimately you
14    ruled that the order should be - I don't want to
15    put words in your mouth - but the situation should
16    go from me having zero custody of my children to
17    me having them each Thursday overnight, correct?
18       A.   If that's what the interim consent
19   custody order provided for that's what I ordered.
20       Q.   Okay.  I'll represent to you that is
21   not what the interim custody order provided for.
22   That's what I'm trying to understand, Your Honor.
23       A.   Well it was my intention to honor your
24   consent interim custody order based upon you
25   showing the Court proof that you had no drugs in

 1  your system.

 2          Q.   So that was a mistake?  The current

 3  order is a mistake to the extent it doesn't comply

 4  with the status quo prior to?

 5          A.   This is the first time I've been

 6  presented with that issue.

 7          Q.   I'm sorry, could you explain that a

 8  little bit further?

 9          A.   Mr. Grant, it was my assumption that I

10  was ordering the interim custody order.  You

11  representing to me now that is not the case, this

12  is the first I've heard of it.

13          Q.   Okay.  And what did you look at to

14  issue the order that said one day per night?

15          A.   Your --

16          Q.   I'm sorry, one day per week.  I'm

17  sorry, I misspoke.

18          A.   The interim custody order.

19          Q.   So you did look at it?

20          A.   I've looked at everything, Mr. Grant,

21  except the writs.

22          Q.   Okay.  But you looked at the interim

23  custody order, then when you wrote the June order

24  you mistakenly just included one night per week?

25          A.   I don't know that I made a mistake.

1    This is the first I've heard of it.

2        Q.   Okay.  There was a hearing when I

3    presented -- On that preliminary injunction issue,

4    I presented a business records affidavit and the

5    court ordered test results to you, correct?

6        A.   Correct.

7        Q.   Do you recall you asking me if I had

8    brought an expert witness?

9        A.   No, I asked whether or not you brought

10   in the custodian of records.

11       Q.   Okay.  So you deny that you asked me if

12   I had an expert witness?

13       A.   I just recall there was no one from

14   Asure Lab present in the courtroom to lay a

15   foundation for the test results based upon Ms.

16   Brody's objection.

17       Q.   Do you recall that there was a

18   custodian -- there was a records affidavit?

19       A.   That lays a foundation for the report

20   but not the interpretation of the report.

21       Q.   Exactly.  So do you remember you

22   suggesting that you could not interpret the report

23   without someone from Asure Test there?

24       A.   If I said that I said that.

25       Q.   Okay.  Have you ever needed an expert

1    to interpret the results of an Asure test?

2         A.   Yes.

3         Q.   When?

4         A.   Any time in my trials where the

5    opposing counsel objected to it I had to bring

6    someone in from Asure.

7         Q.   Oh, okay.  What about outside of trial?

8         A.   Depends on whether there was an

9    objection or not, Mr. Grant.

10        Q.   How many times have you changed custody

11   for a parent and it prejudiced them and you relied

12   upon an Asure test and didn't use an expert?

13        A.   I have no independent recollection of

14   it happening at any time.

15        Q.   So you've called in an expert every

16   time you've changed custody prior to trial?

17        A.   I did.

18        Q.   And what's that expert's name?

19        A.   I called someone from Asure.

20        Q.   Okay.

21        A.   I think her name was Adrianne

22   Fairbanks.

23        Q.   And she would say what?

24        A.   She would testify about the procedure,

25   how the sample was taken, who the sample was taken

1  from, what tests were performed, how it was

2  determined that these test results were negative or

3  positive.

4       Q.   Okay.  So going back to the test

5  results.  So if it says cocaine and it says

6  negative you're not comfortable interpreting that?

7       A.   I'm not comfortable when you testified

8  at trial that you had cocaine in your safe.

9            MR. GRANT:  Move to strike.

10           THE COURT:  You said if he was

11   comfortable with that.  That was responsive.  Ask

12   your next question.

13           MR. GRANT:  Move to strike.

14  BY MR. GRANT:

15       Q.   Judge, if we're going to go outside of

16  the bounds here, do you remember my testimony at

17  trial that I've never used cocaine in my life?

18       A.   I think your testimony was it was for

19  the ladies.

20       Q.   That wasn't my question.  Can you read

21  back the question, please.

22           (The last question was read back by the

23   court reporter.)

24       A.   I remember your testimony, but I have

25  to determine the credibility of it.

1          Q.   Oh.  And you don't have any bias or
2    prejudice against me right now do you?
3          A.   None.
4          Q.   None.  Okay.  You're sure?
5          A.   I'm positive.
6          Q.   Okay.  When trial began I moved or made
7    an oral motion for recusal, correct?
8          A.   Correct.
9          Q.   And you denied that motion?
10         A.   It was already ruled on.
11         Q.   I'm sorry, when was it ruled on?
12         A.   Judge Brown ruled on it.
13         Q.   On a motion to recuse?
14         A.   Yes, he did.  I'm part of the
15   Twenty-First Judicial Circuit.
16         Q.   Do you not understand that -- Am I --
17   You don't understand that a judge has an ongoing
18   obligation under the judicial canons and rules of
19   professional -- of judicial conduct to evaluate
20   whether or not they should recuse on a daily basis?
21         A.   If you say so.
22         Q.   I'm asking you.  Actually you're the
23   expert.  I'm asking you.  Do you not?
24         A.   On a daily basis?
25         Q.   Ongoing basis.

1          A.   On an ongoing basis?

2          Q.   Right.

3          A.   If I violated one of the canons of

4    ethics I would recuse myself.

5          Q.   No, that wasn't my question.  My

6    question here is your position as the presiding

7    judge of the Twenty-First Circuit is that once a

8    motion to recuse is denied it can never be -- you

9    have no obligation to address your obligation to

10   recuse again?

11         A.   No, I disagree with that.

12         Q.   Okay.

13         A.   If you file it appropriately, which

14   you've done now, I would agree.

15         Q.   Okay.  So an oral motion at trial --

16         A.   You've already confessed that,

17   Mr. Grant.  You filed it under the rule, not under

18   the statute.

19         Q.   I'm talking about at trial.

20         A.   You filed it under the rule.  Your oral

21   motion was under the rule, not under the statute.

22   I think I'm free to deny it.

23         Q.   So you're saying I cited a rule?

24         A.   I don't know what you cited, Mr. Grant.

25   You've cited so many things.

1           Q.   I cited the Canons of Judicial Ethics.

2           A.   And I believe that I have abided by all

3    the canons of ethics in treating you fairly,

4    impartially, and without bias.

5           Q.   Appearance of impropriety specifically?

6           A.   There is no appearance of impropriety.

7    That's your belief.

8           Q.   Okay, you don't believe -- Under the

9    Missouri Supreme Court precedent you don't -- a

10   reasonable third person would think it's

11   appropriate for you to remain the trial judge in

12   this case?

13          A.   Yes, I believe that a reasonable person

14   would come to the same conclusion.

15          Q.   Wow.

16               MS. BRODY:  Your Honor, I'm going to

17    move to strike wow.

18               THE COURT:  Just ask questions, please.

19               MR. GRANT:  Sorry.  I withdraw that.

20    That was inappropriate.  Sorry.  I didn't expect

21    that one.

22   BY MR. GRANT:

23          Q.   The escort order that you entered two

24   days -- Strike that.  When did you learn that you

25   were named as a defendant in a federal lawsuit?

1        A.   I haven't been served yet.  I think our

2   -- I think I was notified by our communications

3   officer that there was a lawsuit pending in federal

4   court filed by you.

5        Q.   And when was that?

6        A.   I don't recall.

7        Q.   Was it before or after the escort

8   order?

9        A.   Oh, it was before the escort order.

10       Q.   Okay.  And the escort order speaks for

11   itself.  Commissioner Greaves -- How did you learn

12   of the situation involving Commissioner Greaves?

13       A.   I think I was contacted by John

14   Connelly in the sheriff's department.

15       Q.   And have you reviewed my written

16   response to your escort order?

17       A.   I have not.

18       Q.   Okay.  Let me just ask you a question.

19   If Commissioner Greaves - And I'll represent this

20   as an officer of the Court - was sent a white

21   envelope that was 10 x 13 inches purchased at

22   WalMart would you agree that's not a suspicious

23   package?

24       A.   I didn't do the investigation,

25   Mr. Grant, and I'm not going to go ahead and

1  comment on the perception that Commissioner Greaves

2  had or the Kirkwood police had with respect to the

3  delivery of whatever the heck it was.  This was

4  based upon her belief that she was threatened.

5       Q.   Okay.  Do you believe it's reasonable

6  for her to believe that?

7       A.   I can't speak to her state of mind, I'm

8  sorry, Mr. Grant.

9       Q.   Okay.  Well you issued the escort

10 order.

11      A.   Correct, based upon representations

12 made to me I did.

13      Q.   Well, but you just -- but you had to

14 find that a reasonable person then would have been

15 -- felt intimidated.

16      A.   Well in this circumstance, based upon

17 the pleadings that you have filed naming

18 Commissioner Greaves, I believe a reasonable person

19 would feel intimidated or threatened by your

20 actions.

21      Q.   An envelope by U.S. mail?

22      A.   To this day I don't know what was on

23 it.  That's what she believed.

24      Q.   Okay.  And you brought that up.  The

25 hearing on January 21st, do you recall commenting

1   on my allegations of ex parte communications

2   involving Commissioner Greaves?

3           A.   Ex parte communications between you and

4   Commissioner Greaves?

5           Q.   No, the allegations that Commissioner

6   Greaves engaged in ex parte judicial

7   communications.

8           A.   I know you made that allegation, yeah,

9   I'm aware of that.

10          Q.   Do you remember commenting on that,

11  whether I was correct or incorrect?

12          A.   I do not.

13          Q.   Okay.  Do you remember commenting on my

14  analogy to Santa's sleigh being on the roof as the

15  only explanation for her sua sponte order not being

16  ex parte?

17          A.   I think I remember that in your

18  pleadings and commenting on it.

19          Q.   Okay, thank you.  Did you form an

20  opinion one way or the other if she had engaged in

21  ex parte judicial communications?

22          A.   No.  I just thought your artistry in

23  some of your pleadings was entertaining.

24          Q.   Thank you, Your Honor.  We're here

25  today on the hearing pursuant to the motion to

1   disqualify, right?  That's why we're here?

2        A.   I assume so.

3        Q.   And I filed that on August 5th?

4        A.   I don't know when you filed it.

5        Q.   Okay.  But I presented it to you on

6   August 12th?

7        A.   If you say so, Mr. Grant.  I trust you.

8        Q.   Did you enter the escort order after I

9   presented you the -- You asked to use the word

10  called in the order, handwritten order, do you

11  remember that?

12       A.   I don't.  Sorry.

13       Q.   How did you have jurisdiction to enter

14  an escort order after a motion to disqualify you

15  was filed and after you had already e-mailed the

16  Missouri Supreme Court asking for a senior judge?

17       A.   This is where you and I disagree on the

18  law.  Until I'm removed as a judge I have

19  jurisdiction over your case whether you file a

20  motion to disqualify me or not.

21       Q.   Do you believe there's case law

22  supporting that?

23       A.   That's my understanding of the law,

24  yes.

25       Q.   Okay.  Thank you, Your Honor.  That's

1  all I have.

2           THE COURT:  Any questions from either

3    of the two attorneys?

4           MS. BRODY:  Yes, Your Honor.

5           THE COURT:  Go ahead.

6                 CROSS EXAMINATION

7    BY MS. BRODY:

8        Q.  Judge Hilton, if the docket reflects

9  that on March 27th you set the hearing for the TRO

10 that I applied for on that day on March 28th would

11 you disagree with that fact?

12       A.  No.

13       Q.  And that on March 28th, after more than

14 24 hours notice, you held a hearing on my motion

15 for TRO at that time?

16       A.  I assume that the court file would

17 reflect that.

18       Q.  That's correct.  And that the initial

19 line in that order is that Mr. Grant failed to

20 appear, although notified through CaseNet, as he is

21 the attorney of record?

22       A.  That's my recollection.

23       Q.  Okay.  That is not an ex parte TRO is

24 it?

25       A.  It's a TRO with notice.

1           MR. GRANT:  Lack of foundation.  Or --
2    Objection withdrawn.
3           THE COURT:  Okay.
4  BY MS. BRODY:
5      Q.   And, Judge Hilton, when you make
6  application or communication with the Supreme Court
7  advising them that a motion to disqualify you has
8  been filed and in response to that they appoint a
9  senior judge is that a sua sponte Supreme Court
10 motion or finding?
11     A.   That's a great question.  I assume so.
12     Q.   Even though you have alerted them to
13 the fact that a motion to disqualify has been
14 filed?
15     A.   Yeah, it doesn't happen immediately,
16 but I would hope that they would honor my request.
17     Q.   Yeah.  And in this circumstance
18 originally it was Judge Lynn Wood, is that correct?
19     A.   Judge Brown.
20     Q.   Yeah, Judge Brown.  And today we have
21 Judge Zerr?
22     A.   Correct.
23     Q.   Okay.  And both of these senior judges
24 were appointed based on a motion to disqualify
25 being filed by Mr. Grant and you advising the

1    Supreme Court of the filing --

2           A.   Correct.

3           Q.   -- is that correct?

4           A.   Correct.

5           Q.   Okay.  Is there anything remarkable to

6    you that the Supreme Court appointed a senior judge

7    to hear the motion to disqualify?

8           A.   No.

9           Q.   Now the delay in you publishing - or

10   sorry - your clerical staff publishing the order

11   appointing Judge Wood to hear --

12          A.   Brown.

13          Q.   Brown.  Sorry.  -- to hear the motion

14   to disqualify, was that an effort on your part in

15   any way exhibiting bias or prejudice to Mr. Grant?

16          A.   None whatsoever.

17          Q.   Okay.  And was it in fact just a

18   clerical delay?

19          A.   Correct.

20          Q.   So there was no intention behind the

21   delay in filing it or publishing it to the

22   St. Louis County docket?

23          A.   No.  These are not typical so the

24   process is unusual for a clerk to enter or process.

25   I can't speak for Ms. Gipson but I think she just

1    assumed it was automatically on the docket.

2         Q.   And, Your Honor, we heard -- Sorry.  We

3    had a trial in this matter at the end of June,

4    correct?

5         A.   Correct.

6         Q.   Okay.  And it lasted two days, is that

7    correct?

8         A.   That's correct.

9         Q.   And at the close of evidence both

10   parties rested, correct?

11        A.   Correct.

12        Q.   And was there a motion to disqualify

13   you pending at that time?

14        A.   No, there was not.

15        Q.   And was there any active motion to

16   disqualify filed prior to that period of time?

17        A.   No.

18        Q.   Okay.  So we have now filed, submitted

19   to you proposed findings of fact and conclusions of

20   law, is that correct?

21        A.   I have not looked at the minutes or the

22   docket based upon these proceedings.

23        Q.   Okay.  Well if I were to warrant you

24   that both parties have in fact filed their proposed

25   findings of fact and conclusions of law and the

1  docket reflects that, is it your opinion the case

2  is now under submission?

3        A.   If based upon representations, yes, it

4  is.  And I appreciate all parties following my

5  court order.

6        Q.   Thank you.  Based on this case that you

7  just handed us, Kristine Hendrix vs The City of St.

8  Louis, Eastern District 108858, you believe that

9  this is dispositive of the fact that since this

10 case has already been tried that the motion to

11 disqualify is not timely filed?

12       A.   That's my legal opinion.

13       Q.   Thank you, Your Honor.  I don't have

14 anything further.

15                    CROSS EXAMINATION

16 BY MR. FENLEY:

17       Q.   Just a point of clarification, Your

18 Honor.  In regards to the order from March from the

19 Supreme Court, do you have any reason to believe

20 that they had independent knowledge of what was

21 going on in this case outside of your request to

22 them?

23       A.   I assume not.

24       Q.   So I think the use of the sua sponte

25 order is more so that it came out of the blue with

1     no one notifying them of what was happening in the

2     case, but you had notified them, correct?

3           A.   That's correct.

4           Q.   So no formal motion was filed

5     necessarily so it's sua sponte in terms of it came

6     out of -- without a formal motion but at least

7     notice was provided to the Supreme Court, correct?

8           A.   Correct.  I don't know the timing of

9     Mr. Grant's writs to the Supreme Court.  I mean,

10    they may have more information than the Supreme

11    Court normally has on these requests.

12          MR. FENLEY:  I have no further

13      questions.

14          THE COURT:  Mr. Grant.

15          MR. GRANT:  Yes, brief followup.

16          THE COURT:  Go ahead.

17                  REDIRECT EXAMINATION

18    BY MR. GRANT:

19          Q.   Would you agree that the delay in the

20    Supreme Court order being published to the docket

21    was prejudicial to me?

22          A.   No.  What's prejudicial is you not

23    appearing on the date it was set for hearing.

24          MR. GRANT:  Move to strike as

25      nonresponsive.

```
 1                    THE COURT:  Sustained.  Next question.
 2    BY MR. GRANT:
 3         Q.   You understand that I filed a writ that
 4    was essentially moot?
 5         A.   Which writ?
 6         Q.   The very first writ, Your Honor.
 7         A.   If that's your belief I guess so.
 8         Q.   Okay.  I'm just asking.  Well, strike
 9    that.  Your Honor, have you looked at the court
10    docket lately?
11         A.   I just answered that question.  No, I
12    have not.
13         Q.   I'm sorry, in this case?
14         A.   No.
15         Q.   Oh, okay.  If there were motions filed
16    on July 23rd and throughout August that are pending
17    ruling wouldn't you agree this case is not under
18    submission?
19         A.   I would not agree.
20         Q.   Okay.  Can you explain that?
21         A.   The evidence was closed, Mr. Grant.  I
22    was just waiting on the proposed findings.
23         Q.   So you -- Strike that.  Is it your
24    position that the motions that were filed are not
25    ripe for ruling?
```

1          A.   I don't know what motions have been

2     filed.  They haven't been noticed up for hearing.

3     I don't know what motions have been filed.

4          Q.   Okay.  And did you ask Mr. Fenley for

5     his recommendation as the guardian ad litem during

6     trial when I could have cross-examined him?

7          A.   I think I asked him for that at the

8     close of evidence.

9          Q.   Okay.  Didn't you order him to file

10    that in writing on July 11th?

11         A.   If that's what my order says then

12    that's true.

13         Q.   Okay.  And if that is what the record

14    shows then I would have no ability to cross-examine

15    him, correct?

16         A.   You're the litigator, Mr. Grant.

17         Q.   Okay.  Have you reviewed his

18    recommendation?

19         A.   I have not.

20         Q.   Do you believe that a guardian ad litem

21    has to provide an explanation and basis for the

22    recommendation on both sole and physical custody?

23         A.   In order for him to comply with the

24    standards I believe he has to present a parenting

25    plan that he believes is in the best interest of

1   the children based upon the evidence at trial.

2          Q.   Okay.  And do you have any

3   understanding what his current recommendation is?

4          A.   I do not.

5          Q.   Do you believe it conflicts with the

6   children's wishes?

7          A.   I can't comment 'cause I don't know

8   what his recommendation is.

9          Q.   Okay.  Do you know if your current

10  order of one night per week conflicts with the

11  children's wishes?

12              MS. BRODY:  Your Honor, I'm gonna

13    object.

14         A.   You want me to comment on the evidence

15  before I rule?

16              THE COURT:  Go ahead.

17              MS. BRODY:  Thank you.  I'm going to

18    object on the basis this is irrelevant to whether

19    or not Judge Hilton should be disqualified.

20              MR. GRANT:  I'll withdraw actually.

21    I'll withdraw it, Your Honor.  I think that's best

22    actually.

23              THE COURT:  Okay.

24  BY MR. GRANT:

25         Q.   During trial there was an exchange

1    about my triggers and why I relapsed, do you

2    remember that?

3          A.   Was that through your testimony?

4          Q.   Yes, I was cross-examining my sister,

5    Ms. Grant, and you interjected when I was asking

6    her what my triggers were.  And Judge Zerr has it,

7    but you said, I don't want to hear why you

8    determined - I'm paraphrasing - that you're a

9    psychiatrist/psychologist and you determined on

10   your own you couldn't self-medicate.  Do you

11   remember that exchange?

12         A.   I don't, I'm sorry.

13         Q.   If that exchange took place do you

14   believe that reflects bias?

15         A.   No.

16         Q.   No.  Do you believe that a party should

17   be asked in front of the trial judge to ask -- or

18   whether or not they want to apologize for making

19   criminal allegations against them?

20         A.   Do I think it's proper?

21         Q.   Correct.

22         A.   Yes.

23         Q.   You do?

24         A.   I do.

25         Q.   That's not grounds for a mistrial or

1    recusal?

2          A.   I don't believe so.

3          Q.   Okay.  That's all I have, Your Honor.

4               THE COURT:  Any other recross?

5               MS. BRODY:  Yes, Your Honor.

6                      RECROSS EXAMINATION

7      BY MS. BRODY:

8          Q.   When questions were asked during the

9    trial, Judge Hilton, about apologies to be made to

10   the Court or its staff was Mr. Grant in the

11   courtroom?

12         A.   He was.

13         Q.   And did he represent himself at the

14   time?

15         A.   He did.

16         Q.   And did he make any objections to those

17   questions?

18         A.   Not that I recall.

19         Q.   Thank you.

20              MR. FENLEY:  I have nothing further.

21              THE COURT:  Mr. Grant.

22              MR. GRANT:  Nothing for this witness.

23                      EXAMINATION

24     BY THE COURT:

25         Q.   You want me to read to you the

1    transcript portion he was talking about, or do you
2    care?
3         A.   No, I don't mind.
4         Q.   Okay.  I think it's on -- starting at
5    page 198.
6         A.   I haven't been provided a copy so...
7         Q.   I only have the copy that -- It's
8    online.  I don't have a copy.  It's filed as an
9    exhibit.  I'm reading it off the...
10             It says -- It says -- I'll just read it
11    to you.  I read it earlier into the record.
12             There was a question about triggers,
13    and there was a question saying -- by the
14    questioner, who was I think Mr. Grant, says:  I'm
15    just trying to establish today on the record -
16    Thank you - do you know what any of the triggers
17    have been for my relapse or relapses?  The answer
18    by the witness was:  So you're asking for me any
19    instances 2019?
20             "QUESTION:  Yes.  Do you know the
21    cause?
22             "ANSWER:  No.
23             "QUESTION:  Okay, thank you.  Do you
24    know that I've had two hip replacements since
25    2019?"  Statement by the Court:  How is this

1   relevant?  How is that relevant?

2               "MR. GRANT:  I'm trying to -- Well

3   strike that.  It's --

4               "COURT:  Is it relevant because it's

5   how you self-medicated?  Is that how it's rel --

6   How is that relevant?  How is it relevant?

7               "MR. GRANT:  Yes, that's exactly what I

8   was trying to get to.

9               "COURT:  Okay, so this is another

10  excuse for your disease of alcoholism because you

11  decided as a mental health professional and as a

12  psychiatrist/psychologist that you could

13  self-medicate.  That was okay?

14              "MR. GRANT:  No, Your Honor.  I'm an

15  alcoholic.  I made a terrible decision.

16              "COURT:  Well let's hear about those

17  instead of your excuses, okay.

18              "MR. GRANT:  Okay.

19              "COURT:  Because hip replacement

20  surgery, that's no excuse for your behavior.

21  None.  So let's get to something more relevant

22  where it's your own, Mr. Grant.

23              "MR. GRANT:  I owned that I have a

24  disease.

25              "COURT:  So far I haven't heard it.

"MR. GRANT: I own it. Let me make that clear.

"COURT: Well I can't wait to hear about what your plan is for your complete recovery because I haven't heard it yet.

"MR. GRANT: You'll hear about it when I testify, Your Honor.

"COURT: Thank you. Let's move on."

I think that's the interplay he's talking about.

A. Okay.

Q. Do you want to make anymore comment about that?

A. No.

Q. Okay. Anything else?

MR. GRANT: No. Other than the -- Not for this witness.

THE COURT: Okay, you can step down. Thank you very much.

THE WITNESS: Thank you.

THE COURT: So you're still going to give me a thumb drive, right?

MR. GRANT: Yes, I have it right here.

THE COURT: What else do you have?

MR. GRANT: I think we have a

```
1   stipulation on -- Well never mind.  Strike that.
2   I'm not going to ask that.
3           Your Honor, that is all the evidence I
4   have today other than argument.  I would like to
5   conclude with argument.
6           THE COURT:  Is there any evidence from
7   either one of the other parties?  Evidence,
8   besides argument.
9           MR. FENLEY:  Your Honor, I think the
10  understanding was that I would give an explanation
11  of that phone call, which I'm happy to do here and
12  be sworn.
13          THE COURT:  Let's do that now.  If you
14  want to be sworn that will be fine.  That will
15  give it some gravitas.
16                    JOHN FENLEY,
17  having been sworn, testified as follows:
18          THE COURT:  You may testify in the
19  narrative.
20          MR. FENLEY:  Thank you, Your Honor.
21          So I think following one of these
22  hearings in June of this year I asked Mr. Grant to
23  stick around and notified him I had another matter
24  to handle and I'd be back up to talk to him.  He
25  had left.  I took longer wherever I was.
```

1    Understandable, that's fine.

2            So I think in the following next couple

3    of days we had a phone call.  I vividly remember I

4    was coming back from St. Charles County and I was

5    in the car during said phone call.  And it started

6    with Mr. Grant wanting to find some sort of

7    resolution to this.  I think he had contacted me

8    in some form saying, Hey, I'll drop everything if

9    I go back to fifty-fifty.  I'll drop all my

10   accusations, I won't sue anyone, I won't do

11   anything if I get back to fifty-fifty.

12           MR. GRANT:  Objection.  Hearsay, lack

13   of foundation.

14           THE COURT:  Once again, I'm allowing

15   him to just comment.  We're doing this a little

16   bit oddly.  Trying to give him some leeway to give

17   his recollection of it.  Otherwise I would agree

18   with you, but I'm doing it a little bit out of

19   order.  Go ahead.

20           MR. FENLEY:  So the gist of what I was

21   trying to get Mr. Grant to say is that if you look

22   at the record there are pleadings and all of the

23   writs, this underlying file, there are all sorts

24   of allegations without basis that I think are

25   inappropriate for a litigator to make.  I don't

1    know if it's actually in the court file, but there

2    was a filing that was at least submitted to the

3    Court that I have where he accused me of using

4    cocaine on a daily basis.

5            MR. GRANT:  Objection.  That's untrue.

6    There's no foundation.  That's untrue.

7            THE COURT:  We're talking about the

8    conversation, not other things that happened,

9    okay.

10           MR. FENLEY:  Well, all the stuff that

11   has happened up to this point and all the

12   accusations, that's what I'm trying to get him to

13   say, Look, I don't have any basis in reality for

14   what you are accusing all of us of, this criminal

15   conspiracy, not acting in the best interest of

16   your children, having it out against you, that

17   there's corruption in the courthouse.  And I'm

18   essentially saying, Matt, I have not seen any

19   basis in reality for that, I need you to get

20   beyond that and come to some realization or

21   agreement that that is not true and talk to Ms.

22   Copeland's attorney about a potential resolution

23   to this; I would support anything that you two can

24   agree on, and if you come to some sort of

25   realization that the accusations you're making are

1     not true and what you're telling your children is

2     not true I would probably be in a better position

3     to make a better recommendation for you than what

4     I would otherwise based on his conduct during the

5     case.

6              So he -- My interpretation of what

7     Mr. Grant is accusing me of, since I said drop all

8     the accusations and then you'll get more time with

9     your kids that it's some sort of quid pro quo.

10    Wherein he's telling me initially, I'll drop

11    everything if you give me more time for the kids.

12    So I think it all starts with him there.

13              And then the gist of the conversation

14    is, I would love for you to have a healthy

15    relationship for your children -- with your

16    children, I would love for everyone to get past

17    all this and move on and you maintain your

18    sobriety, there's nothing more that I want, but

19    when you are accusing everyone in the building,

20    the entire judiciary - Ms. Gipson, Judge Hilton,

21    myself, Ms. Brody --

22              MR. GRANT:  Objection.  Foundation

23    regarding the entire building.

24              THE COURT:  Overruled.  Continue.

25              MR. FENLEY:  -- of being in some sort

1      of corrupt criminal enterprise, his prior

2      attorneys, all of that.  When he's doing that I

3      have reason to believe that he is not in a good

4      place to be parenting his children.  So if he was

5      going to disavow that and say, I no longer believe

6      that, and, yes, it was all false, then I would

7      have a better understanding -- or be in a better

8      position to recommend more time then.  That's what

9      I remember the gist of that phone call being.

10                    THE COURT:  Okay.

11                    MR. GRANT:  Cross-examination, Your

12      Honor?

13                    THE COURT:  If you feel the need go

14      ahead.

15                    MR. GRANT:  Yes.

16                         CROSS EXAMINATION

17      BY MR. GRANT:

18          Q.   Mr. Fenley, you sent me an e-mail

19      asking -- You testified just now that it started

20      with me.  You sent me an e-mail asking to speak

21      that led to that phone call didn't you?

22          A.   If you say so.  That is true, an e-mail

23      or a text message, I don't deny that that could be

24      the case.

25          Q.   Okay.  So if that's the case and if the

137

1  Court allows me to submit it that would conflict

2  with your recollection that this was all me and

3  starts with me.  You reached out to me, right?

4        A.   I remember somewhere in that

5  conversation or somewhere in our conversations

6  recorded, not written, you would state that you

7  would drop everything if we go back to fifty-fifty.

8        Q.   You understood that was after -- that

9  was -- that was long after this recording, correct?

10       A.   I don't know the date of the recording.

11       Q.   Okay.  You don't dispute it was June 3?

12       A.   I don't know when it was made, because

13 I remember there's also an e-mail from you on

14 June 18th that you initiated, Let me know if we

15 have time for a short call or meeting today, and

16 that's what I think that phone call stemmed from.

17       Q.   Well I have it on my -- Well if we need

18 to get into it I have it on my phone so, yeah, Your

19 Honor.

20            Mr. Fenley, you testified about a

21  reference to cocaine.  Isn't it true that the

22  document you're referring to I included that and

23  had a footnote with a web link to the explanation

24  for you to see what hyperbole is, isn't that true?

25       A.   Could be true.  But I've never accused

1     another litigator of using cocaine in a written

2     pleading, nor do I think it's appropriate for any

3     litigator to accuse somebody of using cocaine on a

4     daily basis.

5             Q.  I did not accuse you of using cocaine

6     did I?  Didn't I say I could have and then say that

7     would be hyperbole?

8             A.  Either way I think it's inappropriate.

9             Q.  Well, all right.  So let me ask you

10    this.  If I would have said -- If I was the same

11    person on that phone call and I said, Okay, I

12    disavow it, I was wrong, then you would have said

13    I'm okay to have my kids; is that what your

14    testimony is?

15            A.  I think that mischaracterizes the

16    testimony to an extent.  I would have considered

17    additional time or considered a different

18    recommendation if you had put on the record in

19    front of everyone that you were acting

20    inappropriately during this litigation.

21            Q.  No, but you would have given the kids

22    to somebody who was not in a good place but just

23    told you what you wanted to hear?

24            A.  That is inaccurate and that

25    mischaracterizes what I just said.

1             MR. GRANT:  No further questions of

2     this witness, Your Honor.

3             THE COURT:  Anyone else?

4             MS. BRODY:  Thank you, Your Honor.

5     Just a couple.

6             THE COURT:  Go ahead.

7                     CROSS EXAMINATION

8     BY MS. BRODY:

9         Q.  John, you say that -- just now that

10    what you were trying to say was that Mr. Grant has

11    been acting inappropriately during the litigation,

12    is that correct?

13        A.  That is correct.

14        Q.  And did it affect or cause you to have

15    concerns over his mental health?

16        A.  It did.

17        Q.  And how that would affect the children?

18        A.  It did.

19        Q.  And when he made an allegation in one

20    of his pleadings on CaseNet that I was trying to

21    kill him did that have an affect?

22            MR. GRANT:  Objection.  Lack of

23      foundation.

24            THE COURT:  Overruled.

25            MS. BRODY:  It's in the pleadings that

```
 1    you filed.

 2          A.   Yes.

 3          Q.   And that Judge Hilton was part of the

 4    plot to kill him?

 5          A.   Correct.

 6          Q.   Those all had led you to believe that

 7    you should -- or could have made different

 8    conclusions regarding his mental health through the

 9    system the best interest of the children?

10          A.   Correct.

11               MS. BRODY:  Thank you.  I have nothing

12      else.

13               MR. GRANT:  Brief followup based on

14      those questions.

15               THE COURT:  Go ahead.

16                      RECROSS EXAMINATION

17    BY MR. GRANT:

18          Q.   Mr. Fenley, if you had these concerns

19    why didn't you file a motion for mental evaluation

20    at any point in time that these were occurring

21    between mid February and trial?  You're the kids

22    guardian ad litem.

23          A.   I think the pleadings you filed spoke

24    for themselves, Matt.

25          Q.   You didn't think you would need -- On
```

1    the kids' behalf if their father was mentally ill

2    that it was in their best interest to have an

3    expert opinion on that?  You didn't think that was

4    in their best interest?  Unfortunately bad for me

5    but in their best interest?

6         A.   I was relying on what you have filed

7    with the Court and your statements on how you are

8    an experienced litigator at a top law firm.  And in

9    my years of practice, albeit less than you, I have

10   never seen somebody file the things that you have

11   filed in a sane manner.

12        Q.   Mr. Fenley, this person who doesn't

13   file things in a sane manner, with the exception of

14   when I was in Mexico and there was a court order

15   against it, I've had my children every single week

16   since going back to October, isn't that true?

17        A.   That is true.

18        Q.   Okay.  And you haven't asked the Court

19   to take the children away and say zero custody,

20   this man is insane?

21        A.   'Cause I don't think that is best for

22   your children.

23        Q.   All right.  Thank you.  Nothing

24   further.

25             THE COURT:  Okay.  At this point you

1    will favor me with a copy of the thumb drive and I

2    will declare the evidence closed in this case.

3    I'm going to take the matter under advisement.  I

4    will render a judgment.  It will be in writing.

5    It will come out to you all through the system.

6    You're on system representing yourself, right?

7                MR. GRANT:  Yes, Your Honor.

8                THE COURT:  So should come to you

9    through the system.

10               MR. GRANT:  Yeah.

11               THE COURT:  Okay, so I'll send it to

12   you through the system.  I anticipate hopefully

13   getting it done fairly quickly.  I don't think I

14   have anything in the next couple of days, so I'll

15   try to put it together in the next couple days

16   because I understand the urgency to get to an

17   answer on this case, So I'll attempt to accomplish

18   that.

19               As I said, the answer is going to be

20   either one of two things:  One, that Judge Hilton

21   should be disqualified and will request the

22   Supreme Court to appoint someone in his lieu or,

23   two, that the petition has not been proven to the

24   extent that he should be disqualified for cause

25   and that he will continue on the case as long as

1    he feels ethically appropriate to do so.  And

2    those are the only two options that I really see

3    happening.

4            And number three is I am not going to

5    be involved however it turns out.  If the Supreme

6    Court appoints someone new it will not be me.  So

7    this is the only involvement I will have in the

8    case.  Everybody understand that?

9            MS. BRODY:  Yes, Your Honor.

10           MR. GRANT:  Judge -- Never mind.  No,

11   nothing further.  Sorry.

12           THE COURT:  Okay.  At this point then

13   the Court is going to stand in recess and you will

14   hear from me when I have it done.

15                              ***

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2          I, Rhonda J. Laurentius, a Certified Court
   Reporter and Registered Professional Reporter,
3  hereby certify that I am the official court
   reporter for Division 13 of the Circuit Court of
4  the County of St. Louis, State of Missouri; that on
   the 27th day of August, 2025, I was present and
5  reported all the proceedings had in the case of
   MATTHEW R. GRANT, PETITIONER, VS. C.M.G., et al.,
6  RESPONDENTS, CAUSE NO. 12SL-DR03959-02.

7          I further certify that the foregoing 144
   pages contain a true and accurate reproduction of
8  the proceedings requested be transcribed.

9          I further certify that this transcript
   contains pages 1 through 145 inclusive and that
10 this reporter takes no responsibility for missing
   or damaged pages of this transcript when same
11 transcript is copied by any party other than this
   reporter.

12

13

14

15

16
           /s/ Rhonda J. Laurentius, CCR #0419
17         Official Court Reporter
           Twenty-First Judicial Circuit
18         (314) 615-8070

19

20

21

22

23

24

25