Page 1

```
 1
 2
 3
 4     IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
              STATE OF MISSOURI
 5
 6
 7
 8          MATTHEW R. GRANT vs. C.M.G., ET AL.
 9
10            Cause No. 12SL-DR03959-02
11
12
13        (Deposition start time: 1:58 p.m.)
14
15
            DEPOSITION OF SARAH GRANT
16        TAKEN ON BEHALF OF THE PETITIONER
17              JUNE 13, 2025
18
19
20
21
22
23
24
25
```

Page 2

```
 1                   I N D E X
 2
 3    Direct Examination by Mr. Grant          Page  5
 4    Proceedings with Judge Hilton            Page 75
 5    Continued Direct Examination             Page 83
 6
 7
 8    (Petitioner's Exhibits 1 and 2 were not given to the
      reporter).
 9
10                    EXHIBITS
11
12    Petitioner's Exhibit 1                   Page  9
      Document Production
13
      Petitioner's Exhibit 2                   Page  9
14    Subpoena
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1         IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
                       STATE OF MISSOURI
 2
 3    MATTHEW R. GRANT,         )
 4         PETITIONER,          )
 5    VERSUS                    )  CAUSE NUMBER 12SL-DR03959-02
 6                              )  DIVISION 13
 7    C.M.G., ET AL.,           )
 8         RESPONDENT.          )
 9
10    DEPOSITION OF SARAH GRANT, produced, sworn and examined
11    on June 13, 2025, between the hours of eight o'clock in the
12    forenoon and six o'clock in the afternoon of that day, at the
13    offices of St. Louis County Courthouse, 105 S. Central
14    Avenue, Clayton, Missouri, 63105, before Linda A. Madel, a
15    Certified Court Reporter, #535, and Notary Public within and
16    for the State of Missouri, in a certain cause now pending in
17    the Circuit Court of the County of St. Louis, State of
18    Missouri, in re: Matthew R. Grant vs. C.M.G, et al., on
19    behalf of the Petitioner.
20
21
22
23
24
25
```

Page 4

```
 1                 A P P E A R A N C E S
 2  For the Petitioner
 3     Matthew R. Grant
        1625 Mason Knoll Road
 4     St. Louis, MO 63131
        (314) 412-9112
 5     mattgrant.stl.gmail.com
 6  For the Respondent
 7     Maia Brodie
        BRODIE LAW
 8     8909 Ladue Road
        St. Louis, MO 63124
 9     (314) 726-6242
        mbrodie@brodielawstl.com
10
11  For the Witness
12     Lawrence G. Gillespie
        GILLESPIE, HETLAGE & COUGHLIN, LLC
13     120 S. Central Avenue
        Suite 650
14     Clayton, MO 63105
        (314) 863-5444
15     lgillespie@ghc-law.com
16  Guardian ad Litem
17     John R. Fenley
        REINKER HAMILTON FENLEY, LLC
18     2016 S. Big Bend Blvd.
        St. Louis, MO 63117
19     (314) 333-4140
        john@rhflegal.com
20
    Reported by:
21
        Linda A. Madel, CCR
22     LEXITAS LEGAL
        711 North Eleventh Street
23     St. Louis, MO 63101
        (314) 644-2191
24
    Also Present:  Rebecca Copeland, Honorable Bruce Hilton
25
```

**Exhibit H**



Sarah Grant                                                                    June 13, 2025

Page 5

1        IT IS HEREBY STIPULATED AND AGREED by and between

2   counsel for the Plaintiffs and counsel for the Defendants

3   that this deposition may be taken in shorthand by Linda A.

4   Madel, CCR and notary public, and afterwards transcribed into

5   printing, and signature by the witness expressly reserved.

6

7                    SARAH GRANT,

8   of lawful age, being produced, sworn and examined on behalf

    of the Petitioner, Matthew R. Grant, deposes and says:

9

10                 DIRECT EXAMINATION

11  BY MR. GRANT:

12     Q   Can you state your full name for the record.

13     A   Sarah Michelle Grant.

14     Q   Do you prefer to go by Sarah or Ms. Grant or some

15  other name?

16     A   You can call me Sarah.

17     Q   Okay.  Sarah, you understand you're under oath,

18  right?

19     A   Yes, she just read it to me.

20     Q   Okay.  Have you ever given a deposition before?

21     A   No.

22     Q   So I'll give you a little -- my version of

23  the ground rules.  As the court reporter stated, we can't

24  talk over each other and we need to speak up.  So it's

25  important because there will be a typewritten transcript.  So

Page 6

1   if you would allow me to finish my question and then start

2   your answer and I will return the courtesy and allow you to

3   finish your answer before I start my next question just so

4   we're not, in fact, talking over each other.  Does that sound

5   fair?

6      A   Fair.

7      Q   Okay.  If I ask you a question and you answer it,

8   I'm going to assume you understood it.  So if you don't

9   understand the question, please tell me you don't understand

10  and ask me to rephrase it.  Is that fair?

11     A   Yep.

12     Q   Please give yes or no or audible answers.  You

13  can't use your hands o shake your head.  Is that fair?

14     A   Okay.

15     Q   Let's see.  We'll take a break about every hour,

16  but you can take a break whenever you like as long as there's

17  not a question pending.  Just speak up.

18         MR. GILLESPIE:  I'm going to interject at this

19  point.  You're talking about taking a break every hour.  This

20  is only a two hour depo.

21         MR. GRANT:  I'm just saying.

22         MR. GILLESPIE:  Okay.

23         MS. BRODIE:  So one break.

24         MR. GILLESPIE:  One break.

25     Q   (By Mr. Grant)  And I think that covers it.

Page 7

1      Q   What's your current address?

2      A   I don't feel comfortable answering that question.

3      Q   What's your current address?

4          MR. GILLESPIE:  You have to answer it.

5      A   Even with --

6          MR. GILLESPIE:  He's entitled --

7      A   -- safety.

8          MR. GILLESPIE:  He's entitled to know your

9   address.

10     A   Well, there's two.

11     Q   (By Mr. Grant)  Okay.  What are they?

12     A   17051 Cambury Lane, Wildwood, Missouri, 63040.  And

13  5463 Pernod Avenue, St. Louis, Missouri, 63139.

14     Q   In the last two years what telephone numbers have

15  you used?

16     A   (636) 578-3476.

17     Q   Any other numbers?

18     A   Not personal numbers.

19     Q   Okay.  Who's your cell phone provider?

20     A   Verizon.

21     Q   Okay.  And has it been Verizon for that entire last

22  two year time frame?

23     A   Yes.

24     Q   Okay.  The phone that you -- did you bring a phone

25  today?

Page 8

1      A   I don't have it with me.

2      Q   Ah, interesting.  The phone that you don't have

3   with you, where is it?

4          MR. GILLESPIE:  Objection; relevancy.

5      Q   (By Mr. Grant)  So I should have stated that

6   Mr. Gillespie will state certain objections throughout the

7   day.  That's for the record for the Judge later.  You can

8   allow him to make his objection, but you still have to

9   answer.  Subject to his objection is noted.

10         MR. GILLESPIE:  I'm going to dispute that because

11  it is beyond the scope of the deposition as set forth in the

12  Judge's order of February 28th, 2025.  I'm going to instruct

13  her not to answer as well as I'm going to instruct her not to

14  answer on anything that may be privileged.  So subject to

15  Mr. --

16         MR. GRANT:  Can you --

17         MR. GILLESPIE:  Wait a minute.  Subject to

18  Mr. Grant's legal instructions, you can listen to his

19  questions.

20         MR. GRANT:  Can you read into the record, Larry,

21  the language that you believe supports your instruction.

22         MR. GILLESPIE:  I'm not going to -- no, I don't

23  read anything into the record.  It's your deposition.

24     Q   (By Mr. Grant)  Okay.  Well, let me come at this

25  way, Ms. Grant.  In front of your attorney is a stack of

Page 9

1  documents that he produced to me.  I'm going to mark that as
2  Exhibit 1.
3       MR. GILLESPIE:  And I'm going to object to one -- a
4  packet of information that apparently includes multiple
5  documents all being one exhibit.  But it's his deposition.
6  If he wants to do it in his inevitable legal litigation
7  expertise, I will let him do so.
8       MR. GRANT:  For the record, it's called a group
9  exhibit, Larry.  It's pretty common.
10      MR. GILLESPIE:  No, it isn't.  Not like that.
11  Group exhibits are paginated, group exhibits identify the
12  documents contained therein.  But you're so smart, go ahead.
13      MR. GRANT:  Okay.  Thank you, Larry.  Move to
14  strike.
15      Q   (By Mr. Grant)  Ms. Grant, are you aware that
16  you -- I'll serve -- I'll hand you what's marked as Exhibit
17  2.  Once you've had a chance to take a look at that, please
18  let me know.  While you're reviewing that, I'll just ask you
19  does that appear to be the subpoena you were served last May
20  or so?
21      A   I'm happy to answer once I've finished reviewing.
22  To the best of my knowledge it looks the same.
23      Q   Okay.  And are Exhibit 1 appear to be the documents
24  that you provided to your lawyer who provided them to my
25  lawyer at the time?  If you want to thumb through those.

Page 10

1       MR. GRANT:  We can go off the record and save time
2  for this.  We'll go back.  I don't want to burn my two hours
3  on that.
4       MR. GILLESPIE:  No, no, no.  We're going to burn
5  the two hours.
6       MR. GRANT:  No.
7       MR. GILLESPIE:  Hold on.
8       MR. GRANT:  No, we're not.
9       MR. GILLESPIE:  Stay on the record.  Your
10  deposition is for two hours.  If you ask her to review what
11  appears to be about 600 pieces paper, that's part of your two
12  hours.
13      MR. GRANT:  Larry, you want to -- this is the
14  question.  Larry, do you want to stipulate that that's the
15  document production you made?
16      MR. GILLESPIE:  I don't know.  I don't know what
17  you slipped in there.
18      MR. GRANT:  All right.  I'll save that then.  We're
19  going to do that in the trial.
20      Q   (By Mr. Grant)  My question is, Sarah, can you look
21  at Category 1 of Exhibit A.
22      MR. GILLESPIE:  What would Category 1 be?
23      Q   (By Mr. Grant)  No, I'm sorry.  We're back to the
24  other document, Exhibit 2.  Category 1 of Exhibit A, the
25  subpoena to be clear.

Page 11

1       MR. GILLESPIE:  So we're going back and forth on
2  exhibits.
3       MR. GRANT:  We are.
4       MR. GILLESPIE:  Okay.
5       MR. GRANT:  All day.
6       MR. GILLESPIE:  Well, no.  Two hours.
7       MR. GRANT:  We'll see.
8       MR. GILLESPIE:  I know you have difficulty reading
9  court orders, but it says two hours.
10      MR. GRANT:  Sure, Larry.
11      A   Can you state again where I'm looking.
12      Q   (By Mr. Grant)  I want to know did you fully comply
13  with producing Category 1?
14      A   As in Number 1?
15      Q   Yes, Number 1.  Category 1.  Exhibit A, Number --
16  there's a one and then there's a period behind it.
17      A   You called it a category, so I'm just clarifying.
18      MR. GILLESPIE:  You mean as of the date that she
19  produced these back in -- let me see, what was the date?
20      MR. GRANT:  The date --
21      MR. GILLESPIE:  Hold on.  I'm talking.
22      MR. GRANT:  No speaking objections.
23      MR. GILLESPIE:  I'm asking a question for
24  clarification because you can't ask a direct question.  As of
25  June 10, 2024.

Page 12

1       Q   (By Mr. Grant)  Sarah, my question is limited to
2  the time you made your document production did you comply
3  with Number 1 of the Exhibit A, which is of Exhibit 2.  The
4  Deposition Exhibit 2.
5       A   As to the best that I could.
6       Q   Okay.  Is there anything that you could not
7  produce?
8       A   Audio recordings.
9       Q   Okay.  Did you have video recordings?
10      A   Did not.
11      Q   No video.  Were there ever video recordings that
12  would have been responsive?
13      A   To this subpoena?
14      Q   Yes.
15      A   No.
16      Q   Okay.  So what audio recordings existed that you
17  were unable to produce that were responsive?
18      A   An audio recording of you and I on the night on
19  which I took you to the hospital.
20      Q   Okay.  And what was the problem that -- or what
21  prohibited you from producing that?
22      A   When my phone is connected to a computer, I cannot
23  extract anything from it and they're two big in size to get
24  off in another form.
25      Q   And so you couldn't play it on your phone and

888-893-3767
www.lexitalegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


Page 13

1  record it on your computer?

**2    A   I couldn't play it on my phone and record it on my**
**3  computer.**

4    Q   Right.

**5    A   I don't know how to record it onto my computer.**

6    Q   You don't know if your computer has the ability to
7  record?

**8    A   Audio?  Like a mic?**

9    Q   Yes.

**10    A   No, I've never done that.**

11    Q   Okay.  Are you willing to produce that phone at a
12  mutually agreeable date and time prior to trial so that I can
13  make a recording of that audio?

14        MR. GILLESPIE:  Objection.  That is not -- we don't
15  answer questions in depositions based on producing documents
16  or other things at a later time.  If you had wanted to pursue
17  this in your subpoena that you directed to her over a year
18  ago, you could have requested that.  But you did not.

19        MR. GRANT:  Larry.

20        MR. GILLESPIE:  Her answer is no.

21        MR. GRANT:  I'm asking the witness.

22        MR. GILLESPIE:  She doesn't answer those kinds of
23  questions.  I do.

24        MR. GRANT:  You're not paying this guy, are you?

25    Q   (By Mr. Grant)  So you still possess that.  What

Page 14

1  sort of -- what's the make and model of your phone to the
2  best of your knowledge?

**3    A   I don't know.  It's a pretty old phone.  It's an**
**4  iPhone.**

5    Q   Okay.  It's an iPhone.  And to the best of your
6  abilities you have no idea how to make a recording of a
7  recording on an iPhone?

8        MR. GILLESPIE:  Objection; asked and answered.
9  Subject to that, you can answer it again.

**10    A   No, I don't know to make a recording of it on my**
**11  computer.**

12    Q   (By Mr. Grant)  Or any other handheld device or
13  otherwise?

**14    A   I'm pretty sure you then would have told me it's**
**15  not in its original form.**

16    Q   Why do you believe that?

**17    A   Because I'm your sister and I happen to know how**
**18  you try to control and manipulate others.**

19    Q   So you believe that not producing it at all would
20  be preferable?

**21    A   No.**

22    Q   So how do I get my hands on the recording?

23        MR. GILLESPIE:  Objection to the form of the
24  question.  You're not -- you can't give him technical
25  advice.

Page 15

1    Q   (By Mr. Grant)  What's your recommendation of how I
2  get my hands on the recording?  What would you recommend?

3        MR. GILLESPIE:  Objection to the form of the
4  question.

5        MR. GRANT:  You can answer.

6        MR. GILLESPIE:  It's also beyond the scope of
7  the --

8        MR. GRANT:  Her --

9        MR. GILLESPIE:  -- February 28, 2025 -- two people
10  don't talk at the same time, Mr. Grant.

11        MR. GRANT:  That's true, Larry.  Thank you for
12  reminding.

13        MR. GILLESPIE:  I think you may need that reminding
14  more than once.

15        MR. GRANT:  Be ready.

16        MR. GILLESPIE:  Be ready for what?

17        MR. GRANT:  To remind me.

18        MR. GILLESPIE:  Oh, okay.

19    Q   (By Mr. Grant)  Sarah, can you answer that again?

20        MR. GILLESPIE:  Objection.  First of all, I don't
21  really know what question he's asked now.  So could you read
22  back whatever question he's referring to.

23  (Whereupon the Reporter read back Mr. Grant's question as
    follows: What would you recommend?)

24

25        MR. GILLESPIE:  Same objection.

Page 16

**1    A   The question before that question was?**

2    Q   (By Mr. Grant)  What in your opinion, if the Court
3  were to order it, would you recommend as the manner of
4  producing that audio?

5        MR. GILLESPIE:  I'm instructing you -- objection.
6  I'm instructing you not to answer.  It is beyond the scope of
7  the February 28, 2025, order.

8    Q   (By Mr. Grant)  Sarah, did I have 50 percent
9  custody at the time you made that recording?

10        MR. GILLESPIE:  Objection; beyond the scope of the
11  February 28 order.  I'm instructing you not to answer.  It
12  also calls for a legal conclusion on your behalf.

13    Q   (By Mr. Grant)  Sarah, do you know when -- that I
14  had cust -- let me ask you this.  What was my custody prior
15  to this litigation starting?

16        MR. GILLESPIE:  If you know.

**17    A   I've never seen your custody agreement.**

18    Q   (By Mr. Grant)  What's your understanding?  Did I
19  have custody of my children at all?

**20    A   Yes, they were in your custody at times.**

21    Q   Okay.  At the time that you made that recording
22  during that month or that week did I have partial custody of
23  my children to your knowledge?

**24    A   Yeah, your children were there that day.**

25    Q   Okay.  Thank you.  So they were present in the



Page 17

1  home?

**2    A    Not at the time of the recording.**

3    Q    Okay.  So we've laid the foundation that the
4  children were in the home prior to the recording.  So that's
5  why it's within the scope of the order, Larry.

6        My question is instead of refusing to produce it
7  what manner do you believe you could produce it if you were
8  ordered to do so?

9        MR. GILLESPIE:  Objection; calls for a legal
10  conclusion, beyond the scope of the February 28, 2025, order.
11  And I'm instructing you not to answer.

12    Q    (By Mr. Grant)  Okay.  We'll move on.

13        Sarah, you're a college graduate; is that true?

**14    A    It's true.**

15    Q    And you also went to nursing school?

**16    A    Yes.**

17    Q    And you didn't know how to make a recording?

18        MR. GILLESPIE:  Objection; argumentative.  Instruct
19  you not to answer.

20    Q    (By Mr. Grant)  How many personal laptops or
21  computers do you have?

**22    A    One.**

23    Q    And have you had that for the last two years?

**24    A    Yes.**

25    Q    And what make is that?

Page 18

1        MR. GILLESPIE:  Objection as to relevancy.  Subject
2  to that, you can answer the question.

**3    A    I don't recall.  I don't use it currently because**
**4  it no longer works.**

5    Q    (By Mr. Grant)  Oh, okay.  Well, for the record
6  please retain that.  It will be inspected in future
7  proceedings.

8        MR. GILLESPIE:  Hold on.  I'm talking.  To the
9  extent that that's a question, whatever it may be, I'm
10  instructing you not to answer, okay.  And you can ignore any
11  instruction that it may contain.

12    Q    (By Mr. Grant)  Let me clarify.  You can ignore
13  this if you like at your own -- do whatever you want.  I'm
14  just making a statement on the record that you're on notice
15  of --

16        MR. GILLESPIE:  On notice of what?

17        MR. GRANT:  Don't speak over me, Larry.  You're
18  on -- I'm placing you on notice of anticipated litigation.
19  You need to do a complete hold of all information.

20        MR. GILLESPIE:  First of all, the Court's order
21  indicated that this is only to be about this litigation.  If
22  you're trying to put something together for some other
23  litigation, this deposition is going to end really fast.

24        MR. GRANT:  I'm going to get an order in this case
25  getting this information, so --

Page 19

1        MR. GILLESPIE:  Well, then you've had a year.  I
2  can't wait.

3        MR. GRANT:  I'm not going to get it from this
4  Judge.

5        MR. GILLESPIE:  Oh, that's right.  That's right.

6        MR. GRANT:  Yeah.

7        MR. GILLESPIE:  Are you unbuttoning your shirt?  Is
8  it getting more unbuttoned?

9        MR. GRANT:  No.  This is just how I wear it,
10  Larry.

11        MR. GILLESPIE:  Okay.

12        MR. GRANT:  Love it.  Love it.  For the record, I
13  love that Mr. Gillespie just commented on the top button is
14  unbuttoned on my shirt.

15        MR. GILLESPIE:  For the record, it's the top three
16  buttons, but beyond that.

17        MR. GRANT:  For the record, it's on number two.
18  Oh, my.

19    Q    (By Mr. Grant)  You produced text messages in this
20  case in response to this subpoena; is that true, Sarah?

**21    A    That's true.**

22    Q    Was that in full compliance with the subpoena?

**23    A    Yes.**

24    Q    You produced emails in response to the subpoena,
25  true?

Page 20

**1    A    I believe I may have.  This was a year ago --**

2    Q    Okay.

**3    A    -- that you're asking me about.**

4    Q    Okay.  Can you please flip to -- on the bottom
5  right of each page is there a number on the big stack.  This
6  is why we can use group exhibits.  It's called a Bates
7  number.  So if you can flip --

8        MR. GILLESPIE:  Oh, thank you.

9    Q    (By Mr. Grant)  If you can flip to Page Number 136,
10  please.  Let me know when you've had a chance to review that.
11  Just that page.

**12    A    Okay.**

13    Q    It says, dang, Stacy.  Just read your email.
14  Nobody should ever try to mess with you.  Did I state that
15  correctly?

**16    A    Yes.**

17    Q    Okay.  Did you produce that email?

**18    A    No.**

19    Q    Is there a reason why?

**20    A    I didn't have it.**

21    Q    What happened to it?

**22    A    I deleted it.**

23    Q    Did you check your deleted items?

**24    A    I did.**

25    Q    And it's gone?



Sarah Grant                                                                June 13, 2025

1    A   Correct.

2    Q   How often do you delete your deleted items?

3    A   I don't know.

4    Q   When's the last time you deleted your deleted
5    items?

6    A   I'm pretty sure it's set to automatically delete on
7    some time frame as well.

8    Q   I understand that.  I'm asking when you
9    affirmatively took an act to delete your deleted items?
10   When's the last time?

11   A   I don't recall.

12   Q   Was it when you deleted this email?

13   A   I don't recall.

14   Q   Is it possible the last time you deleted your
15   deleted items was when you deleted this email?

16       MR. GILLESPIE:  Objection; asked and answered.
17   Subject to that, we can take the next hour and 40 minutes
18   answering that question.

19   A   The question again is?

20       MR. GRANT:  Can you read it back, please.

21   (Whereupon the Reporter read back Mr. Grant's question as
     follows: Is it possible the last time you deleted your
22   deleted items was when you deleted this email?)

23   A   I don't believe so.

24   Q   (By Mr. Grant)  Okay.  We're going to go through
25   them, but you produced photographs also, correct?  Just

1    generally?

2    A   Yes.

3    Q   Did you delete any photographs that were taken in
4    between the first and the last photograph?

5    A   I do not --

6        MR. GILLESPIE:  Hold on, hold on.  I'm going to
7    object to the form of the question.  I don't know what he's
8    talking about.  Is he specifically referring to Exhibit A's
9    photographs or just photographs in general?  If you can
10   figure out what he's talking about, you can answer the
11   question.

12   Q   (By Mr. Grant)  Sarah, did you understand my
13   question?  You were starting to answer it.  I asked if you
14   produced -- let me break it down for Larry.  I asked if you
15   produced photographs in response to the subpoena.  Is that
16   true?  You did?

17   A   Yes.

18   Q   Okay.  And you're staring at them right now in
19   front of you on the top of the page is photographs you
20   produced, correct?

21       MR. GILLESPIE:  I'll object to the characterization
22   of the witness.  She has the exhibit in front of her.  That's
23   all.

24   Q   (By Mr. Grant)  You see photographs on that
25   exhibit?

1    A   I do.

2    Q   Okay.  Thank you.

3        MR. GRANT:  Larry, those are photographs on that
4    piece of paper?  Your witness -- your client just said so.

5        MR. GILLESPIE:  You characterized it as staring at
6    photographs.  You didn't identify what photographs, you
7    didn't identify the exhibit.

8    Q   (By Mr. Grant)  Ms. Grant, those exhibits bear
9    numbers, don't they?  iPhone numbers; they're designated file
10   numbers?

11   A   Yes.

12   Q   Okay.  Is it your testimony that you produced
13   consecutively every photograph taken between the first one
14   and the last one that you produced?

15   A   That pertain to your exhibit, yes.

16   Q   Ah, okay.  What were the other photographs?

17       MR. GILLESPIE:  Objection; beyond the scope of the
18   February 28, 2025, order and you're instructed not to
19   answer.

20   Q   (By Mr. Grant)  Okay.  As you sit here today do you
21   have any factual basis to believe that I should not have 50
22   percent custody of my children?

23       MR. GILLESPIE:  Objection; calls for an opinion of
24   the witness who is not a party to this proceeding and is
25   completely irrelevant.  Subject to that, you can answer the

1    question.

2    A   I have --

3        MR. GILLESPIE:  It also calls for a legal
4    conclusion.

5        MR. GRANT:  Let the record reflect Maia just wrote
6    that objection for Larry.

7        MR. GILLESPIE:  Oh, I didn't realized you had x-ray
8    vision.  Go ahead.

9        MR. GRANT:  No, regular vision.

10       MR. GILLESPIE:  Okay.

11   Q   (By Mr. Grant)  Go ahead, Sarah.  You can answer.

12   A   I honestly don't even remember your question at
13   this point.

14   Q   Let me rephrase it in a different manner.

15       Are you aware of any reason that it would be a risk
16   to the children ███████████ to be in my custody as
17   of this moment?

18   A   ████████████████ ?

19   Q   Yeah, the children.

20       MR. GILLESPIE:  You have two children with the same
21   name?

22       MR. GRANT:  ████████████ .

23       MR. GILLESPIE:  You said ██████ --

24       MR. GRANT:  Did I?  I'm sorry.

25   A   Yes.

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179

LEXITAS

Sarah Grant                                                      June 13, 2025

1    MR. GRANT: I misspoke. Thank you. Thank you for
2  correcting me.
3    **A   Yes.**
4    Q   (By Mr. Grant) ▮▮▮▮▮▮▮▮▮▮▮▮
5    **A   Sorry. You lost me on the two same names. So once**
6  **more.**
7    Q   I misspoke. Are you aware of any facts that would
8  lead you to believe that ▮▮▮▮▮▮▮▮ are in any danger
9  or are at any risk in my custody as of now?
10   **A   Facts being things that I've witnessed, yes.**
11   Q   Okay. List those for me?
12   **A   I don't think we have all the time for that.**
13   Q   Well, we have plenty of time. Go ahead. That's
14  what we're here to talk about.
15   **A   You're an alcoholic.**
16   Q   Okay. Let's take one at a time. So let's stop
17  there. Alcoholic. Okay. So is it your opinion then that
18  any parent who's an alcoholic cannot have custody of their
19  children?
20    MR. GILLESPIE: Objection; calls for a legal
21  conclusion. Subject to that, you can answer the question.
22   **A   That seems very general to ask me about all**
23  **alcoholics. I have one experience with you.**
24   Q   (By Mr. Grant) Okay. So you don't believe that
25  because of my alcoholism that -- you believe because of my

1  alcoholism I am a danger to the children?
2    MR. GILLESPIE: Objection; mischaracterizes the
3  witness' answer. Subject to that, you can answer the
4  question.
5    **A   Can you repeat the question.**
6    Q   (By Mr. Grant) Yes. Due to my alcoholism, which
7  I'm in recovery for the record, do you believe --
8    MS. BRODIE: I'm going to object Counsel
9  testifying.
10    MR. GRANT: That's fine.
11    MS. BRODIE: In a deposition.
12    MR. GRANT: You can object.
13    MS. BRODIE: This is question and answer only, not
14  statements in the record.
15    MR. GRANT: Okay. Thanks, Maia.
16    MS. BRODIE: You're welcome.
17   Q   (By Mr. Grant) Ms. Grant or Sarah, I'm sorry. I
18  was prepared to call you Ms. Grant all day. Sarah, is it
19  your testimony or do you believe that based upon my
20  alcoholism, whatever status it is, that the children would be
21  in risk of any sort of danger in my custody today?
22    MR. GILLESPIE: Objection to the form of the
23  question. I didn't understand the beginning of it. But
24  subject to that, you can answer the question if you
25  understand it.

1    **A   You're asking me I if I think your children should**
2  **be in your custody today based on your alcoholism?**
3    Q   (By Mr. Grant) Yeah. Yes.
4    **A   I don't think that they should be in your custody**
5  **based on your alcoholism.**
6    Q   Okay. And what specifically -- can you explain
7  why?
8    **A   Because you would drink yourself in a room for days**
9  **and they would see you maybe once a day.**
10   Q   Okay. So -- and that was what month and year?
11   **A   It started back in 2019.**
12   Q   When was the last time that you had personal
13  knowledge of that happening?
14   **A   March, 2024.**
15   Q   Okay. And what's the month and year now?
16   **A   Oh, hold on. That date might have been wrong.**
17  **This is '25. So, yeah, March of 2024.**
18   Q   What's the date now, month and year?
19   **A   This is June, 2025.**
20   Q   Okay. So it's been more than a year, correct?
21   **A   Correct.**
22   Q   Okay. So is it your testimony then that the
23  incident that you were describing over a year ago is
24  sufficient to create danger for the children now?
25    MR. GILLESPIE: Objection; mischaracterizes her

1  testimony. Subject to that, you can answer the question.
2    **A   Sorry. You're going to have to repeat questions**
3  **after objections so that I know what the question was**
4  **again.**
5    MR. GRANT: Can you read it back.
6  (Whereupon the Reporter read back Mr. Grant's question as
7   follows: So is it your testimony then that the incident that
8   you were describing over a year ago is sufficient to create
9   danger for the children now?)
9    **A   With my knowledge, yes.**
10   Q   (By Mr. Grant) Okay. So it's your opinion that I
11  should never have custody of my children ever again?
12   **A   That sounds like you're putting words in my mouth.**
13   Q   I'm asking you is that your opinion?
14   **A   Ever again?**
15   Q   Yeah.
16   **A   You asked me about present day and my answer is on**
17  **present day.**
18   Q   All right. In your opinion what would it take in
19  your opinion for it to be appropriate for me to have custody
20  of my kids?
21    MR. GILLESPIE: Objection; beyond the scope of this
22  witness' knowledge or expertise. You're asking for her
23  opinion and a legal conclusion. Subject to that, if you, you
24  know, have the ability to look into a crystal ball, you can
25  answer the question.



Sarah Grant                                                                              June 13, 2025

Page 29

1    Q   (By Mr. Grant)  Go ahead and answer the question,
2  please.
3    A   I believe you're asking me to speculate for all
4  **future days from now and I can't do that.**
5    Q   Okay.  If the record shows, which it does in this
6  case, I'll represent to you that in the record there's
7  evidence that I haven't had a drink since March 17th, 2024,
8  how long -- how much time has to pass until you believe that
9  the -- we're going to get to other things, but the alcoholism
10  is a reason that the boys should not be in my custody?
11    MR. GILLESPIE:  Objection as to relevance, calls
12  for speculation and assumes facts not in evidence.  Subject
13  to that, all of those, you can answer the question.
14    **A   I would tell you, Matt, that I have zero confidence**
15  **that your children should be in your custody because you have**
16  **been sober in the past for two years and yet we're still**
17  **going down the same road.**
18    Q   (By Mr. Grant)  And so that any other parent who
19  had a similar circumstance should never have their kids?
20    MR. GILLESPIE:  Objection; I'm going instruct you
21  not to answer.  That's argumentative.
22    MR. GRANT:  You can't instruct her not to answer.
23    MR. GILLESPIE:  Yeah, I can.  I just did.
24    MR. GRANT:  All right.  I'm sure your former law
25  partner will back you up on that, Larry.  We'll add that to

Page 30

1  the Supreme Court briefing.
2    MR. GILLESPIE:  Oh, please do.
3    MR. GRANT:  And you notice I highlighted you on
4  that.  That's a promise.
5    MS. BRODIE:  Could we go back to relevant issues
6  and stop this tit for tat stuff.  It's childish.
7    Q   (By Mr. Grant)  So I have no interest in going
8  through every single personal observation that you -- that
9  took place that you may testify about, but what I want to
10  know is we talked about alcoholism.  What are the other
11  reasons you believe that I would be a risk or a danger to the
12  children now if I had custody?
13    **A   Because you had violent hallucinations.**
14    Q   Okay.
15    **A   Firearms in your house.**
16    Q   Okay.  And anything else?
17    **A   At a minimum depression, suicidal ideations,**
18  **suicidal attempts.**
19    Q   Okay.  Keep going.  Anything else?
20    **A   I think that's all I have right now.**
21    Q   Okay.  Let's take those in order.  So violent
22  hallucinations.  Would I be -- well, strike that.  Violent
23  hallucinations.  When is the last time that you believe that
24  occurred referring to me?
25    **A   February, 2024.**

Page 31

1    Q   Okay.  And, again, that's more than a year ago?
2    **A   Yes.**
3    Q   Okay.  And similarly to save time it's your opinion
4  that because even though a year has passed that that is a
5  reason to keep the children from me?
6    MR. GILLESPIE:  Objection; this is a fact
7  deposition.  She's not an expert witness.
8    MR. GRANT:  She is testifying --
9    MR. GILLESPIE:  Hold on, hold on.  All she is here
10  to do is give you facts for your case, not to expound as to
11  her opinion about things.  So subject to that, you can answer
12  factually.  Your opinion has nothing to do with it.
13    MR. GRANT:  Let me rephrase it.
14    Q   (By Mr. Grant)  Sarah, you testified that a fact
15  that I was a danger to the children.  I want to know -- I
16  want to follow up on that fact.  And I want to know if the
17  fact that I had violent -- as you described it violent
18  hallucinations in February, 2024, if that being a year --
19  more than year ago is it because that's -- why is that not
20  enough time to eliminate your concerns?
21    MR. GILLESPIE:  Objection; beyond the scope of this
22  witness' ability to expound upon your recovery.  But subject
23  to that, you can answer the question.
24    **A   I'm going to give you the same answer I gave as**
25  **before.  You had hallucinations prior to that date as well,**

Page 32

1  **so we seem to have a pattern.**
2    Q   (By Mr. Grant)  All right.  Okay.  And I'll ask you
3  the same question then.  So any other parent you believe
4  factually would be a risk to their children if they similarly
5  had a pattern of violent hallucinations when they're
6  drinking?
7    MR. GILLESPIE:  Objection; calls for a legal
8  conclusion.  Subject to that, you can answer the question.
9    **A   If there's any parent that is experiencing the**
10  **things that I just listed off to you, I don't believe they**
11  **should have custody of their children.**
12    Q   (By Mr. Grant)  Thank you.  And to clarify, all the
13  things you listed off for me took place when I was drinking
14  alcohol, true?
15    **A   I can't say that they were directly related.**
16    Q   Can you please list the instances of any of the
17  things you've listed so far that took place when I was
18  sober?
19    **A   I can only tell you that if I saw you drinking**
20  **alcohol, then I can tell you were drinking on that specific**
21  **episode.**
22    Q   Can you -- okay.  Let me ask a more specific
23  question.  Can you cite a single incident in which the items
24  you listed as risk issues occurred in which you believe I was
25  sober?



**A I believe there are instances that I would come to your house I didn't see you drinking, but yet you were having suicidal ideations and attempts.**
Q And you're an RN; is that right?
**A Yes.**
Q Do you believe that someone could be under the influence of alcohol if they're not actively drinking in front of you?
MR. GILLESPIE: Objection; calls for medical opinion beyond this witness' expertise and training. Also calls for a legal conclusion. It's also speculative. Subject to that, you can answer the question.
**A I believe the amount of alcohol that you drank and with police officers telling me your blood alcohol content level and that you were still up and walking around, sure, these things can happen without you currently drinking alcohol.**
Q (By Mr. Grant) Thank you. That's what I was trying to establish. So you cannot give me an instance of any of these -- of the things you mentioned as a risk factor in which you believe I was sober?
**A Matt, you very well could have been sober on some of these occasions, yes. Could you also been drunk on some occasions? Yes. I believe it was all across the board.**
Q List for me the ones in this which you think I was

sober? Not under -- let me define sober. Not actively drinking as a drink in my hand, but under the influence of alcohol?
MR. GILLESPIE: I'm going to object to the form of the question. If you understand it, go ahead.
**A I'm not sure that I understand your question.**
Q (By Mr. Grant) Sarah, do you know what under the influence of alcohol means?
**A Yes. I also understand what --**
Q So yes is the answer. Thank you. So since you understand the phrase under the influence of alcohol, I'm asking you for instances in which you believe I had a violent hallucination with or without firearms with or without depression with or without suicidal ideations when I was not under the influence of alcohol?
MR. GILLESPIE: I'm going to object to the form --
Q (By Mr. Grant) List those for me.
MR. GILLESPIE: -- of the question. I don't know how you can answer that.
Q (By Mr. Grant) Go ahead.
**A You want instances in which these things happened and you weren't under the influence of alcohol?**
Q Correct. Cite one.
**A When I first came to your house in 2019 you were a mess, in tears, depressed. You're asking me to make a**

**differential between alcohol intake and depression.**
Q Correct.
**A And being distraught.**
Q I'm asking you what your factual personal -- what your personal knowledge is. Based on your personal observations was I under the influence or not? Or do you not know?
**A I can tell you the instances in which I saw you drinking and when your blood alcohol content was taken.**
Q Can you list for me any instances in which in your opinion based on your personal knowledge you believe I was not under the influence of alcohol?
MR. GILLESPIE: I'm going to object to the form of the question. What instances of what?
Q (By Mr. Grant) You can answer.
**A Honestly you have me confused as to what you're wanting me to answer.**
Q Sarah, let me start over. This is a simple question. The issue is again if the evidence shows that I'm over a year sober and you're raising these issues that are connected to alcohol --
**A They're also connected to potential not alcohol and your mental health.**
Q Thank you. That's what I want to ask about.
**A Perfect.**

Q All right. Give me an example of any of these things happening when I was a hundred percent sober?
**A Your mental health and being a hundred percent sober, these are not necessarily mutually exclusive. You can be drinking and not be drunk or having these things happen and be drinking. I came over in points of emergencies, Matt, so I have the knowledge that I have upon the point in which I arrived and where things went from there.**
Q I just want to clarify. You're not an expert in mental health, are you?
**A No.**
Q What's your nursing board licensing? You're an RN?
**A Correct.**
Q You have no -- do you have any specialty training in mental health?
**A We learn about mental health in nursing school.**
Q Okay. Just like -- so you like every other nursing student learned about mental health, correct?
**A Correct.**
Q But you have no special training, correct? In mental health area?
**A Correct.**
Q Okay. So you would agree with me that an expert would need to come in to talk about my mental health, correct?

Page 37

1    MR. GILLESPIE:  Objection; calls for a legal
2  conclusion.  You're asking whether she can prove something.
3  She's not a party.  You're the one that has to prove stuff,
4  not her.
5    MR. GRANT:  I don't have to prove anything, Larry.
6  Q   (By Mr. Grant) Go ahead.  You can answer.
7    MR. GILLESPIE:  No, I'm -- you're not giving a
8  legal conclusion and that's what he's asking for.
9  Q   (By Mr. Grant) Sarah -- let me ask this.  Sarah,
10 do you believe you have the specialized expertise and
11 knowledge to opine on the impact of mental health when
12 someone's sober and its impact on risk to children?
13 **A   I believe I have the knowledge as your sister**
14 **showing up at moments of emergencies as to whether or not**
15 **those children should have been with you during that time.**
16 Q   Okay.  So let's tackle that.  Let's go back to 2019
17 you referenced it earlier.  Just generally I went to rehab in
18 2019, correct?
19 **A   In late 2019.**
20 Q   Right.  I just said 2019, so the answer is yes,
21 correct?
22 **A   In 2019, yes.**
23 Q   Thank you.  And after 2019 do you agree that there
24 was a period of sobriety?
25 **A   Well, COVID took place, so I can't comment on your**

Page 38

1  **sobriety.**
2  Q   Okay.  Do you have any personal knowledge that I
3  wasn't sober, for example, in the spring of 2020?
4  **A   No.**
5  Q   How about the summer of 2020?
6  **A   No.**
7  Q   How about at any point in time prior to
8  Thanksgiving, 2023?
9  **A   Yes.**
10 Q   When?
11 **A   That would be the year 2022.**
12 Q   What month?
13 **A   November.**
14 Q   And so tell me what happened in November, 2022,
15 that leads you to believe I was not sober?
16 **A   I believe it was Thanksgiving of 2022.**
17 Q   You don't -- okay.  Let me ask you another
18 question.  What happened, if anything, relating to alcohol or
19 my behavior on Thanksgiving of '23?
20 **A   I'm not sure that we did Thanksgiving, 2023.**
21 Q   So let's just go -- we'll use your date.
22 Between -- and I didn't ask you a month.  But in late 2019,
23 between the time frame late 2019 and whenever, whether it's
24 Thanksgiving -- we'll assume it's Thanksgiving, 2022 -- do
25 you have any evidence or reason to believe that I was

Page 39

1  drinking during that time frame?
2  **A   One more time.  Do I have reason to believe that**
3  **your drinking when?**
4  Q   During that time frame?
5  **A   Which time frame?**
6  Q   Between when I went to rehab in 2019 and up to
7  November, Thanksgiving, 2022?
8  **A   Well, I'm not sure it was Thanksgiving, 2022, but I**
9  **believe it was November, 2022.  Do I have personal --**
10 Q   It was Thanksgiving or -- sorry.  We'll use --
11 **A   Do I have personal knowledge?**
12 Q   Yes.
13 **A   No.  Did other people witness things?  Yes.**
14 Q   Okay.  That would be called hearsay.  So I'm asking
15 about your personal knowledge.
16 **A   No, I know from the point in which I returned to**
17 **your home.**
18 Q   Okay.  So based on your -- we'll talk about the
19 time period of your personal knowledge.  So do you believe
20 that during that time frame the children were -- when I was
21 not drinking, the children were in danger in my custody?
22    MR. GILLESPIE:  Objection; calls for speculation on
23 behalf of the witness.  Also beyond her personal knowledge.
24 Subject to that, you can answer the question.
25 **A   You're asking me to acknowledge whether or not you**

Page 40

1  **were drinking during these times.  I don't have the knowledge**
2  **that you weren't drinking.**
3  Q   (By Mr. Grant)  If you assume I wasn't?
4    MR. GILLESPIE:  Objection.
5  **A   I'm not going to assume.**
6    MR. GILLESPIE:  Calls for speculation.  She's not
7  assuming anything.
8    MR. GRANT:  Larry, I can absolutely ask a witness
9  to assume certain facts.
10   MR. GILLESPIE:  Yeah, and I can instruct her not to
11 answer.
12 Q   (By Mr. Grant)  All right.  I will make the
13 question -- if you assume I had no drinks between November of
14 '22 -- sorry, November of '19 to November of 2022 or if it
15 was earlier, whatever that period of which I was of sobriety,
16 do you believe the kids were in any risk of harm or danger in
17 my custody?
18 **A   I became aware of the harm again when I became**
19 **aware the issues were arising for another time.**
20 Q   Because I had started drinking?
21 **A   I mean I came over and you were depressed and**
22 **crying your eyes out and telling me that you almost checked**
23 **yourself into an institution yourself just prior.  So that's**
24 **the knowledge I have of the scenario.**
25 Q   Do you believe I had relapsed at that time?



Page 41

1    A    You admitted that you had relapsed at that time.

2    Q    Okay.  So I wasn't sober.  I'm asking you about the

3    period in which I was sober.

4         MR. GILLESPIE:  Do you know what period he's

5    talking about?

6    A    You're asking about a period and you're making me

7    assume that you were sober in that time.

8    Q    (By Mr. Grant)  Pick any time you want between 2019

9    when I was in Texas and I came back, whatever date you want

10   to guess and assume, after I returned.  During that time I

11   had sobriety when I returned from the first rehab, was I a

12   danger to the children?

13        MR. GILLESPIE:  I'm going to object to the form of

14   the question.  If you understand it, you can answer.

15   A    I don't understand the question.

16   Q    (By Mr. Grant)  Okay.  So let me move on.  So you

17   understand that if the children are not in my custody,

18   they're in Rebecca Copeland's custody, correct?

19   A    When?  Now?

20   Q    As a general proposition if the boys are not in my

21   custody, they're in their mother's custody, correct?

22   A    For --

23        MR. GILLESPIE:  I'm going to object.  You're

24   calling for a legal conclusion on her behalf, you're calling

25   for her to comment upon your assessment of what's going on

Page 42

1    right now.  If you ask her a question about what she knows

2    now, that's fine.

3    Q    (By Mr. Grant)  I'm not -- I'm asking common sense.

4    If the kids are not with their father at all, they're with

5    their mother, right?

6         MR. GILLESPIE:  Then why are you asking the

7    question if it's common sense?

8         MR. GRANT:  Because you can't answer it, which

9    illustrates you're being difficult.  So I would like the

10   witness to agree --

11        MR. GILLESPIE:  I instruct you not to answer the

12   question.  This is silly.

13   Q    (By Mr. Grant)  Sarah, you understand that if the

14   kids are not with me, they're with their mom?

15        MR. GILLESPIE:  Same objection.  Same

16   instruction.

17   Q    (By Mr. Grant)  Fine.  Do you believe Rebecca

18   Copeland is a good mother?

19   A    I believe Rebecca Copeland -- I don't have concerns

20   about her as a mother.

21   Q    You don't?  Before we go through, you haven't

22   raised concerns about Rebecca Copeland in text messages?

23   A    Not that I recall.

24   Q    You didn't raise the issue of engaging in a

25   correspondence with Stacy about her inability to get the kids

Page 43

1    to school?

2    A    Not that I recall.

3    Q    If I represent to you that the evidence already

4    existing in the case is that the kids missed over 1,100

5    periods of school while in her custody, would that suggest

6    that maybe she's not a good mother?

7         MR. GILLESPIE:  Objection; I'm instructing you not

8    to answer.  There's no evidence of this whatsoever.  If he

9    wants to show you something so you can look at it, fine.

10        MR. GRANT:  Then you would object to it as hearsay,

11   Larry, so I'm not playing your game.

12        MR. GILLESPIE:  Thank you for the legal

13   instruction.  I've given her her instructions.

14   Q    (By Mr. Grant)  So I just want to be clear.  Based

15   on all your years of observation you believe that Rebecca

16   Copeland is a good mother?

17   A    In all the years of Rebecca Copeland as an

18   observation as a parent from what I've observed, yes, she's a

19   great parent.

20   Q    Okay.  I need to just take a moment.

21        Are you aware at the time in which I had the

22   children in December of -- end of November, 2023, and you

23   came over, correct?

24   A    Uh-huh.

25   Q    You drove me to an institution, correct, or the

Page 44

1    hospital actually?

2    A    Yes.

3    Q    Okay.  And so at that point in time you know that I

4    had some custody of the kids, correct?

5    A    Yes.

6    Q    Okay.  And then at that point in time you returned

7    to my home, true?

8    A    After I took you to the hospital?

9    Q    In the coming next two days?

10   A    Yes.

11   Q    Okay.  And did you have permission to enter my

12   home?

13        MR. GILLESPIE:  Objection; beyond the scope of the

14   February 28, 2025, order especially given the fact that

15   you've already threatened to sue Ms. Grant for a number of

16   purported violations, I'm instructing you not to answer.

17        MR. GRANT:  I'm allowed -- in fact, you were in the

18   courtroom, Larry, when the Judge agreed I could inquire as to

19   her credibility.

20        MR. GILLESPIE:  No, you stated credibility.  He

21   didn't acknowledge that.  You stated it.

22        MR. GRANT:  All right.

23        MR. GILLESPIE:  I'm instructing you not to

24   answer.

25   Q    (By Mr. Grant)  All right.  Sarah, you've been

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Page 45

1  interviewed by the Town & Country police?
2     **A    No.**
3     Q    Have you been contacted in any way by the police?
4        MR. GILLESPIE:  I'm instructing you not to answer.
5  It's beyond the scope of the February 28, 2025, order.
6     Q    (By Mr. Grant)  Have you ever been arrested for a
7  crime involving dishonesty?
8        MR. GILLESPIE:  I'm instructing you not to answer
9  as it's beyond the February 28, 2025, order.
10    Q    (By Mr. Grant)  With regard to the children during
11  the time frame in which I was drinking that you referenced in
12  your testimony --
13    **A    Which time frame?**
14    Q    The time frame in which you've already referenced
15  in your testimony, all of it, are you aware of any other
16  person than yourself making audio or video recordings of
17  me?
18    **A    No.**
19    Q    You're not aware of Stacy Thomas making any audio
20  or video recordings?
21    **A    No.**
22    Q    Have you seen text messages where she has stated
23  that she possesses video recordings?
24       MR. GILLESPIE:  Objection; calls for speculation
25  and there is no evidence in front of this witness as to these

Page 46

1  purported recordings.  If you have something, show it to
2  her.
3        MR. GRANT:  I said have you seen and your objection
4  is speculation, Larry?
5        You can answer the question.
6        MR. GILLESPIE:  No.  Objection.  I'm instructing
7  you not to answer.
8        MR. GRANT:  I mean this is a circus.
9        MR. GILLESPIE:  Yeah, it is.
10       MR. GRANT:  Have you seen a piece of A, B and C
11  calls for speculation?  I mean, Larry, this is why you do
12  family law.  I mean this is crazy.
13       MR. GILLESPIE:  Mr. Grant, you're asking her if she
14  is aware --
15       MR. GRANT:  Has seen.
16       MR. GILLESPIE:  Let me finish.  You're asking her
17  if she has seen a text.  If you've got a text, show it to
18  her.
19       MR. GRANT:  I don't have to show it.  I can ask her
20  what she remembers.
21    Q    (By Mr. Grant)  Do you remember seeing ever, do you
22  have a recollection, of a text or an email or any other
23  personal knowledge of Stacy Thomas ever taking the position
24  that she possessed audio or video recordings of me?
25       MR. GILLESPIE:  If you can follow that compound

Page 47

1  question, go ahead and answer it.
2     **A    I don't recall seeing a text message of Stacy**
3  **saying that she has video recordings of you.**
4     Q    (By Mr. Grant)  Okay.  Has she ever told you that
5  she did?
6     **A    No.**
7     Q    Okay.  Thank you.  See, this should go pretty
8  smooth.
9        MR. GILLESPIE:  If you knew how to ask a question,
10  it would.
11       MR. GRANT:  Have you seen, Sarah, is pretty
12  straightforward.  That's --
13    **A    That wasn't your first question.**
14       MR. GRANT:  Yes, it was.
15    Q    (By Mr. Grant)  Have you -- with regard to the
16  children have you been interviewed by -- let me rephrase
17  that.  With regard to the children have you communicated in
18  any way with John Fenley?
19    **A    We passed in the hallway once.**
20    Q    Okay.  And was that today or prior to today?
21    **A    Oh, so twice including today.**
22    Q    Okay.  And the gentleman in the blue suit with his
23  shirt buttoned up all the way to the top is Mr. Fenley.  I'll
24  represent that.  Other than passing, you haven't communicated
25  with him; is that true?

Page 48

1     **A    That's true.**
2     Q    Okay.  With regard to the children on how many
3  occasions have you communicated with Rebecca Copeland's
4  lawyer Maia Brodie?
5     **A    Exact same answer.**
6     Q    Okay.  So only in passing?
7     **A    Yes.**
8     Q    Okay.  Thank you.  It doesn't have to be a dramatic
9  answer.
10    **A    It's not a dramatic answer.**
11    Q    I know.
12       MR. GILLESPIE:  It's not a dramatic question
13  either.
14       MR. GRANT:  I know.
15    Q    (By Mr. Grant)  When did you retain
16  Mr. Gillespie?
17       MR. GILLESPIE:  Objection; beyond the scope of the
18  February 28, 2025, order and it's also irrelevant.  And I'm
19  instructing you not to answer.
20       MR. GRANT:  I'm trying to establish when
21  attorney/client privilege took place, Larry.
22       MS. BRODIE:  And that's irrelevant.  Objection.
23       MR. GILLESPIE:  That's irrelevant, too.
24    Q    (By Mr. Grant)  Okay.  Have you spoken with Larry
25  Gillespie regarding me and the children?



Page 49

1    MR. GILLESPIE:  Objection; attorney/client
2  privilege.  You're not going anywhere near there.
3    MR. GRANT:  Okay.  So there is attorney/client
4  privilege then, Mr. Gillespie?
5    MR. GILLESPIE:  Oh, my gosh.  You just figured that
6  out.  Yes.
7    MS. BRODIE:  I believe you're on the court
8  record.
9    MR. GILLESPIE:  I'm in the court file.
10   MR. GRANT:  So I'm entitled to establish when that
11 began.
12   MR. GILLESPIE:  You are not entitled to ask any
13 questions about conversations that the two of --
14   MR. GRANT:  I didn't.  I asked what date she
15 engaged you.  She can answer when she hired you as a
16 lawyer.
17   MR. GILLESPIE:  Objection as to relevance.
18  **A    In the year 2024.**
19   Q    (By Mr. Grant) Okay.  Thank you.  Ms. Copeland had
20 a lawyer before Ms. Brodie named Sylvia Pociask.  I probably
21 butchered that name.  Did you communicate with her in any
22 way?
23  **A    No.**
24   Q    Did you have any involvement in any court
25 appearances at all relating to the children in this case?

Page 50

1    MR. GILLESPIE:  Objection to the form of the
2  question.  If you understand that, you can answer it.
3    Q    (By Mr. Grant) Let me ask a different question.
4  Other than sitting potentially waiting to do something, have
5  you ever been actively involved in any sort of proceeding, a
6  TRO proceeding or any other proceeding in a courthouse
7  relating to ▮▮▮▮▮▮▮▮▮▮▮▮ or ▮▮▮▮▮
▮▮▮▮▮▮  That's my question.
9  **A    No.**
10   MR. GRANT:  Thank you.  Can we go off the record
11 for a second.
12   (Whereupon there was a discussion held off the record).
13   MR. GRANT:  We can go back on the record.
14   Q    (By Mr. Grant) Are you planning to testify at
15 trial?
16  **A    Is that to me?**
17   Q    Yeah.  All my questions are to you.
18  **A    Well, usually you say Sarah first.**
19   Q    Sorry.  Sarah, are you planning to testify at
20 trial?
21  **A    Nobody has asked me to testify at trial.**
22   Q    If you were asked, are you going to appear
23 voluntarily at trial?
24   MR. GILLESPIE:  I'm going instruct you not to
25 answer.

Page 51

1    Q    (By Mr. Grant) Okay.  You're currently not
2  planning to testify then?
3  **A    I didn't show up here today voluntarily.  You
4  subpoenaed me.**
5    Q    That's why I was -- you haven't received a subpoena
6  for trial?
7  **A    I have not.**
8    Q    Do you know when trial is?
9  **A    Yes.**
10   Q    When is it?
11 **A    The 23rd and 24th of this month.**
12   Q    Did you take off work?
13 **A    No.**
14   Q    Are you working either of those days?
15   MR. GILLESPIE:  Objection; beyond the scope of the
16 February 28, 2025, order.  I'm instructing you not to
17 answer.
18   MR. GRANT:  Okay, Larry.
19   MR. GILLESPIE:  If you want to ask about the
20 pending motions and the issues associated with them and the
21 best interest of children in accordance with the February 28,
22 2025, order at a court hearing that you did not attend,
23 you're more than welcome to do so.
24   MR. GRANT:  Go ahead.  Are you done?
25   MR. GILLESPIE:  Yeah.

Page 52

1    MR. GRANT:  All right.  Thank you.
2    Q    (By Mr. Grant) Have you discussed my custody of
3  the children with your now husband?
4    MR. GILLESPIE:  Objection; beyond the scope of the
5  February 28, 2025, order.  It's completely irrelevant.  I'm
6  instructing you not to answer.
7    MR. GRANT:  For the record, Ms. Brodie just told
8  him to say that.
9    MS. BRODIE:  For the record I didn't.
10   MR. GRANT:  Yes, you did.
11   MS. BRODIE:  Okay.  I didn't.  You want to keep
12 going?  You can say yes you did and I'll say I didn't and
13 then we can go back and forth.
14   MR. GRANT:  No, I just wanted to say --
15   MS. BRODIE:  Let's just keep doing it.
16   MR. GILLESPIE:  Let me make -- tell you any time I
17 reference the February 20, '28, (sic) order -- or February
18 28, 2025, order you don't answer.  I don't have to repeat
19 that every time.
20   Q    (By Mr. Grant) When is the last time you spoke
21 with Rebecca Copeland about the boys?
22 **A    What is today, Friday?  So this week.**
23   Q    Okay.  Generally what was the topic of
24 conversation?
25 **A    Celebrating their birthdays.**



Page 53

1  Q  Did you see either of them on their birthdays?
2  A  I did not.
3  Q  Have you seen them regarding their birthdays on any
4  other day?
5  A  As of their birthdays this year?
6  Q  Yes.
7  A  Not as of yet.
8  Q  Okay.  Have the boys spent the night at your
9  residence ever?
10  A  Yes.
11  Q  How many times approximately?
12  A  A few.
13  Q  Is that less than ten?
14  A  Yes.
15  Q  Is that less than five?
16  A  Maybe.  I don't know.
17  Q  Whatever that number is, I don't want you to
18  speculate or guess -- but I thought you might be able to
19  estimate, which is allowed -- did any of those occasions take
20  place before November, 2022?
21  A  No.
22  Q  Okay.  Since this case has been filed, you have
23  observed me with the boys, have you not?
24  A  Observed you with the boys?
25  Q  You've seen me from a distance, correct?

Page 54

1  A  I've seen you at the same event as the boys.
2  Q  What was that?
3  A  Carter's football game.
4  Q  Were you present on a drop off?
5  A  I didn't see you.
6  Q  Okay.
7  A  But sure, yeah, you were in the driveway, your car
8  was.
9  Q  That's -- thanks.  I just wanted to establish that.
10  Do you have any recollection of anything about my drop off
11  being unusual?
12  A  You were playing extremely loud music.
13  Q  Okay.  Do you believe it was so loud that it was
14  damaging to the kids' ears?
15  A  I wasn't in the car.
16  Q  As an RN do you know that alcoholism is a disease
17  covered by the ADA?
18  MR. GILLESPIE:  Objection; calls for a legal
19  conclusion.  You're asking her about the Americans With
20  Disabilities Act.
21  MR. GRANT:  I'm asking her what she's been trained
22  in as a nurse.
23  Q  (By Mr. Grant)  What do you know?  If you don't
24  know, you do or don't.
25  A  I know that alcoholism is a disease.

Page 55

1  Q  Thank you.
2  A  I know that as a normal person, not an RN.
3  Q  Okay.  Even better.
4  A  As well.
5  Q  Thanks.
6  A  You're welcome.
7  Q  Even better.  I thought it was common sense, too.
8  And with regard to alcoholism you don't have any
9  specialized training as to how long someone should stay at
10  rehab, do you?
11  MR. GILLESPIE:  Objection; irrelevant.  Subject to
12  that, you can answer the question.
13  A  I think it's probably personalized to the
14  alcoholic.
15  Q  (By Mr. Grant)  I just want to make sure that
16  you're -- I need to know if you're going to testify that I
17  should have stayed longer at any particular rehab?
18  MR. GILLESPIE:  Again, subject to that --
19  objection; irrelevant.  Subject to that, you can answer the
20  question.
21  A  You're asking me what I'm going to trial about?
22  Q  (By Mr. Grant)  I'm just wondering if you have an
23  opinion in 2019 I should have stayed at rehab longer?
24  MR. GILLESPIE:  Objection; her opinion is
25  irrelevant.  Subject to that, you can answer the question.

Page 56

1  A  I have knowledge that you were kicked out of Texas
2  in 2019.
3  Q  (By Mr. Grant)  And what was that knowledge?  Do
4  you have personal knowledge of that or is that hearsay,
5  someone told you that?
6  A  Oh, no, they called me and conferenced you in on
7  that phone call.
8  Q  They called you?
9  A  Yeah.
10  Q  Okay.  So someone else told you.  So we would need
11  to talk to that person to find out if it's true?
12  A  No, we were all present on the phone call
13  together.
14  Q  Okay.  But that assumes that person is telling the
15  truth?
16  A  Well, he was the owner of the rehab facility and
17  gave long reasons as to why I was being removed.
18  Q  Okay.  Excellent.  Thank you.  And that's all true.
19  He did give many reasons in his mind.
20  MS. BRODIE:  Is that a statement?
21  Q  (By Mr. Grant)  What's your understanding as to how
22  many times I've been to rehab?
23  A  At least four.
24  Q  Okay.  Do you have any personal knowledge as to
25  whether or not I have a sponsor right now?



Sarah Grant                                                                June 13, 2025

Page 57

1    A   No.

2    Q   Do you have any personal knowledge whether or not I

3  go to AA meetings now?

4    A   No.

5    Q   Do you have any personal knowledge -- then,

6  therefore, you have no personal knowledge as to how often, if

7  I do go, that I go to AA meetings, correct?

8        MR. GILLESPIE:  Go ahead and answer the question.

9    A   Correct.

10   Q   (By Mr. Grant)  Thank you.  You mentioned firearms

11  and suicidal ideation.  I want to follow-up on that.  Do you

12  have any personal knowledge of any actual suicide attempts?

13   A   I have the knowledge --

14   Q   It's a yes or no, then we'll get to it?

15   A   Yes.

16   Q   Okay.  So what is it that you have personal

17  knowledge of?

18   A   That you were in the creek with a gun.

19   Q   And what's that based on?

20   A   That's what you told me on the phone call that made

21  me come to your house today -- or that day.

22   Q   And what was the month and year that that

23  happened?

24   A   It was summer, so it would either have been late

25  July, early August, 2019.

Page 58

1    Q   Okay.  Next?  Is there another one or is that it?

2    A   You cut your wrists in I believe the month was

3  November of 2023.

4    Q   Okay.  What do you base that on?  What's your

5  personal knowledge based on?

6    A   You told me that you cut your wrists and I showed

7  up and saw your wrists cut.

8    Q   Okay.  So it's my statement and you observed it

9  with your eyes?

10   A   I didn't -- I observed the cuts afterwards.

11   Q   Okay.  That's what I was asking.

12   A   Yes.

13   Q   You saw scarring?

14   A   No, I saw a cut with dried blood.

15   Q   Okay.  That's what I'm trying to get at is what you

16  saw.  That's it.  What -- let me ask you this.  What did you

17  see on the wrists?

18   A   Cuts.

19   Q   Okay.  Thank you.  And you said dried blood?

20   A   Well, again, because you had done it overnight.

21   Q   Okay.  And did it appear to be an actual suicide

22  attempt to you?

23   A   It was an act.

24   Q   So it was --

25   A   There are ideations, ideas and then are actions.

Page 59

1  It was an act.  I also have the knowledge of others that you

2  told me on that day.

3    Q   Well -- oh, let's get -- let's go into my

4  statements, yes.  What did I tell you on that day?  We'll

5  start with that day.  What else did I tell you about that

6  topic?

7    A   That you had jumped from Christine's moving car in

8  order to die.

9    Q   Okay.  Did I say any more, anything more about that

10  incident that I supposedly -- that -- sorry.  Did I say

11  anything, any more details, about the incident you just

12  described?

13   A   No.

14   Q   Okay.  All right.  Next --

15   A   Except later in the evening you said you were meant

16  to die that way.

17   Q   Meant to die jumping out of the car?

18   A   Yeah.

19   Q   Okay.  Next.

20   A   You told me the same day that you previously tried

21  to use your vehicle in your garage, but was unsuccessful

22  because it's a newer car and newer cars shut off.

23   Q   Next?

24   A   The creek, the car.  That may be all.

25   Q   Okay.  And what month and year was that again?

Page 60

1    A   That you told me those?

2    Q   Yeah.

3    A   That was either late November or early December,

4  2023.

5    Q   Okay.  And you don't know if those actually

6  happened, correct?

7    A   Besides the cuts, no.

8    Q   Oh, yeah.  We had moved on from that.  But, yeah,

9  the jumping out of the car and the vehicle in the garage, you

10  don't know if that's true or not, do you?

11   A   I take you as your word.

12   Q   What is your understanding if you have one of the

13  phrase cry for help?

14   A   I mean not related to that, but I have the

15  understanding if someone is potentially in harm to take them

16  seriously.

17   Q   Okay.  But my question is what is your

18  understanding as to what a cry for help is?

19   A   That people may cry for help.

20   Q   What does that mean?

21   A   That they want you to pay attention to them and

22  maybe help them.

23   Q   Okay.  Is it your understanding that people say

24  things that are untrue in order to get attention and to get

25  help?



Page 61

1    MR. GILLESPIE: I'm going to object. He's asking
2  you to impeach his own prior statements. But subject to
3  that, you can answer the question.
4    MR. GRANT: You can answer.
5    **A   My answer is if anybody is telling me remotely**
6  **something that is harmful to them and may end their life, I'm**
7  **going to take it seriously.**
8    Q   (By Mr. Grant) Okay. Well, that wasn't my
9  question, but that's fine. Back to -- I didn't ask this
10  question. Your observation of scarring and dried blood on my
11  wrists --
12    **A   I never said scarring.**
13    Q   Oh, you're right. I'm sorry. Thank you. Let me
14  rephrase that.
15    Back to your observation of cutting in some way,
16  cuts on my wrists, is there any way that could have led to
17  death?
18    MR. GILLESPIE: Objection; calls for speculation.
19  Subject to that, you can answer the question.
20    **A   I can tell you it didn't kill you.**
21    Q   (By Mr. Grant) You're a nurse. Would you -- if
22  you were there when it happened, would you have driven me to
23  the emergency room?
24    **A   Yep.**
25    Q   Because of the blood loss, not because of the act

Page 62

1  itself?
2    **A   Because of the act itself.**
3    Q   What about the blood loss?
4    **A   I don't know how much blood you lost.**
5    Q   The cutting was -- would you describe -- agree that
6  it was minimal?
7    **A   Again, I didn't witness your blood loss.**
8    Q   No, I asked you about the cutting?
9    **A   That your cutting was minimal?**
10    Q   Yes.
11    **A   You had multiple cuts to one wrist I know of. I**
12  **can't recall whether or not it was to the second wrist.**
13    Q   Approximately how many?
14    **A   Matt, I was in a heightened state of panic over**
15  **your life.**
16    Q   If you can't answer, you can't answer. I'm just
17  asking you how many?
18    MR. GILLESPIE: How many what?
19    MR. GRANT: She knows.
20    MR. GILLESPIE: No, how many what?
21    Q   (By Mr. Grant) Sarah, do you understand my
22  question when I said how many?
23    MR. GILLESPIE: Objection. You don't answer until
24  he explains how many what.
25    MR. GRANT: You can answer if you understand.

Page 63

1    MR. GILLESPIE: No, I'm instructing you not to
2  answer.
3    Q   (By Mr. Grant) Sarah, are you able to estimate how
4  many cuts you observed?
5    MR. GILLESPIE: Thank you. Cuts.
6    MR. GRANT: She knew what I was talking about.
7    MR. GILLESPIE: Why didn't you tell me?
8    MR. GRANT: Because if you can't keep up, then I
9  can't help you. Go ahead.
10    **A   I can't estimate as to how many cuts.**
11    Q   (By Mr. Grant) Okay.
12    **A   There were plural for cuts.**
13    Q   Okay. And the question is do you believe that what
14  you saw if it went untreated could have led to death?
15    **A   Do I believe that it could have led to death**
16  **because someone cut their wrist?**
17    Q   No, I'm not asking you about the mental health
18  aspect. I'm talking about the cutting, the acts of cutting?
19    **A   That's a gateway to more actions.**
20    Q   Okay. And I'm not asking you about that. That may
21  be. I don't know. I'm not asking about that. I'm asking
22  about the cuts?
23    **A   Okay. So what's your question about the cuts?**
24    Q   In your opinion did they require stitches?
25    **A   No.**

Page 64

1    Q   Okay, thanks. In your opinion were any veins or
2  arteries hit?
3    **A   Could have. I don't know.**
4    Q   In your experience what sort of blood loss happens
5  when a vein or artery is cut with a knife?
6    MR. GILLESPIE: Objection; irrelevant. He's trying
7  to prove he's sane because he didn't quite kill himself. But
8  subject to that, you can answer the question.
9    **A   What was the question?**
10    MR. GRANT: You can read it back, please.
11  (Whereupon the Reporter read back Mr. Grant's question as
12  follows: In your experience what sort of blood loss happens
    when a vein or artery is cut with a knife?)
13    **A   It varies.**
14    Q   (By Mr. Grant) Okay.
15    **A   There are veins and arteries of different sizes.**
16    Q   So you believe, just to clarify, then what you
17  observed on my wrist is consistent with a vein or artery --
18  or artery being cut?
19    MR. GILLESPIE: Objection; she did not testify to
20  that. You're mischaracterizing.
21    MR. GRANT: I'm asking.
22    MR. GILLESPIE: No, wait a minute. You're
23  mischaracterizing her testimony.
24    MR. GRANT: Let me ask you a new question.
25    Q   (By Mr. Grant) Do you believe what you observed

Sarah Grant                                                                          June 13, 2025

Page 65

1  was consistent or inconsistent with a vein or artery being
2  cut with a knife?
3      **A   I do not know.**
4      Q   Okay.  Thank you.  You referenced my depression.
5  Let's -- before we go -- we'll take it first from now.  Do I
6  currently -- do you know, do you have personal knowledge,
7  whether I suffer from depression?
8      **A   Do I have personal knowledge whether or not you**
9  **suffer from depression right now?**
10     Q   Yes.
11     **A   I couldn't possibly answer that, but once you have**
12 **depression it's much like alcoholism, it's there.**
13     Q   So is that your lay person opinion or is that a
14 nurse?
15     **A   I'm not here to testify as a nurse.**
16     Q   Oh, okay.
17     **A   I'm here as your sister.**
18     Q   So you believe that depression never goes away?
19     **A   I think it can be a recurring pattern like**
20 **relapsing on alcoholism.**
21     Q   Right.  But someone can get sober from alcohol and
22 someone can recover from depression?
23         MR. GILLESPIE:  You're asking a question or is that
24 a statement?
25     Q   (By Mr. Grant)  Is that correct what I stated?

Page 66

1      **A   I don't have the knowledge to answer that**
2  **question.**
3      Q   (By Mr. Grant)  Okay.  Do you know -- have personal
4  knowledge if I'm on any medication, any depression management
5  medication?
6      **A   Are you asking currently?**
7      Q   Yes.
8      **A   No, I have no knowledge of you in general**
9  **currently.**
10     Q   Okay.  Thank you.  So we can -- thank you.
11         Let's go backwards.  When these things were
12 happening that you've described, let's just stick with the --
13 let's stick with the cutting incident, for example.  Do you
14 know if I been prescribed depression medication at that time?
15     **A   You had medications in your bathroom.**
16     Q   Were they depression related to your knowledge?
17     **A   I don't recall.**
18     Q   Okay.  And, regardless, do you know if I was taking
19 the medication that was in my bathroom as prescribed?
20     **A   On many occasions over the years you've told me you**
21 **do not take your medications as prescribed.**
22     Q   Okay.  So the answer to my question would be --
23         MR. GRANT:  Oh, that's -- do you want to take a
24 quick or are you okay?
25         THE REPORTER:  I'm fine.

Page 67

1          MR. GRANT:  All right.  I made an alarm in case we
2  wanted to take a break.
3      Q   (By Mr. Grant)  And you have a general
4  understanding as to what happens if depression is not managed
5  with the medication that's been prescribed?
6      **A   Possibly, yes.**
7      Q   Okay.  And do you know whether or not I'm currently
8  blowing into a breathalyzer one way or the other?
9      **A   Again, I don't have knowledge of you presently.**
10     Q   Okay.  Do you believe that if I were blowing in a
11 breathalyzer, that would eliminate any risk of relapse?
12         MR. GILLESPIE:  Objection; calls for speculation,
13 calls for knowledge beyond this witness' expertise.  It's
14 also irrelevant.  Subject to that, you can answer.  Let me
15 finish.  Subject to that, you can answer the question.
16     Q   (By Mr. Grant)  Go ahead.
17     **A   You're going to need to reread the question.**
18     Q   (By Mr. Grant)  Let's come at it from a different
19 angle.  You testified that basically no matter what I should
20 not have custody of the children, correct?  Do you remember
21 that?
22         MR. GILLESPIE:  Objection; mischaracterizes the
23 witness' testimony.
24     Q   (By Mr. Grant)  Did I characterize it correctly?
25     **A   No.**

Page 68

1      Q   Okay.  What was your testimony then?
2      **A   I don't believe I used the words no matter what.**
3      Q   Okay.  Well, then what are the circumstances under
4  which I should have custody of my children?
5      **A   When I have -- I mean when maybe you've proven**
6  **sobriety longer than what you've proven sobriety in the**
7  **past.**
8      Q   Okay.  Is that your lay person opinion or is that
9  your opinion based on medical training?
10     **A   This is my opinion as Sarah.**
11     Q   Okay.  Well, but Sarah is a nurse.
12     **A   Sarah's not your nurse.**
13     Q   Was Sarah ever my nurse?
14     **A   No, but I was your caretaker at times in your**
15 **life.**
16     Q   Define caretaker?
17         MR. GILLESPIE:  As you understand it.
18         MR. GRANT:  As she used it.
19     **A   I tried to get you to eat, I tried to get you to**
20 **drink water, took you to the hospital when you needed to go**
21 **to the hospital, I tried to get you to go to your doctor's**
22 **appointments, tried to get you to keep going to therapy.**
23     Q   (By Mr. Grant)  What's the difference between a
24 caretaker and a nurse?
25     **A   A caretaker can just be someone that is mindful of**

888-893-3767
www.lexitalegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Page 69

1  your needs and wants to help.

2    Q   And a nurse doesn't do that?

3        MR. GILLESPIE:  Objection; argumentative.  Subject

4  to that, you can answer the question.

5    A   A nurse has training and does more than just

6  that.

7    Q   (By Mr. Grant)  Okay.  You're a nurse, correct?

8    A   Yes.

9    Q   And you provided care for me, correct?

10   A   I tried to provide care for you and I was not a

11 nurse at the time also.

12   Q   The entire time?

13   A   I was not a nurse in 2019.

14   Q   I'm not talking about 2019.  I didn't put a date.

15   A   Okay.

16   Q   Let me clarify.

17   A   You're speaking about things like it's the

18 generalization of the entire time.

19   Q   Did you ever take care of me as a nurse ever?

20   A   I took care of you as your sister who loved you

21 and wanted to get you help.

22   Q   So is that a yes or no?

23       MR. GILLESPIE:  Objection; argumentative.  She's

24 not an adverse witness.  You can't make it yes or no.  You

25 asked a question.

Page 70

1        MR. GRANT:  I can make it yes or no, Larry.

2        MR. GILLESPIE:  Go ahead.  Make my day.

3    A   What is your question?

4    Q   (By Mr. Grant)  Did you ever take care of me at any

5  point from 2019 to present in the capacity as a nurse?

6    A   No.

7    Q   Okay.  Is it your understanding that HIPAA treats

8  caregivers and nurses differently?

9        MR. GILLESPIE:  Objection; beyond the scope of the

10 February 28, 2025, order and I'm instructing you not to

11 answer the question.

12   Q   (By Mr. Grant)  Do you know from '29 to present

13 whether I have ever seen a psychiatrist?

14       MR. GILLESPIE:  From '29?

15   A   Yeah.

16       MR. GRANT:  Did I say that?

17       MR. GILLESPIE:  Yes, you did.

18       MR. GRANT:  Oh, wow.  I believe the group because

19 everybody's nodding.  Let me rephrase.  And I apologize.

20   Q   (By Mr. Grant)  From 2019 to present that we've

21 been talking about, that time frame, do you know if I was

22 seeing a psychiatrist?

23   A   You told me that you were seeing a psychiatrist as

24 well as a therapist.  I drove you to an appointment, but I

25 couldn't tell you who was on the other side of that door,

Page 71

1  whether it was therapist or a psychiatrist.

2    Q   Okay.  It was a medical office?

3    A   Yes.

4    Q   And I went through the door?

5    A   Yes.

6    Q   And I stayed there for while?

7    A   Yes.

8    Q   Then I came back out?

9    A   Yes.

10   Q   Okay.  There was a question in your mind whether it

11 was a psychiatrist or therapist?

12   A   You asked me if it was a psychiatrist.  I'm telling

13 you I don't know the person's title on the other side of the

14 door.

15   Q   Oh, for that particular appointment?

16   A   You've told me other times that you're seeing a

17 therapist and a psychiatrist online, but you've told me a lot

18 of things that end up not being true.

19   Q   That's what I'm trying to get at, Sarah.  Do you

20 have any reason to disbelieve that I was not seeing a

21 psychiatrist or therapist at any point in time in which I

22 told you I was?

23       MR. GILLESPIE:  Object to the form of the question.

24 It's about a triple negative.  Do you understand what the

25 question was?

Page 72

1    A   Not entirely.

2    Q   (By Mr. Grant)  Sarah, do you have personal

3  knowledge of any instance in which I stated I was seeing a

4  psychiatrist or therapist, but in reality you have personal

5  knowledge that I wasn't?

6    A   I have personal knowledge of showing up at your

7  house and you told me you slept through an appointment.

8    Q   Okay.

9    A   So that's not seeing them that day.

10   Q   That wasn't my question.  Can you read my question

11 back, please.

12 (Whereupon the Reporter read back Mr. Grant's question as

   follows:  Sarah, do you have personal knowledge of any

13 instance in which I stated I was seeing a psychiatrist or

   therapist, but in reality you have personal knowledge that I

14 wasn't?)

15   A   No, my answers are what I gave you and you fire

16 most of your providers.

17   Q   (By Mr. Grant)  Okay.  Move to -- all right.  I'll

18 just follow-up on that.  So the answer is, no, you have no

19 personal knowledge of an inconsistency between my statement

20 on therapists and psychiatrists in reality, correct?

21       MR. GILLESPIE:  I'm going to object to the form of

22 the question.  If you understand that.

23   Q   (By Mr. Grant)  Sarah, let me come at it another

24 way.

25       MR. GILLESPIE:  Okay.

Page 73

1  Q   (By Mr. Grant)  What you did was shoehorn in two

2  answers, so we're going to split them up.  So what you tried

3  to get in there we'll go ahead and get in to help you out.

4  **A   I'm trying to answer your question.**

5  Q   I didn't ask if I fired therapists.

6  **A   Right, but that shows that there was a point in**

7  **which you had providers, but you weren't -- and then weren't**

8  **going to them.**

9  Q   Okay.  Let me follow-up on that.  Did you know if

10  in the instance singular or plural in which that happened if

11  I hired a new a therapist or psychiatrist?

12  **A   You would say that you did.**

13  Q   Do you have any personal knowledge that that was

14  untrue?

15  **A   No, just like -- no.**

16  Q   Thank you.  You drove me to the facility in

17  December or November -- end of November, '23, correct?

18  **A   Yes.**

19  Q   And then you learned when I was being discharged,

20  correct?

21  **A   Yes.**

22  Q   How did you learn that?

23  **A   The social worker or case worker or whatever her**

24  **title is called me.**

25  Q   And is it your understanding that you're allowed to

Page 74

1  have that information?

2  MR. GILLESPIE:  Objection; beyond the scope of the

3  February 28, 2025, order.  I'm instructing you not to answer.

4  Q   (By Mr. Grant)  Have you been trained in HIPAA?

5  MR. GILLESPIE:  Objection; 2020  -- or February 28,

6  2025, order.  Instructing you not to answer.

7  Q   (By Mr. Grant)  Do you have any personal knowledge

8  as to how many times prior to this lawsuit -- we'll call it a

9  lawsuit being filed -- Rebecca Copeland took either of the

10  kids to the dentist?

11  **A   No.**

12  MR. GRANT:  All right.  Before we go off the record

13  since we have about 35 minutes left, I'm going to ask to see

14  Judge Hilton and get a ruling on Larry's objections.  If you

15  could please take note of the time.

16  Off the record three twenty

17  MR. GILLESPIE:  It's part of your two hours.

18  MR. GRANT:  We'll see.

19  Could you see if the Judge is available.

20  (Whereupon there was an off the record discussion at 3:20

21  p.m. and the proceedings reconvened at 3:20 p.m.)

22  MR. GRANT:  We can go back on the record until the

23  Judge gets here.

24  Q   (By Mr. Grant)  Sarah --

25  BAILIFF DEKEN:  Counsel.

Page 75

1  MR. GRANT:  Oh, here we go.

2  (Whereupon Judge Hilton joined the proceedings).

3  JUDGE HILTON:  Thank you.  I'm ready.  How can I

4  help.

5  MR. GRANT:  Judge, we seem to have a disagreement

6  between myself and Mr. Gillespie as to the proper

7  interpretation of your order as to her deposition.  Not --

8  the issue at hand is my ability to inquire as to the witness'

9  credibility and Mr. Gillespie believes that's inappropriate

10  and has instructed the witness not to answer my questions on

11  topics such as trespassing at my home.

12  MR. GILLESPIE:  If you recall, Judge, the order

13  said that his inquiry shall be limited to matters pending

14  before the Court in this matter only and specifically the

15  best interests of the children.

16  Now, Mr. Grant has threatened my client with all

17  kinds of other causes of action which are attached to our

18  motion to quash, which we had previously filed and he is

19  attempting to inquire as to matters associated with his

20  threatened litigation and he's characterizing it as

21  credibility.  He's included references to HIPAA, he's

22  included references to potential trespassing, all kinds of

23  things that he raised in his potential lawsuit.  Nothing to

24  do with the best interests of the children and the pending

25  litigation before you.

Page 76

1  JUDGE HILTON:  And there is not a lawsuit pending

2  against your sibling?

3  MR. GRANT:  No.

4  JUDGE HILTON:  So why would I not sustain that

5  objection?

6  MR. GRANT:  Because the question goes to -- I would

7  like to ask her about -- this is during the time frame in

8  which she gathered evidence for this litigation.  She came

9  into my home to gather evidence in anticipation of this

10  litigation.  And I'd like to ask about that.  It directly

11  relates to the people -- to the best interests of the

12  children.  And she is their aunt and she has testified that

13  they stayed the night with her, so it's also relevant under

14  the statute.

15  JUDGE HILTON:  Well, I would agree that you can

16  inquire into them spending the night with her, but that would

17  be the limitation of your inquiry.

18  MR. GRANT:  How -- I would like to test the

19  witness' credibility.  If she is a criminal, I should be able

20  to lay that foundation.

21  MR. GILLESPIE:  Then, Your Honor, I would --

22  JUDGE HILTON:  I would disagree, so your objection

23  will be sustained.  Anything related to the children, her

24  observations of you with the children would be relevant.  You

25  know, anything -- I don't know what's transpired during the

Page 77

1  deposition, but any questions propounded on her that she's
2  not qualified to answer I assume that you have objected to.
3  So what other issues do we have?
4      MR. GILLESPIE:  I think that's it.
5      MR. GRANT:  So even -- she is --
6      JUDGE HILTON:  If there was another case pending
7  against your sibling, I would allow you to do that.  But
8  since there is no litigation, the only thing that's relevant
9  to me is what's in the best interest of your children.
10     MR. GRANT:  Isn't the credibility of this witness
11  relevant?
12     JUDGE HILTON:  I'm prepared to judge credibility of
13  all witnesses at trial.
14     MR. GRANT:  I would like to ask the questions to
15  get the answers that will help you -- assist the Court in
16  determining the credibility of this witness.
17     JUDGE HILTON:  Well, this isn't a trial.  This is a
18  deposition.  Okay.
19     MR. GRANT:  Yeah, it's my understanding that
20  deposition testimony is broader than trial testimony.  It's
21  intended to solicit testimony from a witness to be used at
22  trial.
23     JUDGE HILTON:  And I appreciate that.  I'm going to
24  go ahead and try to be consistent in my rulings, so I'm going
25  to go ahead and grant the objection.

Page 78

1      MR. GRANT:  Understood.  Thank you, Your Honor.
2      MR. GILLESPIE:  I think that's it, Your Honor.
3      JUDGE HILTON:  So while we have everybody here,
4  Mr. Grant has filed several motions and then filed a motion
5  to shorten time to continue the trial and other related
6  motions.  As everyone is well aware, I'm on vacation next
7  week, but for the sake of the children and the family I'll
8  make myself available to come in and hear those motions if I
9  can find a court reporter.  Subject to that when is everybody
10  available next week?
11     MR. GILLESPIE:  I'm available Tuesday and
12  Wednesday, Your Honor, if I need to be there.  I don't know
13  whether I need to be there on behalf of Ms. Grant.
14     MR. FENLEY:  I have time Monday.  Tuesday I'm here
15  anyways in the morning, in the building at least.  Free all
16  afternoon.
17     MR. GRANT:  I can make anything work.
18     MS. BRODIE:  Are we talking about like 45 minutes,
19  your Honor, because I have hearings, you know, speckled all
20  over the week, so --
21     JUDGE HILTON:  I'm on vacation.
22     MS. BRODIE:  I know.
23     JUDGE HILTON:  So I don't have time between now and
24  the trial setting to entertain your motions, Mr. Grant, and
25  you know that because I let you know I was going on vacation.

Page 79

1  So it's really up to me as to when I say I'm available.  And
2  I have to find a court reporter because my court reporter is
3  on vacation.  You're not only inconveniencing the Court,
4  you're inconveniencing my entire staff.  But that's your
5  choice.  Maybe you'd prefer setting it on Juneteenth when the
6  court's closed.
7      MR. GRANT:  Are you -- you're going to -- you can
8  just deny it on the motion, Judge.
9      JUDGE HILTON:  Well, and that's what you alluded
10  to.
11     MR. GRANT:  Well, am I wrong?
12     JUDGE HILTON:  I haven't heard the motion yet.
13     MR. GRANT:  Well, I think --
14     JUDGE HILTON:  You sent me a courtesy copy, which I
15  appreciate.
16     MR. GRANT:  Then I don't think we should set it on
17  Juneteenth.  I did send you a courtesy copy.
18     JUDGE HILTON:  I mean I don't have to have a
19  hearing.
20     MR. GRANT:  I would request one.
21     JUDGE HILTON:  That's why I'm having this
22  discussion.
23     MR. GRANT:  Yeah.
24     JUDGE HILTON:  Do you mind reaching out to Megan
25  and see if she has any availability next week.

Page 80

1      BAILIFF DEKEN:  She knows she's available Monday
2  afternoon or Friday.  And then the rest of the other days
3  she's not sure.  She's available Thursday if we need.
4  Juneteenth.
5      JUDGE HILTON:  Monday afternoon available for Mr.
6  Fenley, Mr. Grant and Ms. Brodie?
7      MR. FENLEY:  I'm open all day Monday.
8      MS. BRODIE:  I am available from noon to 2:15 in the
9  afternoon and then -- so, actually, eleven to 2:15 on
10  Monday.
11     JUDGE HILTON:  Let's set it at one o'clock then.
12     MS. BRODIE:  Okay.
13     JUDGE HILTON:  Prepare a memo that Mr. Grant's
14  motion to shorten time is granted and list the motions that
15  are being heard despite the Judge being on vacation for
16  Monday --
17     BAILIFF DEKEN:  The 16th, sir.
18     JUDGE HILTON:  June 16th at one o'clock.  Are you
19  ready then, Mr. Grant?
20     MR. GRANT:  Oh, not at the moment.
21     MR. FENLEY:  I will.
22     MR. GRANT:  I'm sorry.  You need me to sign it.  I
23  apologize.  Let's see.
24     MR. FENLEY:  I'll take care of it.  You just keep
25  going with the deposition so we're not wasting more time.

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                                California Firm Registration #179



Sarah Grant                                                                June 13, 2025

Page 81

1       MR. GRANT:  Here we go.  No, I don't even know
2   where it is.
3       BAILIFF DEKEN:  Look at the arrows.
4       JUDGE HILTON:  I know this is a deposition and I
5   don't mean to be an old crabby Judge, but I expect everybody
6   to dress appropriately and have the appropriate attire on
7   when they appear in my courtroom.  I've had judges sanction
8   lawyers for not wearing a tie.
9       MR. GRANT:  Apologies, Judge.  I'm not here for a
10  court hearing.
11      JUDGE HILTON:  This is a courthouse.  This is a
12  courtroom.
13      MR. GRANT:  It is indeed.
14      MR. FENLEY:  Do you plan on calling up all your
15  motions?
16      JUDGE HILTON:  Thus you dress appropriately.
17      MR. FENLEY:  Do you plan on calling up all your
18  motions?
19      MR. GRANT:  Yeah.  Judge, it's not just -- I
20  attempted previously.  There's a motion to continue, a motion
21  for sanctions and a motion to strike.  So if you -- Ms.
22  Brodie said she's available at eleven, as early as eleven.
23      JUDGE HILTON:  The court reporter is only available
24  in the afternoon.
25      MR. GRANT:  Okay.  Well, noon?

Page 82

1       MS. BRODIE:  She said one.
2       JUDGE HILTON:  I apologize.  Did you also file a
3   motion, another motion to disqualify the Guardian?
4       MR. FENLEY:  It was part of the motion to continue.
5       JUDGE HILTON:  Okay.
6       MR. GRANT:  While he's writing that up, Judge, I
7   anticipate we may have a dispute on a hard stop at four
8   o'clock.  Would the Court allow me additional time to cover
9   the time we spent not in the deposition?
10      MR. GILLESPIE:  I don't have any problem with the
11  five or ten minutes we spent on the issues extraneous to the
12  deposition, Your Honor.  So if that means we go until 4:10, I
13  don't have a problem with that, but --
14      JUDGE HILTON:  Thank you.
15      MR. GRANT:  That was all I was asking.
16      JUDGE HILTON:  Thank you, Mr. Gillespie.
17  (Whereupon Ms. Brodie excused herself from the proceedings).
18      MR. FENLEY:  Make sure I covered everything.
19      MR. GRANT:  Looks right to me.
20  (Whereupon Ms. Brodie returned to the proceedings).
21      JUDGE HILTON:  Ms. Brodie.
22      MS. BRODIE:  Thank you, Your Honor.  Sorry about
23  that.
24  (Whereupon there was a discussion held off the record and
25      Judge Hilton left the proceedings).
25      MR. GRANT:  Back on the record.

Page 83

1   Q   (By Mr. Grant)  Sarah -- I'm bouncing around a bit
2   here.  The email that was deleted from your deleted items,
3   what email address would that have been or could you list all
4   of them that it could have been?
5       MR. GILLESPIE:  Objection as to relevancy.  And
6   subject to that if you even know what he's talking about, go
7   ahead and answer.
8   Q   (By Mr. Grant)  Let me go back.  When we started
9   the deposition we went through the subpoena that was served
10  on you and it asked for emails, correct?
11  A   Yes.
12  Q   And then we talked about the Stacy Thomas email
13  that you texted said, dang, Stacy?
14  A   Uh-huh, uh-huh.
15  Q   And I asked you where it was and you said you
16  deleted it?
17  A   Uh-huh.
18  Q   What email address did you delete it from?
19  A   I don't recall.
20  Q   Okay.  So list all your email addresses that you
21  would have used in --
22      MR. GILLESPIE:  I'm going to object to relevancy.
23  Subject to -- no, I'm just going to instruct you not to
24  answer.  Intimidation.  There's absolutely no reason for
25  that.

Page 84

1   Q   (By Mr. Grant)  All right.  Are you aware that --
2   let me lay some foundation.  Do you know who Stacy Thomas is?
3   A   Yes.
4   Q   And who is she?
5   A   My cousin.
6   Q   Okay.
7   A   Our cousin.
8   Q   She is indeed our cousin.
9       JUDGE HILTON:  I apologize.  Where would I find --
10      MR. GRANT:  We can go off the record.
11  (Whereupon there was a discussion held off the record).
12      MR. GRANT:  Back on the record.
13  Q   (By Mr. Grant)  We established who Stacy Thomas is.
14  You are aware, are you not, that as far as the children are
15  concerned Ms. Thomas attempted to terminate the children's
16  health insurance?
17      MR. GILLESPIE:  Objection as to relevance and your
18  personal knowledge.  But subject to that, you can answer the
19  question.
20  A   What was the question?
21      MR. GRANT:  Can you read it back, please.
22  (Whereupon the Reporter read back Mr. Grant's question as
    follows:  We established who Stacy Thomas is.  You are aware,
23  are you not, that as far as the children are concerned Ms.
    Thomas attempted to terminate the children's health
    insurance?)
25  A   No, I don't know what Ms. Thomas attempted to do.



Page 85

1    Q   (By Mr. Grant)  Okay.  So just to follow-up on
2  that, you're not aware of her communicating with any person
3  or entity regarding the domestic partner status between
4  myself and Christine Tinker?
5    **A   I'm aware of correspondence.**
6    Q   That's what I'm referring to.  What's the
7  correspondence you're aware of?
8    **A   A message to a health insurance company.**
9    Q   Okay.  And did you see it before it went?
10   **A   No.**
11   Q   Did you see it after the fact?
12   **A   Yes.**
13   Q   Was that what is referenced in the text?
14   **A   No.**
15   Q   That was something else.  Okay.  As the children's
16  aunt did you have concern that Stacy Thomas was attempting to
17  pull their health insurance?
18       MR. GILLESPIE:  Objection as to what her concerns
19  may be as completely irrelevant, but subject to that, you can
20  answer the question.
21   **A   I can't speak for what Stacy Thomas was attempting**
22  **to do.**
23   Q   (By Mr. Grant)  But you -- well, you know she was
24  attempting to pull -- to cancel the insurance?
25       MR. GILLESPIE:  Objection.

Page 86

1    **A   No, I don't know that.**
2        MR. GILLESPIE:  Hold on.  Objection.  That
3  mischaracterizes her testimony.  She didn't know that.
4    **A   Yeah.**
5    Q   (By Mr. Grant)  Let me ask you this then.  What
6  was -- what's your personal knowledge and interpretation of
7  the communication you saw?
8    **A   Stacy sent an email to a health insurance company**
9  **regarding you and domestic partnership and addresses or**
10  **something of that sort.**
11   Q   And based on your conversations with her and Ms.
12  Copeland you have no idea what the intent of that was?
13   **A   I did not have conversations with them regarding**
14  **that.**
15   Q   Okay.  It would be pure speculation that that was
16  intended to result in the termination of insurance?
17       MR. GILLESPIE:  Objection.  That's -- there's no
18  way to answer that question.  That's his statement on the
19  record.  You're instructed not to answer.
20   Q   (By Mr. Grant)  Well, regarding the -- I'll ask you
21  a general subject then.  Regarding the best interests of the
22  children is it in the best interests of the children to
23  cancel their health insurance?
24       MR. GILLESPIE:  Objection; calls for speculation.
25  Subject to that, you can answer the question.

Page 87

1    **A   I mean I don't know whether there was a result of**
2  **that correspondence, so I can't speculate on anything**
3  **there.**
4    Q   (By Mr. Grant)  Okay.  I'm just asking what your
5  personal knowledge is.
6        MR. GILLESPIE:  I'm -- no, you didn't.  You didn't
7  ask her personal knowledge.  You asked for her assessment of
8  something you speculated about.
9    Q   (By Mr. Grant)  Moving on.  Sarah, we're going to
10  go through a bunch of texts.  We got about twenty minutes.
11       MR. GILLESPIE:  You got fifteen.
12       MR. GRANT:  We can see.
13   Q   (By Mr. Grant)  I'm going to try to -- we can
14  actually get you out of here early if we can stay high level.
15       MR. GILLESPIE:  Well, that's pretty much within
16  your control.
17   Q   (By Mr. Grant)  Do you remember that I asked for
18  your assistance to get checked into Harris House?
19   **A   I remember that you asked me to pull some strings**
20  **for you.**
21   Q   You remember then.  Exactly.
22   **A   I do remember.**
23   Q   And you declined, right?
24   **A   I remember that they wouldn't let you in and you**
25  **asked me to pull strings for you.**

Page 88

1    Q   Okay.  And what was your response that you
2  recall?
3        MR. GILLESPIE:  Objection; asked and answered.
4        MR. GRANT:  I'm asking her response.
5        MR. GILLESPIE:  Asked and answered.  She already
6  answered the question.  Subject to that, you can answer
7  again.
8    **A   You're going to have to repeat the question.**
9        MR. GRANT:  Can you read it back.
10       THE REPORTER:  I'll have to go all the way back.
11       MR. GRANT:  I'll ask it again.
12   Q   (By Mr. Grant)  We established that I asked for
13  help and that I asked for you to pull strings in the context
14  of that.  What we haven't asked ABOUT, I'm asking you now, is
15  what was your response to that request?
16   **A   That I wasn't going TO help you pull strings to get**
17  **into an institution that wouldn't accept you.  I don't have**
18  **that ability.**
19   Q   Thank you.  And do you recall asking me at some
20  point for my insurance card?
21   **A   Yes.**
22   Q   And what was the purpose for that request?
23   **A   Because you and I were discussing potential rehab**
24  **for you.**
25   Q   Did you ever investigate any rehab facilities?

888-893-3767
www.lexitalegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Sarah Grant                                                                June 13, 2025

Page 89

1    A   Yes.

2    Q   Did you ever send me any information?

3    A   No.

4    Q   Why not?

5    A   You hadn't accepted the help and also you were the
6    person needing the help.  I'm not sure that you're the best
7    decision maker as to where that should be.  You told me to
8    make it someplace warm.

9    Q   That's a true statement; I did say that.  Bouncing
10   around a bit.  Do you know who Christine Tinker is?

11   A   I do.

12   Q   And to get right to the heart of it do you have any
13   personal knowledge, have you observed anything, that would
14   suggest that the boys being around Christine Tinker would be
15   any sort of danger to them in any way?

16   A   I mean through a conversation with her she seemed
17   to be in denial that you had relapsed, so that yes.

18   Q   Okay.  Based upon everything that's happened do you
19   believe that she's in denial that I relapsed now?

20   A   I can't comment as to now.

21   Q   Okay.  So you think it's possible that she believes
22   I haven't relapsed ever in this time frame?

23   A   I believe the other is also possible, so --

24   Q   Okay.  You do?  That's what I want to establish
25   that.

Page 90

1    A   I'm not sure that we're speaking the same language
2    here.

3    Q   That when I went to rehab?

4    A   Yeah.

5    Q   You know I went to rehab in March, 2024?

6    A   I was informed.

7    Q   Okay.  Do you believe that that informed her that I
8    had relapsed?

9    A   I believe that that informed her that there was a court
10   case about child custody.

11   Q   You believe that she -- that -- you think it's
12   possible that she knew I went to rehab and didn't understand
13   that I had relapsed in my alcoholism?

14       MR. GILLESPIE:  Objection as to relevance.  Beyond
15   the ability of this witness to speculate about the mindset of
16   this individual.

17       MR. GRANT:  She just testified.  I asked.

18       MR. GILLESPIE:  She said once.  She talked about
19   one conversation.  You're asking about the entire universe.

20       MR. GRANT:  I asked about today.

21       MR. GILLESPIE:  Okay.

22   A   I can't answer about you about Christine today.

23   Q   (By Mr. Grant)  Isn't it obvious that -- there's no
24   dispute to anyone that I relapsed in my alcoholism back in at
25   least March of 2024?

Page 91

1        MR. GILLESPIE:  I think we can stipulate it's
2    obvious.

3        MR. GRANT:  Thank you.  I'll stipulate to it.  I
4    don't know why we're having an argument about it.

5    Q   (By Mr. Grant)  What happened to my wine?

6        MR. GILLESPIE:  Objection to the form of the
7    question.

8    A   You know what happened to your wine.

9    Q   (By Mr. Grant)  What happened to it?

10   A   We removed it from your premises.  An alcoholic
11   doesn't need wine.

12   Q   What happened to it after that?

13   A   It was stored.

14   Q   Where?

15   A   It was stored at my house.

16   Q   Where is it today?

17   A   Not at my house.

18   Q   Is it still under your custody or control?

19   A   Nope.

20   Q   Was it sold?

21   A   Not to my knowledge.  Not to my knowledge.

22   Q   Who has custody and control of my wine
23   collection?

24   A   It was moved.

25   Q   All right.  Sarah, is it somewhere that I can

Page 92

1    legally access it?

2        MR. GILLESPIE:  Objection to --

3    A   Why would an alcoholic want to legally access their
4    wine?

5        MR. GILLESPIE:  Hold on, hold on.  It is beyond the
6    scope of the February 28, 2025, order as to the status,
7    location or existence of his purported wine collection, so
8    I'm instructing you not to answer.

9    Q   (By Mr. Grant)  Okay.  I'll ask one last question.
10   I want to be clear.  You are refusing to return my wine
11   collection?

12       MR. GILLESPIE:  Objection; same deal.  Same deal.
13   2025, February 28; beyond the scope of that order.  You are
14   instructed not to answer the question.

15   Q   (By Mr. Grant)  Did you go to the post office to
16   determine the status of my domestic partnership with Ms.
17   Tinker?

18       MR. GILLESPIE:  Objection; beyond the scope of the
19   February 28, 2025, order.  Instructed not to answer.

20   Q   (By Mr. Grant)  Let me ask you this way.
21   Did going -- if going to the post office had anything to do
22   with the kids' best interests, tell me if you did or not?

23       MR. GILLESPIE:  Objection; beyond the February 28,
24   2025, order.  You're taking a square peg and trying to fit it
25   into a round hole.  Ain't going to work.  You're instructed



Page 93

1  not to answer.
2   Q   (By Mr. Grant)  Just wanted to establish if that
3  was for the kids or not?
4       MR. GILLESPIE:  That's a statement.  That's not a
5  question.  You're instructed not to respond to it.
6   Q   (By Mr. Grant)  Sarah, were you looking out for the
7  kids' best interests when you went to the post office?
8       MR. GILLESPIE:  Objection; beyond the scope of the
9  February 28, 2025, order.  Instructed not to answer.  Her
10  looking out for the kids' best interests has nothing to do
11  with this litigation.  It's whether you and Rebecca Copeland
12  can.
13      MR. GRANT:  Larry, you should read the statute.
14      MR. GILLESPIE:  You know what?  I have.  Maybe you
15  should try to understand it.
16      MR. GRANT:  You should read the case law I guess I
17  should say.
18      MR. GILLESPIE:  She's a witness.  She is not a
19  party.
20   Q   (By Mr. Grant)  Do you have any personal knowledge
21  of the rehab that I went to?
22   A   What time?
23   Q   The March -- thank you for clarifying.  March,
24  2024.
25   A   I believe you texted me a link.

Page 94

1   Q   Did you look into the facility at all?
2   A   I read their first webpage that was about beautiful
3  beaches, surfing competitions, things like that.
4   Q   Did you do any investigation into the actual
5  services being provided there, mental health services and/or
6  alcoholism services?
7   A   No, pretty much after you threatened me, I
8  stopped.
9   Q   What was the threat that I made?
10   A   That you were coming after me.
11   Q   What did you interpret that to mean?
12      MR. GILLESPIE:  Objection; beyond the scope of the
13  February 28, 2025, order.  Instruct you to go down that
14  street no further.
15   Q   (By Mr. Grant)  I'm entitled -- do you fear for
16  your physical safety?
17      MR. GILLESPIE:  Objection; February 28, 2025,
18  order.  It's beyond the scope of this litigation, has nothing
19  to do with this litigation and instruct you not to answer.
20   Q   (By Mr. Grant)  You showed up at Matt Eilers'
21  office in June, right?
22      MR. GILLESPIE:  Objection; beyond the scope of the
23  February 28, 2025, order.
24   Q   (By Mr. Grant)  And you showed up at Matt Eilers'
25  office in December?

Page 95

1       MR. GILLESPIE:  Objection; beyond the scope of the
2  February 28, 2025, order.
3   Q   (By Mr. Grant)  But now we're in a courtroom?
4       MR. GILLESPIE:  Objection; beyond the scope of the
5  February 28, 2025, order.  Instruct you not to answer.
6   Q   (By Mr. Grant)  Why is a conference room no longer
7  acceptable?
8       MR. GILLESPIE:  Objection; beyond the scope of the
9  February 28, 2025 order.  Instruct you not to answer.  You've
10  got about five minutes.  I'd get to something relevant.
11      MR. GRANT:  Well, Larry, I'm creating a record for
12  the Supreme Court.
13      MR. GILLESPIE:  I'm sure they can't wait to read
14  it.  I know they're with bated breath.
15      MR. GRANT:  I agree with you on that.
16   Q   (By Mr. Grant)  So to follow-up on the relevant
17  question that Larry agrees is relevant do you have any
18  criticisms of the facility that I went to for treatment of
19  alcoholism in March of 2024?
20   A   I don't know much more than what I just told you
21  about the treatment center that you went to in March of
22  2024.
23   Q   So the answer is, no, I have no criticisms?  Or
24  no?
25   A   I can't say yes or no.  I don't know them, about

Page 96

1  them.
2   Q   So you have no criticisms?
3   A   I guess you could say I don't.
4   Q   Thank you.
5   A   You have to have knowledge about them to have
6  criticisms.
7   Q   Thank you.  It was a pretty easy question and
8  answer.
9       MS. BRODIE:  It's four minutes.
10   Q   (By Mr. Grant)  How do you know -- other than text,
11  how have you communicated with Rebecca Copeland about the
12  children once this case was filed?
13   A   By phone.
14   Q   What about Stacy Thomas?
15   A   By phone.
16   Q   Didn't you use a Google Drive?
17   A   In the past.  You just asked me once this case
18  started.
19   Q   I was going to -- thank you.  So you haven't used
20  the Google Drive since the case was filed?
21   A   Correct.
22   Q   Okay.  Prior to this case being filed did you use
23  Google Drive?
24   A   There was a Google Drive.
25   Q   Who set it up?



Sarah Grant                                          June 13, 2025

Page 97

1   A   I don't recall.

2   Q   Okay.  Did you set it up?

3   A   I did not.

4   Q   So it had to be Stacy or Rebecca?

5   A   Yes.

6   Q   Do you think it was Rebecca?

7       MR. GILLESPIE:  Objection; beyond the scope of the

8   February 28, 2025, order.  If it has something to do with

9   what's pending in this litigation and the best interests of

10  the children, fine.  But this does not.

11  Q   (By Mr. Grant)  So wasn't that created to address

12  the best interests of the children?

13      MR. GILLESPIE:  Objection; it's an attempt to take

14  a square peg and fit it into a round hole.  You're instructed

15  not to answer.

16  Q   (By Mr. Grant)  Sarah, why was the Google Drive

17  created?

18      MR. GILLESPIE:  Objection; beyond the scope of the

19  February 28, 2025, order.  Instruct you not to answer.

20  Q   (By Mr. Grant)  Oh, my.  So can you confirm for the

21  record it was not for the best interests of the children?

22      MR. GILLESPIE:  Same objection.  Instruction not to

23  answer.

24  Q   (By Mr. Grant)  So just to be clear, since 2019 to

25  present have you used any service other than email, phone or

Page 98

1   Google Drive to communicate with Rebecca or Stacy about me

2   and/or the children and alcoholism?

3       MR. GILLESPIE:  Objection to the form of the

4   question; it's a compound question.  I don't know how you can

5   answer it because he's got seven parts to it.

6   Q   (By Mr. Grant)  Did you understand the question?

7   A   You're asking if I communicated with them outside

8   of phone and email and text?

9   Q   Yeah.

10      MR. GILLESPIE:  And then he added a whole bunch of

11  other stuff.

12  A   As to what other proposed methods are there?

13  Q   (By Mr. Grant)  Do you guys have a What's App

14  group?

15  A   No.

16  Q   Okay.  Any other -- I'm asking is there any other

17  form of communication?

18  A   No.

19  Q   Okay.  That was it.  It's not supposed to be a

20  trick question.

21  A   It just seems like a silly question.

22  Q   That can be your opinion.

23      MR. GILLESPIE:  You want her opinion on everything

24  else.

25  Q   (By Mr. Grant)  Do you know whether or not the

Page 99

1   mother of the children in this case deleted her text

2   messages?

3       MR. GILLESPIE:  Objection as to scope.  I mean ever

4   on any device with anyone?

5   Q   (By Mr. Grant)  After this litigation was filed?

6       MR. GILLESPIE:  Again, same objection.  Any text

7   messages she has ever sent to anyone?

8   Q   (By Mr. Grant)  Related to me as a parent and the

9   kids' best interests?

10  A   You're asking me if I have knowledge of her

11  deleting text messages?

12  Q   Yeah.

13  A   I don't have knowledge of her deleting text

14  messages.

15  Q   I just wanted to know if you do.  Did you ever

16  enter my house through the garage?

17      MR. GILLESPIE:  Objection; beyond the scope of the

18  February 28, 2025, order.  And it is now 4:10.  We're

19  leaving.

20      We will not waive.  We will read the deposition.

21      MR. GRANT:  Thank you for your time, Sarah.

22      MS. BRODIE:  At this point I won't ask for a copy,

23  but I may get in touch with you later.

24      THE REPORTER:  MR. GRANT:  What kind of copy do you

25  need?

Page 100

1       MR. GRANT:  What's your normal turn around?  I

2   don't need a rush.

3       THE REPORTER:  6/27.

4       MR. GRANT:  No, then I need an expedited

5   transcript.

6       THE REPORTER:  Gave me a date.

7       MR. GRANT:  Next Friday.

8       THE REPORTER:  Do you want hard copy, email, PDF?

9       MR. GRANT:  Just etran is fine.  I'll need the

10  official one obviously.

11      MR. GILLESPIE:  She's going to need time to read

12  it.

13      (Whereupon there was a discussion held off the record.)

14      THE REPORTER:  Can you do it Wednesday by the end

15  of the day?

16      MR. GRANT:  We'll take what you can do.

17      MR. GILLESPIE:  That's fine.

18      (Witness excused at 4:10 p.m.)

19

20

21

22

23

24

25



Sarah Grant                                                                    June 13, 2025

**Page 101**

CERTIFICATE OF REPORTER

1

2

3        I, Linda A. Madel, a Certified Court Reporter,

4   #535, and Notary Public within and for the State of Missouri,

5   do hereby certify that the witness whose testimony appears in

6   the foregoing deposition was taken by me to the best of my

7   ability and thereafter reduced to typewriting under my

8   direction; that I am neither counsel for, related to, nor

9   employed by any of the parties to the action in which this

10  deposition was taken, and further that I am not a relative or

11  employee of any attorney or counsel employed by the parties

12  thereto, nor financially or otherwise interested in the

13  outcome of the action.

14

15

16                              _Linda A. Madel_

17                        _____

18                        Notary Public within and for

19                           the State of Missouri

20

21

22   My commission expires February 18, 2027.

23

24

25

**Page 102**

1                        LEXITAS LEGAL
             Phone (314) 644-2191 * Fax (314) 644-1334
2
3                        June 18, 2025
4
     Gillespie, Hetlage & Coughlin, LLC
5    120 S. Central Avenue, Suite 650
     Clayton, MO 63105
6    lgillespie@ghc-law.com
7    Attn: Lawrence G. Gillespie
8    In Re: Matthew R. Grant vs. C.M.G., et al.
9    Dear Mr. Gillespie:
10   Please find enclosed a copy of the deposition of Sarah Grant
     taken on June 13, 2025, in the above referenced case. Also
11   enclosed is the original signature page and errata sheets.
12   Please have the witness read the copy of the transcript,
     indicate any changes and/or corrections desired on the errata
13   sheets, and sign the signature page before a notary public.
14   Please return the errata sheets and notarized signature page
     to opposing counsel for filing prior to trial date.
15
16   Thank you for your attention to this matter.
17   Sincerely yours,
18
19   Linda A. Madel
     Certified Court Reporter
20   Notary Public
21   CC: Matthew R. Grant
22       Maia Brodie
23
24
25

**Page 103**

WITNESS ERRATA SHEET

1

2

3   WITNESS NAME: SARAH GRANT

4   CASE NAME: MATTHEW R. GRANT VS. C.M.G., ET AL.

5   DATE TAKEN: JUNE 13, 2025

6

7   Page #_____  Line #_____

8   Should read: _____

    Reason for change:_____

9

10  Page #_____  Line #_____

11  Should read: _____

12  Reason for change:_____

13

14  Page #_____  Line #_____

15  Should read: _____

16  Reason for change:_____

17

18  Page #_____  Line #_____

    Should read: _____

19

    Reason for change:_____

20

21  Page #_____  Line #_____

22  Should read: _____

23  Reason for change:_____

24

25  WITNESS SIGNATURE: _____

**Page 104**

1   STATE OF                        )
    COUNTY OF                       )
2
        I, Sarah Grant, do hereby certify:
3
            That I have read the foregoing deposition;
4           That I have made such changes in form and/or
    substance to the within deposition as might be necessary to
5   render the same true and correct;
            That having made such changes thereon, I hereby
6   subscribe my name to the deposition.
            I declare under penalty of perjury that the
7   foregoing is true and correct.
8           Executed this         day of
    2025.
9
                          _____
10
                                    Sarah Grant
11
12  My Commission Expires:
13  Notary Public:
14  Signature page to Lawrence G. Gillespie
15  LAM/ Sarah Grant /June 13, 2025
16  Matthew R. Grant vs. C.M.G., et al.
17
18
19
20
21
22
23                              **Exhibit G**
24
25



Page 105

```
1          IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI
2     Matthew R. Grant,         )
                                )
      v.                        )   Cause No. 12SL-DR03959-02
3     C.M.G., et al.            )   Division  13
4               CERTIFICATE OF DEPOSITION
5          Comes now Linda A. Madel, and pursuant to Rule
      57.03(g)(2)(a) states as follows:
6          The deposition of Sarah Grant, was taken on June 13,
      2025.
7          The name and address of the person or firm having
      custody of the original transcript is:
8
           Matthew R. Grant
9          1625 Mason Knoll Road
           St. Louis, MO 63131
10
           At the time of delivery of the transcript, the
11    deposition charges had not been paid.  Payment status will be
      updated at the request of the Court pursuant to Section
12    492.590(2) RSMo.
13
      By:_____
14
           LEXITAS LEGAL
15         (800) 280-3376
           www.lexitaslegal.com
16
17
18
19
20
21
22
23
24
25
```



**1**

**1** 9:2,23 10:21,22, 24 11:13,14,15 12:3

**1,100** 43:4

**10** 11:25

**136** 20:9

**16th** 80:17,18

**17051** 7:12

**17th** 29:7

**19** 40:14

**2**

**2** 9:17 10:24 12:3, 4

**20** 52:17

**2019** 27:11 34:24 37:16,18,19,20, 22,23 38:22,23 39:6 41:8 55:23 56:2 57:25 69:13, 14 70:5,20 97:24

**2020** 38:3,5 74:5

**2022** 38:11,14,16, 24 39:7,8,9 40:14 53:20

**2023** 38:8,20 43:22 58:3 60:4

**2024** 11:25 27:14, 17 29:7 30:25 31:18 49:18 90:5, 25 93:24 95:19,22

**2025** 8:12 15:9 16:7 17:10 23:18 27:19 44:14 45:5, 9 48:18 51:16,22 52:5,18 70:10 74:3,6 92:6,13,19,

24 93:9 94:13,17, 23 95:2,5,9 97:8, 19 99:18

**22** 40:14

**23** 38:19 73:17

**23rd** 51:11

**24th** 51:11

**25** 27:17

**28** 15:9 16:7,11 17:10 23:18 44:14 45:5,9 48:18 51:16,21 52:5,17, 18 70:10 74:3,5 92:6,13,19,23 93:9 94:13,17,23 95:2,5,9 97:8,19 99:18

**28th** 8:12

**29** 70:12,14

**2:15** 80:8,9

**3**

**35** 74:13

**3:20** 74:20

**4**

**40** 21:17

**45** 78:18

**4:10** 82:12 99:18 100:18

**5**

**50** 16:8 23:21

**5463** 7:13

**6**

**6/27** 100:3

**600** 10:11

**63040** 7:12

**63139** 7:13

**636 578-3476** 7:16

**A**

**A's** 22:8

**AA** 57:3,7

**abilities** 14:6

**ability** 13:6 28:24 31:22 75:8 88:18 90:15

**absolutely** 40:8 83:24

**accept** 88:17

**acceptable** 95:7

**accepted** 89:5

**access** 92:1,3

**accordance** 51:21

**acknowledge** 39:25 44:21

**act** 21:9 54:20 58:23 59:1 61:25 62:2

**action** 75:17

**actions** 58:25 63:19

**actively** 33:7 34:1 50:5

**acts** 63:18

**actual** 57:12 58:21 94:4

**ADA** 54:17

**add** 29:25

**added** 98:10

**additional** 82:8

**address** 7:1,3,9 83:3,18 97:11

**addresses** 83:20 86:9

**admitted** 41:1

**adverse** 69:24

**advice** 14:25

**affirmatively** 21:9

**afternoon** 78:16 80:2,5,9 81:24

**age** 5:8

**agree** 36:23 37:23 42:10 62:5 76:15 95:15

**agreeable** 13:12

**agreed** 5:1 44:18

**agreement** 16:17

**agrees** 95:17

**ahead** 9:12 24:8, 11 25:13 29:1 34:5,20 37:6 47:1 51:24 57:8 63:9 67:16 70:2 73:3 77:24,25 83:7

**alarm** 67:1

**alcohol** 32:14,20 33:7,13,14,17 34:3,8,11,15,22 35:1,9,12,21,22 38:18 65:21

**alcoholic** 25:15, 17,18 55:14 91:10 92:3

**alcoholics** 25:23

**alcoholism** 25:25 26:1,6,20 27:2,5

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



29:9 30:10 54:16, 25 55:8 65:12,20 90:13,24 94:6 95:19 98:2

**allowed** 44:17 53:19 73:25

**alluded** 79:9

**Americans** 54:19

**amount** 33:13

**and/or** 24:16,18, 22 94:5 98:2

**angle** 67:19

**answering** 7:2 21:18

**answers** 6:12 72:15 73:2 77:15

**anticipate** 82:7

**anticipated** 18:18

**anticipation** 76:9

**Apologies** 81:9

**apologize** 70:19 80:23 82:2 84:9

**App** 98:13

**apparently** 9:4

**appearances** 49:25

**appears** 10:11

**appointment** 70:24 71:15 72:7

**appointments** 68:22

**appropriately** 81:6,16

**approximately** 53:11 62:13

**area** 36:21

**argument** 91:4

**argumentative** 17:18 29:21 69:3, 23

**arising** 40:19

**arrested** 45:6

**arrived** 36:8

**arrows** 81:3

**arteries** 64:2,15

**artery** 64:5,12,17, 18 65:1

**aspect** 63:18

**assessment** 41:25 87:7

**assist** 77:15

**assistance** 87:18

**assume** 6:8 38:24 40:3,5,9,13 41:7, 10 77:2

**assumes** 29:12 56:14

**assuming** 40:7

**attached** 75:17

**attempt** 58:22 97:13

**attempted** 81:20 84:15,23,25

**attempting** 75:19 85:16,21,24

**attempts** 30:18 33:3 57:12

**attend** 51:22

**attention** 60:21,24

**attire** 81:6

**attorney** 8:25

**attorney/client** 48:21 49:1,3

**audible** 6:12

**audio** 12:8,16,18 13:8,13 16:4 45:16,19 46:24

**August** 57:25

**aunt** 76:12 85:16

**automatically** 21:6

**availability** 79:25

**Avenue** 7:13

**aware** 9:15 24:15 25:7 40:18,19 43:21 45:15,19 46:14 78:6 84:1, 14,22 85:2,5,7

---

### B

**back** 10:2,23 11:1, 19 15:22,23 21:20,21 27:11 28:5,6 29:25 30:5 37:16 41:9 50:13 52:13 61:9,15 64:10,11 71:8 72:11,12 74:22 82:25 83:8 84:12, 21,22 88:9,10 90:24

**backwards** 66:11

**BAILIFF** 74:25 80:1,17 81:3

**ball** 28:24

**base** 58:4

**based** 13:15 26:19 27:2,5 35:5,11 39:18 43:14 57:19 58:5 68:9 86:11 89:18

**basically** 67:19

**basis** 23:21

**bated** 95:14

**Bates** 20:6

**bathroom** 66:15, 19

**beaches** 94:3

**bear** 23:8

**beautiful** 94:2

**began** 49:11

**beginning** 26:23

**behalf** 5:8 16:12 39:23 41:24 78:13

**behavior** 38:19

**believes** 75:9 89:21

**big** 12:23 20:5

**birthdays** 52:25 53:1,3,5

**bit** 83:1 89:10

**blood** 33:14 35:9 58:14,19 61:10,25 62:3,4,7 64:4,11

**blowing** 67:8,10

**blue** 47:22

**board** 33:24 36:12

**bottom** 20:4

**bouncing** 83:1 89:9

**boys** 29:10 41:20 52:21 53:8,23,24 54:1 89:14

**break** 6:15,16,19, 23,24 22:14 67:2

**breath** 95:14

**breathalyzer** 67:8, 11

**briefing** 30:1

**bring** 7:24



**broader** 77:20

**Brodie** 6:23 26:8, 11,13,16 30:5 48:4,22 49:7,20 52:7,9,11,15 56:20 78:18,22 80:6,8,12 81:22 82:1,17,20,21,22 96:9 99:22

**building** 78:15

**bunch** 87:10 98:10

**burn** 10:2,4

**butchered** 49:21

**button** 19:13

**buttoned** 47:23

**buttons** 19:16

**C**

**call** 5:16 26:18 56:7,12 57:20 74:8

**called** 9:8 11:17 20:6 39:14 56:6,8 73:24

**calling** 41:24 81:14,17

**calls** 16:12 17:9 23:23 24:3 25:20 29:11 32:7 33:9, 11 37:1 39:22 40:6 45:24 46:11 54:18 61:18 67:12,13 86:24

**Cambury** 7:12

**cancel** 85:24 86:23

**capacity** 70:5

**car** 54:7,15 59:7, 17,22,24 60:9

**card** 88:20

**care** 69:9,10,19,20 70:4 80:24

**caregivers** 70:8

**caretaker** 68:14, 16,24,25

**cars** 59:22

**Carter** 24:22 25:4, 8 50:7

**Carter's** 54:3

**case** 18:24 19:20 29:6 31:10 43:4 49:25 53:22 67:1 73:23 77:6 90:10 93:16 96:12,17, 20,22 99:1

**category** 10:21, 22,24 11:13,15,17

**CCR** 5:4

**Celebrating** 52:25

**cell** 7:19

**center** 95:21

**chance** 9:17 20:10

**characterization** 22:21

**characterize** 67:24

**characterized** 23:5

**characterizing** 75:20

**check** 20:23

**checked** 40:22 87:18

**child** 90:10

**childish** 30:6

**children** 16:19,23, 24 17:4 23:22

24:16,19,20 25:19 26:1,20 27:1,24 28:7,11 29:15 30:12 31:5,15 32:4,11 37:12,15 39:20,21 41:12,17 43:22 45:10 47:16,17 48:2,25 49:25 51:21 52:3 67:20 68:4 75:15, 24 76:12,23,24 77:9 78:7 84:14, 23 86:22 96:12 97:10,12,21 98:2 99:1

**children's** 84:15, 23 85:15

**choice** 79:5

**Christine** 85:4 89:10,14 90:22

**Christine's** 59:7

**circumstance** 29:19

**circumstances** 68:3

**circus** 46:8

**cite** 32:23 34:23

**clarification** 11:24

**clarify** 18:12 32:12 36:9 64:16 69:16

**clarifying** 11:17 93:23

**clear** 10:25 43:14 92:10 97:24

**client** 23:4 75:16

**closed** 79:6

**collection** 91:23 92:7,11

**college** 17:13

**comfortable** 7:2

**comment** 37:25 41:25 89:20

**commented** 19:13

**common** 9:9 42:3, 7 55:7

**communicate** 49:21 98:1

**communicated** 47:17,24 48:3 96:11 98:7

**communicating** 85:2

**communication** 86:7 98:17

**company** 85:8 86:8

**competitions** 94:3

**complete** 18:19

**completely** 23:25 52:5 85:19

**compliance** 19:22

**comply** 11:12 12:2

**compound** 46:25 98:4

**computer** 12:22 13:1,3,5,6 14:11

**computers** 17:21

**Con** 50:7

**concern** 85:16

**concerned** 84:15, 23

**concerns** 31:20 42:19,22 85:18

**conclusion** 16:12 17:10 24:4 25:21 28:23 32:8 33:11 37:2,8 41:24 54:19

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**conference** 95:6

**conferenced** 56:6

**confidence** 29:14

**confirm** 97:20

**confused** 35:16

**connected** 12:22 35:21,22

**Connor** 24:16,18, 22,23 25:4,8 50:7

**consecutively** 23:13

**consistent** 64:17 65:1 77:24

**contacted** 45:3

**contained** 9:12

**content** 33:14 35:9

**context** 88:13

**continue** 78:5 81:20 82:4

**control** 14:18 87:16 91:18,22

**conversation** 52:24 89:16 90:19

**conversations** 49:13 86:11,13

**Copeland** 42:18, 19,22 43:16,17 49:19 52:21 74:9 86:12 93:11 96:11

**Copeland's** 41:18 48:3

**copy** 79:14,17 99:22,24 100:8

**correct** 21:1,25 22:20 27:20,21 34:23 35:2 36:13, 18,19,20,22,25 37:18,21 41:18,21

43:23,25 44:4 53:25 57:7,9 60:6 65:25 67:20 69:7, 9 72:20 73:17,20 83:10 96:21

**correcting** 25:2

**correctly** 20:15 67:24

**correspondence** 42:25 85:5,7 87:2

**counsel** 5:2 26:8 74:25

**Country** 45:1

**court** 5:23 11:9 16:2 30:1 49:7,9, 24 51:22 75:14 77:15 78:9 79:2,3 81:10,23 82:8 90:9 95:12

**court's** 18:20 79:6

**courtesy** 6:2 79:14,17

**courthouse** 50:6 81:11

**courtroom** 44:18 81:7,12 95:3

**cousin** 84:5,7,8

**cover** 82:8

**covered** 54:17 82:18

**covers** 6:25

**COVID** 37:25

**crabby** 81:5

**crazy** 46:12

**create** 27:24 28:7

**created** 97:11,17

**creating** 95:11

**credibility** 44:19, 20 75:9,21 76:19

77:10,12,16

**creek** 57:18 59:24

**crime** 45:7

**criminal** 76:19

**criticisms** 95:18, 23 96:2,6

**cry** 60:13,18,19

**crying** 40:22

**crystal** 28:24

**current** 7:1,3

**cust** 16:14

**custody** 16:9,14, 17,19,20,22 23:22 24:16 25:9,18 26:21 27:2,4 28:11,19 29:10,15 30:12 32:11 39:21 40:17 41:17,18,21 43:5 44:4 52:2 67:20 68:4 90:10 91:18,22

**cut** 58:2,6,7,14 63:16 64:5,12,18 65:2

**cuts** 58:10,18 60:7 61:16 62:11 63:4, 5,10,12,22,23

**cutting** 61:15 62:5,8,9 63:18 66:13

---

## D

**damaging** 54:14

**dang** 20:13 83:13

**danger** 25:8 26:1, 21 27:24 28:7 30:11 31:15 39:21 40:16 41:12 89:15

**date** 11:18,19,20

13:12 27:16,18 31:25 38:21 41:9 49:14 69:14 100:6

**day** 8:7 11:5 16:24 26:18 27:9 28:16, 17 53:4 57:21 59:2,4,5,20 70:2 72:9 80:7 100:15

**days** 27:8 29:4 44:9 51:14 80:2

**deal** 92:12

**death** 61:17 63:14, 15

**December** 43:22 60:3 73:17 94:25

**decision** 89:7

**declined** 87:23

**Defendants** 5:2

**define** 34:1 68:16

**DEKEN** 74:25 80:1,17 81:3

**delete** 21:2,6,9 22:3 83:18

**deleted** 20:22,23 21:2,4,9,12,14,15, 21,22 83:2,16 99:1

**deleting** 99:11,13

**denial** 89:17,19

**dentist** 74:10

**deny** 79:8

**depo** 6:20

**deposes** 5:8

**deposition** 5:3,20 8:11,23 9:5 10:10 12:4 18:23 26:11 31:7 75:7 77:1,18, 20 80:25 81:4 82:9,12 83:9



99:20

**depositions** 13:15

**depressed** 34:25 40:21

**depression** 30:17 34:14 35:1 65:4,7, 9,12,18,22 66:4, 14,16 67:4

**describe** 62:5

**describing** 27:23 28:7

**designated** 23:9

**details** 59:11

**determine** 92:16

**determining** 77:16

**device** 14:12 99:4

**die** 59:8,16,17

**difference** 68:23

**differential** 35:1

**differently** 70:8

**difficult** 42:9

**difficulty** 11:8

**direct** 5:10 11:24

**directed** 13:17

**directly** 32:15 76:10

**Disabilities** 54:20

**disagree** 76:22

**disagreement** 75:5

**disbelieve** 71:20

**discharged** 73:19

**discussed** 52:2

**discussing** 88:23

**discussion** 50:12 74:20 79:22 82:24

**disease** 54:16,25

**dishonesty** 45:7

**dispute** 8:10 82:7 90:24

**disqualify** 82:3

**distance** 53:25

**distraught** 35:3

**doctor's** 68:21

**document** 10:15, 24 12:2

**documents** 9:1,5, 12,23 13:15

**domestic** 85:3 86:9 92:16

**door** 70:25 71:4, 14

**dramatic** 48:8,10, 12

**drank** 33:13

**dress** 81:6,16

**dried** 58:14,19 61:10

**drink** 27:8 29:7 34:2 68:20

**drinking** 32:6,13, 19,20 33:2,7,16 34:2 35:9 36:5,6 39:1,3,21 40:1,2, 20 45:11

**drinks** 40:13

**Drive** 96:16,20,23, 24 97:16 98:1

**driven** 61:22

**driveway** 54:7

**drop** 54:4,10

**drove** 43:25 70:24 73:16

84:11 100:13

**drunk** 33:23 36:5

**Due** 26:6

———————

**E**

**earlier** 37:17 40:15

**early** 57:25 60:3 81:22 87:14

**ears** 54:14

**easy** 96:7

**eat** 68:19

**Eilers'** 94:20,24

**eleven** 80:9 81:22

**eliminate** 31:20 67:11

**email** 20:13,17 21:12,15,22 46:22 83:2,3,12,18,20 86:8 97:25 98:8 100:8

**emails** 19:24 83:10

**emergencies** 36:6 37:14

**emergency** 61:23

**end** 18:23 43:22 61:6 71:18 73:17 100:14

**engaged** 49:15

**engaging** 42:24

**enter** 44:11 99:16

**entertain** 78:24

**entire** 7:21 69:12, 18 79:4 90:19

**entitled** 7:6,8 49:10,12 94:15

**entity** 85:3

**episode** 32:21

**establish** 33:19 48:20 49:10 54:9 89:24 93:2

**established** 84:13, 22 88:12

**estimate** 53:19 63:3,10

**etran** 100:9

**evening** 59:15

**event** 54:1

**everybody's** 70:19

**evidence** 29:7,12 35:19 38:25 43:3, 8 45:25 76:8,9

**Exact** 48:5

**EXAMINATION** 5:10

**examined** 5:8

**Excellent** 56:18

**exclusive** 36:4

**excused** 82:17 100:18

**exhibit** 9:2,5,9,16, 23 10:21,24 11:15 12:3,4 22:8,22,25 23:7,15

**exhibits** 9:11 11:2 20:6 23:8

**existed** 12:16

**existence** 92:7

**existing** 43:4

**expect** 81:5

**expedited** 100:4

**experience** 25:23 64:4,11

**experiencing** 32:9

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**expert** 31:7 36:9, 23

**expertise** 9:7 28:22 33:10 37:10 67:13

**explain** 27:6

**explains** 62:24

**expound** 31:10,22

**expressly** 5:5

**extent** 18:9

**extract** 12:23

**extraneous** 82:11

**extremely** 54:12

**eyes** 40:22 58:9

---

**F**

**facilities** 88:25

**facility** 56:16 73:16 94:1 95:18

**fact** 6:4 31:6,14, 16,17 44:14,17 85:11

**factor** 33:20

**facts** 25:7,10 29:12 31:10 40:9

**factual** 23:21 35:4

**factually** 31:12 32:4

**fair** 6:5,6,10,13

**family** 46:12 78:7

**fast** 18:23

**father** 42:4

**fear** 94:15

**February** 8:12 15:9 16:7,11 17:10 23:18 30:25 31:18 44:14 45:5,

9 48:18 51:16,21 52:5,17 70:10 74:3,5 92:6,13,19, 23 93:9 94:13,17, 23 95:2,5,9 97:8, 19 99:18

**feel** 7:2

**Fenley** 47:18,23 78:14 80:6,7,21, 24 81:14,17 82:4, 18

**fifteen** 87:11

**figure** 22:10

**figured** 49:5

**file** 23:9 49:9 82:2

**filed** 53:22 74:9 75:18 78:4 96:12, 20,22 99:5

**find** 56:11 78:9 79:2 84:9

**fine** 26:10 42:2,17 43:9 61:9 66:25 97:10 100:9,17

**finish** 6:1,3 46:16 67:15

**finished** 9:21

**fire** 72:15

**firearms** 30:15 34:13 57:10

**fired** 73:5

**fit** 92:24 97:14

**flip** 20:4,7,9

**follow** 31:16 46:25

**follow-up** 57:11 72:18 73:9 85:1 95:16

**football** 54:3

**form** 12:24 14:15, 23 15:3 22:7

26:22 34:4,16 35:13 41:13 50:1 71:23 72:21 91:6 98:3,17

**foundation** 17:3 76:20 84:2

**frame** 7:22 21:7 38:23 39:1,4,5,20 45:11,13,14 70:21 76:7 89:22

**Free** 78:15

**Friday** 52:22 80:2 100:7

**front** 8:25 22:19, 22 33:8 45:25

**full** 5:12 19:22

**fully** 11:12

**future** 18:6 29:4

---

**G**

**game** 43:11 54:3

**garage** 59:21 60:9 99:16

**gateway** 63:19

**gather** 76:9

**gathered** 76:8

**gave** 31:24 56:17 72:15 100:6

**general** 22:9 25:22 41:20 66:8 67:3 86:21

**generalization** 69:18

**generally** 22:1 37:17 52:23

**gentleman** 47:22

**Gillespie** 6:18,22, 24 7:4,6,8 8:4,6,

10,17,22 9:3,10 10:4,7,9,16,22 11:1,4,6,8,18,21, 23 13:14,20,22 14:8,23 15:3,6,9, 13,16,18,20,25 16:5,10,16 17:9, 18 18:1,8,16,20 19:1,5,7,11,13,15 20:8 21:16 22:6, 21 23:5,17,23 24:3,7,10,20,23 25:20 26:2,22 27:25 28:21 29:11,20,23 30:2 31:6,9,21 32:7 33:9 34:4,16,18 35:13 37:1,7 39:22 40:4,6,10 41:4,13,23 42:6, 11,15 43:7,12 44:13,20,23 45:4, 8,24 46:6,9,13,16, 25 47:9 48:12,16, 17,23,25 49:1,4,5, 9,12,17 50:1,24 51:15,19,25 52:4, 16 54:18 55:11, 18,24 57:8 61:1, 18 62:18,20,23 63:1,5,7 64:6,19, 22 65:23 67:12,22 68:17 69:3,23 70:2,9,14,17 71:23 72:21,25 74:2,5,17 75:6,9, 12 76:21 77:4 78:2,11 82:10,16 83:5,22 84:17 85:18,25 86:2,17, 24 87:6,11,15 88:3,5 90:14,18, 21 91:1,6 92:2,5, 12,18,23 93:4,8, 14,18 94:12,17,22 95:1,4,8,13 97:7, 13,18,22 98:3,10,



23 99:3,6,17 100:11,17

**give** 5:22 6:12 14:24 31:10,24 33:19 36:1 56:19

**giving** 37:7

**good** 42:18 43:6, 16

**Google** 96:16,20, 23,24 97:16 98:1

**gosh** 49:5

**graduate** 17:13

**grant** 5:7,8,11,13, 14 6:21,25 7:11 8:5,16,20,24,25 9:8,13,15 10:1,6, 8,13,18,20,23 11:3,5,7,10,12,20, 22 12:1 13:19,21, 24,25 14:12 15:1, 5,8,10,11,15,17, 19 16:2,8,13,18 17:12,20 18:5,12, 17,24 19:3,6,9,12, 17,19 20:9 21:20, 24 22:12,24 23:3, 8,20 24:5,9,11,22, 24 25:1,4,24 26:6, 10,12,15,17,18 27:3 28:5,10 29:1, 18,22,24 30:3,7 31:8,13,14 32:2, 12 33:18 34:7,17, 20 35:15 37:5,6,9 40:3,8,12 41:8,16 42:3,8,13,17 43:10,14 44:15, 17,22,25 45:6,10 46:3,8,10,13,15, 19,21 47:4,11,14, 15 48:14,15,20,24 49:3,10,14,19 50:3,7,8,10,13,14 51:1,18,24 52:1,2,

7,10,14,20 54:21, 23 55:15,22 56:3, 21 57:10 61:4,8, 21 62:19,21,25 63:3,6,8,11 64:10, 14,21,24,25 65:25 66:3,23 67:1,3,16, 18,24 68:18,23 69:7 70:1,4,12,16, 18,20 72:2,17,23 73:1 74:4,7,12,18, 22,24 75:1,5,16 76:3,6,18 77:5,10, 14,19,25 78:1,4, 13,17,24 79:7,11, 13,16,20,23 80:6, 19,20,22 81:1,9, 13,19,25 82:6,15, 19,25 83:1,8 84:1, 10,12,13,21 85:1, 23 86:5,20 87:4,9, 12,13,17 88:4,9, 11,12 90:17,20,23 91:3,5,9 92:9,15, 20 93:2,6,13,16, 20 94:15,20,24 95:3,6,11,15,16 96:10 97:11,16, 20,24 98:6,13,25 99:5,8,21,24 100:1,4,7,9,16

**Grant's** 8:18 15:23 21:21 28:6 64:11 72:12 80:13 84:22

**granted** 80:14

**great** 43:19

**ground** 5:23

**group** 9:8,11 20:6 70:18 98:14

**Guardian** 82:3

**guess** 41:10 53:18 93:16 96:3

**gun** 57:18

**guy** 13:24

**guys** 98:13

---

## H

**hallucination** 34:13

**hallucinations** 30:13,22,23 31:18,25 32:5

**hallway** 47:19

**hand** 9:16 34:2 75:8

**handheld** 14:12

**hands** 6:13 14:22 15:2

**happen** 14:17 33:16 36:5

**happened** 20:21 34:21 38:14,18 57:23 60:6 61:22 73:10 89:18 91:5, 8,9,12

**happening** 27:13 36:2 66:12

**happy** 9:21

**hard** 82:7 100:8

**harm** 40:16,18 60:15

**harmful** 61:6

**Harris** 87:18

**head** 6:13

**health** 35:23 36:3, 10,15,16,18,21,24 37:11 63:17 84:16,23 85:8,17 86:8,23 94:5

**hear** 78:8

**heard** 79:12 80:15

**hearing** 51:22 79:19 81:10

**hearings** 78:19

**hearsay** 39:14 43:10 56:4

**heart** 89:12

**heightened** 62:14

**held** 50:12 82:24 84:11 100:13

**high** 87:14

**highlighted** 30:3

**Hilton** 74:14 75:2, 3 76:1,4,15,22 77:6,12,17,23 78:3,21,23 79:9, 12,14,18,21,24 80:5,11,13,18 81:4,11,16,23 82:2,5,14,16,21, 24 84:9

**HIPAA** 70:7 74:4 75:21

**hired** 49:15 73:11

**hit** 64:2

**hold** 10:7 11:21 18:8,19 22:6 27:16 31:9 86:2 92:5

**hole** 92:25 97:14

**home** 17:1,4 39:17 44:7,12 75:11 76:9

**honestly** 24:12 35:16

**Honor** 76:21 78:1, 2,12,19 82:12,22

**hospital** 12:19 44:1,8 68:20,21

**hour** 6:15,19,20 21:17

---

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


Case: 4:25-cv-01203-JMD    Doc. #: 114-9    Filed: 12/23/25    Page: 35 of 43 PageID
#: 2090
Sarah Grant                                              June 13, 2025Index: hours..kind

**hours** 10:2,5,10, 12 11:6,9 74:17

**house** 30:15 33:2 34:24 57:21 72:7 87:18 91:15,17 99:16

**hundred** 36:2,3

**husband** 52:3

**I**

**idea** 14:6 86:12

**ideas** 58:25

**ideation** 57:11

**ideations** 30:17 33:3 34:14 58:25

**identify** 9:11 23:6, 7

**ignore** 18:10,12

**illustrates** 42:9

**impact** 37:11,12

**impeach** 61:2

**important** 5:25

**inability** 42:25

**inappropriate** 75:9

**incident** 27:23 28:6 32:23 59:10, 11 66:13

**included** 75:21,22

**includes** 9:4

**including** 47:21

**inconsistency** 72:19

**inconsistent** 65:1

**inconveniencing** 79:3,4

**individual** 90:16

**inevitable** 9:6

**influence** 33:7 34:2,8,11,15,22 35:6,12

**information** 9:4 18:19,25 74:1 89:2

**informed** 90:6,7,9

**inquire** 44:18 75:8,19 76:16

**inquiry** 75:13 76:17

**inspected** 18:6

**instance** 33:19 72:3,13 73:10

**instances** 32:16 33:1 34:12,21 35:8,10,14

**institution** 40:23 43:25 88:17

**instruct** 8:12,13 17:18 29:20,22 40:10 42:11 50:24 83:23 94:13,19 95:5,9 97:19

**instructed** 23:18 75:10 86:19 92:14,19,25 93:5, 9 97:14

**instructing** 16:5,6, 11 17:11 18:10 43:7 44:16,23 45:4,8 46:6 48:19 51:16 52:6 63:1 70:10 74:3,6 92:8

**instruction** 8:21 18:11 42:16 43:13 97:22

**instructions** 8:18 43:13

**insurance** 84:16, 24 85:8,17,24 86:8,16,23 88:20

**intake** 35:1

**intended** 77:21 86:16

**intent** 86:12

**interest** 30:7 51:21 77:9

**interesting** 8:2

**interests** 75:15,24 76:11 86:21,22 92:22 93:7,10 97:9,12,21 99:9

**interject** 6:18

**interpret** 94:11

**interpretation** 75:7 86:6

**interviewed** 45:1 47:16

**Intimidation** 83:24

**investigate** 88:25

**investigation** 94:4

**involved** 50:5

**involvement** 49:24

**involving** 45:7

**iphone** 14:4,5,7 23:9

**irrelevant** 23:25 48:18,22,23 52:5 55:11,19,25 64:6 67:14 85:19

**issue** 35:19 42:24 75:8

**issues** 30:5 32:24 35:20 40:19 51:20 77:3 82:11

**items** 20:23 21:2, 5,9,15,22 32:23 83:2

**J**

**John** 47:18

**joined** 75:2

**judge** 8:7 19:4 44:18 74:14,19,23 75:2,3,5,12 76:1, 4,15,22 77:6,12, 17,23 78:3,21,23 79:8,9,12,14,18, 21,24 80:5,11,13, 15,18 81:4,5,9,11, 16,19,23 82:2,5,6, 14,16,21,24 84:9

**Judge's** 8:12

**judges** 81:7

**July** 57:25

**jumped** 59:7

**jumping** 59:17 60:9

**June** 11:25 27:19 80:18 94:21

**Juneteenth** 79:5, 17 80:4

**K**

**kicked** 56:1

**kids** 28:20 29:19 40:16 42:4,14,25 43:4 44:4 74:10 93:3

**kids'** 54:14 92:22 93:7,10 99:9

**kill** 61:20 64:7

**kind** 99:24



Case: 4:25-cv-01203-JMD    Doc. #: 114-9    Filed: 12/23/25    Page: 36 of 43 PageID
#: 2081
Sarah Grant
June 13, 2025Index: kinds..mic

**kinds** 13:22 75:17, 22

**knew** 47:9 63:6 90:12

**knife** 64:5,12 65:2

**knowledge** 9:22 14:2 16:23 27:13 28:9,22 35:5,11 36:7 37:11,13 38:2 39:11,15,19, 23 40:1,24 46:23 56:1,3,4,24 57:2, 5,6,12,13,17 58:5 59:1 65:6,8 66:1, 4,8,16 67:9,13 72:3,5,6,12,13,19 73:13 74:7 84:18 86:6 87:5,7 89:13 91:21 93:20 96:5 99:10,13

**L**

**laid** 17:3

**Lane** 7:12

**language** 8:21 90:1

**laptops** 17:20

**Larry** 8:20 9:9,13 10:13,14 11:10 13:19 15:11 17:5 18:17 19:10 22:14 23:3 24:6 29:25 37:5 40:8 43:11 44:18 46:4,11 48:21,24 51:18 70:1 93:13 95:11, 17

**Larry's** 74:14

**late** 37:19 38:22, 23 57:24 60:3

**law** 29:24 46:12 93:16

**lawful** 5:8

**lawsuit** 74:8,9 75:23 76:1

**lawyer** 9:24,25 48:4 49:16,20

**lawyers** 81:8

**lay** 65:13 68:8 76:20 84:2

**lead** 25:8

**leads** 38:15

**learn** 36:16 73:22

**learned** 36:18 73:19

**leaving** 99:19

**led** 61:16 63:14,15

**left** 74:13 82:24

**legal** 8:18 9:6 16:12 17:9 24:3 25:20 28:23 32:7 33:11 37:1,8 41:24 43:12 54:18

**legally** 92:1,3

**level** 33:15 87:14

**licensing** 36:12

**life** 61:6 62:15 68:15

**limitation** 76:17

**limited** 12:1 75:13

**Linda** 5:3

**link** 93:25

**list** 25:11 32:16 33:25 34:17 35:10 80:14 83:3,20

**listed** 32:10,13,17, 24

**listen** 8:18

**litigation** 9:6

16:15 18:18,21,23 75:20,25 76:8,10 77:8 93:11 94:18, 19 97:9 99:5

**location** 92:7

**long** 6:16 29:8 55:9 56:17

**longer** 18:4 55:17, 23 68:6 95:6

**loss** 61:25 62:3,7 64:4,11

**lost** 25:5 62:4

**lot** 71:17

**loud** 54:12,13

**Louis** 7:13

**love** 19:12,13

**loved** 69:20

**M**

**made** 10:15 12:2 16:9,21 57:20 67:1 94:9

**Madel** 5:4

**Maia** 24:5 26:15 48:4

**make** 8:8 13:13 14:1,6,10 17:17, 25 34:25 40:12 52:16 55:15 69:24 70:1,2 78:8,17 82:18 89:8

**maker** 89:7

**making** 18:14 41:6 45:16,19

**managed** 67:4

**management** 66:4

**manipulate** 14:18

**manner** 16:3 17:7

24:14

**March** 27:14,17 29:7 90:5,25 93:23 95:19,21

**mark** 9:1

**marked** 9:16

**Matt** 29:14 33:22 36:6 62:14 94:20, 24

**matter** 67:19 68:2 75:14

**matters** 75:13,19

**Matthew** 5:8

**means** 34:8 82:12

**meant** 59:15,17

**medical** 33:9 68:9 71:2

**medication** 66:4, 5,14,19 67:5

**medications** 66:15,21

**meetings** 57:3,7

**Megan** 79:24

**memo** 80:13

**mental** 35:23 36:3, 10,15,16,18,21,24 37:11 63:17 94:5

**mentioned** 33:20 57:10

**mess** 20:14 34:25

**message** 47:2 85:8

**messages** 19:19 42:22 45:22 99:2, 7,11,14

**methods** 98:12

**mic** 13:8

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**Michelle** 5:13

**mind** 56:19 71:10 79:24

**mindful** 68:25

**mindset** 90:15

**minimal** 62:6,9

**minimum** 30:17

**minute** 8:17 64:22

**minutes** 21:17 74:13 78:18 82:11 87:10 95:10 96:9

**mischaracterizes** 26:2 27:25 67:22 86:3

**mischaracterizing** 64:20,23

**missed** 43:4

**Missouri** 7:12,13

**misspoke** 25:1,7

**model** 14:1

**mom** 42:14

**moment** 24:17 43:20 80:20

**moments** 37:14

**Monday** 78:14 80:1,5,7,10,16

**month** 16:22 27:10,15,18 38:12,22 51:11 57:22 58:2 59:25

**morning** 78:15

**mother** 42:5,18,20 43:6,16 99:1

**mother's** 41:21

**motion** 75:18 78:4 79:8,12 80:14 81:20,21 82:3,4

**motions** 51:20 78:4,6,8,24 80:14 81:15,18

**mouth** 28:12

**move** 9:13 17:12 41:16 72:17

**moved** 60:8 91:24

**moving** 59:7 87:9

**multiple** 9:4 62:11

**music** 54:12

**mutually** 13:12 36:4

---

## N

**named** 49:20

**names** 25:5

**necessarily** 36:4

**needed** 68:20

**needing** 89:6

**negative** 71:24

**newer** 59:22

**night** 12:18 53:8 76:13,16

**nodding** 70:19

**noon** 80:8 81:25

**normal** 55:2 100:1

**notary** 5:4

**note** 74:15

**noted** 8:9

**notice** 18:14,16,18 30:3

**November** 38:13, 14 39:7,9 40:13, 14 43:22 53:20 58:3 60:3 73:17

**number** 11:14,15

12:3 19:17 20:5,7, 9 44:15 53:17

**numbers** 7:14,17, 18 23:9,10

**nurse** 54:22 61:21 65:14,15 68:11, 12,13,24 69:2,5,7, 11,13,19 70:5

**nurses** 70:8

**nursing** 17:15 36:12,16,17

---

## O

**oath** 5:17

**object** 9:3 22:7,21 26:8,12 34:4,16 35:13 41:13,23 43:10 61:1 71:23 72:21 83:22

**objected** 77:2

**objection** 8:4,8,9 13:14 14:8,23 15:3,20,25 16:5, 10 17:9,18 18:1 21:16 23:17,23 24:6 25:20 26:2, 22 27:25 28:21 29:11,20 31:6,21 32:7 33:9 37:1 39:22 40:4 42:15 43:7 44:13 45:24 46:3,6 48:17,22 49:1,17 50:1 51:15 52:4 54:18 55:11,19,24 61:18 62:23 64:6,19 67:12,22 69:3,23 70:9 74:2,5 76:5, 22 77:25 83:5 84:17 85:18,25 86:2,17,24 88:3 90:14 91:6 92:2, 12,18,23 93:8

94:12,17,22 95:1, 4,8 97:7,13,18,22 98:3 99:3,6,17

**objections** 8:6 11:22 28:3 74:14

**observation** 30:8 43:15,18 61:10,15

**observations** 35:6 76:24

**observed** 43:18 53:23,24 58:8,10 63:4 64:17,25 89:13

**obvious** 90:23 91:2

**occasions** 33:23, 24 48:3 53:19 66:20

**occurred** 30:24 32:24

**office** 71:2 92:15, 21 93:7 94:21,25

**officers** 33:14

**official** 100:10

**online** 71:17

**open** 80:7

**opine** 37:11

**opinion** 16:2 23:23 25:17 28:10,13,18,19,23 31:3,11,12 33:10 35:11 55:23,24 63:24 64:1 65:13 68:8,9,10 98:22, 23

**order** 8:12 16:3,7, 11 17:5,10 18:20, 24 23:18 30:21 44:14 45:5,9 48:18 51:16,22 52:5,17,18 59:8

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


60:24 70:10 74:3,
6 75:7,12 92:6,13,
19,24 93:9 94:13,
18,23 95:2,5,9
97:8,19 99:18

**ordered** 17:8

**orders** 11:9

**original** 14:15

**overnight** 58:20

**owner** 56:16

---

## P

**p.m.** 74:20 100:18

**packet** 9:4

**paginated** 9:11

**panic** 62:14

**paper** 10:11 23:4

**parent** 25:18
29:18 32:3,9
43:18,19 99:8

**part** 10:11 74:17
82:4

**partial** 16:22

**partner** 29:25 85:3

**partnership** 86:9
92:16

**parts** 98:5

**party** 23:24 37:3
93:19

**pass** 29:8

**passed** 31:4 47:19

**passing** 47:24
48:6

**past** 29:16 68:7
96:17

**pattern** 32:1,5
65:19

**pay** 60:21

**paying** 13:24

**PDF** 100:8

**peg** 92:24 97:14

**pending** 6:17
51:20 75:13,24
76:1 77:6 97:9

**people** 15:9 39:13
60:19,23 76:11

**percent** 16:8
23:22 36:2,3

**Perfect** 35:25

**period** 11:16
37:24 39:19 40:15
41:3,4,6

**periods** 43:5

**permission** 44:11

**Pernod** 7:13

**person** 45:16 55:2
56:11,14 65:13
68:8 85:2 89:6

**person's** 71:13

**personal** 7:18
17:20 27:12 30:8
35:4,5,11 38:2
39:9,11,15,19,23
46:23 56:4,24
57:2,5,6,12,16
58:5 65:6,8 66:3
72:2,4,6,12,13,19
73:13 74:7 84:18
86:6 87:5,7 89:13
93:20

**personalized**
55:13

**pertain** 23:15

**Petitioner** 5:8

**phone** 7:19,24 8:2
12:22,25 13:2,11
14:1,3 56:7,12

**photograph** 22:4
23:13

**photographs**
21:25 22:3,9,15,
19,24 23:3,6,16

**phrase** 34:11
60:13

**physical** 94:16

**Pick** 41:8

**piece** 23:4 46:10

**pieces** 10:11

**place** 30:9 32:13,
17 37:25 48:21
53:20

**placing** 18:18

**Plaintiffs** 5:2

**plan** 81:14,17

**planning** 50:14,19
51:2

**play** 12:25 13:2

**playing** 43:11
54:12

**plenty** 25:13

**plural** 63:12 73:10

**Pociask** 49:20

**point** 6:19 24:13
36:7 38:7 39:16
44:3,6 70:5 71:21
73:6 88:20 99:22

**points** 36:6

**police** 33:14 45:1,
3

**position** 46:23

**possess** 13:25

**possessed** 46:24

**possesses** 45:23

**possibly** 65:11
67:6

**post** 92:15,21 93:7

**potential** 35:22
75:22,23 88:23

**potentially** 50:4
60:15

**prefer** 5:14 79:5

**preferable** 14:20

**premises** 91:10

**Prepare** 80:13

**prepared** 26:18
77:12

**prescribed** 66:14,
19,21 67:5

**present** 16:25
28:16,17 54:4
56:12 70:5,12,20
97:25

**presently** 67:9

**pretty** 9:9 14:3,14
21:6 47:7,11
87:15 94:7 96:7

**previously** 59:20
75:18 81:20

**printing** 5:5

**prior** 13:12 16:14
17:4 31:25 38:7
40:23 47:20 61:2
74:8 96:22

**privilege** 48:21
49:2,4

**privileged** 8:14

**problem** 12:20
82:10,13

**proceeding** 23:24
50:5,6

---



**proceedings** 18:7
74:20 75:2 82:17,
20,24

**produce** 12:7,17
13:11 17:6,7
20:17

**produced** 5:8 9:1
11:19 19:19,24
21:25 22:14,15,20
23:12,14

**producing** 11:13
12:21 13:15 14:19
16:4

**production** 10:15
12:2

**prohibited** 12:21

**promise** 30:4

**proper** 75:6

**proposed** 98:12

**proposition** 41:20

**propounded** 77:1

**prove** 37:2,3,5
64:7

**proven** 68:5,6

**provide** 69:10

**provided** 9:24
69:9 94:5

**provider** 7:19

**providers** 72:16
73:7

**psychiatrist**
70:13,22,23 71:1,
11,12,17,21 72:4,
13 73:11

**psychiatrists**
72:20

**public** 5:4

**pull** 85:17,24
87:19,25 88:13,16

**pure** 86:15

**purported** 44:16
46:1 92:7

**purpose** 88:22

**pursue** 13:16

**put** 18:22 69:14

**putting** 28:12

## Q

**qualified** 77:2

**quash** 75:18

**question** 6:1,3,7,
9,17 7:2 10:14,20
11:23,24 12:1
14:24 15:4,21,22,
23 16:1 17:6 18:2,
9 21:18,19,21
22:7,11,13 24:1,
12 25:21 26:4,5,
13,23,24 28:1,3,6,
25 29:1,13 31:23
32:3,8,23 33:12
34:5,6,18 35:14,
19 38:18 39:24
40:13 41:14,15
42:1,7,12 46:5
47:1,9,13 48:12
50:2,3,8 55:12,20,
25 57:8 60:17
61:3,9,10,19
62:22 63:13,23
64:8,9,11,24
65:23 66:2,22
67:15,17 69:4,25
70:3,11 71:10,23,
25 72:10,12,22
73:4 76:6 84:19,
20,22 85:20
86:18,25 88:6,8
91:7 92:9,14 93:5
95:17 96:7 98:4,6,
20,21

**questions** 8:19
13:15,23 28:2
49:13 50:17 75:10
77:1,14

**quick** 66:24

## R

**raise** 42:24

**raised** 42:22 75:23

**raising** 35:20

**reaching** 79:24

**read** 5:19 8:20,23
15:21,23 20:13
21:20,21 28:5,6
64:10,11 72:10,12
84:21,22 88:9
93:13,16 94:2
95:13 99:20
100:11

**reading** 11:8

**ready** 15:15,16
75:3 80:19

**reality** 72:4,13,20

**realized** 24:7

**reason** 20:19
24:15 29:10 31:5
38:25 39:2 71:20
83:24

**reasons** 30:11
56:17,19

**Rebecca** 41:18
42:17,19,22
43:15,17 48:3
52:21 74:9 93:11
96:11 97:4,6 98:1

**recall** 18:3 21:11,
13 42:23 43:2
47:2 62:12 66:17
75:12 83:19 88:2,
19 97:1

**received** 51:5

**recollection** 46:22
54:10

**recommend** 15:2,
23 16:3

**recommendation**
15:1

**reconvened** 74:20

**record** 5:12 8:7,
20,23 9:8 10:1,9
13:1,2,5,7 18:5,14
19:12,15,17 24:5
26:7,14 29:5,6
49:8 50:10,12,13
52:7,9 74:12,16,
20,22 82:24,25
84:10,11,12 86:19
95:11 97:21
100:13

**recording** 12:18
13:13 14:6,7,10,
22 15:2 16:9,21
17:2,4,17

**recordings** 12:8,9,
11,16 45:16,20,23
46:1,24 47:3

**recover** 65:22

**recovery** 26:7
31:22

**recurring** 65:19

**reference** 52:17

**referenced** 37:17
45:11,14 65:4
85:13

**references** 75:21,
22

**referring** 15:22
22:8 30:24 85:6

**reflect** 24:5

**refusing** 17:6
92:10



Case: 4:25-cv-01203-JMD    Doc. #: 114-9    Filed: 12/23/25    Page: 40 of 43 PageID
#: 2085
Sarah Grant                                                    June 13, 2025 Index: regard..silly

**regard** 45:10
47:15,17 48:2
55:8

**regular** 24:9

**rehab** 37:17 39:6
41:11 55:10,17,23
56:16,22 88:23,25
90:3,5,12 93:21

**relapse** 67:11

**relapsed** 40:25
41:1 89:17,19,22
90:8,13,24

**relapsing** 65:20

**related** 32:15
60:14 66:16 76:23
78:5 99:8

**relates** 76:11

**relating** 38:18
49:25 50:7

**relevance** 29:11
49:17 84:17 90:14

**relevancy** 8:4 18:1
83:5,22

**relevant** 30:5
76:13,24 77:8,11
95:10,16,17

**remember** 24:12
46:21 67:20
87:17,19,21,22,24

**remembers** 46:20

**remind** 15:17

**reminding** 15:12,
13

**remotely** 61:5

**removed** 56:17
91:10

**repeat** 26:5 28:2
52:18 88:8

**rephrase** 6:10

24:14 31:13 47:16
61:14 70:19

**reporter** 5:23
15:23 21:21 28:6
64:11 66:25 72:12
78:9 79:2 81:23
84:22 88:10 99:24
100:3,6,8,14

**represent** 29:6
43:3 47:24

**request** 79:20
88:15,22

**requested** 13:18

**require** 63:24

**reread** 67:17

**reserved** 5:5

**residence** 53:9

**respond** 93:5

**response** 19:20,
24 22:15 88:1,4,
15

**responsive** 12:12,
17

**rest** 80:2

**result** 86:16 87:1

**retain** 18:6 48:15

**return** 6:2 92:10

**returned** 39:16
41:10,11 44:6
82:20

**review** 10:10
20:10

**reviewing** 9:18,21

**risk** 24:15 25:9
26:21 30:11 32:4,
24 33:20 37:12
40:16 67:11

**RN** 33:4 36:12
54:16 55:2

**road** 29:17

**room** 27:8 61:23
95:6

**round** 92:25 97:14

**rules** 5:23

**ruling** 74:14

**rulings** 77:24

**rush** 100:2

**S**

**safety** 7:7 94:16

**sake** 78:7

**sanction** 81:7

**sanctions** 81:21

**sane** 64:7

**Sarah** 5:7,13,14,
16,17 10:20 12:1
15:19 16:8,13
17:13 19:20 22:12
24:11 26:17,18
31:14 34:7 35:18
37:9 42:13 44:25
47:11 50:18,19
62:21 63:3 68:10,
11,13 71:19 72:2,
12,23 74:24 83:1
87:9 91:25 93:6
97:16 99:21

**Sarah's** 68:12

**save** 10:1,18 31:3

**scarring** 58:13
61:10,12

**scenario** 40:24

**school** 17:15
36:16 43:1,5

**scope** 8:11 15:6
16:6,10 17:5,10
23:17 28:21 31:21
44:13 45:5 48:17

51:15 52:4 70:9
74:2 92:6,13,18
93:8 94:12,18,22
95:1,4,8 97:7,18
99:3,17

**send** 79:17 89:2

**sense** 42:3,7 55:7

**serve** 9:16

**served** 9:19 83:9

**service** 97:25

**services** 94:5,6

**set** 8:11 21:6
79:16 80:11 96:25
97:2

**setting** 78:24 79:5

**shake** 6:13

**shirt** 19:7,14 47:23

**shoehorn** 73:1

**shorten** 78:5
80:14

**shorthand** 5:3

**show** 43:9 46:1,
17,19 51:3

**showed** 58:6
94:20,24

**showing** 37:14
72:6

**shows** 29:5 35:19
73:6

**shut** 59:22

**sibling** 76:2 77:7

**sic** 52:17

**side** 70:25 71:13

**sign** 80:22

**signature** 5:5

**silly** 42:12 98:21



**similar** 29:19

**similarly** 31:3 32:4

**simple** 35:18

**single** 30:8 32:23

**singular** 73:10

**sir** 80:17

**sister** 14:17 37:13 65:17 69:20

**sit** 23:20

**sitting** 50:4

**size** 12:23

**sizes** 64:15

**slept** 72:7

**slipped** 10:17

**smart** 9:12

**smooth** 47:8

**sober** 29:16 32:18, 25 33:21,22 34:1 35:20 36:2,4 37:12 38:3,15 41:2,3,7 65:21

**sobriety** 37:24 38:1 40:15 41:11 68:6

**social** 73:23

**sold** 91:20

**solicit** 77:21

**someone's** 37:12

**someplace** 89:8

**sort** 14:1 26:21 50:5 64:4,11 86:10 89:15

**sound** 6:4

**sounds** 28:12

**speak** 5:24 6:17 18:17 85:21

**speaking** 11:22 69:17 90:1

**special** 36:20

**specialized** 37:10 55:9

**specialty** 36:14

**specific** 32:20,22

**specifically** 22:8 27:6 75:14

**speckled** 78:19

**speculate** 29:3 53:18 87:2 90:15

**speculated** 87:8

**speculation** 29:12 39:22 40:6 45:24 46:4,11 61:18 67:12 86:15,24

**speculative** 33:11

**spending** 76:16

**spent** 53:8 82:9,11

**split** 73:2

**spoke** 52:20

**spoken** 48:24

**sponsor** 56:25

**spring** 38:3

**square** 92:24 97:14

**St** 7:13

**stack** 8:25 20:5

**Stacy** 20:13 42:25 45:19 46:23 47:2 83:12,13 84:2,13, 22 85:16,21 86:8 96:14 97:4 98:1

**staff** 79:4

**staring** 22:18 23:5

**start** 6:1,3 35:18

59:5

**started** 27:11 40:20 83:8 96:18

**starting** 16:15 22:13

**state** 5:12 8:6 11:11 20:14 62:14

**stated** 5:23 8:5 44:20,21 45:22 65:25 72:3,13

**statement** 18:14 56:20 58:8 65:24 72:19 86:18 89:9 93:4

**statements** 26:14 59:4 61:2

**status** 26:20 85:3 92:6,16

**statute** 76:14 93:13

**stay** 10:9 55:9 87:14

**stayed** 55:17,23 71:6 76:13

**stick** 66:12,13

**stipulate** 10:14 91:1,3

**STIPULATED** 5:1

**stitches** 63:24

**stop** 25:16 30:6 82:7

**stopped** 94:8

**stored** 91:13,15

**straightforward** 47:12

**street** 94:14

**strike** 9:14 30:22 81:21

**strings** 87:19,25 88:13,16

**student** 36:18

**stuff** 30:6 37:3 98:11

**subject** 8:9,14,17 14:9 18:1 21:17 23:25 25:21 26:3, 24 28:1,23 29:12 31:11,22 32:8 33:12 39:24 55:11,18,19,25 61:2,19 64:8 67:14,15 69:3 78:9 83:6,23 84:18 85:19 86:21,25 88:6

**subpoena** 9:19 10:25 12:13 13:17 19:20,22,24 22:15 51:5 83:9

**subpoenaed** 51:4

**sue** 44:15

**suffer** 65:7,9

**sufficient** 27:24 28:7

**suggest** 43:5 89:14

**suicidal** 30:17,18 33:3 34:14 57:11

**suicide** 57:12 58:21

**suit** 47:22

**summer** 38:5 57:24

**supports** 8:21

**supposed** 98:19

**supposedly** 59:10

**Supreme** 30:1 95:12

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


**surfing** 94:3

**sustain** 76:4

**sustained** 76:23

**sworn** 5:8

**Sylvia** 49:20

**T**

**tackle** 37:16

**taking** 6:19 46:23
66:18 92:24

**talk** 5:24 15:10
25:14 36:24 39:18
56:11

**talked** 30:10 83:12
90:18

**talking** 6:4,19
11:21 18:8 22:8,
10 41:5 63:6,18
69:14 70:21 78:18
83:6

**tat** 30:6

**tears** 34:25

**technical** 14:24

**telephone** 7:14

**telling** 33:14 40:22
56:14 61:5 71:12

**ten** 53:13 82:11

**terminate** 84:15,
23

**termination** 86:16

**test** 76:18

**testified** 31:14
67:19 76:12 90:17

**testify** 30:9 50:14,
19,21 51:2 55:16
64:19 65:15

**testifying** 26:9
31:8

**testimony** 23:12
26:19 27:22 28:1,
6 45:12,15 64:23
67:23 68:1 77:20,
21 86:3

**Texas** 41:9 56:1

**text** 19:19 42:22
45:22 46:17,22
47:2 85:13 96:10
98:8 99:1,6,11,13

**texted** 83:13 93:25

**texts** 87:10

**Thanksgiving**
38:8,16,19,20,24
39:7,8,10

**therapist** 70:24
71:1,11,17,21
72:4,13 73:11

**therapists** 72:20
73:5

**therapy** 68:22

**thing** 77:8

**things** 13:16 25:10
29:9 31:11 32:10,
13,17 33:16,20
34:21 36:2,5,8
39:13 60:24 66:11
69:17 71:18 75:23
94:3

**Thomas** 45:19
46:23 83:12 84:2,
13,15,22,23,25
85:16,21 96:14

**thought** 53:18
55:7

**threat** 94:9

**threatened** 44:15
75:16,20 94:7

**thumb** 9:25

**Thursday** 80:3

**tie** 81:8

**time** 7:22 9:25
10:1 12:2 13:12,
16 15:10 16:9,21
17:2 21:4,7,10,14,
21 25:12,13,16
27:12 29:8 30:23
31:3,20 37:15
38:7,23 39:1,2,4,
5,19,20 40:19,25
41:1,7,8,10 43:21
44:3,6 45:11,13,
14 52:16,19,20
66:14 69:11,12,18
70:21 71:21 74:15
76:7 78:5,14,23
80:14,25 82:8,9
89:22 93:22 99:21
100:11

**times** 16:20 40:1
53:11 56:22 68:14
71:16 74:8

**Tinker** 85:4 89:10,
14 92:17

**tit** 30:6

**title** 71:13 73:24

**today** 7:25 23:20
26:21 27:2 47:20,
21 51:3 52:22
57:21 90:20,22
91:16

**told** 14:14 47:4
52:7 56:5,10
57:20 58:6 59:2,
20 60:1 66:20
70:23 71:16,17,22
72:7 89:7 95:20

**top** 19:13,15 22:19
47:23

**topic** 52:23 59:6

**topics** 75:11

**touch** 99:23

**Town** 45:1

**trained** 54:21 74:4

**training** 33:10
36:14,20 55:9
68:9 69:5

**transcribed** 5:4

**transcript** 5:25
100:5

**transpired** 76:25

**treatment** 95:18,
21

**treats** 70:7

**trespassing**
75:11,22

**trial** 10:19 13:12
50:15,20,21,23
51:6,8 55:21
77:13,17,20,22
78:5,24

**trick** 98:20

**triple** 71:24

**TRO** 50:6

**true** 15:11 17:13,
14 19:20,21,25
22:16 32:14 44:7
47:25 48:1 56:11,
18 60:10 71:18
89:9

**truth** 56:15

**Tuesday** 78:11,14

**turn** 100:1

**twenty** 74:16
87:10

**typewritten** 5:25

**U**

**uh-huh** 43:24
83:14,17

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


**unable** 12:17

**unbuttoned** 19:8, 14

**unbuttoning** 19:7

**understand** 5:17 6:9 21:8 22:12 26:23,25 34:5,6,9, 11 41:14,15,17 42:13 50:2 62:21, 25 68:17 71:24 72:22 90:12 93:15 98:6

**understanding** 16:18 56:21 60:12,15,18,23 67:4 70:7 73:25 77:19

**understood** 6:8 78:1

**universe** 90:19

**unsuccessful** 59:21

**untreated** 63:14

**untrue** 60:24 73:14

**unusual** 54:11

---

**V**

---

**vacation** 78:6,21, 25 79:3 80:15

**varies** 64:13

**vehicle** 59:21 60:9

**vein** 64:5,12,17 65:1

**veins** 64:1,15

**Verizon** 7:20,21

**version** 5:22

**video** 12:9,11 45:16,20,23 46:24

47:3

**violations** 44:16

**violent** 30:13,21, 22 31:17 32:5 34:12

**vision** 24:8,9

**voluntarily** 50:23 51:3

---

**W**

---

**wait** 8:17 19:2 64:22 95:13

**waiting** 50:4

**waive** 99:20

**walking** 33:15

**wanted** 13:16 52:14 54:9 67:2 69:21 93:2 99:15

**wanting** 35:17

**warm** 89:8

**wasting** 80:25

**water** 68:20

**wear** 19:9

**wearing** 81:8

**webpage** 94:2

**Wednesday** 78:12 100:14

**week** 16:22 52:22 78:7,10,20 79:25

**whatsoever** 43:8

**When's** 21:4,10

**Wildwood** 7:12

**wine** 91:5,8,11,22 92:4,7,10

**witness'** 26:3 28:22 31:22 33:10 67:13,23 75:8

76:19

**witnessed** 25:10

**witnesses** 77:13

**wondering** 55:22

**word** 60:11

**words** 28:12 68:2

**work** 51:12 78:17 92:25

**worker** 73:23

**working** 51:14

**works** 18:4

**wow** 70:18

**wrist** 62:11,12 63:16 64:17

**wrists** 58:2,6,7,17 61:11,16

**writing** 82:6

**wrong** 27:16 79:11

**wrote** 24:5

---

**X**

---

**x-ray** 24:7

---

**Y**

---

**year** 7:22 13:17 19:1 20:1 27:10, 15,18,20,23 28:7 31:1,4,18,19 35:20 38:11 49:18 53:5 57:22 59:25

**years** 7:14 17:23 29:16 43:15,17 66:20

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F. California Firm Registration #179

