UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW R. GRANT, individually, as *Next Friend* to C.L.G. and as *Next Friend* to C.M.G., and on behalf of all others similarly situated, | ) ) ) ) | |
| and | ) ) ) | Case No. 25-CV-1203-JMD |
| STOP MISSOURI CORRUPTION, LLC, dba www.StopMissouriCorruption.com | ) ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| vs. | ) ) | |
| BRUCE F. HILTON, in his individual and official capacity as Presiding Circuit Judge of the 21st Circuit Court of the State of Missouri, et al. | ) ) ) ) ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
COMBINED SUGGESTIONS IN SUPPORT SANCTIONS**

On April 23, 2026, this Court entered a Memorandum and Order dismissing Plaintiffs'

First Amended Complaint with Prejudice, denying leave for Plaintiffs' December 23, 2025,

Proposed Second Amended Complaint (Doc. 114, Attachment #1) to be deemed filed, finding

that Plaintiff Grant acted in bad faith in bringing this action, and inviting briefing on the issue of

Sanctions.[1]  *See* Doc. 130, Memorandum and Order ("Dismissal Order").

On May 7, 2026, at this Court's invitation, Defendants filed their Combined Suggestions

In Support Of Sanctions.  Doc. 132 ("Defendants' Suggestions").  As discussed below, the

Defendants' filing speaks volumes to the finding of this Court that is barred by under the

doctrine of *collateral estoppel*.

---

[1] The Court has not addressed the updated, detailed factual allegations in Plaintiff's Second Amended Complaint.  *Compare* Dismissal Order *with* Doc. 114, Attachment #1.

1

As discussed below, each of Plaintiff's filings were made in *good faith* after an extensive pre-filing investigation.

### A. Defendants' Combined Suggestions in Support.

This Court's conclusion that Plaintiff has acted in bad faith by attempting to intervene and terminate the judicial corruption he has discovered and should be sanctioned can be dismissed by simply reviewing the brief filed by the Defendants on this topic. *See* Doc. 132.

As an initial matter, none of the Defendants served or filed a Rule 11 Motion for Sanctions in response to Plaintiff's August 11, 2025, Complaint (sealed Docs. 2 and 3); Plaintiffs' September 12, 2025, First Amended Complaint (Doc. 35) ("FAC"), or Plaintiff's December 23, 2025, proposed Second Amended Complaint (Doc. 114, Attachment #1) ("SAC").[2]

On top of Defendants never seeking any relief from this Court under Rule 11, nowhere in Defendants' Combined Suggestions do they *themselves* even argue or assert that Plaintiff is acting in bad faith and made up this factual scenario.[3] *Id.* **Absolutely nowhere**.[4] The omission is no accident.

Defendants' merely state:

---

[2] Each of the Complaints filed in this matter are in the public domain. Plaintiff's citation and discussion of his proposed Second Amended Complaint is not a concession that his First Amended Complaint is fatally flawed in any manner. To the contrary, Plaintiff's First Amended Complaint was drafted to comply with both Rule 8 *and Rule 9(b)*.

[3] Defendant Fenley requested a call with Plaintiff in which he attempted a quid pro quo in which Plaintiff would drop his allegations of a criminal conspiracy in exchange for custody of his children. *See* https://drive.google.com/file/d/1sucH0k3IJsJtwovNCi7yEA1jaCEhAIfa/view?usp=drive_link

[4] The reason is obvious to those that know facts much more extensive than those previously made available to this Court. Plaintiff never imagined he would need to cite Judge Zerr's finding in any of his Complaints. Both Plaintiff's First and Proposed Second Amended Complaint include facts and evidence included to comply with FED.R.CIV.P. 9(b). *See* Doc. Doc. 114, Attachment #1 and Doc. 35.

*The Court* in its April 23, 2026, Order found that Grant has litigated in bad faith in numerous areas. See Doc. #130, at 16-17. *The Court* additionally found that this case is motivated by Grant attempting to repackage a custody dispute into a federal RICO case, constituting improper purpose.

Doc. 132, Defendants' Suggestions in Support, p. 2 (citation omitted) (emphasis added).

The Defendants are aware that retired Circuit Judge Richard Zerr, appointed by the Missouri Supreme Court in the state court family court, expressly found that Plaintiff Grant "**sincerely believes**" that the corruption at issue is real and he has acted in **good faith** as an officer of this Court after conducting a thorough pre-filing investigation.

**B.  Judge Richard Zerr's August 29, 2025, Judgment.**

On August 5, 2025, Plaintiff filed a Motion to Disqualify in the referenced state court matter. **Exhibit B**.  Thereafter, Chief Justice W. Brent Powell of the Missouri Supreme Court entered an Order dated August 19, 2025, that appointed retired Circuit Judge Richard Zerr as a Senior Judge in the matter.  **Exhibit C**.  On August 27, 2025, Judge Zerr held an evidentiary hearing in which Plaintiff and Defendant Hilton both provided testimony on the issue of potential disqualification.  **Exhibit D**, Transcript of August 27, 2025, Proceedings before Senior Judge Richard Zerr.

On August 29, 2025, after personally observing Plaintiff Grant's testimony and considering his evidence, Senior Judge Zerr issued his Judgment that resolved the issue of Plaintiff's sincere and good-faith beliefs regarding the corruption he pursues in this matter:

> In listening to the testimony of Petitioner and reading the many filings he has made in this Court and in the Appellate Courts, *it is clear that the Petitioner sincerely believes* that he is enmeshed in *an organized and pervasive conspiracy* to deprive him of a fair hearing.

*See* **Exhibit E**, ¶8, Judge Zerr's Judgment On Petitioners Motion To Disqualify Or Recuse, For Cause Pursuant RSMo Section 509.090 (emphasis added).

3

Unlike this Court, Judge Zerr had the opportunity to personally *preside over a hearing* and *personally observed Plaintiff's sworn testimony* and saw the *sincerity* in Plaintiff's claim of corrupt behavior.

Plaintiff notes that Judge Zerr, trusted and assigned by the Missouri Supreme Court, served on several benches for a career spanning *more than 43 years*. *See* https://ballotpedia.org/Rick_Zerr. This Court's finding of bad faith flies directly in the face of a prior ruling from of a very experienced judge.

Also, Judge Zerr's hearing and decision were dated August 27th and 29th, 2025, just a few short weeks after Plaintiff's August 11, 2025 filing of his original Complaint in this matter– that was assigned to United States District Judge Henry A. Autrey.[5] The fact that the Defendants did not cite Judge Zerr's finding to this Court is itself troubling. *See, e.g.,* Missouri Rule of Professional Responsibility 4-3.3(a)(2) ("A lawyer shall not … fail to disclose to the tribunal *legal authority* in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel.") (emphasis added).

Regardless, there can be no dispute that Plaintiff's **good-faith** beliefs are concretely established.

**C. *Collateral Estoppel* - Plaintiff's Sincere and Good-Faith Belief as to the Judicial Corruption He Has Exposed.**

As the United States Supreme Court stated, "[t]his Court has long recognized that 'the determination of a question directly involved in one action is conclusive as to that question in a second suit.' The idea is straightforward: Once a court has decided an issue, it is 'forever settled

---

[5] This matter was *removed* from Judge Autrey's court and *transferred* to the Honorable Joshua M. Divine. *See* Doc. unnumbered entry dated August 12, 2025, immediately preceding Doc. 8 and Doc. 8 ("District Judge Henry Edward Autrey no longer assigned to case. ***Case reassigned*** to District Judge Joshua M. Divine for all further proceedings.") (emphasis added).

as between the parties …"  *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 147, 135 S. Ct. 1293, 1302, 191 L. Ed. 2d 222 (2015) (citations omitted) (extending *issue preclusion* to prior administrative finding by the Trademark Trial and Appeal Board [TTAB]).

Here, there can no question that Senior Judge Richard Zerr, appointed by the Missouri Supreme Court in the St. Louis County Family Court matter, considered and provided an express ruling on *the issue of Plaintiff's sincere belief* that is at direct odds with this Court's later finding that "by a preponderance of the evidence, that this suit has been filed for the improper purpose of harassing and imposing costs on others.  Other aspects of the litigation reinforce the Court's conclusion that Grant has litigated in bad faith."[6]  *See* Dismissal Order, p. 17.

Plaintiff, per his oath, has sought to protect the constitutional rights of his children, himself and other children that are likely future victims of the St. Louis County Family Court. As Plaintiff previously noted, he is an attorney, member of the Missouri and Illinois Bar Associations and has been admitted to practice before this district court since approximately 2001.  **Exhibit A**, ¶7.  All of Plaintiff's efforts in the state court case and in filing and continuing to litigate this matter, through anticipated appeal, are solely intended to end corruption that Plaintiff and others have known to exist in the St. Louis County Family Court.[7]

---

[6] Judge Zerr's well-informed and evidence-based conclusion has extensive evidentiary support.  Again, not even the Defendants state that they agree with this Court's finding that Plaintiff acted in bad faith.  *See generally* Doc. 132, p. 2, Defendant's Response on Sanctions (""*The Court* in its April 23, 2026, Order found that Grant has litigated in bad faith in numerous areas. See Doc. #130, at 16-17. *The Court* additionally found that this case is motivated by Grant attempting to repackage a custody dispute into a federal RICO case, constituting improper purpose.") (citation omitted) (emphasis added).  No where do Defendants attempt to contradict Judge Richard Zerr's finding on this issue in his Final Order and Judgment.

[7] Plaintiff also presents confirmation of his good faith belief from his therapist who has seen almost weekly since January 4, 2025 – right when the criminal enterprise was being discovered.  *See* May 20, 2026, letter attached as **Exhibit F** ("With regards to Mr. Grant's belief system regarding his treatment during his custody battle, he ***has always seemed genuine*** in his position that the legal system has ***conspired against him***.") (emphasis added).

Any suggestion that Plaintiff would risk his professional career and reputation in prospective dissatisfaction with a state court decision that *did not even exist* at the time of filing of the initial Complaint is simply incorrect.[8]  As discussed below, Plaintiff possesses actual evidence to support each of his factual allegations.

### D. Plaintiff's January 28, 2025, Motion for Temporary Restraining Order – More Corroborating Evidence of Good Faith and Actual Corruption.

Plaintiff's February 7, 2025, hearing testimony followed Defendant Copeland's January 24, 2025, attempt to lure Plaintiff to check out his minor children from their schools. [9]  **Exhibit A**, ¶¶20-21.  Defendant Copeland's misconduct led Plaintiff to obtain a setting for a hearing on a Temporary Restraining Order.  *Id.*  Plaintiff filed an extensive Motion to Temporary Restraining Order revealing his good faith beliefs that have already been submitted to the Missouri Court of Appeals and Missouri Supreme Court. **Exhibit G.**

In his January 28, 2025, Motion for TRO, Plaintiff includes even more corroborating evidence that Plaintiff has acted in good faith and that the corruption he alleges is real and took place in the precise manner that he alleges:[10]

---

[8] It was no easy decision to expose the corruption at issue in this matter.  Plaintiff's decision led him to file his appeal in Chicago, Illinois, flee the country within hours of the filing out of his fear for his safety, being handcuffed at the direction of Defendant Hilton, and being charged with a crime for posting a copy of the Complaint in this matter that was available to the public on PACER.  *See* discussion *infra.*  The retaliation Plaintiff has suffered continues to this day.

[9] If this Court's version of events were true, there is no reasonable explanation for the sworn testimony and the Motion for TRO that followed that was based upon a false report of a kidnapping threat.  *See* **Exhibit G** (January 28, 2025, Motion for Temporary Restraining Order w/o exhibits).  There are simply to many factual background details to include to complete the picture of the full extent of the conspiracy and criminal enterprise.

[10] Critically important is the fact that Plaintiff did not know that Defendant Hilton was part of the RICO enterprise when he filed the Motion to TRO.  Plaintiff considered him an ally as he pretended to be.

> 3. The actions that have transpired in this case, and particularly those since the January 21, 2025, hearing in this matter, make it clear that the Children in this case are in immediate and extreme danger.[2]
>
> 4. When this Court considers what transpired on January 21, 2025 – it will be abundantly clear.
>
> 5. Petitioner believes that this Court recognizes that the Children in this case have suffered and are currently suffering as a result of the corruption and despicable 'parenting,' including, but not limited to the individuals expressly listed in this Motion.[3]
>
> 6. This case is now about the actions of crooks after they are caught.[4] This case is about, in its most focused sense, about what one crook and perjurer - who is the

**Exhibit G**, p. 3.

> 8. After the Court's statements as Presiding Judge of the 21st Circuit in Division 13 on January 21, 2025, Petitioner reached out to three (3) individuals.
>
> 9. Petitioner firmly demanded an immediate agreement to 50/50 custody that he sent via email to Ms. Brodie and Mr. Fenley as is discussed and addressed in his January 24, 2025, Motion Discharge Mr. Fenley and for Sanctions.

*Id.* at p. 4.

As the TRO filing shows, Plaintiff has had a good faith belief in his allegations going back to January 2025.  The situation caused significant uneasiness and Plaintiff even sought to place his consent to the jurisdiction of Defendant Hilton on hold as he considered reviving his request for transfer to the Missouri Supreme Court:

> 9. Also, Petitioner has demonstrated why his previously filed consent(s) to this Court's jurisdiction should be delayed until he has had an additional opportunity to retain new counsel before this Court enters a ruling on such filing(s).

*Id.* at p. 40.

7

**E. More Corroborating Evidence:  Plaintiff Grant's February 7, 2025, Sworn Testimony:  "I Hold All The Cards."**

As Plaintiff has alleged, on January 21, 2025, Defendant Hilton engaged in a charade in order to entice Plaintiff to consent to his jurisdiction following a Motion to Disqualify Defendant Greaves for her involvement in ex parte communication.  Doc. 114, Attachment #1 at ¶197, ¶¶219-231 (SAC); *see also* Doc. 35, Attachment #1 at ¶331, ¶¶343-367 (FAC).  The evidence of Defendant Greaves' violation of the Rules of Judicial Conduct was easily proven, and it led to her recusal before the hearing on the motion to oust her from the case.  *See, e.g.,* **Exhibit H** (Plaintiff's January 9, 2025, Supplement and Amendment By Interlineation to Motion to Disqualify Commissioner Greaves for Cause, and for Transfer to the Missouri Supreme Court – Case No. 12SL-DR03959-02).

On January 21, 2025, Defendant Hilton inherited the case, and he chastised Defendants Brodie and Fenley for allowing him and his children to suffer under unjustifiably long periods without any transition to normal custody.  Plaintiff details the situation in the allegations of his Complaints.  Doc. 114, Attachment #1 at ¶197, ¶¶219-231 (SAC); *see also* Doc. 35, Attachment #1 at ¶331, ¶¶343-367 (FAC).

This Court can confirm these statements are true because when Plaintiff took the stand a few weeks later on February 7, 2025, he testified:

the consent order since October 2nd. And, if the Court will recall, the Court's commentary on the record on January the 21st, I've never been in a better position than I am right now. And candidly, since we're on the record, I hold all the cards. So when I received that notice, I knew only one thing, which was -- my concern was only one thing,

which was that Ms. Copeland indeed knew what was coming and was unwilling to accept it and --

**Exhibit I**, February 7, 2025, Hearing Transcript, pp. 7:19-8:2 (highlighting added).

This Court should note that lack of any commentary or reaction to Plaintiff's "I hold all the cards" testimony from Defendant Hilton, Defendant Fenley or Defendant Brodie because the charade was still ongoing.

It is because the corruption of at least Brodie and Fenley (both present) had been exposed as of that date, that Plaintiff took the stand with such vigor. Defendant Hilton had just acknowledged Defendant Greaves' ex parte judicial communications, ruled that what happened in the case prior to his involvement was a "travesty" and caused "suffering," and he stated he was the one that could help. **Exhibit A**, ¶20.

### F. Plaintiff Possesses Evidence of Defendant Hilton's Ex Parte Judicial Communications that are part of the RICO conspiracy.

Defendant Hilton, the very presiding 21st Circuit Presiding Judge at issue, has not only engaged in the criminal conduct alleged in Plaintiff's initial, First Amended and proposed

9

Second Amended Complaints, he has brazenly engaged in ex parte judicial communications in the very 2018 case Plaintiff cited to this Court:

**1.  Proof of Ex Parte Judicial Communication in EXAMPLE CASE #1 in Plaintiff's Second Amended Complaint.**

Ex parte judicial communications are so commonplace within the St. Louis County RICO criminal enterprise that the counsel and judges involved correspond with one another ex parte in side conversations without a second thought.  Here, Defendant Hilton requested legal precedent from the one side defending his Order in writ proceedings:



**Exhibit J** (redacted and emphasis added).



**Exhibit K** (emphasis added).

There is no justification or excuse for any sitting judge to request and receive ex parte

legal research from only one side – the one that he favors on the issue at hand.

The ex parte judicial communications between co-conspirators are not limited to emails.

In this example, Defendant Hilton picked up the phone and called an attorney on one side in

EXAMPLE RICO CASE #1 referenced in Plaintiff's Second Amended Complaint:



**Exhibit L** (redacted and emphasis added); *see also* Doc. 114, Attachment #1,
¶134 and Doc. 35, ¶119.

11

Defendant Hilton not only approved but even fixed a typo for the Writ brief drafted by one side's counsel:



**Exhibit M.**

The ex parte judicial communications are so commonplace because the individuals are all part of the same RICO enterprise:

On Feb 16, 2018, at 7:54 AM, "Bruce.Hilton@courts.mo.gov" <Bruce.Hilton@courts.mo.gov> wrote:

So sorry that your client has to incur the expense of defending me. Not sure of the procedural issues or the timing of filing a response but I think an attachment of the minute entries from the court of appeals in particular the admonishment may be benefici

**From:** Patricia Susi
**Sent:** Friday, February 16, 2018 8:20 AM
**To:** Bruce.Hilton@courts.mo.gov
**Subject:** Re: ▮▮▮▮▮ writ

Agreed. Thank you.

*Patricia K. Susi, Principal*

130 S. BEMISTON, SUITE 200
CLAYTON, MISSOURI 63105
(314) 725-8788
(314) 571-6827 (Direct)
(314) 725-8789 (Fax)
psusi@chgolaw.net

**Exhibit N** (redacted and emphasis added).

Fortunately, Plaintiff was able to acquire these exemplar emails without the aid of FED.R.CIV.P. 26 discovery. Plaintiff possesses even more corroborating evidence that these allegations are not only made in good faith, but each is also factually true and supported by actual evidence.

> **G. Plaintiff Has Been Criminally Charged by a Member of the "Buying Future Litigation" Email Law Firm For Posting The Unsealed Complaint That Was Available On PACER.**

13

As the emails above demonstrate, the authors and recipients of the emails have much to explain.  Plaintiff notes that he redacted the name of law firm involved in the "Buying Future Litigation" email.  *See* Docs. 2 and 3 at p. 11 and ¶100 (sealed); *see also* Doc. 35, ¶119.

However, Plaintiff's proposed Second Amended Complaint included the revelation of a litany of facts and evidence which this Court has failed to consider.

Specifically, on *December 23, 2025*, Plaintiff filed his proposed Second Amended Complaint revealing the name of the previously redacted law firm at issue in the "Buying Future Litigation" email – Curtis, Heinze, Garrett and O'Keefe, P.C.  *See* Doc. 114, Attachment #1, ¶¶105, 131.

What happened next and *later that same day – December 23, 2025* - is simply astounding.  A member – Keith Cheung - of the very law firm *revealed* and included ***unredacted*** in Plaintiff's proposed Second Amended Complaint filed a criminal charge against Plaintiff in the Municipal Court of the City of Town & Country, Missouri.  *See* December 23, 2025 @ 4:23 p.m. Information/Citation attached as **Exhibit O**; *see also* https://chgolaw.com/attorneys/keith-k-cheung ("Prosecuting Attorney, City of Town and Country, Missouri (1994- Present)").  This is all actually true.  It boggles the mind, but it is nonetheless true.

The real interesting component of the December 23, 2025, criminal charge is that it is based solely upon Plaintiff's actions months earlier, on September 8, 2025.  *See* **Exhibit O.**  The actions of Plaintiff cited and that led to the criminal charges was literally posting the very same Complaint on the internet that was simultaneously available to the general public via PACER on September 8, 2025.  *Id.; see also* **Exhibit A,** ¶¶49-51.  It is shocking and it is unconstitutional.[11]

---

[11] As intended, Plaintiff has had to expend personal funds to retain criminal defense counsel for an obviously baseless charge filed as retaliation by an obviously biased and/or conflicted prosecuting attorney.  **Exhibit A,** ¶51.

**H.  The FBI Credentialed Witness Plaintiff Identified In His Complaints Has Already Testified.**

In the Court's Dismissal Order, it implies that it may not believe that Plaintiff actually has a witness that will testify that "that he [Plaintiff] was stalked and surveilled 'inside various establishments, including eavesdropping,' and that he "will present the testimony of an FBI credentialed Missouri licensed attorney to confirm this allegation." Dismissal Order, p. 14. Once again, on this issue, the Court appears to fail to believe facts as true that are *already proven*.

During the final hearing/trial in the state court matter, Plaintiff ***did, in fact,*** present the very witness this Court implies may *not* exist.  Mr. Scott Baucum, former Vice President, Associate General Counsel of Bayer US, LLC and the former global chief compliance officer of Monsanto Company, a large and well-known publicly traded company (now owned by Bayer AG), testified and confirmed that he personally witnessed ***precisely*** *what Plaintiff alleges in this matter*.

Specifically, Mr. Baucum testified as to his FBI credentials and about an instance in which he personally observed that Plaintiff was followed by a black SUV at a high rate of speed, weaving through traffic and a separate occasion where he observed in-person surveillance and eavesdropping.

- As Plaintiff represented to this Court, Mr. Baucum testified that he ***still holds FBI credentials*** and is I am the "special government employee for the federal government.  I am a strategic engagement advisor for the private sector of the Federal Bureau of Investigations." **Exhibit P**, p. 381:10-13.

15

- Mr. Baucum "had the training of DSAC, the Domestic Security Alliance Counsel. And I also lecture in that regard, and *I lecture at Quantico once or twice or year* on that detection. *Id.* at 381:17-20.

Additionally, as Plaintiff represented to the Court in his pleadings, Mr. Baucum confirmed the in-person surveillance and stalking by vehicle referenced in his Complaints. *See* Doc. 114, Attachment #1, ¶119(a) & (b).

Q. Thank you. And yes.  Have you had occasion to observe -- I don't want you to testify about anything I've ever said – observe whether or not I've been surveilled?

A. *I have.*

Q. (By Mr. Grant) Can you explain to Judge Hilton what you observed?

A. Well, part of our conversations involved you felt like somebody was watching you, following you, that kind of thing. I had occasion to be involved in that many times.
One time after we met, I wanted to know rather it is or is not. I left. I waited. I waited for you to go by. And then knowing where you were going, I took a shortcut to another location waiting for you to come by. I noticed you go by. And so I was going to get in
behind you and see if anything was going on. And *there was a black SUV that was following you very closely, pretty high rate of speed, weaving in and out of traffic. There's no question there was something going on there.*

…

Q. (By Mr. Grant) What about any other instances? Has there ever been any instances where anyone else was nearby that you can think of?

A. Well, I believe it was that same night. We left where we were at, went to another location, sat down. And there was an older man and woman that had walked in and sat close to us. There was a frequent eye contact or checking there for a while. *Certainly, consisted[sic]with what I've known somebody trying to eavesdrop or listen.*

*Id.* at p. 386:10-19.

Further, Mr. Baucum testified regarding Plaintiff's litigation role that provides this Court context for his aggressive pleading and briefing style:

Q. (By Mr. Grant) Outside counsel have various roles. When I worked for you, what role did I fill?

16

A.  Mr. Grant was not someone that I asked for when I felt like I was headed in a direction for resolution. Mr. Grant was the individual I would ask for when I knew I needed an ex parte TRO; when I knew I needed some sanctions; some pleadings struck; some permanent injunctions. Those are the times when I asked for Mr. Grant's assistance in the case.

…

Q.  And based on those observations, how did I perform in that regard?

A.  Well, I was very happy with that. I don't remember a time that I was unhappy with that. But, again, *I would not have called you if I needed to resolve something with a reasonable person*.

Id. at p. 389:14-19 (emphasis added).

There can be little doubt that Plaintiff's allegations of stalking and surveillance are not only "plausible" but, in fact, they are true.

## I.  Plaintiff Fled The United States Out Of Fear For His Personal Safety.

As the Court is partially aware based upon its reference on page 2 of the Dismissal Order, Plaintiff Grant sought refuge and safety in a foreign Country within 2 hours of the completion of his filing his initial Petition for Writ of Mandamus/Prohibition in the Missouri Court of Appeals for the Eastern District of Missouri.[12]

Although this Court acknowledges reading his Missouri Supreme Court case *Grant v. Hilton*, SC101040, it does not realize the importance of those filings.

First, the Court cites a reference in which the Court states that "summarily denying Grant's writ petition, which alleged that Grant was 'hiding in a foreign country' because Judge Hilton was trying to 'assassinate' him." Dismissal Order, p. 2 (citing *Grant v. Ex Rel Hilton*, SC0101040). Once again, the Court is mistaken in its interpretation of Plaintiff's filing.

---

[12] Plaintiff hereby produces evidence of all of these events. *See* **Exhibit A**, ¶¶25-28 and Exhibits 2 and 3 thereto.

Plaintiff never thought or alleged that Defendant Hilton *personally* was a threat to him. Instead, Plaintiff was and still is (now to a lesser extent due to the public knowledge of these events) concerned about his personal safety as a result of his exposure of the RICO criminal enterprise at issue in this matter.  **Exhibit A**, ¶¶36-37.

While this Court goes to great lengths to persuade itself that Plaintiff's filing contains a contrived story and was filed in bad faith, the Court never once addresses the possibility that the allegations, supported by ample evidence, are true.  If it did, it would see that Plaintiff Grant's reporting of Defendant Hilton to the DOJ, his filing of his initial writ from a hotel next to O'Hare Airport less than 2 hours from his international flight and his seeking refuge in a foreign country along with the rest of the mountain of evidence, demonstrates a person not only acting in good faith, but as licensed attorney that knows precisely the danger he is in by exposing the very real judicial corruption at issue in this matter.

There is no reason that Plaintiff Grant would have driven to Chicago, Illinois from his home in St. Louis County, Missouri other than a good faith belief that he was in potential danger if he filed his Petition for Writ in St. Louis in conjunction with a flight out of Lambert International Airport.

The Court does not address how seeking refuge in a foreign country and seeking the Missouri Supreme Court's assistance with a safe return is consistent with a litigant who has contrived the entire scenario yet to come and would, in bad faith, 4 months later file a Civil RICO and Civil Rights Act complaint in this district courthouse before Defendant Hilton issued

his post-trial judgment.   The corroborating evidence of a ***good faith*** filing is simply overwhelming.[13]

Plaintiff suggests that this Court has no way of understanding the mental toll and damage that was inflicted by gang-stalking, surveillance, etc. for a period of approximately 1 month. That is the very reason the gang stalking and surveillance in broad daylight is used.  It amounts to relentless intimidation by a criminal enterprise with almost endless resources.[14]

Plaintiff did not just hide in a foreign country for a short time; he paid a huge personal sum to stay in hotels for 29 days – until he felt that he had exposed the corruption in a wide enough fashion to safely return.[15]

There can be no doubt that Plaintiff's actions demonstrate only a good faith belief that he was and continues to be a victim of an existing RICO criminal enterprise.

### J. Plaintiff's Ongoing Investigation Continues to Bear Fruit – Additional Victims, Witnesses and Evidence.

As the proposed Second Amended Complaint filed on December 23, 2025, Plaintiff's ongoing investigation has uncovered even more evidence of victims and the pattern used by the RICO enterprise.  For example, Plaintiff has identified and alleged the enterprise's involvement in St. Louis County probate adult conservatorships and guardian ad litem matters and its scheme to defraud victims out of assets and funds in those matters.  Doc. 114, Attachment #1 at ¶121.

---

[13] Again, Plaintiff reported Defendant Hilton to the United States Department of Justice on February 3, 2025, before he finally exposed his role in the enterprise on February 7, 2025, and indicated he was not an ally after all.  *See* **Exhibit Q**, Court Docket for *Grant v. Copeland*, Case No. 12-SL-DR03959-02, dated May 20, 2026.

[14] Plaintiff urges the Court to now consider the implications of the fact that Plaintiff's allegations are true - or at least might be.  The conspiracy once thought to be too extensive to be true can wield a huge hammer.  In reality, no one can actually imagine the impact of the RICO enterprise's actions in this matter.

[15] In January 2025, Plaintiff hired and paid for a private investigator to assist in his very preliminary investigation of the criminal enterprise and its participants.  **Exhibit A, ¶47.**

As noted above, Plaintiff continues to obtain more ex parte judicial communications.  He has also identified a litany of additional victims who he has personally interviewed.  To the extent any Court should deem more EXAMPLE cases dated between Plaintiff's case and the "Buying Future Litigation" and "Ex Parte Judicial Communications" matter, Plaintiff can provide them.

Plaintiff notes that his proposed Second Amended Complaint not only identifies the mortgage company at issue, but Plaintiff has also identified the private investigative entity known to provide surveillance for family court matters such as what took place with Plaintiff in February and March 2025.  Plaintiff even sent these entities Document Preservation Demand letters.  **Exhibits R and S.**  These actions are entirely *inconsistent* with a litigant acting in bad faith.

1. **Plaintiff Possesses Proof of the Judicial Refinancing Referenced in his Proposed Amended Complaint.**

As Plaintiff keeps repeating, he has evidence to support all of his allegations.  For example, Plaintiff has the proof of the real estate records to prove that the now-retired St. Louis County judge did, in fact, refinance his property approximately 20 times in 20 years.  **Exhibit T.**

Plaintiff did not just select this judge out of a hat.  He was caught in ex parte judicial communications surrounding the exposure of corrupt St. Louis County guardians ad litems and their coordination to uncover a "mole" that was leaking proof that the St. Louis County Family Court and its guardians ad litem were, indeed, corrupt:



**Exhibit U,** full ex parte email from Judge Burton (excerpt with emphasis added above).

As the email illustrates, Judge Burton was having ex parte judicial communications and proposed a private ex parte judicial meeting he was arranging. *Id.* Further, Judge Burton asked that the recipient, Sarah Pleban, only forward the email to certain GALs and "***and all that you trust …***"[16]  *Id.* (emphasis added).

---

[16] The Court should note that the recipient, Sarah Pleban, is the same individual that refinanced her home at the same mortgage company where Judge Burton and Defendant Fenley refinanced their homes. *See* Dismissal Order, p. 14.  Plaintiff points out that the individual cited as using the suspect mortgage company is the same individual (Sarah Pleban) in the career-ending ex parte emails with Judge Burton. Again, Plaintiff has already sent the mortgage company a document preservation letter.  **Exhibit R.**

21

Not surprisingly, after being caught, judge Burton quickly retired under more than suspicious circumstances.  *See* **Exhibit V.**

### 2.   **Plaintiff has identified a Family Court Expert Therapist Ph.D.** *Whistleblower***!**

Plaintiff continues to investigate the RICO enterprise up through the date of this filing. As one additional and remarkable development, Plaintiff has identified and interviewed a family court appointed therapist expert that is willing to testify in this matter as a whistleblower on other court-appointed therapists that have colluded with the RICO criminal enterprise to provide false opinions in order to prolong St. Louis County Family Court matters.  **Exhibit A**, ¶56.  The court appointed expert holds a Ph.D. and has testified in more than 1,000 cases in the St. Louis Family and Juvenile courts.  *Id.*

The importance of this new development should not be overlooked by this Court.

### K.  **Plaintiff's** *Congressional Candidacy* **and draft House Bill addressing Family Court Corruption and Reform.**

Plaintiff notes that his excruciating experience in the St. Louis Family Court and now in this United States District Court, and overall disappointment in Missouri's judicial system's failure to address the corruption has inspired him to run for Congress.  *See* **Exhibit A**, ¶¶43-44; *see also* www.MattGrantforCongress.org (printed and attached as **Exhibit W**); *see also* https://ballotpedia.org/Matthew_Grant (printed and attached as **Exhibit X**) Specifically, Plaintiff, a lifelong Republican, is running for the 2nd District seat in the United States House of Representatives and will be listed as a candidate on the August 4, 2026, Republican Party Primary voting form.[17]

---

[17] Plaintiff has repeatedly noted that he has no qualms with the Republican party as a whole.  Plaintiff is himself a Republican.  It is the bad apples in the bunch that Plaintiff intends to identify and remove from the basket.

It is unfortunate, but it seems that federal legislation is needed to address the plague of corruption in the family courts of this Country.

### a.  Plaintiff Drafted The CHILD Protection Act of 2027.

Plaintiff Matthew Grant's congressional candidacy includes a new House Bill that he has personally drafted and proposed to Missouri citizens in the 2nd District and beyond.  **Exhibit Y.** Plaintiff's proposed legislation proposes using Congressional control of the government's "purse strings" to motivate the states to address the issue of corruption in Family Courts that are funded in large party by federal grants authorized by Title IV-D of the Social Security Act.  *Id.*

The proposed legislation is appropriately titled the "**CHILD**" Protection Act of 2027 as the acronym **CHILD** stands for **C**orruption **H**idden **I**nside **L**egal **D**ockets.  **Exhibit Y**.  In light of the lack of desire for the Missouri appellate courts or this United States District Court to address the *very real* corruption that pervades the Family Court of the 21st Circuit Court of the State of Missouri, Plaintiff will continue to do everything within his power to put in an end to the cancer that spreads in the 21st Circuit Court for the State of Missouri.  Any amount of research reveals that the corruption in play in the St. Louis County Family Court is not limited to that forum alone.

### L.  The Court's Rule 8 Criticisms of Plaintiff's First Amended Complaint.

#### 1.  Standard Incorporation of Factual Allegations by Reference.

This Court took issue and criticized the fact that Plaintiff Grant utilized a factual background structure and incorporated those factual allegations into each of his causes of action in this matter.  Dismissal Order, p. 8.   Specifically, the Court stated: "Because Grant incorporates by reference 368 paragraphs of allegations into every claim, the Court would have

23

to disentangle his allegations and separate the claims that warrant genuine review from those that do not." *Id.*

The Court's observation is correct, but parties routinely must review these many factual allegations that are incorporated by reference into complaints and petitions.

By way of example, counsel for Defendants Hilton and Greaves, the Missouri Attorney General's Office, for whom Honorable Joshua M. Divine worked immediately prior to his service in this Court, filed a Petition on March 31, 2026, directed at several kratom products sold by many defendants. **Exhibit Z.**

In that case, the Missouri Attorney General's Office utilized the very same approach criticized by this Court and incorporated **56 paragraphs** into Count I:

> VI.   CAUSES OF ACTION
>
> Count I:  Violation of the Missouri Merchandising Practices Act
>
> 57.   Plaintiffs incorporate each allegation set out *supra* as if fully set out herein.

**Exhibit Z**, p. 10.

Later in the *30-page Petition*, the Missouri Attorney General's Office, incorporated **paragraphs 1 through 102** into Count II.

> Count II:  Violation §§ 196.015(1), (4), and 196.105.1, RSMo.
>
> 103.   Plaintiffs incorporate each allegation set out *supra* as if fully set out herein.

**Exhibit Z**, p. 22.

This approach in the *American Shaman* case, required each of the 11 named defendants to review and respond to ***several hundred paragraphs.*** This is a normal litigation approach and undertaking.

24

This Court might conclude that in *American Shaman* the Missouri Attorney General's Office engaged in an improper tactic to: "shift onto the defendant and the court the burden of identifying [his] genuine claims [if any] and determining which of those claims might have legal support." Order of Dismissal, p. 8 (quoting *Sagez v. Glob. Agr. Invs., LLC*, No. 11-CV-3059-DEO, 2015 WL 1647921, at *4 (N.D. Iowa Apr. 14, 2015)) (cleaned up).

In theory, if this Court were presented with the Petition in the *American Shaman* case, it would have sua sponte dismissed it and suggested sanctions.  Of course it would not.  The absurdity of the suggestion reveals the error in this Court's approach to *this* Plaintiff's Complaints.

Clearly, there is nothing improper with the Missouri Attorney General's structure and incorporation of prior factual allegations into each Count. The *American Shaman* Complaint, just like Plaintiff Grant's Proposed Second Amended Complaint, reflects how *trial lawyers* practice law every single day in this state.

Moreover, the Missouri Attorney General's Petition in *American Shaman* is also notable that it commences with an "Introduction" and an opening allegation stating:

> "***It's a drug pusher cliché:  The first hit is free.*** It's also American Shaman's business model.  But unlike a street dealer, American Shaman and its offshoots operate on an industrial scale, in the open, on the fiction that the products they sell are legal dietary supplements.  This is false.  The drugs they peddle are deadly opioids banned by state and federal law."

**Exhibit Z**, ¶1.

In this case, the Court has taken issue with Plaintiff Grant's First Amended Complaint that is "filled with extraneous commentary and musings such as "[p]laintiff foolishly fell for Defendant Hilton's act, hook line and sinker," and "[p]laintiff was dumbfounded but it all makes sense now.' Order of Dismissal, p. 7 (citations omitted).

25

Here again, this Court would presumably sua sponte dismiss the Missouri Attorney General's Petition in *American Shahman* for including as its *opening allegation* the musing that "***It's a drug pusher cliché:  The first hit is free.***"  **Exhibit Z**, p. 1.  Of course, it would not.

The reality is that trial lawyers that practice in this Court and in the State of Missouri understand such "extraneous" "musings" are routine.[18]

**M. The Court's Finding Of *Implausibility* Is Belied By Other Criminal Schemes.**

This Court concludes that "[i]t is highly unlikely that 70 people, including sitting state judges, are involved in a RICO scheme designed to defraud citizens of their money by prolonging litigation in St. Louis state courts."  Dismissal Order, p. 10.

As discussed below, the citizens of several states would have irreparably harmed had this Court reviewed and considered the allegations in several past cases.  Fortunately, the preceding judges took a different and the proper view on "plausibility."

**1.   The Implausible? – "Operation Greylord" Involved <u>92 </u>Court Employees.**

As the FBI itself describes, Operation Greylord was "mammoth" and was "one of the most important cases in the annals of public corruption investigations in the United States."[19]

https://www.fbi.gov/history/cases-and-criminals/operation-greylord

As the FBI summarizes, "**<u>92 officials</u>** were indicted, including **<u>17 judges</u>**, 48 lawyers, eight policemen, 10 deputy sheriffs, eight court officials, and one state legislator. Nearly all were

---

[18] Notably, the *American Shaman* Petition lacks any allegation that any of the Kratom products at issue are *actually* offered as a "hit" for "free."  *See generally* **Exhibit Z**.  Again, each litigant has their own drafting style.  That variability in style is inherent in our legal system and is entirely appropriate.

[19] Here, Plaintiff has reported this RICO Enterprise to the Department of Justice.  It may be that an investigation is underway.  Maybe not.  Thankfully, Congress saw fit to allow private individuals to pursue civil RICO claims in situations where the local prosecuting authorities fail to act.  The Court incorrectly interprets the DOJ's failure to act as of this date as complete and total *exoneration*.  It is not.

convicted, most of them pleading guilty." *Id.* In addition to the *17 judges*, that case involved a deputy traffic clerk who served as the "bagman," policemen, deputy sheriffs, *8 court officials*, and 1 state legislator.

The Cook County scheme involved *17 sitting judges*, and this matter involves only *2 sitting judges* at this time.[20]

The FBI's caution in seems particularly applicable here, where it noted that "[h]istorically, of course, these cases were considered local matters. A county court clerk taking bribes? Let the county handle it." *Id.* (emphasis added).

Fortunately, for the residents of Cook County, the FBI and Department of Justice refused to take that "historical" approach and instead, it conducted the "mammoth" investigation that led to the *92 indictments*.

In theory, if the facts of Operation Greylord were presented to this Court in a civil RICO Complaint, this Court would find it "implausible," dismiss it with prejudice, and threaten the attorney signing the Complaint with sanctions. What an unfortunate result that would have been.

This Court fails to realize that almost all government corruption conspiracies could be argued as "implausible" *until they are proven*. The Federal Rules of Civil Procedure and mandatory precedent allow for these conspiracies to be pleaded and proven in the discovery phase.

### 2. Implausible?  The Cash for Kids scandal in Pennsylvania.

In 2009, two (2) sitting state family/juvenile court judges "were exposed for receiving kickbacks in return for harsh adjudications on juvenile delinquents to increase

---

[20] Plaintiff has never alleged the number of judges he has information to suggest are involved in the RICO Enterprise. Plaintiff suggested the number of 70 as his belief as to the total number of individuals, of many professions and titles. Doc. 35, ¶238. Plaintiff has never suggested that the RICO Enterprise includes even 1 additional judge not already mentioned.

occupancy at a private prison operated by PA Child Care." *See*

https://en.wikipedia.org/wiki/Kids_for_cash_scandal

The *Kids for Cash* corruption within the Luzerne County Court of the State of Pennsylvania and its family-juvenile division involved "***thousands of children*** in Luzerne County [improperly ordered] to extended stays in private youth detention centers for minor offenses…" *Id.* (emphasis added).

Moreover, the corrupt judges and their co-conspirators engaged in conduct spanning ***at least 9 years***. *Id.*  Here, Plaintiff has presented actual evidence of corruption in St. Louis County spanning ***only 6 years***. *See, e.g.*, Doc. 35 and Doc. 114, Attachment #1.  If the corruption in Luzerne County was kept under wraps for 9 years, certainly the 6-year scheme Plaintiff exposes is *far from* "implausible."

In the Luzerne County *Kids for Cash* matter, the Supreme Court of Pennsylvania took the reins and "overturned hundreds of adjudications of delinquency in Luzerne County" and "the Pennsylvania General Assembly created a commission to investigate juvenile justice problems in Luzerne County."[21]  https://en.wikipedia.org/wiki/Kids_for_cash_scandal.

Hopefully, the Missouri Supreme Court will at some point step up as the Pennsylvanian Supreme Court did and initiate its own public investigation of the known corruption in the St. Louis County Family Court.  Until such time, that may never come, Plaintiff seeks to properly

---

[21] Plaintiff still hopes that the Missouri Supreme Court follows this example and takes active steps to address the corruption that Plaintiff has exposed.  To date, it is known to have done anything to address the situation in the St. Louis County Family Court.

continue to seek to hold these corrupt judicial officers and corrupt lawyers accountable to the fullest extent that he can.[22]

Again, just imagine the future of the ***thousands of children*** in Luzerne County Pennsylvania, had that court applied this Court's "plausibility" standard.  It is beyond scary.

### 3. Implausible?  St. Louis County Corruption – the County Commissioner – Bribery, Mail Fraud and Honest Services Fraud.

This Court may not be aware, but St. Louis County is no stranger to government corruption.  recall the 2019 bribery and involved the St. Louis County Commissioner's engagement in Bribery, Mail Fraud and Depravation of Honest Services.  *See USA v. Stenger*, 4:19-cr-00312 (CDP) Indictment attached hereto as **Exhibit AA**, p. 44 (citing 18 U.S.C. § 1341 (Frauds and Swindles aka Mail Fraud)).

That case involved corruption by a St. Louis County Commissioner that engaged in a scheme to commit Mail Fraud, ***one of the very same predicates*** alleged by Plaintiff in this matter.  *Compare* **Exhibit AA** *with* Doc. 35 and Doc. 114, Attachment #1.

In that St. Louis County corruption matter, Steve Stenger worked with an individual named John Rallo to obtain bribes and payments for government contracts.  Exhibit DD..

As the ***44-page*** indictment of a single defendant alleged:

> The purpose of the scheme and artifice 'was for STEVEN V. STENGER, a public official, to secretly use his official position to enrich himself through soliciting and accepting campaign contributions from John Rallo and his companies, along with other individuals and entities, in exchange for favorable official action, and for John Rallo and other individuals to enrich themselves and their companies by secretly obtaining favorable action for themselves and for their companies, through corrupt means.

> *Id.* at p. 41.

---

[22] When all is said and done, the Missouri Supreme Court will likely be indispesible in addressing corruption within the 21st Circuit of the State of Missouri.  That fact that it has taken no action to date, is no signal of ***complete exoneration*** either.

Once more, if Mr. Stenger's corruption were brought to this Court's attention in a civil Complaint, in theory, this Court would deem it "implausible" and dismiss it with prejudice.  The **44-page** indictment related to one single defendant, if a civil Complaint, might also lead to this Court to order briefing on the issue of sanctions.

### 4.  Former Illinois Governor Rod R. Blogojevich.

If Plaintiff came forward with a civil complaint that alleged that that a state Governor was attempting to sell a seat in the United States Senate, this Court might dismiss it and conclude: "implausible."  Thankfully, that is not the case as former Illinois Governor Rod Blogoivich was held asccountable. *See* https://en.wikipedia.org/wiki/Rod_Blagojevich

In December 2008, Mr. Blogojevich was charged with attempting to sell the empty seat left by President Barak Obama.  Again, despite no one expecting such an extreme scenario, it was **real** and **not implausible**.

### 5.  Wachtell Lipton Rosen & Katz, Latham & Watkins and Goodwin Procter – Alleged Insider Trading – May 2026.

In the event this Court thinks that the examples cited by Plaintiff are dated, Plaintiff refers the Court to the recent *Wachtel* Insider Trading scandal.  *See, e.g.,*

https://news.bloomberglaw.com/business-and-practice/elite-m-a-lawyers-fed-massive-insider-trading-ring-us-alleges

On May 6, 2026, Department of Justice prosecutors unsealed 2 indictments that charge 30 people for involvement in an insider trading ring.  *Id.*

The underlying facts are shocking to the legal community due to the respect and status of the law firms alleged to be *victims* in some manner and the lawyers allegedly involved.[23]  Even

---

[23] The 2025 AM Law 100 rankings were:  Wachtel (#1 in Profits Per Partner), Latham (#2 in Gross Revenue) and Goodwin Proctor (#21 in Gross Revenue).  As an aside, the law firm in which Plaintiff was

despite the Department of Justice's indictment, the scenario charged would be deemed

"**implausible**" if presented to this Court as a civil RICO claim.

It is worth noting that the insider trading indictment relating to these individuals *spans 85 pages*, longer than Plaintiff's First Amended Complaint (79 pages) and the proposed Second Amended Complaint (78 pages). *See* **Exhibit BB.** In RICO and other similar cases the proper pleading of relevant facts consumes more pages than might be found in a run-of-the-mill civil complaint.

Moreover, in the Wachtel insider trading case, the federal government *incorporated 360 paragraphs by reference* in Count One alone:[24]

COUNT ONE
Securities Fraud Conspiracy
(18 U.S.C. § 1349)

The Grand Jury charges:

361.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 360 of this Indictment.

*Id.* at p. 65.

---

an equity litigation partner and worked for 21 years and as recent as July 2023, Husch Blackwell LLP, was ranked #78.

[24] This Court stated:

> For example, he appears to provide ten different potential predicate acts for his RICO count, *id.* ¶ 375, with facts for each sprinkled throughout the preceding ***368 paragraphs***." Dismissal Order, p. 7 (emphasis added).

Surely, the judge and lawyers in the Wachtell matter are not "… like pigs, hunting for truffles buried in briefs." *Id.* at p. 7 (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (addressing a "brief [that] presents a passel of other arguments" and finding the United States waived any argument that Dunkel failed to preserve an argument on appeal to the United States Supreme Court). This matter does not involve the review of any Supreme Court briefing as was at issue in *Dunkel*, or any briefing at all, and that quote was in the context of whether an issue was waived on appeal to the United States Supreme Court.

The federal government did not stop this well-accepted approach with just Count I. The federal government incorporated all prior paragraphs in Counts II through X. *Id.* Per this Court's equation and objection, the judge, the criminal defendants and counsel in the Wachtell insider trading matter must review ***3,600+ paragraphs***.[25] *See* Dismissal Order, p. 7.

### 6. December 2025, $2,000.000.00 Family Court Legal Malpractice Jury Verdict.

In December 2025, a St. Louis County jury returned a legal malpractice verdict in the amount of $2,000.000.00 based upon legal practice committed in the St. Louis County Family Court.[26] *See* **Exhibit CC,** Judgment in *Fritts v. Cordell and Cordell P.C., et al.,* Case No. 23SL-CC00624. In the *Fritts* case, the client at issue ***claimed that he was the victim of St. Louis County Family Court corruption***. *See* https://substack.com/home/post/p-198581289 ("Joel Fritts the Conspiracy Theorist").

It is beyond notable that Defendant Brodie in this matter, was counsel of record in *Fritts*, and who testified on behalf of the defense in that case, offered testimony regarding the standard of care for attorneys in St. Louis County Family Court cases that was ***rejected*** by the *Fritts* jury. The St. Louis County jury's verdict in *Fritts*, that withstood a Motion for JNOV, was in the amount of **Two-Million Dollars and No/100 ($2,000,000.00)**. *Id.*

The jury's verdict reflects the very "plausible" situation where corruption is alleged to exist and plagues the St. Louis County Family Court.

---

[25] The Court ignores Plaintiff's proposed Second Amended Complaint filed on December 23, 2025. *See* Doc. 114, Attachment #1. Its allegations and included evidence are even more damning.

[26] Claims of corruption within the St. Louis Family Court are not rare and have been the subject of journalists' investigations. There is a complete catalogue of one reporter's investigation of the corruption within the St. Louis County Family Court available online. *See* https://pjmedia.com/megan-fox/2021/05/17/missouri-family-court-corruption-investigation-complete-catalog-n1447471. Ms. Fox is not the only journalist to report on corruption in the St. Louis Family Court. *See, e.g.* https://theeprovocateur.blogspot.com/2021/02/deep-state-in-missouri-reveals-itself.html

**N. Plaintiff Does *Not* Allege That President Trump Is Involved In The Corruption He Has Exposed.[27]**

This Court has stated that Plaintiff claims that the President of the United States Donald J. Trump is involved in the criminal enterprise and corruption identified in Plaintiff's complaints. *See* Dismissal Order, p. 3 (citing ECF 90-2 at 6; ECF 90 at 8, 10).

In support of its claim, the Court first cites page 6 of Docket Entry 90-2.  *Id.*  Plaintiff has reviewed not only the cited page, but also the entire brief and he can locate no reference to support this Court's representation that Plaintiff Grant has alleged that "Donald J. Trump is involved in the criminal enterprise and corruption identified in Plaintiff's complaints."  Indeed, the word "President" and "Trump" appear nowhere in that filing.

Next, the Court cites Docket Entry 90 at pages 8 and 10.  Page 8 of the filing at issue does indeed include the following passage:

> In contrast, Plaintiffs' statement was based upon the, at least, inherent ***appearance of impropriety*** of a sitting Eastern District judge appointed by a Republican president presiding over a case in which Plaintiffs allege ***the local Republican political machine*** contains corrupt individuals that routinely impact the local appointment of both state and federal judges.

Doc. 90, p. 8 (emphasis added).

Again, the excerpt above ***does not*** suggest that President Donald J. Trump is involved in anything.  The language upon which the Court relies references certain corrupt individuals in the "local Republican political machine" and the associated appearance of impropriety.

No fair reading of the excerpt above supports this Court's curious and unsupported interpretation.

---

[27] The court also took issue with Plaintiff's inclusion of a state court claim of conversion.  Dismissal Order, p. 7 ("Why, for example, is it relevant that his sister allegedly removed his wine collection?").  The answer to the Court's is simple.  "It is well established that claim-splitting is discouraged. All claims must be brought together, and cannot be parsed out to be heard by different courts." *Sparkman Learning Ctr. v. Arkansas Dep't of Hum. Servs.,* 775 F.3d 993, 1000 (8th Cir. 2014) (citation omitted).

Next, this Court cites page 10 of the same memorandum (Doc. 90) which actually states:

> A reasonable person would not only take into account Plaintiffs' allegations directed to Republican powerbrokers involved in state and *federal judicial assignments*, that same reasonable person would note that less than 2 months after Plaintiffs' revelation and exposure of corruption, Republican President Donald J. Trump nominated Honorable Joshua M. Divine, a public servant of the State of Missouri, *an original defendant in this case*.

Doc. 90, p. 10 (emphasis in original).

Once again, no fair reading or stretch of reasonable imagination could support the interpretation that Plaintiff alleges President Donald J. Trump had any personal involvement in the selection of his Honor for a United States District Judge to be seated in the State of Missouri.[28]  The claim is wholly unsupported.  To be clear, Plaintiff's allegations are directed at powerbrokers located in St. Louis, Missouri and the *appearance of impropriety* issues in play in light of, among other things, this matter being removed from Judge Autrey's docket and transferred to this Court. These are some of the same powerbrokers with whom Plaintiff has interacted during his professional career.

The Court has misinterpreted Plaintiff's *actual* statements.

**O. The Law Relating To Guardians Ad Litem And Actual § 1983 Liability Is Quite Different Than The Description In This Court's Order.**

1. Defendant Fenley is a "state actor" for purposes of § 1983 due to his alleged conspiracy with two state actors - Defendant, Commissioner Mary W. Greaves, and Defendant, Presiding Judge Bruce F. Hilton.

    i.      This Court's Reliance on *Collins v. Bern*.

---

[28] Plaintiff has no delusions of grandeur.  That said, Plaintiff did report this matter to the office of the United States Attorney General, Pamela Bondi.  Plaintiff does not allege that Ms. Bondi had or has any actual knowledge of Plaintiff's submission.  Again, **good faith** overflows from each of Plaintiff's actions intended to cease the corruption and criminal enterprise Plaintiff has identified and for which he possesses a *mountain* of evidence.

In its Dismissal Order, the Court summarily concludes that Plaintiff's § 1983 claim against Defendant and former guardian ad litem John Fenley does not state a claim and it cites an unpublished decision involving summary judgment from the District of South Dakota in *Collins v. Bern*, No. CIV. 04-4182-KES, 2006 WL 8453547, at *3 (D.S.D. Aug. 30, 2006) (collecting cases).

This Court states categorically that "[a] guardian ad litem does not act 'under color of state law.'" Dismissal Order, P. 12. However, the allegations made by Plaintiff demonstrate why the Court's statement of the applicable law is incorrect.

The *Collins* case involved that court's application of the Indian Child Welfare Act (ICWA) and § 1983 as applied to a public defender and state's attorney general. *Id.* at *1. That case **did not even involve** a guardian ad litem. *Id.*

However, the Collins court *did* cite 3 cases that addressed the interplay of guardians ad litem and § 1983. *Id.* at *3 (citing *Bolin v. Chavez*, 2001 WL 1585758, *3 (10th Cir. 2001); *Malachowski v. City of Keene*, 787 F.2d 704,710 (1st Cir. 1986) and *Meeker v. Kercher*, 782 F.2d 153, 154 (10th Cir. 1986)).

        ii.     The cases cited by the Court in *Collins v. Bern*.

        a.  *Bolin v. Chavez.*

First, the *Bolin* decision and court addressed an inmate's claim directed to a guardian ad litem in a situation where the court found that "[i]ndeed, there is nothing in the record that in any way suggests that Ross was acting on behalf of the State of Colorado when she allegedly interfered with the grievance proceeding." *Id.* at *3.

Importantly, the *Bolin* court next held "[e]qually as important, **Bolin is not claiming** that Ross's alleged conduct in interfering with the grievance proceeding *caused any adverse impact in*

35

*the custody proceedings **or in any way contributed to the deprivations of his constitutional rights that allegedly occurred therein**.*" *Id.* at *3 (emphasis added).  Here, Plaintiff clearly alleges that Defendant Fenley contributed to the deprivation of his and his children's constitutional rights.  *See, e.g.,* Doc. 114, Attachment #1 (SAC), ¶¶188-190, 239-41, 253-54, 256, 284-86 and 305; *see also* **Exhibit A**, ¶23.  More importantly, Plaintiff here **does** allege that Defendant Fenley acted in a criminal conspiracy to deprive his constitutional rights with s**tate actors** Defendant Hilton and Defendant Greaves. *Id.*

Because the *Bolin* case did not even include allegations that the guardian violated the plaintiff's constitutional rights, it has no application as in this matter.

b.  *Malachowski v. City of Keene.*

Next, the *Collins* case, that did not even involve a guardian ad litem, cited *Malachowski v. City of Keene*, 787 F.2d 704, 710 (1st Cir. 1986).  The *Malchowski* case involved a juvenile delinquency proceeding and it is quite instructive.  Plaintiff urges this Court to review the decision cited within the decision it quoted.

While the *Malchowski* case addressed a court-appointed attorney, the United States Court of Appeals for the First Circuit emphasized that:

> "[a]ppellants do allege that appellees Park and Y.S.I. **acted in concert with state officials to deprive appellants of constitutional rights**, *a factor which **would satisfy the "color of state law" requirement**" but it held that the complaint at issue failed to "include sufficient factual detail to defeat a motion to dismiss."

*Id.* at 711 (citing *McGillicuddy v. Clements,* 746 F.2d 76 (1st Cir. 1984) (emphasis added).

The relevant standard that this Court implies does not exist can be found on page 711 in the *Malchowski* case.  In sum, the First Circuit Court of Appeals held that section 1983 claims do survive if they allege that the guardian ad litem "**acted in concert with state officials** to deprive [a party] of constitutional rights." *Id.*

36

Here, Plaintiff expressly alleges that Defendant Fenley acted in concert with two state officials – Defendant Judge Hilton and Defendant Commissioner Greaves.  As such, Plaintiff's Count II states a claim against Defendant Fenley upon which relief can be granted.

A further review of the First Circuit's decision in the case cited, *McGillicuddy v. Clement,* 746 F.2d 76 (1st Cir. 1984), is similarly instructive.  Contrary to this Court's statement of the law, the First Circuit Court of Appeals again held that "Plaintiff's attempt to find the requisite state action in a ***conspiracy between the accounting firm and the state officials*** who authorized the financial review of NHTA ***has more potential***, but the allegations as framed in his complaint are ***factually insufficient*** in light of the standard we observe." *Id.* at 77.

As such, just like *Malchowski*, the *McGillicudy* supports a finding that Plaintiff *does* state a viable claim against Defendant Fenley due to his conspiracy with 2 undoubtedly state actors – Defendant Judge Hilton and Defendant Commissioner Greaves.

c.   *Meeker v. Kercher.*

Finally, the *Collins* decision cited by this Court itself cites *Meeker v. Kercher*, 782 F.2d 153, 154 (10th Cir. 1986).  *Collins* at. *3.

The *Meeker* case lacked any allegations of a conspiracy between the guardian ad litem in that case and any state actor, and it merely recognized the default rule that, absent factual allegations of a conspiracy with or acting in concert with a state actor, a guardian ad litem is not typically a viable defendant in a § 1983 claim.  *Id.  Meeker* adds nothing to the substantive analysis in this matter and does not contradict the correct statement of the law in *Malchowski* and *McGillicudy*

iii.   Additional Cases That Provide Proper Guidance Include *Thomas S. v. Morrow,* 781 F.2d 367 (4th Cir. 1986) and *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982).

In *Thomas S. v. Morrow*, the Fourth Circuit Court of Appeals addressed the detailed and nuanced manner in which § 1983 claims against a Guardian Ad Litem such as Defendant Fenley must be evaluated.  781 F.2d 367.  The *Morrow* court affirmed the district court's grant of summary judgment **against** a state court-appointed guardian.  *Id.* at 369.

The Fourth Circuit held "**[w]e find that jurisdiction over the guardian is proper under 42 U.S.C. § 1983**." *Id.* at 377 (emphasis added).  The Court applied the very analysis that this Court should apply in this matter *vis-a-vis* Defendant Fenley as mandated by the United States Supreme Court in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982).

In *Lugar*, "the Court explained that 'conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State.'  The Court then outlined a **two-part test** for determining whether a defendant's acts may be attributed to the state." *Morrow* at 377 (discussing *Lugar*).

 The first component of the United States Supreme Court's *Lugar* test for the "under color of state law" requirement of § 1983, is satisfied if the deprivation is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by *a person for whom the State is responsible*." Here, as recognized by the First Circuit in *Malchowski* and *McGillicudy*, Plaintiff alleges that the 2 state actors – a state court judge and a state court commissioner – colluded and conspired with a guardian ad litem to deprive Plaintiff and his children of their federal, constitutional rights.  *See, e.g.,* Doc. 114, Attachment #1 (SAC), ¶¶188-190, 239-41, 253-54, 256, 284-86 and 305; *see also* **Exhibit A**, ¶23.

The second component of the *Lugar* test of a cause of action under § 1983 inquires whether the defendant:

38

'may fairly be said to be a state actor.'  In this case the guardian is properly characterized as a state actor because "**he has acted together with or has obtained significant aid from state officials**....

*Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753 (internal citation omitted) (emphasis added).

As the case relied upon by this Court recognizes and as the United States Supreme Court held in *Lugar*, there is no blanket rule that "Defendant Fenley, the guardian ad litem, also cannot be sued for violating § 1983. A guardian ad litem does not act 'under color of state law.'" Dismissal Order, p. 12 (citation omitted).  The Court's statement of the law directly contradicts the holding of the United States Supreme Court.

The law is clear that Plaintiff has stated a § 1983 claim against Defendant Fenley as recognized by *Malchowski* and *McGillicudy,* and as confirmed by the application of the *Lugar* test.

### P.  Defendants' Precedent Relating to Sanctions is Inapplicable.

As a brief discussion of the caselaw cited by Defendants, none of the cases cited are analogous to this situation and none supports the award of sanctions.  Doc. 132, pp. 1-2 (citing *Chambers v. NASCO, Inc*., 501 U.S. 32, 45, 111 S. Ct. 2123, 2133 (1991)); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766-67, 100 S. Ct. 2455 (1980) and *Willhite v. Collins*, 459 F.3d 866, 870 (8th Cir. 2006)).

In *Chambers*, the Supreme Court addressed a rare situation in which the sanctioned party "(1) attempted to deprive the court of jurisdiction by acts of fraud, nearly all of which were performed outside the confines of the court, (2) filed false and frivolous pleadings, and (3) "attempted, by other tactics of delay, oppression, harassment and massive expense to reduce [NASCO] to exhausted compliance."  501 U.S. at 32.  The Court held that "[t]he District Court

39

did not abuse its discretion in resorting to the inherent power in the circumstances of this case." *Id.* at 33 (emphasis added).

In that case, the sanctioned party filed *false* papers that did not become apparent until after the trial on the merits. *Id.* Further, it was clear that the party had engaged in "fraud he perpetrated on the court" and "bad faith he displayed toward both NASCO and the court throughout the litigation." *Id.* at 34.

"Chambers received repeated timely warnings both from NASCO and the court that his conduct was sanctionable." *Id.* "Chambers himself made a swift conclusion to the litigation by means of summary judgment impossible by continuing to assert that material factual disputes existed." *Id.*

Further, the court held that Chambers and his attorney "emasculated and frustrated the purposes of these rules and the powers of [the District] Court by utilizing [notice of a TRO hearing] to prevent NASCO's access to the remedy of specific performance." *Id.* at 36.

Chambers and his attorney took the extreme step to, despite notice of a TRO hearing "the pair acted to place the properties at issue beyond the reach of the District Court by means of the Louisiana Public Records Doctrine." *Id.* The individuals created a trust, transferred properties via warranty deed, and falsely represented that the purchase price had been paid. *Id.*

Moreover, Chambers' attorney participated in a call with the Court in which, "[d]espite the judge's queries concerning the possibility that CTR was negotiating to sell the properties to a third person, Gray *made no mention of the recordation of the deeds earlier that morning*." *Id.* at 37 (emphasis added). The attorney, Gray, "admitted that he had intentionally withheld the information from the court." *Id.* The behavior was so extreme that "the District Judge warned that Gray's and Chambers' conduct had been ***unethical***." *Id.*

40

Next, Chambers "in defiance of the preliminary injunction, [] refused to allow NASCO to inspect CTR's corporate records." *Id.* at 38.  Thereafter, as a result of civil contempt proceedings, Chambers was personally assessed a $25,000.00 fine.  *Id.*

Not to be outdone, even after being advised of the unethical conduct, the violation of the injunction, refusal to allow inspection of documents, and a $25,000.00 fine, Chambers proceeded with "a series of meritless motions and pleadings and delaying actions" that "triggered further warnings from the court."  *Id.*

Realizing that Chambers could not be trusted, the district court sua sponte called a status conference and ordered the cancellation of 2 unnecessary depositions.  *Id.*  After all of this blatant misconduct, "the District Judge again warned counsel that further misconduct would not be tolerated."  *Id.*

Further misconduct took place in an alarming fashion as after trial and before judgment Chambers tried to do an end-around of the looming judgment and he sought permission from the FCC to build a new transmission tower that would have rendered the purchase agreement that he was attempting to avoid "meaningless."  *Id.*  It was not until sanctions were threatened that Chambers withdrew the FCC application.  *Id.*

Chambers still would not respect the court's jurisdiction. He continued undeterred.  Next, he "convinced CTR officials to file formal oppositions to NASCO's pending application for FCC approval of the transfer of the station's license, ***in contravention of both the District Court's injunctive orders and its judgment on the merits***."  Id. at 39.  More sanctions were threatened and Chambers then arranged for the violative oppositions were withdrawn.  Id.

41

Chambers still was not done.  Next, Chambers refused to arrange the closing of the court-ordered sale."  *Id.*  The Court held a hearing, and it warned Chambers yet again that further sanctionable conduct would not be tolerated.  *Id.*

Chambers still did not stop.  During a recess in the hearing, Chambers "***without notice to the court or NASCO***, removed from service at the station all of the equipment at issue, ***forcing the District Court to order*** that the equipment be returned to service."  *Id.* (emphasis added).

Next, the Court of Appeals deemed Chambers' appeal of the trial court's judgment "frivolous."  *Id.* at 40.  The Court of Appeals "imposed appellate sanctions in the form of attorney's fees and double costs, pursuant to Federal Rule of Appellate Procedure 38, and remanded the case to the District Court with orders to fix the amount of appellate sanctions and to determine whether further sanctions should be imposed for the manner in which the litigation had been conducted."  *Id.*

On remand, the district court "imposed sanctions against Chambers in the form of attorney's fees and expenses totaling $996,644.65, which represented the entire amount of NASCO's litigation costs paid to its attorneys."  *Id.*

The court rejected Chambers' claim of reliance on advice of counsel and labeled him a "the strategist" behind the ongoing sanctionable scheme.  *Id.*  The district court found that Chambers had engaged in "attempts to deprive the Court of jurisdiction, ***fraud***, ***misleading*** and ***lying to the Court***."  *Id.* (emphasis added).  Chambers did not accept the sanctions and instead appealed them first to the Court of Appeals and then to the United States Supreme Court.

In sum, the Supreme Court affirmed the inherent powers of the district courts to enter sanctions in the situation before it and it affirmed Chambers' well-deserved sanctions.  Id.

42

The court stated that the sanctions were proper and were imposed "for the fraud he perpetrated on the court and the bad faith he displayed toward both his adversary and the court throughout the course of the litigation." *Id.* at 54.

The *Chambers* court noted that the sanctioned party's actions were "part of [a] ***sordid scheme*** of deliberate misuse of the judicial process" designed 'to defeat NASCO's claim by harassment, repeated and endless delay, mountainous expense and waste of financial resources.'" *Id.* at 56 (emphasis added).

Finally, the Supreme Court rejected "Chambers challenges [to] the District Court's imposition of sanctions for conduct before other tribunals, including the FCC, the Court of Appeals, and this Court, asserting that a court may sanction only conduct occurring in its presence." *Id.* at 57. Lastly, the Court noted that the district court "specifically held" that the sanctions were caused by "solely the relentless, repeated fraudulent and ***brazenly unethical efforts*** of Chambers." *Id.* at 58 (emphasis added).

### 1. This Case Has Nothing In Common With *Chambers.*

This case has no resemblance to *any* of the conduct at issue in *Chambers*.[29] In this case, Plaintiff took no action to deprive this Court of any jurisdiction, did not violate any orders and did not lie to the court.

---

[29] Defendants also rely upon *Willhite v. Collins,* 459 F.3d 866 (8th Cir. 2006). The Eighth Circuit has already limited the application of *Willhite*. As it noted in *C.H. Robinson Worldwide, Inc. v. Lobrano:*
> And *Willhite* illustrates a far more obvious and egregious ***disregard of res judicata***, where an attorney 'and his clients had subjected the defendants to repeated litigation over ***matters that ha[d] been finally adjudicated***'—***commencing a fifth lawsuit on the same subject matter***."

*C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 767 (8th Cir. 2012) (quoting *Willhite*, 459 F.3d at 868 n. 1, 870 (internal quotation omitted)) (affirming denial of sanctions). Just like *Chambers*, the *Willhite* decision has no application to the facts of this case that involve the honest pursuit of judicial corruption by a member of the bar.

In contrast, each of Plaintiff's representations regarding his pre-trial investigation and evidence in his possession are proven to be true. Here, Plaintiff narrowed his Complaint and included extensive and additional amount of the evidence upon which he relies that is also proven to be true. *See* discussion *supra.*

The Senior Judge appointed by the Missouri Supreme Court has already ruled that Plaintiff "**sincerely believes**" his allegations, and that is objectively true by any stretch of the imagination. The lengths to which he has gone, the fear he has endured, and the personal expense Plaintiff has incurred prove his actions are undoubtedly in ***good faith***.

Plaintiff is well-aware that his allegations are *scandalous* and are directed at two sitting jurists, however, the corrupt conduct at issue is true and it must be stopped.

No court or prosecuting authority has stepped up to interfere with the ongoing harm to minor children that takes place daily in the St. Louis Family Court. Plaintiff believes in his oath and he continues to sacrifice, suffer unjust retaliation all because he seeks to bring the public's trust back to the 21st Circuit Court of the State of Missouri.

Plaintiff's actions are not similar to anything in *Chambers* and the legal professional will be much improved if others step up to tackle blatant corruption where it is found just as Plaintiff has done.

It is unclear how Plaintiff has drawn this Court's extreme ire, but he assures this Court that the corruption is real and he is making his best efforts to stop it. Business as usual, including the scheming and ex parte judicial communications that are 'par for the course' in the St. Louis Family Court simply cannot be allowed to continue.

Plaintiff is well-aware that there are others, particularly in the arena of family court, that so complain of "sour grapes." Moreover, there are parents that complain about losing custody of

44

their children where it is entirely appropriate and in the best interests of the child.  This case does not involve either scenario.

Plaintiff does not ask this Court to change his custody situation or otherwise change the any of the state court's rulings.  This case is about badly needed court reform.  This case is about protecting the next 6 years of children that will inevitably find their way to the St. Louis County Family Court.  God willing, Plaintiff's efforts will ultimately succeed and protect them from the current plague in the St. Louis Family Court.

**Q.  Conclusion**

As the foregoing illustrates, this Court has made a significant error in dismissing Plaintiff's Complaint with prejudice.  Not only do Plaintiff's First and proposed Second Amended Complaints comply with Rule 8, but they also comply with Rule 9(b).  The page length upon which this Court relies is not uncommon in complex RICO matters such as this one.

Most importantly, history teaches that this Court's application of the "plausibility" factor is not only incorrect, but that if it was applied in prior very unexpected scenarios, guilty individuals would have avoided accountability.

Pursuant to Rule 60(b), Plaintiff respectfully requests that this Court vacate its Order of Dismissal (Doc. 130), and refrain from entering unwarranted sanctions upon Plaintiff for his *good faith* and *sincere belief* that he has uncovered actual corruption in the St. Louis County Family Court as is supported by the actual evidence he has presented.

Respectfully submitted,

_____*/s/Matthew R. Grant*_____
Matthew R. Grant, #MO50312
GRANT FIRM LLC
701 Market Street
Suite 110, PMB 1709
St. Louis, MO 63131
T: (314) 255-7760
Email: mattgrant.stl@gmail.com

***Pro Se* Plaintiff and as counsel for Co-Plaintiff Stop Missouri Corruption, LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 21, 2026, the foregoing was filed electronically with the Clerk of Court, therefore, to be served electronically by operation of the Court's electronic filing system upon all counsel of record.

_____*/s/  Matthew R. Grant*_____