IN THE MISSOURI COURT OF APPEALS
EASTERN DISTRICT

MATTHEW R. GRANT,                    )
                                     )
        APPELLANT,                   )
                                     )
vs.                                  )    Appeal No. ED114144
                                     )
C.M.G, ET AL.,                       )
                                     )
        RESPONDENTS.                 )

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
TWENTY-FIRST JUDICIAL CIRCUIT, DIVISION 13
Honorable Richard Zerr, Presiding

MATTHEW R. GRANT,                    )
                                     )
        PETITIONER,                  )
                                     )
            vs.                      )   CAUSE NO. 12SL-DR03959-02
                                     )
C.M.G., ET AL.,                      )
                                     )
        RESPONDENTS.                 )

TRANSCRIPT ON APPEAL

AUGUST 27, 2025

FOR THE PETITIONER:              FOR THE RESPONDENTS:
MATTHEW R. GRANT, PRO SE         BRODIE LAW
                                 MS. MAIA BRODIE
                                 8909 Ladue Road
                                 Clayton MO 63105


GUARDIAN AD LITEM:
JOHN FENLEY
ATTORNEY AT LAW
2016 S. Big Bend Blvd.
St. Louis MO 63117




Rhonda J. Laurentius, RPR, CCR
Official Court Reporter - Division 13
Twenty-First Judicial Circuit
(314) 615-8070

1                                    **Exhibit D**

I N D E X

Page

Introductory remarks by the Court............   3

Argument re motion to disqualify.............   8

Petitioner's sworn narrative testimony.......   16

    HONORABLE BRUCE F. HILTON
    Direct Examination by Mr. Grant..........   90
    Cross Examination by Ms. Brodie..........   120
    Cross Examination by Mr. Fenley..........   124
    Redirect Examination by Mr. Grant........   125
    Recross Examination by Ms. Brodie........   130
    Examination by the Court.................   130

    JOHN FENLEY
    Narrative testmy. re phone call recording   134
    Cross Examination by Mr. Grant...........   138
    Cross Examination by Ms. Brodie..........   141
    Recross Examination by Mr. Grant.........   142

Closing remarks by the Court.................   143

E X H I B I T S

| Pet. | Description | Recv'd |
|------|-------------|--------|
| 1 | Email re OFW printout 1/22/25......... | 78 |
| 2 | Email re OFW message report 1/23/25... | 79 |
| 3 | Verified motion to DQ ED Court of Appeals filed 3/26/25............ | 79 |
| 4 | Chain email of 1/24/25................ | 80 |
| 5 | Letter from Commission on Retirement Discipline & Removal 7/31/25..... | 82 |
| 6 | Recorded phone call of 6/3/25......... | 83 |

THE COURT: We're on the record in St. Louis County, Missouri on the matter of Matthew Grant vs CMG, et al. Cause Number is 1211SL-DR03952-02 [sic]. This is Richard Zerr, I'm a senior judge appearing today by order of the Supreme Court.

What's before the Court today is review by myself as a outside judge of a motion to disqualify the assigned judge in this case, Judge Hilton, for cause pursuant to statute. And that's what I will do today. We are dealing with 509.09 I believe is the operative statute.

So, first of all, partywise, I know Ms. Brodie from the years when I was in family court. I don't know if I know Mr. --

MR. FENLEY: Fenley.

THE COURT: -- Fenley. I don't think I know you. And obviously, Mr. Grant, I don't know you.

MR. GRANT: Yes.

THE COURT: So for your benefit, Mr. Grant primarily, and Mr. Fenley also, I'm a senior judge which means I retired a few years ago. I was a judge in St. Charles County. I was on the bench for 20 years in St. Charles County. I know

3

that you're -- some of the folks on how people become judges.  So I was elected in St. Charles County.  And interestingly enough, I was elected to a judgeship in two separate times.  For eight years I was an associate circuit judge in St. Charles.  At that point in time I was elected as a Democratic candidate.  Later I was elected as a circuit judge for 12 years.  At that point in time I was elected as a Republican candidate.  So I have been on both of the party lists in the past.  I am no longer affiliated with the parties these days since I'm no longer in a political position.  I've not been appointed to anything by anybody in the political arena.

During the time I was on the bench as a circuit judge, for six years I was the administrative judge of the family court, so I tried family court cases exclusively for that six-year period.  For the last six years I was assigned to general civil/criminal trials.  I did mostly jury trials in criminal cases during that six-year period.

During the time that I was on the bench I was not only doing the normal things that I do, but I also was assigned from time to time to hear

4

cases on the Court of Appeals as a special judge. And I was also assigned on one occasion to hear a case on the Supreme Court as a special judge.

Since the time of my retirement I been actively assigned by the Supreme Court all around the State of Missouri hearing cases. I am currently assigned by the Supreme Court to hear cases in Franklin County, Gasconade County, Osage County, Warren County, Montgomery County, Audrain County, Reynolds County, Lincoln County, and now here. I get very few assignments, interestingly enough, in St. Charles County; although, about two weeks ago I tried a four-day murder case in St. Charles County. So I'm still trying some significant cases around the State.

I have recently completed my annual education for which I once again am certified as a family court judge. So I am appropriate to be involved in a family court case; although, this has only limited family court application for my purpose in the case. So that's who I am, just so you know, and that's my background.

The decision that's going to happen today is going to be somewhat binary. My role is simply to deal with this case in the setting of

the motion to disqualify.  I'm not here to rule on anything else in the case or take any other actions.  After I'm done hearing the case and when I make the ruling in the case I believe it will either be one where I will believe the motion to disqualify is well-taken and I will determine that Judge Hilton should be disqualified and the Supreme Court will appoint a new judge to hear the case, or I'll determine the motion is not well-taken and Judge Hilton will continue on.  I believe that's the only -- about the only two outcomes that we can have from this case at this point in time.

I've read everything that you filed so far with the exception - And I think I read most of it now this morning - of the thing you filed yesterday or today.  I've read the attachment to your petition which included a petition that you filed in federal court.  I read that from start to finish, which was long reading, but I did read it all.  So I think I'm pretty well-versed with the allegations that are being made.  And now is your opportunity to present any proof or evidence that you have that the allegations you made in the petition are true.

6

So everybody ready to go?

MR. GRANT: Yes, Your Honor.

THE COURT: Okay. Go ahead, you can start.

MR. GRANT: Thank you, Your Honor.

First, before we jump in, I wanted to tee up for the Court that I do believe that my motion raises two issues. I do agree with you that the primary issue is disqualification for cause, and bias and prejudice I do believe I raise. And I do believe Your Honor has jurisdiction and power to rule on the motion to recuse, whether or not Judge Hilton should have recused, which is obviously a separate standard under Rule 2-2-11 -- 2-2.11 under the rules of the canons of rules of judicial conduct.

THE COURT: I've kind of seen that you've invoked both of those, but it seems to me that that consideration is one for Judge Hilton to make and that's to be judged by the Commission on Discipline, Retirement, and Removal if they don't think they've recused theirselves appropriately. I'm not sure I can recuse him. I can disqualify him, I agree with that. I'm not sure I can force him to recuse himself if he doesn't want to.

7

That's where the commission gets involved if that was done inappropriately.

MR. GRANT:  I believe the Court of Appeals can rule that he should have recused is my argument, so I just wanted to preserve that for appeal.

THE COURT:  Okay, I understand.

MR. GRANT:  And thank you, Your Honor. And thank you for -- First of all, I'm impressed that you read all the papers.

THE COURT:  I read them all.

MR. GRANT:  I'm quite verbose and I appreciate all your preparation.

So getting right down to the motion to disqualify.  Obviously the standard is to prove bias or prejudice.  However, I want to start with the general concept that's well recognized in the case law in Missouri, which is the disqualification of judges the courts of law errs on the side of disqualification.  I'm not suggesting that there doesn't have to be evidence, but here on any close call it should be resolved in favor of disqualification of Judge Hilton, and it's because the courts favor public trust in all rulings.  And if you've read my federal court

filing and the briefings in this case obviously I've raised very serious allegations that go to the heart of Judge Hilton's behavior in this case.

And I'll jump right in then with that background, which is the first interaction that I had with Judge Hilton was on January 21st of 2025. And he entered the courtroom and had apparently read my financials, which I was shocked to hear, and had came in as a savior for me purportedly from the bench.

First of all, the hearing was -- which shockingly was not supposed to take place. The only thing that was set for hearing was the motion to withdraw by one of my former two counsel, so I was surprised to hear that Judge Hilton wanted to go forward with the hearing. So we showed up, the motion to withdraw was ruled on, but this is what I'm going to tell you happened first. But then I had a motion to disqualify that was set for hearing on February 7th. I wasn't even prepared to argue it. It wasn't noticed for hearing.

So Judge Hilton entered the courtroom and made this prepared speech which was, Mr. Grant, you've suffered - This is the phrase I'll never forget - you've suffered, your children

9

have suffered, I'm here to help you. And he chastised everyone in this room and in act -- an act -- in a Hollywood-type performance, which is he held up the order and yelled at -- Well Mr. Eilerts had departed the room, but looked at me and said, you know -- or, Mr. Fenley, how could you allow this to go on this long. And said, Mr. Grant, why did you sign this consent order. And I said my lawyer. And he was like, This is outrageous, your kids have suffered, you have suffered, just consent to me. And I said, No, Your Honor. I said this case -- there's an appearance of impropriety and I said, Honestly the way this case has proceeded within the St. Louis Family Court I don't want anything to do with this courthouse. I said, I'm an officer of the Court and I'm just offended of what has happened here. And I do believe that should go into Your Honor's analysis of my credibility.

I do believe -- I don't believe that you should necessarily take what I say as true just because of that, but I do believe -- Just briefly to go on a tangent, the actions I've taken in the four writs and the federal court pleading this is not some sort of ruse for me to suggest

that I just don't like this judge. I mean, I started turning these people in to the OCDC on December 31st. And we'll get to my evidence that I turned them into the U.S. Attorney's Office in February.

But so at the hearing what I now have figured out what happened is Judge Hilton was trying to conceal and contain the corruption within the Twenty-First Circuit within the Twenty-First Circuit. So when he said as the presiding judge -- That's what I never anticipated, as the presiding judge that he would offer to take the case. It made no sense to me. I was there. It was a pretty straight-forward motion. If the motion was to be granted, it was to be transferred to the Missouri Supreme Court. It was very straight-forward.

The fact that the docket and all the surrounding circumstances I'll talk about this morning prove without a doubt that my version of events are true. The fact that he didn't rule that day proves what I'm telling you is true. He sent me home because I said, No, I want to go to the Supreme Court, I want a different judge. And he said, No, Mr. Grant, I'm not allowing you, I'm

11

not ruling on your motion today, you need to go home and think about this, you want to consent to me. And he made it sound like -- And this is what I surmise, which is what he wanted me to surmise, is he was going to hand out justice himself. Because I had a motion for sanctions pending against Ms. Brody, and I had a motion against the Respondent. And at this time I'm trying to think if I had a motion against Mr. Fenley or not. I believe I did. Or I know I had taken -- asserted very strong claims against him.

But it was deception, straight-forward, no doubt about it. He deceived me into consenting to this Court's jurisdiction of the -- I'm sorry, when I say this court I'm referring to Division 13 of the Twenty-First Circuit Court, State of Missouri. And I didn't know any better. I fell for it hook, line, and sinker, as I put in all my pleadings as to what happened. And I walked out of that courtroom that day thinking that this nightmare was over.

And I have as evidence, Your Honor, I'm going to start with -- I expected to have an Elmo here today. I apologize, I didn't even think. I have copies though. And may I approach Your Honor

12

and hand you copies?

THE COURT:   You may.

MR. GRANT:   Okay, thank you.

THE COURT:   We going to designate this as an exhibit?

MR. GRANT:   Yes, I was going to.  For now I was hoping to mark it for identification as Exhibit 1.

THE COURT:   Okay.

MR. GRANT:   So what we have here, Your Honor, is the hearing took place on January 21st. As I said, I walked out of there thinking that I had definitely won, that this -- finally the nightmare was over and all I had to do was decide as to whether I wanted a judge from out-state - or, I'm sorry, that's what Judge Hilton suggested would be the result - whether I wanted to go to the Supreme Court and have uncertainty, which is what Judge Hilton suggested, or I could stick with certainty with Judge Hilton and he would drop the hammer, so to say, on this because it was his court, he was the presiding judge, and he was going to clean it up.  Which is in my pleadings is I was misled by my prior counsel to suggest that Judge Hilton was the savior that he purported to

13

be, which now I know is untrue.

But nevertheless, this document is important because it's contemporaneous communication sent by me to the Respondent, my children's mother, on which -- This is where I start. And I don't pull any punches. You'll see the evidence that's presented in this case. At this point in time my children have been taken from me since March of '24. We're now in the end of January '24. I have blown in a breathalyzer three times a day or more ever since I returned to rehab. I was sober in rehab obviously in March, returned in April blowing in a breathalyzer three times to five times a day, and at this point in time I still had my kids overnight one night a week. It's outrageous.

So at this point I'm extremely frustrated with the system, extremely frustrated. And I finally thought I had won. And so, like I said, this is criminal behavior. This is what I have exposed as criminal behavior. And that's why it says: You need to focus on hiring a criminal defense lawyer ASAP. Don't worry about my sobriety. No one has any concerns about that including you. Give Maia a call and ask her how

yesterday went.

So this was sent, what is it, it's August, roughly seven months ago. But anyway, it was sent within 24 hours of the hearing. This is proof in and of itself of what my version of events is true, because what I'm saying is you lost, you need a criminal defense lawyer because you're going to jail. Which I have not -- That is my goal here, for all of these people to go to jail. Obviously I cannot control that. I have no prosecutorial authority. But that is just one communication on the 22nd.

Then we have a communication on the 23rd which I'll mark -- Well first let me hand it to you and the other parties in the courtroom.

THE COURT: Thank you.

MR. GRANT: Here we have the next day. Now we have January 23rd and I believe --

THE COURT: Exhibit 2? You going to call this two?

MR. GRANT: Oh, I'm sorry, Exhibit 2?

THE COURT: Is that what you're going to call it?

MR. GRANT: Thank you. Yes, totally threw me off. Yes, I can mark this for

15

identification, Your Honor, as Exhibit 2.

THE COURT:   Thank you.

MR. GRANT:   Thank you.   That threw me off.

Exhibit 2 which has been marked for identification is dated January 23, 24 hours later.   I didn't know -- Do you want to swear me in?  I'm happy to.   I'm providing testimony as far as I'm concerned.

THE COURT:   Well, I can do that if that's what you want to do.

MR. GRANT:   Well, I just want it to be clear on the record what I am saying is sworn testimony.

THE COURT:   Okay, then we probably should do that.   Any objection to him testifying in the narrative?

MS. BRODY:   I may, Your Honor.   I don't know how it's going to go.   For now I understand that he's his own counsel.

THE COURT:   Okay.

MR. FENLEY:   I have no objection for the time being, Your Honor.

MATTHEW GRANT, having been sworn, testified as follows:

THE COURT:  In light of testifying in the narrative, and since this has now become an evidentiary issue, always keep in mind if there's an objection made please stop talking so I can deal with the objection.

MR. GRANT:  Absolutely, Your Honor.

THE COURT:  You may continue.

MR. GRANT:  Thank you.  And just now, to make the record clear, I want to clarify that every factual statement that I made prior to being sworn in is truthful and I swear to that under the penalties of perjury.

THE COURT:  Thank you.

MR. GRANT:  Picking back up to this message.  And I assume Your Honor knows what Our Family Wizard is.  So -- I hate to say that, but just in case.

On January 23rd, one day later, I sent another message, but I'll give you some background here.  What I did is I sent an e-mail to the two individuals in this room, which is Mr. Fenley, the guardian ad litem for the children, and Ms. Brody, the counsel for Ms. Copeland.  And I'm referencing that in the first sentence where I say:  As you will hear if you have not already, I am demanding

17

to go to fifty-fifty immediately with me keeping the boys this weekend. You should think carefully about your response, as it will have an important, long-term impact on you in many ways, including, but not limited to your rights with regard to the boys. And that's the key word there is your rights.

They tried to convert this into some sort of threat, and it is not a threat at all. What it is saying here - And there's a plethora of evidence in the record - which is this is my children's mother. She honestly, candidly, she's a terrible person but she's still my kids' mother. So I encouraged her time and time again to get a criminal defense lawyer. And what I'm saying here is do the right thing. That's what I told all these people is to stop this charade and this act and to do the right thing and we'll get this courthouse back on track and get the family court serving justice again. I know that's obviously not going to happen voluntarily.

But the point here is consistent with my message on the 22nd, now on the 23rd I'm following up and saying I'm demanding fifty-fifty. It's because I had thought I had won the hearing

18

on January 21st. It's consistent. And the only version of events that fits this -- these communications that is consistent with what I'm telling you, which I guess I should point out is not in the transcript from January 21st.

I'm being outright up-front, that transcript was doctored and it was manipulated. Absolutely. I put it in the federal complaint. And I believe the court reporter here today is the one who took it down, I'm not sure.

MS. BRODY: I would object, Your Honor. Those are facts not in the record, and it is also without foundation.

MR. GRANT: I'm testifying to personal knowledge.

MS. BRODY: There is no foundation. Objection.

THE COURT: So I think what I'm hearing is it's your belief that the transcript is doctored but you have no way to document that in any way. In other words, there's not a transcript that is on a tape recording that's been made or anything of that nature, it's your recollection this is not what was said at the hearing.

MR. GRANT: Your Honor, yes. It comes

down to my credibility.  And that's why this evidence is so important, because the transcript's not -- I can prove to you the transcript's not true because of all the circumstantial evidence. And let me jump forward a bit.

You'll see in the court record - I think Your Honor can take judicial notice of the docket - that prior to trial I asked Judge Hilton -- I filed a motion to allow me to hire my own court reporter, a certified court reporter, and a certified videographer to come in for trial at my cost to create a separate transcript so this didn't happen again.  And it sure did, it happened again.  I have the trial transcript and they changed it.

Now let's tackle the issue that may be popping in your head; is this man insane.  I'm not insane.  I'm purely sane.  I underwent a mental evaluation last summer.  I see a therapist.  I have my therapist's notes.  They subpoenaed my therapist.  They didn't call my therapist to the stand.  After all this came out in January and I started calling - Sorry - and I started making these criminal allegations - This is the most telling thing of anything - neither Judge Hilton,

nor any of the parties have had the thought.  I'll explain to you why.  None of them have asked for me to undergo a mental evaluation because I will pass with flying colors like --

MS. BRODY:  Objection.  No foundation.

THE COURT:  Again -- Once again, I understand your opinion is that you're competent and you believe other people would testify to that, but they're not here to testify.

MR. GRANT:  That's my testimony.  Is it that they're not allowed?

THE COURT:  Exactly.  So you can't tell me what they would say.  You're a lawyer, you understand that you can't tell me what they would say.  That's hearsay.

MR. GRANT:  It's my belief.

THE COURT:  I understand it's your belief, but you can't tell me what someone else would say about you.

MR. GRANT:  You're correct.  I'm sorry. Let me move to withdraw my testimony on that. Sorry, I misphrased it.  My testimony, my narrative testimony is I believe that the parties have intentionally avoided requesting a mental evaluation because they're afraid of what the

results would be.  We'll never know.

MS. BRODY:  I'm gonna object.  It's hearsay.  He doesn't know what the parties thought or intended.

THE COURT:  You kind of waver back between presenting facts and presenting argument. You understand it's okay for you to present facts, but don't interweave those with arguments as to why something is the case, okay.

MR. GRANT:  Okay.  This is a hearing so I didn't know where oral argument fits in.

THE COURT:  Well it's simpler since you're testifying in the narrative.  And it's always a little untidy for people to be able to object timely.  If you'd keep it to the facts now we can argue later.

MR. GRANT:  Okay, thank you, Your Honor.

So I just want to point out as a fact that I did request a court reporter and a videographer.  That motion was denied.  And my motion stated that if there's nothing to hide why would you not grant the motion.  It made no sense. Obviously it was going to be at my cost.  And I wanted -- From a factual perspective there's never

22

been a request that I undergo a mental evaluation. I believe that my briefing speaks for itself as to whether or not I'm sane. I believe that my 170-page complaint that Your Honor apparently read speaks for itself.

This is not some conspiracy theory. I'm not a lawyer in a basement with a wall with red yarn who's coming up with all this nonsense. This is all real. That's why this is happening to me, because I know it's real. And we're going to get -- And Your Honor is obviously going to have to make a determination on that. But I just want to point out from a factual basis no one has asked for a mental evaluation.

Moving forward to -- Also, no one has disputed -- When I filed the motion for sanctions -- And I started filing Mr. Fenley -- and I filed pleadings asserting that Ms. Brody and Mr. Fenley were engaged in criminal behavior. They've never filed anything with the Court taking issue with that until recently. Just recently there was a motion for sanctions filed after I had posted Mr. Fenley's phone call, which we'll get to, in which he offered to trade me custody for dropping my allegations.

MR. FENLEY:  Your Honor, I'm going to object, as that goes way beyond what was actually in the phone call, it would speak for itself, and his version of events is 100 percent wholeheartedly different than what actually occurred on that phone call.

MR. GRANT:  I do agree it will speak for itself.

THE COURT:  Do you have the phone call recorded?

MR. GRANT:  I do.  It was admitted at trial.

MR. FENLEY:  It was not admitted at trial.

MR. GRANT:  Was it not?

MR. FENLEY:  No, it was not.  It was recorded without my knowledge which I think is a violation of the professional rules.  I understand he's a party to it so I'm not saying it's criminal.  But attorney to attorney, I believe that that is a violation of the rules when one attorney is talking about his client which is himself.  So I wholeheartedly object to anything that is in that phone call.  It was never admitted into evidence.  And it is completely inaccurate in

24

terms of what he is saying. If anything he's the one trying to force me into something as if vice-versa.

MR. GRANT: Your Honor, it was admitted into evidence at a preliminary injunction hearing. He's right. He caught me on a technicality. It is in evidence, and he knows it, and he's afraid of it.

MR. FENLEY: He referenced -- We had no further hearings after the phone call was made is my recollection. I could be wrong. But he tried to admit a transcript that was filed with the pleading. He never actually admitted the phone call.

MR. GRANT: Yes, I did. Judge Hilton suggested it might have been AI. And that's why I initially tried to avoid admitting it. I can put Mr. Fenley on the stand 'cause that's what --

MR. FENLEY: Maybe the court reporter would tell us but I don't think you trust her.

MR. GRANT: I'll call a witness, Your Honor.

THE COURT: That would be fine. You should do that. Because if we don't have the recording that you want to present then it's your

25

statement of what you said is on it, and that's the situation where it becomes a little bit cloudy.

MR. GRANT: And I do have it for this very reason.

THE COURT: Okay.

MR. GRANT: But nevertheless, to circle back, the reason I mention that is all of this is kind of after the fact. Once I exposed what was going on is the only time that anyone has taken issue with it. And there's your proof that everything I'm saying is true. All along everyone has set here and almost - what's the word - almost mocked me for the fact that I could do nothing to defend myself, that I was stuck in this courthouse or in this courtroom and that I was stuck with whatever ruling was going to be made against me. And we'll get to the retaliation that Judge Hilton has taken upon me in various occasions. But finally --

MS. BRODY: Your Honor, I object. That is his opinion. That is not any evidence before this Court.

THE COURT: Again, if you would stick just to the evidence. Just please let's stick

right now to the evidence and we'll do the argument as to what it means later on, okay.

MR. GRANT: Thank you.

From a factual perspective, moving forward, on January 24th I was at home and received notice that there was a safety alert at my children's school. And I sent an e-mail. I won't talk about what the e-mail said 'cause she's going to object. But I will just say I alerted the Court that I was terribly concerned for my children's safety. Again, consistent with I had just won the case, it was my belief that Judge Hilton had just alerted me that he was my -- that he was my savior and he was here to save -- he was here to fix things for me. And reality was it was some sort of ploy. I don't know what -- Well, I won't even speculate at this point.

MS. BRODY: Your Honor, again, I'm gonna object. Those are facts not in evidence. His feelings are not evidence before this Court for any basis or foundation for the Court to disqualify Judge Hilton.

THE COURT: Again, please give me the facts.

MR. GRANT: Thank you, Your Honor.

So from a factual statement, I did communicate with Ms. Gipson who's here in the courtroom today. I copied Mr. Fenley to make sure there was no ex parte communication. I omitted Ms. Brody because her client was at issue in the communication because I was terribly afraid for the safety of my children.

When I learned that the judge was not going to receive my communication I drove here. I sent an e-mail. I think I said -- Well, I drove here myself and I demanded to see Judge Hilton. Now I didn't talk to him about any substance. I'm sure someone's going to argue that was ex parte communication. Whatever. There's e-mails where I say I don't care. And I don't care, because I was afraid for my children's lives. And all I said to Judge Hilton was, Hey, I just need you to read this e-mail. That's all I said. And he did come out into the hallway and that's when he told me -- that's -- Here's the fact. He told me at that time: Mr. Grant --

MS. BRODY: I object, Your Honor. That's hearsay. Anything that Judge Hilton said in a hallway is hearsay.

MR. GRANT: He's a party opponent.

28

THE COURT:  He's really not a party. This is a little bit of a unique situation.  He's not a party, he's the judge on the case.  He's certainly capable of being called.  If you want to call him and come in and testify we can have that.

MR. GRANT:  Oh, I will.  I actually was wondering if I was supposed to drop a subpoena on him or not.

So, in any event, I left that encounter with Judge Hilton learning for the first time ever that he was a family lawyer before he was on the bench.  I had never known that.  And if I had known that I would have never consented to the jurisdiction.  And I also left that encounter with that information knowing that I had been tricked, knowing --

MS. BRODY:  Object again to facts not in evidence.  These are assumptions and opinions made by him, and these are not facts presented to substantiate the foundation of a motion to disqualify.

THE COURT:  Once again, the facts you need to present to me are evidence of bias, evidence of prejudice that relate to things that did not happen within the case itself.  And that's

where you have to be.  How you felt about something is not where the issues in this case lie.  They lie in what Judge Hilton did and what the legal effect of that would be to demonstrate bias or prejudice.

MR. GRANT:  The extra-judicial source was that I left with clear -- my interpretation, which is a fact --

THE COURT:  Your interpretation is not a fact.  Your interpretation is an interpretation.  A fact is what was said.

MR. GRANT:  Well, okay, I'll call Judge Hilton then.

THE COURT:  Okay.

MR. GRANT:  Nevertheless, okay, the factual testimony I will provide is all of the extra-judicial bias and prejudice is the corruption that pervades this courthouse.

MR. FENLEY:  Your Honor, again I'm gonna object that there's absolutely no proof of corruption in the courthouse.  He keeps alleging it but he has yet to provide one fact that any judge who has heard anything of any corruption, or in any of his pleadings.

THE COURT:  So once again, I've read

your pleadings.  I know you believe that corruption is pervasive in the courthouse.  This is an opportunity where if you think that affects Judge Hilton there's a lot of ways you can play that with respect to the future there will be an issue in your federal lawsuit, maybe an issue in other things.  Today the issues are things that affect Judge Hilton's ability to hear the case - That's what we have to focus on - and things that involve bias or prejudice.  Not what your opinions are but the actual facts that exist --

MR. GRANT:  Right.

THE COURT:  -- that you can document.

MR. GRANT:  Just to clarify, the facts are, as I believe the evidence shows, he's a member and/or an associate of the criminal enterprise which is at issue in the complaint.  So I will go forward and just give you factual evidence of that.

MS. BRODY:  I object and move to strike.  Once again, it is an opinion not based on any facts.

THE COURT:  Once again, give me the facts, not your opinion, that he's a member.  I mean, show me what facts support that he is

31

somehow biased or prejudiced against you.

MR. GRANT: Okay, I appeared on January 28th by appointment for -- to argue an ex parte TRO and asked Judge Hilton to grant it. And I asked that if it was denied it still be placed on the court record. And I left -- I made that very clear. And I left the courthouse with nothing on the court record and the motion was denied.

THE COURT: That was this year, January 28th, '25?

MR. GRANT: Yes. And I did present that to Judge Hilton personally. It was off the record.

Moving forward then to February 7th and -- A factual statement. This is very important. In my motion for TRO I state I withdraw my consent to Division 13 which I had provided under -- which -- under -- under what -- I had withdrawn the consent that I had previously provided. I'll provide you the factual reason for that.

The reason is because based upon the events that took place in this courthouse on January 24th I had -- I had -- was all but convinced that I made a huge mistake and that I

32

was -- that my consent, if it could in any way be withdrawn it should have been. And it's in my pleadings. And I would ask the Court to take judicial notice of my pleadings and my motion. I said I would like to stay or withdraw my consent. And that is proof of fact as to what happened on the 24th that we'll get to.

And then so if we move forward to the -- to February 7th, that's when factually I observed and learned that in fact Judge Hilton was part of the RICO corruption. I don't mean to call it RICO corruption. Basically -- Let me switch gears.

I learned on February 7th undoubtedly that Judge Hilton was prejudiced and biased against me. I learned that because of the manner in which the hearing proceeded. I was called to the stand and asked -- The motion, I should clarify, was the motion to vacate the consent order that had kept me from my children. Based upon prior representations from -- without getting into them, with Judge Hilton, it was my understanding that all I had to do was ask to withdraw the consent order that kept me from my children, which made sense to me. The only reason

33

I didn't have my kids is I signed a consent order based upon the advice of counsel. So I appeared at the motion to vacate and withdraw that consent order, and as soon as I walked in - This is a fact - I could tell from Judge Hilton's mannerisms and his initial response to me to demand --

MS. BRODY: Objection. What he's able to discern from a mannerism is not a fact, it is an opinion.

MR. GRANT: It's an observation.

MS. BRODY: It's an opinion.

THE COURT: I'm going to overrule that objection at this point in time. Continue on with what was said or done, not what you thought you saw from body language.

MR. GRANT: Okay. Based upon his statements, which I won't replicate or reiterate, but based upon his statements I knew that --

THE COURT: Well the statements is what we need to hear. You need to present evidence. You can't say you knew from what somebody said and then repeating it. You need to tell me what was said that caused you to believe that Judge Hilton is biased or prejudiced against you. I need to hear what those statements are, not what your

opinion of them were.

MR. GRANT:  He made me get on the stand which is fine, but then the entire hearing was: Mr. Grant, tell me why she's a bad mother.  And I pointed out:  Judge Hilton, this is about -- this is a consent order and the issue is whether I am a danger to my children, it doesn't matter whether or not she's a good mother or not.  He flipped the entire burden of proof on me.  And I stated to him - This is my statement to him - I said:  Judge Hilton, where is the judge that I met that was in this courtroom on January 21st.  And, Judge Zerr, I said this to him.  I said:  Go get him.  Is he in the hallway.  Because I was irate because he had flipped.  That is the moment -- I never stood in front of an -- in front of a judge in a black robe that I knew to -- I don't even know what word you want me to use here because I struggle with decorum and how I address the Court and address Judge Hilton in light of what he's done.  But never in my life have I been so offended as a lawyer to have a judge sit there and openly just flaunt the law.

MS. BRODY:  Your Honor, I'm gonna object.

35

THE COURT: Right. You have filed as exhibit to your most recent supplement the transcript of the proceedings on January 21st.

MR. GRANT: Correct.

THE COURT: Do you have a transcript of the proceedings on February 7th?

MR. GRANT: No. I tried to order it and I been unable to obtain it.

THE COURT: So you made a request?

MR. GRANT: Yes, I have. Twice.

THE COURT: Do you have a copy of those requests?

MR. GRANT: I did not -- I can file a supplement but I did not bring that today, no. I absolutely tried to order it, and I was told on the second time that I hadn't asked before when in fact if you scroll down it was in the e-mail trail.

THE COURT: So what are you indicating the response was?

MR. GRANT: There was no response. I was ignored.

THE COURT: You were just ignored?

MR. GRANT: Yeah, because you can't do anything without paying in advance, so I said how

much does this cost, and again I was ignored just like I was the first time.  That's how they, you know --

THE COURT:  So you've given me a number of copies of our Family Wizard and things like that.  You don't have a copy of your efforts to get the transcript of this proceeding that you're claiming Judge Hilton was --

MR. GRANT:  I did not anticipate the fact of -- I brought the 21st transcript by the way.  I was planning to mark that as an exhibit.

THE COURT:  You've already filed it so I see it.  I've already read it.

MR. GRANT:  Yeah, okay.  But, no, I didn't think to go -- 'Cause that doesn't directly involve Judge Hilton I didn't think to bring that evidence as to --

THE COURT:  Well what's it involve if it doesn't involve Judge Hilton?

MR. GRANT:  Indirectly it does because it's communication between me and the court reporter, not with the Court, not with Judge Hilton.

THE COURT:  I'm talking about the transcript itself.  The transcript itself

37

obviously is fundamental to your claim.

MR. GRANT:  True.  The fact that I was unable to obtain it I cannot directly prove that Judge Hilton directed to withhold that from me.  I don't have that evidence.

THE COURT:  And you can't give me documentation as to when you requested it or whether you agreed to pay a deposit or anything like that?

MR. GRANT:  I can but just not at this moment.  I would request leave of court to submit that after the hearing.

THE COURT:  I think we can let you do that.

MR. GRANT:  Thank you.

THE COURT:  Why don't you go on with the facts that you believe --

MR. GRANT:  Correct.  So the facts are that the hearing was -- How do I put this.  The hearing was another act of theatre.

MS. BRODY:  I'm gonna object.  That is an opinion, not a fact.

MR. GRANT:  I withdraw that.

THE COURT:  Just tell me what was said.

MR. GRANT:  Okay, what was said is

38

Judge Hilton told me -- what I said -- 'cause I had filed a combined motion to vacate, motion to modify judgment -- modification of judgment.  And I had told Judge Hilton that if he denied it I had a right -- immediate right to appeal.  Not necessarily a motion to vacate because you don't have a right to appeal, but the motion to modify the judgment.  And this is critical.  And I said: So if you deny it it's going up on appeal.  And he told --

MS. BRODY:  Your Honor, I would object. That is hearsay anything Judge Hilton said.

THE COURT:  I'm going to overrule it. You can go ahead and say that.

MR. GRANT:  He told me, Mr. Grant, you can go ahead and appeal whatever you want.  He said -- He said, The Court of Appeals is never going to rule in your favor, and I guarantee you they will drag this out until your kids are 18. And I said -- followed up, No, they won't.

MR. FENLEY:  Your Honor, I'm gonna object as to what Judge Hilton said in relation there 'cause I believe that is a factual statement that is inaccurate at this point in time and hearsay.

39

THE COURT: It's certainly hearsay that's made by the Judge. In a setting like this where you're alleging bias or prejudice I think I have to give the Movant some flexibility in being able to recount statements that were made that might reflect that bias or prejudice even though they are theoretically hearsay and they are made by the person through the allegation of bias or prejudice is directed against. So I think I have to give it some flexibility.

MR. GRANT: The statement was so impactful and my recollection is so truthful, I'd like to mark as -- for identification Exhibit, well I think we're at 3, which is a motion to disqualify filed for the -- in the Eastern District Court of Appeals.

So with regard -- Sorry. I didn't know if Your Honor wanted to read it. What I want to point out is there's an affidavit, and the entire -- both bases of my motion was -- were -- was Judge Hilton's statements at that hearing.

THE COURT: Okay, continue.

MR. GRANT: Okay. So I just, again, contemporaneous proof I believe that these things happened and my version of events, as opposed to

what he will say as a denial, for his denial as true.  But that's for Your Honor to determine of course.

Again, going back - I'm sorry - on January 24th I have an e-mail that I sent to the United States Attorney's Office in St. Louis.  I worked at Husch Blackwell for 21 years.  One of the individuals I worked with there is now an AUSA.  I'm going to mark for identification as number four, and I'll just hand these out real quickly.  Again, I didn't mean to move on before.

So again, really the sentence that I've highlighted on one version is that he just ruled on Tuesday and I'm 100 percent on point - And I apologize for my language - the shit show.  The point of this e-mail is again corroborating evidence that my version of events of what happened on January 21st are absolutely true.

I went to the U.S. Attorney's Office, the Department of Justice.  And in fact I made that statement in open court subsequent to this e-mail to put everyone on notice.  And from a factual standpoint I also called OCDC on December 31st to report Mr. Fenley and Ms. Brody.  And I've reported them all here I believe.

41

There's an e-mail trail below.  But this is where I was raising the issue of the safety of my children.

But Mr. Wiseman is a former associate at Husch Blackwell.  I don't know one way or the other if he made it to partner before he went in-house -- or not in-house but became a AUSA.  I believe he became AUSA under my former partner Jeff Jensen.  I know Mr. Wiseman and that's why I reached out to him and sent him this information.  So again, this is corroborating evidence I believe that shows that my version of events on the 21st are in fact true.

So if we move back to evidence of bias, extra-judicial influence and actions, we can move quickly to the 27th and 28th.  So after the 7th and the hearing in which led to ultimately the affidavit in front of the Court of Appeals.  And which, to be clear, they ruled that I did not prove actual bias, which is true.  They didn't -- Two judges recused I will note in light of that filing.  After that filing I guess it's speculation if they're connected.  But the two Republican judges recused, the two Democrats stayed on the panel.  So I think that's

noteworthy.

So what we have here is on the -- So Judge Hilton had taken under consideration my motion to vacate and set aside the consent order. That was the only thing keeping myself from my children. So we're now in February. I hadn't had a drink since March of the prior year. It's almost a year. And this is all -- We're using facial recognition breathalyzers. Oh, and I did a hair follicle drug test the summer before, from a factual standpoint, and passed that. So no one ever alleged that I used drugs. That's outrageous.

But so this whole time -- And the only thing that this court and Judge Hilton were using to hang over my head was this consent order. So I thought based on Judge Hilton's statements that this was the procedural manner in which he was going to, you know, potentially help me and then validate and vacate that consent order and then allow them if they wanted to move for preliminary injunction they could do so, or even a TRO. In any event, he took it under advisement on March 27th, and I filed a similar motion on the morning -- I'm sorry, February. I'll slow down.

43

I tend to talk very fast.  And I apologize for that to both the court reporter and Your Honor.

On February 27th there was a hearing set on February 28th.  So I had no ruling.  I had filed a motion -- I'm sorry.  I had no ruling -- I was of the opinion -- From a factual standpoint my opinion was that I knew that I was in a courtroom --

MS. BRODY:  I'm gonna object to his opinion.

THE COURT:  Again, we're not looking for your opinion right now.  Just give me the facts.  You can --

MR. GRANT:  Okay, the facts are I filed a motion for change of judge on the 27th of February and I filed a motion for change of judge on the morning of the 28th of February. Immediately on that date, on the 28th, Judge Hilton entered an order denying my motion to vacate and set aside the consent order without explanation, which I'll just leave it at that. That was the first overt act of retaliation on the record.

MS. BRODY:  Your Honor, I'm gonna object.  That's another statement of opinion.

44

MR. GRANT: That's what I allege in any event.

THE COURT: Overruled. Go ahead.

MR. GRANT: But this is where we get to the good stuff, if you will. Well let me say from a factual standpoint, unbeknownst to me -- Now I mentioned I been calling - Factual statements - I been calling OCDC sending them e-mails more than once a week. I think I have a total of, I don't know, I think the e-mail to the AUSA was, like, 17 times. And then I ultimately - And we'll get to that - The commission on removal/discipline, they opened a pending investigation into Judge Hilton. I brought a copy of that letter to prove it to you and to introduce into evidence.

But unbeknownst to me, the Missouri Supreme Court, of all the cases pending in the entire State of Missouri with no motion, no petition, first -- you know, no extraordinary writ - Well there is a way - but without anyone asking the Missouri Supreme Court to do anything, sua sponte Chief Justice Russell on behalf of the Court issues an order appointing retired circuit judge Terry Lynn Brown as a senior judge to hear the motion that I had filed on the 27th and 28th.

45

That is amazing.  It is astounding.  And to this day I don't believe many people really understand -- Well let me back up.  Let me testify factually.

Here's -- The key is that I did not learn, that was not published to the docket in this case until after I filed a writ.  That was hidden.  Well, that was concealed from the docket and not published.

MS. BRODY:  Your Honor, I'm gonna object.  There is no facts that it was concealed from the docket.

MR. GRANT:  I changed my -- Yeah, it was not published.  I changed the wording on that. It was not published to the docket for 23 days. It was not published to the docket until 24 hours after I filed a writ in which the writ alleges corruption.  So, again, I believe the Court of Appeals at least will address that from a recusal standpoint.  At that point in time -- That is absolutely grounds for recusal that the Missouri Supreme Court assigns me -- By the way, it just happens to be a retired democratic appointee or democratic judge.  But in any event, it doesn't matter, there's a senior judge appointed to my case that I didn't ask for and I'm not told about

it.

So I go spend hours and hours and hours - This is my first writ I've ever filed - and prepare a writ to the Court of Appeals. And that's what the motion to disqualify you'll see, I handed you, that is within which I filed it. Now admittedly that writ failed because I just recently learned this whole time I was citing the wrong rule because -- Well I won't get into the reason why. Nevertheless, the current motion is procedurally correct. So that prior one was properly denied. The prior ones.

In any event, so, but here's the rub. Or here's -- From a factual standpoint I have evidence. If I might, Your Honor, just because I would like to make it part of the court record, to mark for identification -- if I could mark -- I handed you the motion to DQ, but if I could mark as exhibit -- or for identification number four is my -- the actual writ, petition for writ filed on March 26th.

MR. FENLEY: So number four is your e-mail.

MR. GRANT: Oh, thank you, John. Mr. Fenley. So we'll make this number five.

47

THE COURT:  I got an ED filing that's dated March 26th which is Exhibit 3 which it says Respondent's verified motion to disqualify, is that what you're talking about?

MR. GRANT:  Yeah, I didn't know what to print out.

THE COURT:  Yeah, you marked it as Exhibit 3.

MR. GRANT:  Okay.  So I filed my motion, the petition for writ at approximately 11 a.m. on the 26th.  Several hours later -- Let me back up.  So this is important.

I was terribly concerned for my personal safety.  So I had -- supposed to have my children on the night of the 26th.  So I had sent a note on the 25th to the children's mother that falsely stated that I was going to be out of town for a deposition.  And the response -- Well, and that was not an issue.  That was the only thing that was stated is that I had to be out of town for work.  That was the evening of the 25th.  On the 26th I filed a petition for writ at 11 a.m. At I think 2:17 Mr. Fenley files a motion for therapy and then a motion for something else. Anyway, the Court can take judicial notice I hope

of the court docket on that.  I have that here in my -- I brought that paperwork with me.

In any event, the timing of that is suspicious.  More than suspicious.

MS. BRODY:  Your Honor, I'm gonna object that he is now again stating an opinion.  A filing isn't suspicious.

MR. GRANT:  I withdraw that statement. I just want to lay out the chronology.  The next day -- And I have the Soberlink results as well. I'll get to those in a second and mark those.  But 24 hours after I filed -- Getting to Judge Hilton's actions, 24 hours after I filed my writ he entered -- he granted an ex parte TRO taking my children away from me 100 percent of the time. Now that is the same day that all of a sudden the March -- the motion for -- the order from the Supreme Court shows up on the docket, March 27, 2025.  It was a very busy day.  And the point is, is why would -- There's no evidence, and I can't wait to ask Judge Hilton this, but it was ex parte.  That makes no sense.  And then a full TRO was granted the next day.  But it's flat out retaliation.  Your Honor -- I would ask Your Honor to conclude that that was retaliation, bias, and

49

prejudice against me for filing the writ.

MS. BRODY:   Your Honor, now we're again entering into argument and I thought he was testifying as a witness.

THE COURT:   This is just your testimony.

Let me clarify just timingwise what the court file reflects.   The court file reflects that the order appointing Judge Brown was entered by the Supreme Court on March 4, '25.   It shows -- In the court file it shows it being docketed on that same day, on March 4, 2025.   And then your TRO that you're speaking of was filed looks like on March 27th.   I think you indicated that the special senior judge assignment and the TRO were filed the same day, but in fact the special judge assignment order in the court file reflects right now a filing date in the court file of March 3rd -- or March 4th.

MR. FENLEY:   Judge, for clarity purposes on that, the filing date is March 4th pursuant to the file stamp from the Supreme Court. It did not make the file, the docketed entries until the 26th or 27th of March.   And I believe it was stated to us from Judge Hilton at that time

that there was a clerical error that it didn't get docketed.

THE COURT: Okay. So apparently when they did docket it they docketed it back to the March 4th date because that's what shows in the --

MR. GRANT: It sure did, Your Honor.

MR. FENLEY: It was docketed to the date that it was signed and the file stamp from the Supreme Court.

THE COURT: Okay, that clarifies the facts in my mind. Why don't you continue on.

MR. GRANT: Yeah, and it's in my motion. I filed the e-mail that proves when I received it which was the afternoon of the 27th is when I first learned that there was a senior judge appointed.

THE COURT: Got it.

MR. GRANT: So, but from a timeline perspective -- And let me clarify. And I apologize if I misspoke. The 27th of March -- There was an ex parte TRO on the 27th of March and there was a full hearing TRO on the 28th of March. I hope I didn't confuse those. And then the order from the Supreme Court was entered in the system apparently on March 4th but not published to

51

anyone, including myself, until the 27th. And so that's important, Your Honor, and prejudicial. I filed a writ that was moot. And I subsequently point that out to the Missouri Supreme Court and Court of Appeals later, again, in an unsuccessful writ that I filed because I cite the wrong rule again. It was Rule 51.05 unfortunately. But nevertheless...

So from a factual standpoint that TRO -- And I was severely prejudiced because I actually left the country. And I make no bones about it, Your Honor. What I allege and what's in the complaint, in the RICO complaint is very serious allegations. They are very serious allegations. And I believe if you read the complaint you'll see the explanation as to why I believe people should listen to me.

My office was four doors down from the new Missouri attorney general. I know, I know my partner -- former partner, Jeff Jensen, was the U.S. attorney. This gentleman, Derek Wiseman, was AUSA. They were all within seven doors of my office. I can't talk about the things that I know. The individual -- My firm represented Eric Greitens. And I'm not just casting dispersions

52

that anyone did anything wrong in these contexts. I'm just saying that I know things other people don't know based upon where I worked.  So I hope that my experience, my professional experience brings with it credibility and also unique knowledge as to what I know.  But because of what I know and because of what I knew I was exposing and because I know how high this can lead, as I point out in my RICO filing, and civil -- Everyone seems to get a lot of attention on RICO.  Civil rights act is really my focus.  Due process.

But in any event, I left the country, and I drove to Chicago to leave the country because I was literally afraid that I wouldn't get out of St. Louis, that I would be put away for civil commitment or worse.  So in any event, the prejudice to me was that I left the country and therefore missed a hearing on a preliminary - I'm sorry - a motion to hear my first motion for change of judge, which would have been denied because it cited the wrong rule anyway.

But the point is I believed, as I put in my Missouri Supreme Court writ, which I believe the Court can take notice of, it's on CaseNet - I didn't think to bring a copy of it - but I believe

53

that March 4th order was fake.  It didn't make any sense to me.  It came down after I had filed a writ in the Missouri Court of Appeals.  And I ran it by another Missouri licensed lawyer.  And without getting into what that individual said, there was a joint conclusion that this made no sense.

MS. BRODY:  Your Honor, I'm gonna object to a joint conclusion 'cause it's hearsay of what another person said.

MR. GRANT:  I'll withdraw it.  Based upon the consultation with another Missouri lawyer --

MS. BRODY:  Same objection, Your Honor. It's still hearsay.

THE COURT:  So it's still hearsay. Let's talk about the facts.

MR. GRANT:  Okay, the facts are that I was convinced that that was fake, and I was concerned and afraid to return back.  I mean, this -- Back to the United States.  This sounds like it's some sort of movie or John Grisham novel or -- Like I said, the best thing that -- Well anyway, this is argument.  You don't want to hear this.  I'll save that for later.  But this is all

true.

In any event, so then I returned -- So if we can go from a factual standpoint. So that writ is denied. Then I returned from -- back to the United States and I file a motion to vacate the TRO and dissolve it - I'm sorry - the preliminary injunction which was entered on April 4th I believe. And I take the well-founded position that said, Hey, it doesn't matter why that preliminary injunction was entered, it doesn't belong -- it doesn't -- it's not justified today. That injunctive relief needs to be evaluated on a routine basis. Or at least it can be. And I filed that motion before Judge Hilton. And we had come -- I had made an oral motion first. And we were here in this very courtroom, and Ms. Brody had a motion she was going to set. And you'll see that I set that for hearing on a date certain. I honestly, I don't have it in front of me but it's in the docket. It was set for hearing and was agreed upon by the parties that we would appear and I would argue that motion.

Well I showed up to appear and argue that motion on the agreed upon date. And here's

prejudice and here's bias; Judge Hilton said, Oh, I'm not going to hear your motion, today is not a testimonial docket, so try again, reset it. So that's exactly what he did. So he knew -- When I had a motion, a viable motion he moved the goalpost on me. And, I don't know, whatever knowledge you want to use. All I know is it was infuriating because I finally had a motion that I felt he had to grant because -- Oh, and let me back up.

The TRO was based upon me being in rehab and being drunk. All the parties, everyone has access to my Soberlink data. I never failed a test. I never failed. I passed every test, more than 1,500 Soberlink tests since April of 2024. And then they come in here and Judge Hilton grants a TRO based on the belief that -- All I said was I have to leave town because I'm -- I had a deposition, and they enter a TRO claiming I'm in detox and I'm in rehab. It was a cover story. Well I'm not going to argue.

MS. BRODY:  Your Honor, I'm gonna object. That is assuming facts not in evidence.

THE COURT:  Sustained.

MR. GRANT:  In any event, what's

56

important that -- for Your Honor to understand is when I came back I got a hair follicle test which proved exactly what the other hair follicle test proved the summer before, no drugs in my system, 100 percent negative. And we'll get to that. That's very important. And it's also important that Judge Hilton denied Mr. Fenley's request that I take a hair follicle test in February after I was making these allegations. If they thought I was some sort of -- insane and this is all not true and Judge Hilton isn't prejudiced and he isn't biased or Judge Hilton didn't think that he would have granted it. Well, I'll let Your Honor... But I just want to make the factual statement that motion was filed by the guardian ad litem and it was denied by the Court. And it was denied by the Court after I asked the Court to grant it and order both parents, both plaintiff -- Petitioner, myself, and Respondent, the mother, to undergo a hair follicle test. From a factual standpoint, Judge Hilton looked at Ms. Brody and then he looked at me and said denied. I did not see anything other than that. But those are the facts.

So moving forward to the hearing on the

preliminary injunction and dissolution of that motion.  Then I show up.  We -- Finally that gets reset after he pulled the rug out.  Well after it was not heard on the date that was agreed upon.

THE COURT:  So what was that date?

MR. GRANT:  Umm, boy.

THE COURT:  'Cause the preliminary injunction was entered on 4/4/25.

MR. GRANT:  June the 2nd I believe.  That was the date of the phone call from Mr. Fenley.

MR. FENLEY:  That's not accurate.

MR. GRANT:  Is that not right?  June 2nd?

MR. FENLEY:  It might have been the hearing.  That's not when we had the phone call.

MR. GRANT:  Okay.  I think June 2nd is the date of the hearing.

THE COURT:  And you said you filed a motion to vacate; what day did you file that?

MR. GRANT:  May 17th when I also -- I filed that contemporaneously with the motion for change of judge based upon the Supreme Court order being held from the docket.

THE COURT:  So I see on the 17th a

58

motion for change of judge, a hearing notice for additional GAL fees, and a motion to shorten time. That's what I see filed on 5/17.

MR. GRANT:  I think it's 5/17, 5/20.

MR. FENLEY:  I believe on 5/21 we then had a hearing on -- I know my motion for fees was granted.  I don't know what else we had set that day.  And that day we set the motion to vacate on June 2nd.  We had a hearing on June 2nd.

MR. GRANT:  It was May 20th is the date of the motion to vacate.  I'm sorry.

THE COURT:  I see that.  Okay, now I see that.

MR. GRANT:  Yeah, I misspoke.  The 17th was the change of judge.

THE COURT:  And you say after you filed that motion there was a date agreed to take it up on and Judge Hilton refused to take it up that day, is that what you're telling me?

MR. GRANT:  Correct.  There's two hearing dates for my motion to dissolve the preliminary injunction.  The first one didn't take place, the second one did.

THE COURT:  Okay.

MR. FENLEY:  I believe he tried to take

it up on the 21st.  When Judge Hilton did not hear it that day we set it for the 2nd when everyone was in the courtroom.

THE COURT:  I'm just looking for a notice for the 21st for your motion.

MR. GRANT:  Honestly, Your Honor, I'd have to look at the docket to recreate that.  I can supplement that.

THE COURT:  I see a motion to modify filed on the 20th.  Okay.  Why don't you continue on.

MR. GRANT:  Okay, sorry.  So when the motion for preliminary injunction -- my motion to dissolve the preliminary injunction takes place, coming from the perspective of bias and prejudice, I presented evidence I went to the hair follicle test facility that this court uses - I don't know about St. Charles County - Asure Test in St. Charles, and it is -- it was pursuant to court order.  And I went out there and I asked -- 'Cause this is another thing.  Discovery's been closed since December 2024.  Judge Hilton, speaking of prejudice and denial, he denied my motion to reopen discovery.  I don't know why he would -- He wouldn't allow me to -- This case didn't go to

60

trial until June 23rd and he wouldn't let me conduct any discovery. I could be here all day if I tell you all the prejudice and bias that Judge Hilton has exhibited in this case, and that's one example.

But back to the -- back to the hearing on the preliminary injunction. I had a business records affidavit, and I took the stand, as I am doing today, and testified to a narrative. I also had a business record affidavit from the Soberlink. And my testimony was that I've never failed a breathalyzer test and I tested negative for drugs. And it was a 90-day hair follicle test. So, therefore, we know I was not on drugs when the TRO was entered. But really the focus was on that moment in time should the preliminary injunction be dissolved.

The Judge said, Do you have an expert witness. And I said, Excuse me. He said, You need an expert witness to interpret these hair follicle test results. And from a factual testimony, Your Honor, I almost fell out of my chair. As an officer of this court I said, It says negative. And he said, I can't interpret this, you need an expert witness. And he refused

to admit it for the purposes for which it was offered. What he said is I will -- And you'll see a pleading from me that was filed later in this case prior to trial, because that is the most overt prejudice and bias I've ever heard in my life. A judge who sits -- previously sat in the family court, as I understand it, and was previously a family lawyer and who is the presiding judge sat here from a factual standpoint and said that he couldn't interpret positive versus negative and that I needed to present an expert witness. I'm blown -- Well, actually it took me awhile to recover at that hearing before I could move forward. And the same thing for -- Anyway, the Soberlink results proved that I hadn't had a drink for, again, never have failed, still passed.

So moving forward, when I ultimately get the ruling from Judge Hilton he doesn't -- Remember, the status quo when I go to -- when I file my writ was that -- And I don't think I did clarify this, I'm sorry. I had the kids one night a week - This is pursuant to a consent order - one night a week on Thursdays, one visit on Wednesdays, and one visit every other Sunday. So

on my expectation, from a factual standpoint was, and what I asked was let's go back to at least where we were, status quo, because that TRO was entered, regardless of whether it was entered properly or not, you know I'm not using drugs and you know I'm not using alcohol. Well he doesn't -- His order is, well, no, you can have your kids one day a week only. And it's just again -- Well I'll save it for argument, the motive behind that order. But it's clear as to what -- He didn't -- He didn't dissolve the preliminary injunction. He entered a new preliminary injunction limiting my access to my kids to one day a week, one overnight a week until we'll see -- until there's whatever happens next. Let me stop there.

Moving back to the -- now to trial. I'm trying to do this chronologically obviously, Your Honor. The first day of trial -- And again, I believe after all of this has happened I made clear on the record that I filed a motion to recuse. Not a motion to disqualify, motion to recuse. All of this has happened and Judge Hilton denies it and states he's not -- doesn't have actual bias, which obviously is irrelevant. But that's his statement. But in my motion, and I

63

brought here today -- Well I didn't bring it. I have it in the motion.

The trial testimony, by page and line, I attach it, Your Honor, to the Court. I filed it under seal, or I filed it pursuant to a confidential redacted information sheet because it would take me forever to go through and redact the minor children's names. But there are two passages that I cite in my supplement.

THE COURT: Tell me where that's at.

MR. GRANT: Yes. It's in my -- the supplement that I filed yesterday, last evening. Maybe that's the one you haven't seen. It's titled Fourth Supplement. Here it is. I'm sorry. I found it. The two passages that are relevant - And one is the -- I think the prior supplement - but this one is page 502, lines 20 to 22. The other is pages 198 to 200 I believe.

THE COURT: Let me get there real quickly.

MR. GRANT: Okay, yeah, I'm sorry, I didn't know. I apologize.

THE COURT: 502 you say?

MR. GRANT: Yes.

THE COURT: Okay, hold on. Okay, I'm

64

at 502.   Looks like that is cross examination by Ms. Brody.

MR. GRANT:   Yes.   It's just --

THE COURT:   502, what line?

MR. GRANT:   -- one example.   Oh, I just closed my page.   One second.   Sorry, Your Honor. I believe it was 20 to 22 possibly.   Sorry, I was trying to pull this up.

THE COURT:   20 to...

MR. GRANT:   It says, Do you want to apologize to the Judge.

THE COURT:   I see that.   That's line 20.

MR. GRANT:   Yeah.   So there's a soliloquy on page 198 -- 199 and 200 that is more directed -- that is Judge Hilton himself.

THE COURT:   Hold on.

MR. GRANT:   Umm...

THE COURT:   Hold on.   Let me get there. Okay, 198.

MR. GRANT:   I believe that would be correct, Your Honor.

THE COURT:   Okay, I'm there.

MR. GRANT:   I will have to pull it up. I apologize.   To be candid, I didn't bring a copy

with me it was so voluminous.  It's in my supplement.

In any event, there is an exchange in which Judge Hilton berates me for -- I'm trying to explain what my triggers are and he berates me for making excuses during trial.  It's overtly prejudicial and biased.  And there's some back-story to that that's most important that I should have mentioned earlier; that on February 7th off the record - This was actually off the record so I didn't expect to find it in the transcript -  Judge Hilton disclosed that he's an alcoholic, which was interesting and --

MS. BRODY:  Your Honor, I'm gonna object.  This is now hearsay on a personal level that Judge Hilton can testify to this off-the-record conversation.

THE COURT:  Yeah, I'm going to sustain that objection.

MR. GRANT:  Okay.  Well he berated me because I relapsed.  And he was --

THE COURT:  Tell me where that's at.  I got the transcript now.  Tell me -- It was -- Him berating you in the transcript, tell me where that's at so I can see that and read what the

question was and what the words were.

MR. GRANT:  Your Honor -- I apologize, Your Honor.  I'll have to -- I would have to log in through my phone through WiFi to find that particular.  The page -- It's quoted in my filing. If you could go to CaseNet, go to the docket, it's quoted.

THE COURT:  It's quoted where?

MR. GRANT:  Umm, in the -- what's called the Second Supplement filed yesterday.

THE COURT:  Okay.

MR. GRANT:  I'm almost positive.  I hope I don't send you on a goose hunt.

THE COURT:  First supplement.  So in your what's described as first supplement to the verified application which was filed on August 26th you cite the trial transcript Exhibit A and you cite the following notes which would be at 198, lines 24 through 200, line 12.

MR. GRANT:  Correct.

THE COURT:  Beginning with:  Do you know what the -- and the triggers for the relapse have been, is that what you're talking about?

MR. GRANT:  Yes, Your Honor.

THE COURT:  Okay, let me look at that

entire thing then. That's 198. Okay, so we're at 198. This is questioning by -- It might be your testimony without being questioned. So 198.

MR. GRANT: I think I'm cross-examining Ms. Grant.

THE COURT: That could be.

MR. GRANT: And he interjects.

THE COURT: Starts at the bottom with the question is: I'm just trying to establish today on the record - thank you - do you know what any of the triggers have been for my relapse or relapses? And the answer was: So you're asking me for any instances since 2019?

"QUESTION" -- or "ANSWER: Yes. Do you know the cause?

"ANSWER: No.

"QUESTION: Okay, thank you. Do you know if I've had two hip replacements in 2019? The Court interjects: How is that relevant? How is that relevant? You respond: Trying to -- Well strike that.

"COURT: It's relevant because that's how you self-medicated? How is it relevant?

"QUESTION: Yes, that's -- that is exactly what I was trying to get to.

"COURT:  Okay.  So this is another excuse for your disease of alcoholism because you decided as a mental health professional and as a psychiatrist/psychologist that you can self-medicate, that that was okay?"  Your answer: No, Your Honor, I'm not -- I'm an alcoholic.  I made terrible decisions.

"COURT:  Well let's hear about those instead of excuses, okay.

"ANSWER:  Okay.

"QUESTION:  Because hip replacement surgery, that's no excuse for your behavior.  None.  So let's get something more relevant where you own it, Mr. Grant.

"QUESTION:  I own that I have a disease.

"COURT:  So far I haven't heard it.

"MR. GRANT:  I own it.  Let's make that clear.

"COURT:  Well I can't wait to hear about what your plan is for your complete recovery because I haven't heard it yet.

"MR. GRANT:  You'll hear about it when I testify, Your Honor.

"THE COURT:  Thank you.  Let's move

on.

"MR. GRANT:  Okay."

Is that what you wanted me to hear?

MR. GRANT:  Yes, Your Honor.

THE COURT:  Okay.

MR. GRANT:  Yes, I want to point out that testimony and its consistency with what I mentioned before that I'll examine Judge Hilton about is the berating and the reference to me being a psychiatrist/psychologist.  And I was -- That testimony and his behavior, that is illustrative of his bias and prejudice and hatred of me honestly.

MS. BRODY:  Your Honor, I'm gonna object again.

MR. GRANT:  That is argument.  I withdraw it.  I just want to bring that to the Court's attention and want you to take note as to bias and prejudice.

THE COURT:  Thank you.

MR. GRANT:  Thank you.  And then, yeah, then -- then I mention the other instance that you looked at, Ms. Brody's questioning of me.  There's other instances there but specifically -- And this is for the Court of Appeals, Your Honor, but I

would point that out as I believe that was a moment in which the Judge should have stopped trial, recused, and declared a mistrial to the extent that's appropriate in a bench trial.

So then moving forward to July 11th -- Oh, we're gonna have to play that recording. But after -- Well I can testify to this.

When Mr. Fenley called me he asked to have a phone call. It wasn't my idea. And you can hear the recording as to what was said. And he offered to quid pro quo trade me my children for custody.

MR. FENLEY: Your Honor, I'm gonna object. That's hearsay from that conversation now.

THE COURT: I think the tape recording, if you have it, would be the best record of what was said by anyone.

MR. GRANT: Okay, absolutely. And then I just want -- So fast-forward. After trial I had my kids one day a week. And then at trial you can see in the transcript I didn't -- Mr. Fenley and I had a very aggressive exchange. But I was asked -- That whole apology -- There was a bunch of questions about apologizing and apologizing. And

I refused to apologize for pointing out corruption.  And I paid dearly for it when the guardian ad litem on the 11th recommended that I see my kids one day a week.  It's outrageous.  I'm sorry --

MS. BRODY:  I'm gonna object.

MR. GRANT:  I'm sorry, twice a month.

MS. BRODY:  This is not relevant to the motion to disqualify Judge Hilton.

MR. GRANT:  It's context, Your Honor.

THE COURT:  I'm going to sustain the objection.  Again, we're limiting ourselves right now to what evidence you have of bias or prejudice on Judge Hilton's part that would require this court to recuse him or disqualify him.

MR. GRANT:  Fair enough.  Thank you, Your Honor.

So then we move forward to the escort order.  And more importantly is August 11th.  On August 11th I filed a federal lawsuit which asserts a putative class, which is obviously different than a class, but with civil RICO, civil rights act claims among others.  And named within that complaint are two defendants, Judge Hilton and Commissioner Greaves.  And pursuant to Rule 4

72

- This is in my pleadings - Rule 4 is the Federal Rules of Civil Procedure, I was provided two options, to have all the defendants either served, hand served and pay for it or to offer -- or request waiver of service, which I think Your Honor knows the procedure on that so I won't go into it.

So I elected to do waiver of service via U.S. mail, not certified, not -- just U.S. simple first class mail. So I did that on the 11th as required. We showed up on the 12th for a hearing, Judge Hilton noted the filing, told me that he had -- stated about e-mailing the Supreme Court and asking for a judge, and then said that -- When asked who did you e-mail he said, I'm not going to tell you, you'll sue them, which I think again is evidence of bias and prejudice because --

MS. BRODY: Your Honor, I'm gonna object to that characterization.

THE COURT: Sustained.

MR. GRANT: Well that was his statement was, You will sue them. In any event, so he was aware -- The point of bringing that up is he was aware of the lawsuit on the 12th. And then on the 13th if you read his escort order it is the most

73

shining example --

MS. BRODY:  Again, Your Honor, this is about to be opinion.

MR. GRANT:  Let me back up.  I withdraw it.  Your Honor, if you read the escort order --

THE COURT:  I have it in front of me.

MR. GRANT:  Okay.  It asserts that service by U.S. mail is some form of harassment, intimidation on a commissioner, that a Twenty-First Circuit commissioner cannot handle and needs to be -- to get the police involved if there's service by mail in a 10 x 13 white envelope that I purchased from WalMart.  It was -- I believe Your Honor will conclude, and if you read that, particularly with my response to the escort order, you will see that that entire order was biased, prejudiced, and retaliation.

MS. BRODY:  Okay, again, I'm gonna object on the basis that it is opinion.  I think that the escort order speaks for itself, Your Honor.

THE COURT:  Sustained.

MR. GRANT:  Then just to move forward to this morning, Your Honor.  I've been practicing law for 21 years.  I've never had a complaint

74

filed against me.  I'm sure I have now but I'm not aware of it.  And I had to check in with security and be baby-sat to walk up to this courtroom.  The escort order, it -- it -- it is -- Well, I just want to say that, yeah, I had to wait downstairs and wait to be accompanied to a courtroom.  I'm an officer of the Court, I been practicing for 21 years, and the basis was that escort order and the mailing pursuant to federal rule, civil procedure four.

And subject to -- I have a recording to play for you, Your Honor.  And I think there was one other thing we were going to look up.

THE COURT:  So let me just clarify with you.  You indicated that you elected to have waivers of service mailed out to the parties?

MR. GRANT:  Correct.

THE COURT:  How does that tie in with this letter?  Was this dropped off by --

MR. GRANT:  So --

THE COURT:  Was that dropped off by the postal service?

MR. GRANT:  Yes.

THE COURT:  Okay.

MR. GRANT:  It was sent by U.S. mail.

And apparently -- I can't speak to how it was dropped off, but if you read the escort order I'll let Your Honor decide if that's consistent with the U.S. mail.  It implies that I -- From a factual standpoint the escort order implies that I personally delivered it or had someone personally deliver it and that it was a suspicious package. Thank God I took a photograph.

MR. FENLEY:  And, Your Honor, I think the bigger issue is that it was sent to her home address instead of the courthouse address, where if it was sent to the courthouse - Conjecture - I don't think an escort order would have been entered.  But knowing the home address of a commissioner that he is obviously unhappy with and sending something to I think was the issue.

THE COURT:  Okay.

MR. GRANT:  Can I --

THE COURT:  Sure, you can respond, yeah.

MR. GRANT:  I'll address that.  I anticipate that I'm going to get -- I'm going to encounter every defense possible to this federal lawsuit.  And if I mail it -- Pursuant to federal authority you can mail it to their home address.

And as a courtesy, as I point out in my response, as a courtesy I redacted Judge Hilton's home address, I redacted Commissioner Greaves' home address. I didn't have to. Actually, the burden is for them to ask the Court to redact it. I had no desire to intimidate anyone. What I wanted to head off is some argument that if I mailed it to not their home address that they didn't receive it and, therefore, I have to start over from scratch in 30 days. That was the only reason these things were mailed, pursuant to Rule 4 which is the custom and practice, to everyone's residence.

MR. FENLEY: He sent mine to my office address.

MS. BRODY: And he sent mine to my home, and my home address is not registered with the Missouri Bar.

THE COURT: Okay.

MR. GRANT: I agree, it's not registered with the Missouri Bar.

MS. BRODY: So why didn't you send it to my office? But you decided to send it where my children live, is that right?

MR. GRANT: I sent it to the home residences that I could find. That's what you're

77

supposed to do per the rule.

THE COURT: Okay, I think we heard enough about that. Move on.

MR. GRANT: So, I'm sorry, Judge, I would ask the Court to take a short break and I'll play that recording. And I'd like to -- We can do it now. I was going to move for the documents that have been identified, to move them into evidence, and then I have the recording.

THE COURT: Okay, so tell me what documents you'd like to move into evidence.

MR. GRANT: Yes, I think it's 1 through 5, but we can take them each one at a time.

THE COURT: What's marked as Exhibit 1 is a printout from Our Family Wizard involving a conversation between Mr. Grant and Ms. Copeland which indicates it occurred on January 22nd at 3:04 p.m. Any objection to that?

MS. BRODY: Your Honor, I'm gonna object. This is not the best evidence. His own testimony of how he felt on that day is best evidence, not an e-mail that he sent to somebody.

MR. GRANT: This is a trial exhibit.

THE COURT: It will be admitted over

the objection.

Exhibit 2 is a our Family Wizard message report, conversation between Mr. Grant and Ms. Copeland by e-mail which would indicate being sent on January 23, 2025, at 3:29 p.m.  Any objection to that?

MS. BRODY:  No, Your Honor.

THE COURT:  It will be admitted. Number 3 is a copy of a verified motion to disqualify the Eastern District Court of Appeals which was filed in the Eastern District, ED 113446 apparently filed on March 26, 2025.  Any objection to that?

MS. BRODY:  Your Honor, I object on the basis it has multiple attachments.  These were not offered as part of evidence.  If the Court wants to take judicial notice of filings I don't have an objection to that.

THE COURT:  I will admit this.  I'll also include with that any additional attachments that may be presented to me.

Exhibit 4 is a printout from Gmail of a e-mail communication indicated between the e-mail address mattgrantstl@gmail and derekwiseman@usdoj.gov, indicates a date of

79

January 24, '25 at 1:34 p.m.  It's a chain which includes a copy of an e-mail from Veronica Gipson to Matt Grant on January 24, '25.  It includes another -- appears to be an e-mail from Ms. Gipson and Mr. Grant.  And then also it probably included a PDF of an order.  That's not included, it's just a PDF indication, but I assume this also included the 1.8, an actual PDF attachment, of an awarded date of 1/21/25.  Any objection to this document?

MS. BRODY:  Your Honor, I object.  It's hearsay.

THE COURT:  It will be admitted over that objection.  And I don't have number five. What's five?

MR. GRANT:  Number 5 is the March 26th writ.

MR. FENLEY:  I think that's what you called number 3 already.

THE COURT:  Yeah, three and five is the same thing.  March 26th, is a verified motion to disqualify, if that's what you're calling a writ. It doesn't call it -- It's not styled writ.  If that's what you're calling a writ that's Exhibit 3.

MR. GRANT:  Okay, I'm sorry.  Just, if

80

I can back up. Maybe I should have -- The escort order is on the docket. I have a copy. Do I -- Is Your Honor, can you take judicial notice?

THE COURT: I can take notice of that. That's in the file.

MR. GRANT: Okay. And then I just want to review and see if there's anything that would have been Exhibit 5. Oh. One second. I do have another exhibit.

THE COURT: Okay.

MR. FENLEY: Your Honor, I have an 11 a.m. conference in Division 65 this morning. I didn't anticipate this taking two hours.

THE COURT: Okay. Maybe you need to tell Division 65 you might be late.

MR. GRANT: Five is open then, right, No. 5?

THE COURT: Five is still open, yes.

Okay, Exhibit 5 is the letter from the Commission on Retirement, Removal, and Discipline dated July 31, 2025, to Mr. Grant. Any objection to this?

MS. BRODY: Your Honor, I would object. There is lack of foundation, as well as this is a -- clearly a hearsay document.

81

THE COURT: I would agree it's hearsay. I'm going to admit it over the objection.

MR. GRANT: Just to provide context that I think is important for Your Honor, I made my report to the commission on May 30th and the response was it was too long. And then subsequent activities have happened, and then all of a sudden this arrived in my mailbox so...

THE COURT: Gotcha. Okay, what else do you have to present?

MR. GRANT: Here, I have the recording right here.

THE COURT: Okay, is it loud enough we're going to be able to play it?

MR. GRANT: It's very loud.

THE COURT: Do you have another copy of it?

MR. GRANT: I do have it electronically and I provided it at trial on a thumb drive. But I can provide it on a thumb drive now too.

THE COURT: I just want you to have that preserved in case the court reporter may need to refer to that.

MR. GRANT: That's what I am struggling with. I ask for guidance on that.

THE COURT: I'll let you play it now, and let's call it Exhibit 6, okay. And then I'm going to indicate that the reporter is not going to record that now and if a transcript is necessary we can take that transcript from that. Is that okay with you?

THE COURT REPORTER: Yes, Judge. Thank you.

THE COURT: You can play it now as Exhibit 6. I'm going to go ahead and admit it.

MR. GRANT: I think John was right. I'm sorry, it's June 3rd, not June 2nd. Thank you for correcting me, John.

(Recording began playing to the Court.)

MR. GRANT: Your Honor, I should have warned you, it's 26 minutes.

(Recording was paused.)

MR. FENLEY: Your Honor, I'm gonna object. I don't know how a conversation between the two of us has any relation to what Judge Hilton thinks of this case or if he's biased or not.

THE COURT: Tell me how this relates to the claim that Judge Hilton is biased.

MR. GRANT: I thought we already

83

addressed this. This is the context in which all of this happened; that Mr. Fenley submitted the motion on the 26th -- yeah, the motion on the 27th and the TRO on the 27th. All of this interplays together. The bias and prejudice is reflected in all of this.

THE COURT: Mr. Fenley's bias perhaps. Where's the bias of Judge Hilton reflected in this?

MR. GRANT: This goes -- Here, let me rephrase it. This goes -- If nothing else, it goes to the credibility of me as a witness to prove to you that in fact what I'm saying here is true about this courtroom.

THE COURT: Well, what I'm struggling with is that you have a number of things going on right now, some of which we're gonna not be able to address in this proceeding. Your large claim of systematic and deep-rooted fraud and corruption in the Court here, and the approach you're taking by doing a RICO action in federal court has a whole lot of things that need to be addressed for that, some of which this might be very relevant to that.

To what we're on today is simply

whether or not Judge Hilton by his acts and deeds has indicated that he cannot provide a fair trial in this case.  Not quite very artfully said but basically that's the concept; whether the bias that he has, if he has any, is so pervasive that he can not provide you with a fair trial.  And in that, any thoughts that the guardian ad litem might have about you aren't necessarily attributable to Judge Hilton.  Mr. Fenley may have a deep set hatred for you, but that doesn't mean that Judge Hilton has that same feeling, even though Mr. Fenley's appointed by the judge.

Judges appoint hundreds of people over the course of a year to be guardians in various other roles of the court.  It does not mean -- In fact, the judge does not control how Mr. Fenley undertakes his tasks.  Mr. Fenley's got his own set of guidelines as a guardian ad litem he has to comply with, just like we do as lawyers and judges, and it's up to him to perform his activities within that range of activities.  And if he's not then it would be perhaps I guess at some point in time maybe up to Judge Hilton to remove him if he violates his obligations as a guardian.  But what his thoughts are about you or

85

about what he might talk to you about cannot be attributed to Judge Hilton automatically, which is what you seem to want to do.

MR. GRANT:   Thank you, Your Honor.   Two things.   One, you just reminded me why this is relevant.   I moved to disqualify John Fenley after this phone call, presented this to the Court, and Judge Hilton denied it.   And I think you should hear this and hear that if this would have been presented to you you would have bounced and disqualified Mr. Fenley immediately.

THE COURT:   And this is before the trial?

MR. GRANT:   Yes.

THE COURT:   Okay.

MR. GRANT:   And just one other formality.   I think you did -- Obviously you got the standard correct.   I would just note that the trial is over and Judge Hilton is the finder of fact so, therefore, the fair trial it's more than that here.   Now it's whether I can get a fair judgment.

THE COURT:   But the same applies through the whole process.   It doesn't really change whether we're in a post-hearing or

prehearing setting, the same thing applies.

So do you want -- Hang on.  Hang on.

MR. GRANT:  Oh, I'm sorry.

THE COURT:  You want to play this for 26 minutes?

MR. GRANT:  I would -- I'm happy submitting it.

THE COURT:  Can you submit it to me in a thumb drive?

MR. GRANT:  Yes.  Yes, Your Honor.

THE COURT:  Okay.  Can you submit it on a thumb drive you don't want back?

MR. GRANT:  Yes, Your Honor, I can.

THE COURT:  I can mail it back to you I guess.

Mr. Fenley.

MR. FENLEY:  I also think that this kind of -- you know, in terms of discovery and information produced, if this was never produced in discovery or if there was, I mean, potentially privileged conversations that we're having - I don't necessarily think we have privilege but --

THE COURT:  Where's the privilege lie?

MR. FENLEY:  I think it's with Mr. Grant himself as an attorney representing

87

himself. And he didn't --

THE COURT: I don't see that's necessarily a fact we can look at. And I don't think you have any privilege with the --

MR. FENLEY: I have no privilege with him. I'm don't -- I'm not trying to say --

THE COURT: Nor do you have with your children either because you're not their lawyer. So it is a --

MR. GRANT: That is indicative of why you should listen to the recording.

THE COURT: Okay.

MR. FENLEY: I'm not scared of what's on the recording. I just think it's a low blow to record a conversation as a professional attorney.

THE COURT: I understand what you're saying. At this point in time we can do one of two things. If you think -- Mr. Fenley, if you want me to hear this now so that you can respond to it now that's fine with me, I'll take the time to do it. If you want him to just give me the thumb drive and I'll listen to it later and you want to then testify in some fashion about the conversation I'll let you do that. Even though it's not the way we've done it before I'll do it

because it will save us some time.  And I'll let you tell me what you think is on the recording even though I'll end up hearing it, I can do that.  However, you'd like to do it I'll do that.

MR. FENLEY:  Option two sounds good to me to save time for all involved.

THE COURT:  Okay.  So I'm going to let you submit that.  I'm going to admit it as Exhibit 6.  Give me the thumb drive.  I'll mail it back to you when I'm done.  And when you're done testifying I'm going to let people cross-examine you if they want to.  Then I'm going to let them testify if they want to.  If you want to call Judge Hilton we can do that.  But we just need to start moving along.

But what I'd like to do right now is give counsel the opportunity, we'll take about a five-minute recess, go down and chat with the people down the hall and tell them you're going to be late, okay.  Court will be in recess about five minutes.

(A brief recess was taken.)

***

THE COURT:  We're back on the record after a brief break.  We're still in the process

89

of your case and your presentation, Mr. Grant.

MR. GRANT: Yes. I call the Honorable Bruce F. Hilton to the stand, please.

THE COURT: Have Judge Hilton step in.

HONORABLE BRUCE F. HILTON, having been sworn, testified as follows:

(The witness hands a document to the Court and parties.)

THE COURT: You may proceed.

MR. GRANT: The witness just handed me a case. I don't know what to do at this moment, this -- if I should be allowed to read it or what.

THE COURT: Well you can ask your questions and you can ask him why he handed you the case. Go ahead.

DIRECT EXAMINATION

BY MR. GRANT:

Q. Is it afternoon? Good late morning, Your Honor.

A. Morning.

Q. You just handed me a case, is that true?

A. I did.

Q. And what was the purpose?

A. It may be a dispositive of your motion.

90

Q. This motion this morning?

A. Uh-huh.

Q. And what is your belief as to why that is?

A. I believe the holding is since the evidence has been closed and the case is under submission that your application is untimely.

Q. I haven't had a chance to read it but, okay, thank you for that explanation.

Judge Hilton, I only have a few questions for you.

Isn't it true you told me that you're an alcoholic?

A. That's correct.

Q. Okay. And isn't it true that you pointed out that you've never relapsed?

A. Correct.

Q. And isn't it true on at least two, if not three occasions you pointed out that I relapsed?

A. Correct.

Q. On -- The first time we met on January 21st in this courtroom, which was originally set for a hearing on Commissioner Greaves, do you recall testifying regarding my

financial condition? Or, I'm sorry, strike that. Do you remember commenting upon my financial records or my financial condition?

A. The only comment would have been that I took judicial notice of the entire contents of this file, including your financials.

Q. Okay. You did not make any comment about how much child support currently -- I was currently paying compared to my current income?

A. I may have reviewed the underlying judgment to make a determination as to what you were ordered to pay and the request made by the mother of your children for an increase in child support.

Q. Okay. But my question was do you recall whether you made a comment?

A. I don't.

Q. Okay. So you didn't or you do not recall?

A. I don't recall.

Q. Okay, thank you. Do you remember on numerous occasions at that hearing commenting that I had suffered?

A. I may have.

Q. Okay. So it's a maybe but not a yes?

A.   Well, I mean, I don't think there's a factual dispute about what has transpired in your life professionally.  So if I made a comment that you suffered as a result of your disease I may have said that.

Q.   Oh, okay.  So thank you for clarifying.  So you deny making a comment that I suffered as a result of how these proceedings have played out up to the date of January 21st?

A.   I believe that -- I don't recall specifically what I said.  If it was on the record that would be the best evidence.  But I think my comments more directed at your complaint that your children had suffered, not you.

Q.   Thank you.  And I'm going to ask you about that next.  Have you had occasion to review the transcript from January 21st?

A.   No.

Q.   Do you recall any time in the last several months commenting that you believe the comments that you may have made are not on the transcript?

A.   No.

Q.   Okay.  You deny that?

A.   I deny that.

Q.   Okay.   With regard -- Did you -- You just referenced it, but did you make comments that my children had suffered?

A.   I did.

Q.   And did you make -- Let me back up. Did you generally encourage me to consent to your jurisdiction?

A.   That was your decision.

Q.   So can you read back the question, please?

(The last question was read back by the court reporter.)

A.   That was your decision.

MR. GRANT:   Your Honor, Judge Zerr, can you direct the witness to answer the question.

THE COURT:   I think that he's answering the question that it goes to the next part of it; basically it's your decision to make that decision.   What he said to you about that, it still was your ultimate decision to make the decision to consent to this jurisdiction regardless of what words he might have used.

MR. GRANT:   Right.

BY MR. GRANT:

Q.   Judge Hilton, I agree that the law is

it was my decision to make.  The question is did you encourage me to exercise my discretion and consent to you?

A.   I don't believe so. I offered you an opportunity to have your case heard based on representations that you made that your children had been suffering.  Those were the representations I made.

Q.   Did you send me home that day at the end of the hearing to think about whether or not I wanted to consent to your jurisdiction?

A.   I think that's correct.

Q.   Did you tell me you refused to grant my motion?

A.   I don't know.  You've filed so many motions, Mr. Grant, I don't know what motion you're referring to, I apologize.

Q.   It was the only motion on the 21st of January which is whether or not the case would be transferred to the Missouri Supreme Court?

A.   I don't recall, sorry.

Q.   You don't recall whether you refused to grant my motion?

A.   Did I not grant your motion?  I think the court file would reflect my rulings.  That

95

would be the best evidence.

Q. Let me follow up then. Let's lay a foundation. On the 21st when the hearing concluded there was no ruling on that motion, correct?

A. If you are representing that to me as an officer of the Court I agree.

Q. Okay. And you have no recollection as to whether you told me that I was to go home and think about it because you refused to grant my motion?

A. I don't recall that.

Q. Okay. You don't recall it or you know that you didn't say it?

A. It's the same question.

Q. Pardon?

A. I've answered the question.

Q. No, there's a difference between your answer. Is it you know you didn't say that or you don't recall whether or not you did say it?

A. I don't recall that I said that, Mr. Grant.

Q. Okay. Do you recall at some point after that hearing that I appeared here in the courthouse and demanded to see you?

A. I do recall that.

96

Q.   Okay.   And do you recall that I wanted you to read an e-mail?

A.   I don't recall what you wanted me to do, but I said I wouldn't talk with you because you weren't with the other attorneys of record.

Q.   Okay.

A.   And I refused to have any ex parte communications with you or anyone else involved in this case.

Q.   Do you believe I was attempting to have a substantive communication with you about the case?

A.   I believe you were attempting to have an ex parte communication with me.

Q.   You don't recall that I was asking you to read an e-mail that - Let me finish - that Ms. Gipson was holding in her inbox?

A.   I don't recall.

Q.   Okay.   Do you recall on that date telling me that before you were on the bench you were a family law attorney?

A.   I recall that.

Q.   Do you remember winking at me when you said that?

A.   No, I don't recall that.   We're not

97

that close.

Q.   I didn't mean to imply that, Judge. You received -- Strike that.  When did you learn of the Missouri Supreme Court's sua sponte order dated March 4th?

A.   I don't recall the specific date, Mr. Grant.

Q.   Okay.  Can you estimate for us how soon -- with regard to when it was entered, March 4th, your understanding soon you learned of its existence?

A.   I received the order because I requested same because you were asking to recuse the entire Twenty-First Judicial Circuit.  So I reached out to the Supreme Court to appoint a senior judge or a judge out of circuit to hear that motion.

Q.   So you expected that order?

A.   I have no control over the Supreme Court.

Q.   Okay.

A.   I requested it, they responded, there was a hearing.

Q.   Okay.  So when you received the order -- Strike that.  You were in the courtroom when Ms.

Gipson stated that it was a clerical error that it was not published to the docket, correct?

A. Correct.

Q. Okay. So we know that you learned of the order's existence before March 27th when it was published to the docket, right?

A. If that's what the court file reflects, that's correct.

Q. I'll represent to you that it was published by e-mail to the parties on March 27th at approximately 4 p.m.

A. Thank you.

Q. So based upon that representation, Your Honor, between March 4th when it was file stamped - And I'll represent it's file stamped - and March 27th can you tell us at any point in time when you learned of its existence?

A. The minute I received it from the Supreme Court I knew of its existence.

Q. Right. When was that?

A. I don't recall.

Q. Okay. And how did you receive it from the Supreme Court?

A. E-mail.

Q. Okay. Do you read your e-mails daily?

99

A.    No.

Q.    How often do you read your e-mails?

A.    Depends if I'm on vacation, depends what I have going on.  I try to look at them every other day, every day.  Depends what I've got going on.

Q.    So if you were not on vacation the week of March 4th at most it would have been a couple of days?

A.    I don't know, I don't recall.

Q.    No, I'm -- Do you agree with my interpretation of your testimony that you would have seen that e-mail within a couple of days assuming you weren't on vacation that week?

A.    Correct.

Q.    Okay.  And what is your understanding of the circumstances to which you learned that that order was not published to the docket?

A.    I don't have any independent recollection of that at all.  There's been so many pleadings filed in this case.  My attention was in giving you two days of trial, that was my purpose.

Q.    Pardon?

A.    My purpose was to honoring the two days we set for trial and having your motion heard

before a senior judge.  That was my intention.

Q.  Okay.  When did you come to learn that I had filed a petition for writ in the Eastern District Court of Appeals?

A.  I received that electronically.  I don't recall the date.  You've filed several writs.

Q.  Correct.  I'm talking about the very first one.

A.  You probably have a better recollection than I do since you prepared them.

Q.  I'll represent to you it was filed on March 26th.

A.  I trust your representation.

Q.  Thank you, Your Honor.

Do you remember, at that point in time were you -- did you know that the order from the Missouri Supreme Court was not published on the docket?

A.  No.

Q.  Okay.  The next day - Tell me if you recall this or not - there was an ex parte TRO entered that was presented by Ms. Brody.  Do you remember that?

MS. BRODY:  Your Honor, I'm gonna object to the characterization.  It was not an ex

101

parte order. It was set for hearing. And you received notice.

MR. GRANT: That's the 28th.

MS. BRODY: I applied for a date on the 27th. It was set on the 28th. It was not an order entered. It was a notice of hearing.

Q. Judge Hilton, let me strike that. Let me back up, ask you a different question.

In late March -- Strike that. When you received notice -- I didn't ask you this question. How did you receive notice of the writ? We talked about the Supreme Court --

A. I've already answered that. I received notification electronically from the Court of Appeals.

Q. Yeah, okay, so both the Missouri Supreme Court and the writ.

Did it occur to you that it was odd that I filed a writ if there was a senior judge appointed?

A. I don't know that I can answer that. I don't know what odd means to you.

Q. Well if you had appointed -- if you had requested the Missouri Supreme Court enter an order and assign a senior judge to rule on my motion and

you saw that I took a writ because no one ruled on my motion and I wanted a ruling on my motion --

A.   I don't know what you wanted, the relief you were seeking.

Q.   Oh, you didn't read it?

A.   No.   The only time I get engaged with that if I have to file a response.

Q.   You didn't read that writ?

A.   No.

Q.   To this day have you read it?

A.   No.

Q.   How many writs are you named in typically?

A.   Well with you, four.

Q.   No, I'm saying typically.

A.   Typically very seldom.

Q.   Okay.   So how many -- Ignore this case existing --

A.   That's impossible.

Q.   I agree with that.   If this case -- Excluding this case, how many times a year are you named as a Respondent in a writ?

A.   I been on the bench for eight years and I think maybe four.

Q.   Okay.   So every two -- I'm not saying

103

it would happen every two years, but once every two years. So your testimony under oath is you received notice that you were the Respondent in a writ, that it only happened four times in your career, and you didn't read it?

A. Um-hum, that's correct.

Q. Is there any reason you didn't read it?

A. I don't know how it's relevant to this case but... If I have to file a response I read it. Your writs were denied.

MR. GRANT: Your Honor, I move to strike.

THE COURT: I think it's responsive. Next question.

BY MR. GRANT:

Q. Were you aware when you entered the TRO that I had passed every single one of my breathalyzer tests?

A. That was the representation that you made.

Q. No, I wasn't -- Just to back up. The TRO that was entered after the writ I did not appear for, correct?

A. That's right. We didn't know where you were.

Q.    Correct.   Oh, by the way, did you ask either of the parties where I was?

A.    It's not my burden to introduce evidence.

Q.    I didn't ask you about your burden.   I asked you if you asked.

A.    The evidence that was presented suggested there was a problem.

Q.    What was the evidence that was presented?

A.    That because of your disease there was a concern that you had left either the country and were back in rehab.   And the issue was not just alcohol, it was drugs.

Q.    Okay.   And you denied a motion for drug testing in February, one month prior, correct?

A.    That is correct.

Q.    Okay.   And you saw that I passed a drug test, or you're aware that I passed a drug test the summer prior, correct?

A.    I don't know that I received any evidence of that.

Q.    I asked if you were aware of it.

A.    I'm not aware of it.

Q.    Okay.   Did anyone represent to you

whether or not they tried to get in touch with me to see if I was in rehab or not?

A.   I think the record would probably be the best evidence.  I don't recall.  I think there was representations made by your children's guardian that you had notice of the hearing and that you didn't respond.  That's my recollection.

Q.   Oh.  Interesting.  Thank you for that testimony.

A.   Since you're the attorney of record you also received notice of it.

Q.   Sometime thereafter a preliminary injunction was entered, is that right?

A.   If that's what the file reflects, I guess, yes.

Q.   Okay.  There's a preliminary injunction in place right now isn't there?

A.   Umm, I don't know because I went back to your interim custody order based upon your evidence that you introduced when we had a hearing when you returned.

Q.   Okay.

A.   And that was the negative drug test that was ordered as part of the TRO order.  So I basically dissolved the TRO and went back to your

106

interim custody order is my recollection.

Q.   Okay.   So you believe the TRO was in existence until you entered your order giving me one day a week?

A.   I didn't give it to you, you gave it to yourself.   You're the one that entered into that consent interim custody order.   That was not something that I ruled on.

Q.   I was talking about your June order, your pretrial order.

A.   My June order was based upon me granting the TRO in part and indicating that if you had a negative drug test that you go back to the interim order.

Q.   Okay.   So let's talk about that.   So I tried to argue the motion to dissolve the preliminary injunction prior to it actually being argued, isn't that true?

A.   I know that you testified in the narrative in support of your motion to set aside the interim order and I denied it.

Q.   No, do you remember me appearing on a date that had been noticed and you said this is not an evidentiary -- a testimonial hearing date, you'll have to reset it?   Do you remember that?

A.    If you were going to present testimony that's probably accurate.

Q.    And if the testimony is just me why would it need to be on a separate hearing date?

A.    That's how I handle my docket.

Q.    Oh.  Even though there was a court reporter in the room?

A.    That's how I handle my docket, Mr. Grant.

Q.    Okay.

A.    I have more than one case.

Q.    Yes, thank you, Your Honor.

Moving forward to the -- Ultimately you ruled that the order should be - I don't want to put words in your mouth - but the situation should go from me having zero custody of my children to me having them each Thursday overnight, correct?

A.    If that's what the interim consent custody order provided for that's what I ordered.

Q.    Okay.  I'll represent to you that is not what the interim custody order provided for.  That's what I'm trying to understand, Your Honor.

A.    Well it was my intention to honor your consent interim custody order based upon you showing the Court proof that you had no drugs in

your system.

Q.   So that was a mistake?  The current order is a mistake to the extent it doesn't comply with the status quo prior to?

A.   This is the first time I've been presented with that issue.

Q.   I'm sorry, could you explain that a little bit further?

A.   Mr. Grant, it was my assumption that I was ordering the interim custody order.  You representing to me now that is not the case, this is the first I've heard of it.

Q.   Okay.  And what did you look at to issue the order that said one day per night?

A.   Your --

Q.   I'm sorry, one day per week.  I'm sorry, I misspoke.

A.   The interim custody order.

Q.   So you did look at it?

A.   I've looked at everything, Mr. Grant, except the writs.

Q.   Okay.  But you looked at the interim custody order, then when you wrote the June order you mistakenly just included one night per week?

A.   I don't know that I made a mistake.

This is the first I've heard of it.

Q.   Okay.   There was a hearing when I presented -- On that preliminary injunction issue, I presented a business records affidavit and the court ordered test results to you, correct?

A.   Correct.

Q.   Do you recall you asking me if I had brought an expert witness?

A.   No, I asked whether or not you brought in the custodian of records.

Q.   Okay.   So you deny that you asked me if I had an expert witness?

A.   I just recall there was no one from Asure Lab present in the courtroom to lay a foundation for the test results based upon Ms. Brody's objection.

Q.   Do you recall that there was a custodian -- there was a records affidavit?

A.   That lays a foundation for the report but not the interpretation of the report.

Q.   Exactly.   So do you remember you suggesting that you could not interpret the report without someone from Asure Test there?

A.   If I said that I said that.

Q.   Okay.   Have you ever needed an expert

110

to interpret the results of an Asure test?

        A.    Yes.

        Q.    When?

        A.    Any time in my trials where the opposing counsel objected to it I had to bring someone in from Asure.

        Q.    Oh, okay.  What about outside of trial?

        A.    Depends on whether there was an objection or not, Mr. Grant.

        Q.    How many times have you changed custody for a parent and it prejudiced them and you relied upon an Asure test and didn't use an expert?

        A.    I have no independent recollection of it happening at any time.

        Q.    So you've called in an expert every time you've changed custody prior to trial?

        A.    I did.

        Q.    And what's that expert's name?

        A.    I called someone from Asure.

        Q.    Okay.

        A.    I think her name was Adrianne Fairbanks.

        Q.    And she would say what?

        A.    She would testify about the procedure, how the sample was taken, who the sample was taken

111

from, what tests were performed, how it was determined that these test results were negative or positive.

Q.  Okay.  So going back to the test results.  So if it says cocaine and it says negative you're not comfortable interpreting that?

A.  I'm not comfortable when you testified at trial that you had cocaine in your safe.

MR. GRANT:  Move to strike.

THE COURT:  You said if he was comfortable with that.  That was responsive.  Ask your next question.

MR. GRANT:  Move to strike.

BY MR. GRANT:

Q.  Judge, if we're going to go outside of the bounds here, do you remember my testimony at trial that I've never used cocaine in my life?

A.  I think your testimony was it was for the ladies.

Q.  That wasn't my question.  Can you read back the question, please.

(The last question was read back by the court reporter.)

A.  I remember your testimony, but I have to determine the credibility of it.

112

Q. Oh. And you don't have any bias or prejudice against me right now do you?

A. None.

Q. None. Okay. You're sure?

A. I'm positive.

Q. Okay. When trial began I moved or made an oral motion for recusal, correct?

A. Correct.

Q. And you denied that motion?

A. It was already ruled on.

Q. I'm sorry, when was it ruled on?

A. Judge Brown ruled on it.

Q. On a motion to recuse?

A. Yes, he did. I'm part of the Twenty-First Judicial Circuit.

Q. Do you not understand that -- Am I -- You don't understand that a judge has an ongoing obligation under the judicial canons and rules of professional -- of judicial conduct to evaluate whether or not they should recuse on a daily basis?

A. If you say so.

Q. I'm asking you. Actually you're the expert. I'm asking you. Do you not?

A. On a daily basis?

Q. Ongoing basis.

113

A.   On an ongoing basis?

Q.   Right.

A.   If I violated one of the canons of ethics I would recuse myself.

Q.   No, that wasn't my question.   My question here is your position as the presiding judge of the Twenty-First Circuit is that once a motion to recuse is denied it can never be -- you have no obligation to address your obligation to recuse again?

A.   No, I disagree with that.

Q.   Okay.

A.   If you file it appropriately, which you've done now, I would agree.

Q.   Okay.   So an oral motion at trial --

A.   You've already confessed that, Mr. Grant.   You filed it under the rule, not under the statute.

Q.   I'm talking about at trial.

A.   You filed it under the rule.   Your oral motion was under the rule, not under the statute. I think I'm free to deny it.

Q.   So you're saying I cited a rule?

A.   I don't know what you cited, Mr. Grant. You've cited so many things.

114

Q. I cited the Canons of Judicial Ethics.

A. And I believe that I have abided by all the canons of ethics in treating you fairly, impartially, and without bias.

Q. Appearance of impropriety specifically?

A. There is no appearance of impropriety. That's your belief.

Q. Okay, you don't believe -- Under the Missouri Supreme Court precedent you don't -- a reasonable third person would think it's appropriate for you to remain the trial judge in this case?

A. Yes, I believe that a reasonable person would come to the same conclusion.

Q. Wow.

MS. BRODY: Your Honor, I'm going to move to strike wow.

THE COURT: Just ask questions, please.

MR. GRANT: Sorry. I withdraw that. That was inappropriate. Sorry. I didn't expect that one.

BY MR. GRANT:

Q. The escort order that you entered two days -- Strike that. When did you learn that you were named as a defendant in a federal lawsuit?

115

A.    I haven't been served yet.  I think our -- I think I was notified by our communications officer that there was a lawsuit pending in federal court filed by you.

Q.    And when was that?

A.    I don't recall.

Q.    Was it before or after the escort order?

A.    Oh, it was before the escort order.

Q.    Okay.  And the escort order speaks for itself.  Commissioner Greaves -- How did you learn of the situation involving Commissioner Greaves?

A.    I think I was contacted by John Connelly in the sheriff's department.

Q.    And have you reviewed my written response to your escort order?

A.    I have not.

Q.    Okay.  Let me just ask you a question. If Commissioner Greaves - And I'll represent this as an officer of the Court - was sent a white envelope that was 10 x 13 inches purchased at WalMart would you agree that's not a suspicious package?

A.    I didn't do the investigation, Mr. Grant, and I'm not going to go ahead and

comment on the perception that Commissioner Greaves had or the Kirkwood police had with respect to the delivery of whatever the heck it was. This was based upon her belief that she was threatened.

Q. Okay. Do you believe it's reasonable for her to believe that?

A. I can't speak to her state of mind, I'm sorry, Mr. Grant.

Q. Okay. Well you issued the escort order.

A. Correct, based upon representations made to me I did.

Q. Well, but you just -- but you had to find that a reasonable person then would have been -- felt intimidated.

A. Well in this circumstance, based upon the pleadings that you have filed naming Commissioner Greaves, I believe a reasonable person would feel intimidated or threatened by your actions.

Q. An envelope by U.S. mail?

A. To this day I don't know what was on it. That's what she believed.

Q. Okay. And you brought that up. The hearing on January 21st, do you recall commenting

117

on my allegations of ex parte communications involving Commissioner Greaves?

A.   Ex parte communications between you and Commissioner Greaves?

Q.   No, the allegations that Commissioner Greaves engaged in ex parte judicial communications.

A.   I know you made that allegation, yeah, I'm aware of that.

Q.   Do you remember commenting on that, whether I was correct or incorrect?

A.   I do not.

Q.   Okay.  Do you remember commenting on my analogy to Santa's sleigh being on the roof as the only explanation for her sua sponte order not being ex parte?

A.   I think I remember that in your pleadings and commenting on it.

Q.   Okay, thank you.  Did you form an opinion one way or the other if she had engaged in ex parte judicial communications?

A.   No.  I just thought your artistry in some of your pleadings was entertaining.

Q.   Thank you, Your Honor.  We're here today on the hearing pursuant to the motion to

118

disqualify, right?  That's why we're here?

        A.   I assume so.

        Q.   And I filed that on August 5th?

        A.   I don't know when you filed it.

        Q.   Okay.  But I presented it to you on August 12th?

        A.   If you say so, Mr. Grant.  I trust you.

        Q.   Did you enter the escort order after I presented you the -- You asked to use the word called in the order, handwritten order, do you remember that?

        A.   I don't.  Sorry.

        Q.   How did you have jurisdiction to enter an escort order after a motion to disqualify you was filed and after you had already e-mailed the Missouri Supreme Court asking for a senior judge?

        A.   This is where you and I disagree on the law.  Until I'm removed as a judge I have jurisdiction over your case whether you file a motion to disqualify me or not.

        Q.   Do you believe there's case law supporting that?

        A.   That's my understanding of the law, yes.

        Q.   Okay.  Thank you, Your Honor.  That's

119

all I have.

THE COURT:   Any questions from either of the two attorneys?

MS. BRODY:   Yes, Your Honor.

THE COURT:   Go ahead.

CROSS EXAMINATION

BY MS. BRODY:

Q.   Judge Hilton, if the docket reflects that on March 27th you set the hearing for the TRO that I applied for on that day on March 28th would you disagree with that fact?

A.   No.

Q.   And that on March 28th, after more than 24 hours notice, you held a hearing on my motion for TRO at that time?

A.   I assume that the court file would reflect that.

Q.   That's correct.  And that the initial line in that order is that Mr. Grant failed to appear, although notified through CaseNet, as he is the attorney of record?

A.   That's my recollection.

Q.   Okay.  That is not an ex parte TRO is it?

A.   It's a TRO with notice.

120

MR. GRANT: Lack of foundation. Or -- Objection withdrawn.

THE COURT: Okay.

BY MS. BRODY:

Q. And, Judge Hilton, when you make application or communication with the Supreme Court advising them that a motion to disqualify you has been filed and in response to that they appoint a senior judge is that a sua sponte Supreme Court motion or finding?

A. That's a great question. I assume so.

Q. Even though you have alerted them to the fact that a motion to disqualify has been filed?

A. Yeah, it doesn't happen immediately, but I would hope that they would honor my request.

Q. Yeah. And in this circumstance originally it was Judge Lynn Wood, is that correct?

A. Judge Brown.

Q. Yeah, Judge Brown. And today we have Judge Zerr?

A. Correct.

Q. Okay. And both of these senior judges were appointed based on a motion to disqualify being filed by Mr. Grant and you advising the

121

Supreme Court of the filing --

A.    Correct.

Q.    -- is that correct?

A.    Correct.

Q.    Okay.  Is there anything remarkable to you that the Supreme Court appointed a senior judge to hear the motion to disqualify?

A.    No.

Q.    Now the delay in you publishing - or sorry - your clerical staff publishing the order appointing Judge Wood to hear --

A.    Brown.

Q.    Brown.  Sorry.  -- to hear the motion to disqualify, was that an effort on your part in any way exhibiting bias or prejudice to Mr. Grant?

A.    None whatsoever.

Q.    Okay.  And was it in fact just a clerical delay?

A.    Correct.

Q.    So there was no intention behind the delay in filing it or publishing it to the St. Louis County docket?

A.    No.  These are not typical so the process is unusual for a clerk to enter or process. I can't speak for Ms. Gipson but I think she just

122

assumed it was automatically on the docket.

Q. And, Your Honor, we heard -- Sorry. We had a trial in this matter at the end of June, correct?

A. Correct.

Q. Okay. And it lasted two days, is that correct?

A. That's correct.

Q. And at the close of evidence both parties rested, correct?

A. Correct.

Q. And was there a motion to disqualify you pending at that time?

A. No, there was not.

Q. And was there any active motion to disqualify filed prior to that period of time?

A. No.

Q. Okay. So we have now filed, submitted to you proposed findings of fact and conclusions of law, is that correct?

A. I have not looked at the minutes or the docket based upon these proceedings.

Q. Okay. Well if I were to warrant you that both parties have in fact filed their proposed findings of fact and conclusions of law and the

docket reflects that, is it your opinion the case is now under submission?

A.   If based upon representations, yes, it is.  And I appreciate all parties following my court order.

Q.   Thank you.  Based on this case that you just handed us, Kristine Hendrix vs The City of St. Louis, Eastern District 108858, you believe that this is dispositive of the fact that since this case has already been tried that the motion to disqualify is not timely filed?

A.   That's my legal opinion.

Q.   Thank you, Your Honor.  I don't have anything further.

CROSS EXAMINATION

BY MR. FENLEY:

Q.   Just a point of clarification, Your Honor.  In regards to the order from March from the Supreme Court, do you have any reason to believe that they had independent knowledge of what was going on in this case outside of your request to them?

A.   I assume not.

Q.   So I think the use of the sua sponte order is more so that it came out of the blue with

124

no one notifying them of what was happening in the case, but you had notified them, correct?

A.   That's correct.

Q.   So no formal motion was filed necessarily so it's sua sponte in terms of it came out of -- without a formal motion but at least notice was provided to the Supreme Court, correct?

A.   Correct.  I don't know the timing of Mr. Grant's writs to the Supreme Court.  I mean, they may have more information than the Supreme Court normally has on these requests.

MR. FENLEY:  I have no further questions.

THE COURT:  Mr. Grant.

MR. GRANT:  Yes, brief followup.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. GRANT:

Q.   Would you agree that the delay in the Supreme Court order being published to the docket was prejudicial to me?

A.   No.  What's prejudicial is you not appearing on the date it was set for hearing.

MR. GRANT:  Move to strike as nonresponsive.

125

THE COURT: Sustained. Next question.

BY MR. GRANT:

Q. You understand that I filed a writ that was essentially moot?

A. Which writ?

Q. The very first writ, Your Honor.

A. If that's your belief I guess so.

Q. Okay. I'm just asking. Well, strike that. Your Honor, have you looked at the court docket lately?

A. I just answered that question. No, I have not.

Q. I'm sorry, in this case?

A. No.

Q. Oh, okay. If there were motions filed on July 23rd and throughout August that are pending ruling wouldn't you agree this case is not under submission?

A. I would not agree.

Q. Okay. Can you explain that?

A. The evidence was closed, Mr. Grant. I was just waiting on the proposed findings.

Q. So you -- Strike that. Is it your position that the motions that were filed are not ripe for ruling?

126

A.   I don't know what motions have been filed.   They haven't been noticed up for hearing. I don't know what motions have been filed.

Q.   Okay.   And did you ask Mr. Fenley for his recommendation as the guardian ad litem during trial when I could have cross-examined him?

A.   I think I asked him for that at the close of evidence.

Q.   Okay.   Didn't you order him to file that in writing on July 11th?

A.   If that's what my order says then that's true.

Q.   Okay.   And if that is what the record shows then I would have no ability to cross-examine him, correct?

A.   You're the litigator, Mr. Grant.

Q.   Okay.   Have you reviewed his recommendation?

A.   I have not.

Q.   Do you believe that a guardian ad litem has to provide an explanation and basis for the recommendation on both sole and physical custody?

A.   In order for him to comply with the standards I believe he has to present a parenting plan that he believes is in the best interest of

127

the children based upon the evidence at trial.

Q.   Okay.  And do you have any understanding what his current recommendation is?

A.   I do not.

Q.   Do you believe it conflicts with the children's wishes?

A.   I can't comment 'cause I don't know what his recommendation is.

Q.   Okay.  Do you know if your current order of one night per week conflicts with the children's wishes?

MS. BRODY:  Your Honor, I'm gonna object.

A.   You want me to comment on the evidence before I rule?

THE COURT:  Go ahead.

MS. BRODY:  Thank you.  I'm going to object on the basis this is irrelevant to whether or not Judge Hilton should be disqualified.

MR. GRANT:  I'll withdraw actually. I'll withdraw it, Your Honor.  I think that's best actually.

THE COURT:  Okay.

BY MR. GRANT:

Q.   During trial there was an exchange

about my triggers and why I relapsed, do you remember that?

A.   Was that through your testimony?

Q.   Yes, I was cross-examining my sister, Ms. Grant, and you interjected when I was asking her what my triggers were.  And Judge Zerr has it, but you said, I don't want to hear why you determined - I'm paraphrasing - that you're a psychiatrist/psychologist and you determined on your own you couldn't self-medicate.  Do you remember that exchange?

A.   I don't, I'm sorry.

Q.   If that exchange took place do you believe that reflects bias?

A.   No.

Q.   No.  Do you believe that a party should be asked in front of the trial judge to ask -- or whether or not they want to apologize for making criminal allegations against them?

A.   Do I think it's proper?

Q.   Correct.

A.   Yes.

Q.   You do?

A.   I do.

Q.   That's not grounds for a mistrial or

129

recusal?

A.   I don't believe so.

Q.   Okay.  That's all I have, Your Honor.

THE COURT:   Any other recross?

MS. BRODY:   Yes, Your Honor.

RECROSS EXAMINATION

BY MS. BRODY:

Q.   When questions were asked during the trial, Judge Hilton, about apologies to be made to the Court or its staff was Mr. Grant in the courtroom?

A.   He was.

Q.   And did he represent himself at the time?

A.   He did.

Q.   And did he make any objections to those questions?

A.   Not that I recall.

Q.   Thank you.

MR. FENLEY:   I have nothing further.

THE COURT:   Mr. Grant.

MR. GRANT:   Nothing for this witness.

EXAMINATION

BY THE COURT:

Q.   You want me to read to you the

transcript portion he was talking about, or do you care?

    A.  No, I don't mind.

    Q.  Okay.  I think it's on -- starting at page 198.

    A.  I haven't been provided a copy so...

    Q.  I only have the copy that -- It's online.  I don't have a copy.  It's filed as an exhibit.  I'm reading it off the...

      It says -- It says -- I'll just read it to you.  I read it earlier into the record.

      There was a question about triggers, and there was a question saying -- by the questioner, who was I think Mr. Grant, says:  I'm just trying to establish today on the record - Thank you - do you know what any of the triggers have been for my relapse or relapses?  The answer by the witness was:  So you're asking for me any instances 2019?

      "QUESTION:  Yes.  Do you know the cause?

      "ANSWER:  No.

      "QUESTION:  Okay, thank you.  Do you know that I've had two hip replacements since 2019?"  Statement by the Court:  How is this

131

relevant?  How is that relevant?

"MR. GRANT:  I'm trying to -- Well strike that.  It's --

"COURT:  Is it relevant because it's how you self-medicated?  Is that how it's rel -- How is that relevant?  How is it relevant?

"MR. GRANT:  Yes, that's exactly what I was trying to get to.

"COURT:  Okay, so this is another excuse for your disease of alcoholism because you decided as a mental health professional and as a psychiatrist/psychologist that you could self-medicate.  That was okay?

"MR. GRANT:  No, Your Honor.  I'm an alcoholic.  I made a terrible decision.

"COURT:  Well let's hear about those instead of your excuses, okay.

"MR. GRANT:  Okay.

"COURT:  Because hip replacement surgery, that's no excuse for your behavior. None.  So let's get to something more relevant where it's your own, Mr. Grant.

"MR. GRANT:  I owned that I have a disease.

"COURT:  So far I haven't heard it.

132

"MR. GRANT:  I own it.  Let me make that clear.

"COURT:  Well I can't wait to hear about what your plan is for your complete recovery because I haven't heard it yet.

"MR. GRANT:  You'll hear about it when I testify, Your Honor.

"COURT:  Thank you.  Let's move on."

I think that's the interplay he's talking about.

A.  Okay.

Q.  Do you want to make anymore comment about that?

A.  No.

Q.  Okay.  Anything else?

MR. GRANT:  No.  Other than the -- Not for this witness.

THE COURT:  Okay, you can step down. Thank you very much.

THE WITNESS:  Thank you.

THE COURT:  So you're still going to give me a thumb drive, right?

MR. GRANT:  Yes, I have it right here.

THE COURT:  What else do you have?

MR. GRANT:  I think we have a

133

stipulation on -- Well never mind.  Strike that. I'm not going to ask that.

Your Honor, that is all the evidence I have today other than argument.  I would like to conclude with argument.

THE COURT:  Is there any evidence from either one of the other parties?  Evidence, besides argument.

MR. FENLEY:  Your Honor, I think the understanding was that I would give an explanation of that phone call, which I'm happy to do here and be sworn.

THE COURT:  Let's do that now.  If you want to be sworn that will be fine.  That will give it some gravitas.

JOHN FENLEY, having been sworn, testified as follows:

THE COURT:  You may testify in the narrative.

MR. FENLEY:  Thank you, Your Honor.

So I think following one of these hearings in June of this year I asked Mr. Grant to stick around and notified him I had another matter to handle and I'd be back up to talk to him.  He had left.  I took longer wherever I was.

134

Understandable, that's fine.

So I think in the following next couple of days we had a phone call.  I vividly remember I was coming back from St. Charles County and I was in the car during said phone call.  And it started with Mr. Grant wanting to find some sort of resolution to this.  I think he had contacted me in some form saying, Hey, I'll drop everything if I go back to fifty-fifty.  I'll drop all my accusations, I won't sue anyone, I won't do anything if I get back to fifty-fifty.

MR. GRANT:  Objection.  Hearsay, lack of foundation.

THE COURT:  Once again, I'm allowing him to just comment.  We're doing this a little bit oddly.  Trying to give him some leeway to give his recollection of it.  Otherwise I would agree with you, but I'm doing it a little bit out of order.  Go ahead.

MR. FENLEY:  So the gist of what I was trying to get Mr. Grant to say is that if you look at the record there are pleadings and all of the writs, this underlying file, there are all sorts of allegations without basis that I think are inappropriate for a litigator to make.  I don't

135

know if it's actually in the court file, but there was a filing that was at least submitted to the Court that I have where he accused me of using cocaine on a daily basis.

MR. GRANT:  Objection.  That's untrue. There's no foundation.  That's untrue.

THE COURT:  We're talking about the conversation, not other things that happened, okay.

MR. FENLEY:  Well, all the stuff that has happened up to this point and all the accusations, that's what I'm trying to get him to say, Look, I don't have any basis in reality for what you are accusing all of us of, this criminal conspiracy, not acting in the best interest of your children, having it out against you, that there's corruption in the courthouse.  And I'm essentially saying, Matt, I have not seen any basis in reality for that, I need you to get beyond that and come to some realization or agreement that that is not true and talk to Ms. Copeland's attorney about a potential resolution to this; I would support anything that you two can agree on, and if you come to some sort of realization that the accusations you're making are

136

not true and what you're telling your children is not true I would probably be in a better position to make a better recommendation for you than what I would otherwise based on his conduct during the case.

So he -- My interpretation of what Mr. Grant is accusing me of, since I said drop all the accusations and then you'll get more time with your kids that it's some sort of quid pro quo. Wherein he's telling me initially, I'll drop everything if you give me more time for the kids. So I think it all starts with him there.

And then the gist of the conversation is, I would love for you to have a healthy relationship for your children -- with your children, I would love for everyone to get past all this and move on and you maintain your sobriety, there's nothing more that I want, but when you are accusing everyone in the building, the entire judiciary - Ms. Gipson, Judge Hilton, myself, Ms. Brody --

MR. GRANT:  Objection.  Foundation regarding the entire building.

THE COURT:  Overruled.  Continue.

MR. FENLEY:  -- of being in some sort

137

of corrupt criminal enterprise, his prior attorneys, all of that. When he's doing that I have reason to believe that he is not in a good place to be parenting his children. So if he was going to disavow that and say, I no longer believe that, and, yes, it was all false, then I would have a better understanding -- or be in a better position to recommend more time then. That's what I remember the gist of that phone call being.

THE COURT: Okay.

MR. GRANT: Cross-examination, Your Honor?

THE COURT: If you feel the need go ahead.

MR. GRANT: Yes.

CROSS EXAMINATION

BY MR. GRANT:

Q. Mr. Fenley, you sent me an e-mail asking -- You testified just now that it started with me. You sent me an e-mail asking to speak that led to that phone call didn't you?

A. If you say so. That is true, an e-mail or a text message, I don't deny that that could be the case.

Q. Okay. So if that's the case and if the

138

Court allows me to submit it that would conflict with your recollection that this was all me and starts with me. You reached out to me, right?

A. I remember somewhere in that conversation or somewhere in our conversations recorded, not written, you would state that you would drop everything if we go back to fifty-fifty.

Q. You understood that was after -- that was -- that was long after this recording, correct?

A. I don't know the date of the recording.

Q. Okay. You don't dispute it was June 3?

A. I don't know when it was made, because I remember there's also an e-mail from you on June 18th that you initiated, Let me know if we have time for a short call or meeting today, and that's what I think that phone call stemmed from.

Q. Well I have it on my -- Well if we need to get into it I have it on my phone so, yeah, Your Honor.

Mr. Fenley, you testified about a reference to cocaine. Isn't it true that the document you're referring to I included that and had a footnote with a web link to the explanation for you to see what hyperbole is, isn't that true?

A. Could be true. But I've never accused

139

another litigator of using cocaine in a written pleading, nor do I think it's appropriate for any litigator to accuse somebody of using cocaine on a daily basis.

Q.   I did not accuse you of using cocaine did I?  Didn't I say I could have and then say that would be hyperbole?

A.   Either way I think it's inappropriate.

Q.   Well, all right.  So let me ask you this.  If I would have said -- If I was the same person on that phone call and I said, Okay, I disavow it, I was wrong, then you would have said I'm okay to have my kids; is that what your testimony is?

A.   I think that mischaracterizes the testimony to an extent.  I would have considered additional time or considered a different recommendation if you had put on the record in front of everyone that you were acting inappropriately during this litigation.

Q.   No, but you would have given the kids to somebody who was not in a good place but just told you what you wanted to hear?

A.   That is inaccurate and that mischaracterizes what I just said.

140

MR. GRANT:  No further questions of this witness, Your Honor.

THE COURT:  Anyone else?

MS. BRODY:  Thank you, Your Honor. Just a couple.

THE COURT:  Go ahead.

CROSS EXAMINATION

BY MS. BRODY:

Q.   John, you say that -- just now that what you were trying to say was that Mr. Grant has been acting inappropriately during the litigation, is that correct?

A.   That is correct.

Q.   And did it affect or cause you to have concerns over his mental health?

A.   It did.

Q.   And how that would affect the children?

A.   It did.

Q.   And when he made an allegation in one of his pleadings on CaseNet that I was trying to kill him did that have an affect?

MR. GRANT:  Objection.  Lack of foundation.

THE COURT:  Overruled.

MS. BRODY:  It's in the pleadings that

141

you filed.

A.    Yes.

Q.    And that Judge Hilton was part of the plot to kill him?

A.    Correct.

Q.    Those all had led you to believe that you should -- or could have made different conclusions regarding his mental health through the system the best interest of the children?

A.    Correct.

MS. BRODY:    Thank you.    I have nothing else.

MR. GRANT:    Brief followup based on those questions.

THE COURT:    Go ahead.

RECROSS EXAMINATION

BY MR. GRANT:

Q.    Mr. Fenley, if you had these concerns why didn't you file a motion for mental evaluation at any point in time that these were occurring between mid February and trial?  You're the kids guardian ad litem.

A.    I think the pleadings you filed spoke for themselves, Matt.

Q.    You didn't think you would need -- On

the kids' behalf if their father was mentally ill that it was in their best interest to have an expert opinion on that? You didn't think that was in their best interest? Unfortunately bad for me but in their best interest?

A.   I was relying on what you have filed with the Court and your statements on how you are an experienced litigator at a top law firm. And in my years of practice, albeit less than you, I have never seen somebody file the things that you have filed in a sane manner.

Q.   Mr. Fenley, this person who doesn't file things in a sane manner, with the exception of when I was in Mexico and there was a court order against it, I've had my children every single week since going back to October, isn't that true?

A.   That is true.

Q.   Okay. And you haven't asked the Court to take the children away and say zero custody, this man is insane?

A.   'Cause I don't think that is best for your children.

Q.   All right. Thank you. Nothing further.

THE COURT: Okay. At this point you

143

will favor me with a copy of the thumb drive and I will declare the evidence closed in this case. I'm going to take the matter under advisement. I will render a judgment. It will be in writing. It will come out to you all through the system. You're on system representing yourself, right?

MR. GRANT:   Yes, Your Honor.

THE COURT:   So should come to you through the system.

MR. GRANT:   Yeah.

THE COURT:   Okay, so I'll send it to you through the system. I anticipate hopefully getting it done fairly quickly. I don't think I have anything in the next couple of days, so I'll try to put it together in the next couple days because I understand the urgency to get to an answer on this case, So I'll attempt to accomplish that.

As I said, the answer is going to be either one of two things: One, that Judge Hilton should be disqualified and will request the Supreme Court to appoint someone in his lieu or, two, that the petition has not been proven to the extent that he should be disqualified for cause and that he will continue on the case as long as

144

he feels ethically appropriate to do so.  And those are the only two options that I really see happening.

And number three is I am not going to be involved however it turns out.  If the Supreme Court appoints someone new it will not be me.  So this is the only involvement I will have in the case.  Everybody understand that?

MS. BRODY:  Yes, Your Honor.

MR. GRANT:  Judge -- Never mind.  No, nothing further.  Sorry.

THE COURT:  Okay.  At this point then the Court is going to stand in recess and you will hear from me when I have it done.

\*\*\*

145

REPORTER'S CERTIFICATE

I, Rhonda J. Laurentius, a Certified Court Reporter, hereby certify that I am the official court reporter for Division 13 of the Circuit Court of the County of St. Louis, State of Missouri; that on the 27th day of August, 2025, I was present and reported all the proceedings had in the case of MATTHEW R. GRANT, PETITIONER, VS. C.M.G., et al., RESPONDENTS, CAUSE NO. 12SL-DRO3959-02.

I further certify that the foregoing 145 pages contain a true and accurate reproduction of the proceedings requested be transcribed.

I further certify that this transcript contains pages 1 through 146 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.


/s/ Rhonda J. Laurentius, CCR #0419
Official Court Reporter
Twenty-First Judicial Circuit
(314) 615-8070

146