one of the targets.  And from that point forward, I worked with them to address internal threats and things of that nature because Monsanto Company, and later Bayer, were specific targets of the People's Republic of China to steal intellectual property.

Q.  And with regard to the FBI or any other federal agency, do you hold any credentials, or did you hold any credentials?

A.  Yes, I do still hold credentials.  I am the special government employee for the federal government.  I am a strategic engagement advisor for the private sector of the Federal Bureau of Investigations.

Q.  And in that position, have you had occasion to be involved one way or the other in any sort of FBI agent training?

A.  Yes, well, I've had the training of DSAC, the Domestic Security Alliance Counsel.  And I also lecture in that regard, and I lecture at Quantico once or twice or year on that detection.

Q.  Okay.  So you go to Quantico and lecture?

A.  I do.

Q.  Okay.  In the last year or so, have you had occasion to interact with me?

A.  Yes.

**Exhibit P**

A.   Well, there was another time that we met.  And there was an individual that was sitting outside in the car; stayed there until we were getting ready to leave.  And then that person left simultaneously.

Q.   Just as a layman, do you have any suspicion whether that person was conducting surveillance?

MS.  BRODIE:  I'm going to object.  There's a lack of foundation.

THE COURT:  Sustained.

Q.   (By Mr. Grant) What about any other instances?  Has there ever been any instances where anyone else was nearby that you can think of?

A.   Well, I believe it was that same night.  We left where we were at, went to another location, sat down.  And there was an older man and woman that had walked in and sat close to us.  There was a frequent eye contact or checking there for a while.  Certainly, consisted with what I've known somebody trying to eavesdrop or listen.

Q.   And was it usual or unusual for what would happen in that environment?

A.   Well, in the environment of what you felt, that would have been consistent with what you were saying.  Had I been in there with my wife, maybe I wouldn't have noticed it, but I was paying more attention in those

MS. BRODIE:  Objection, relevance.

THE COURT:  Was he employed by Husch?

MR. GRANT:  No, as a client.  Let me ask it a different way.

Q.  (By Mr. Grant) Outside counsel have various roles.  When I worked for you, what role did I fill?

A.  Mr. Grant was not someone that I asked for when I felt like I was headed in a direction for resolution. Mr. Grant was the individual I would ask for when I knew I needed an ex parte TRO; when I knew I needed some sanctions; some pleadings struck; some permanent injunctions.  Those are the times when I asked for Mr. Grant's assistance in the case.

Q.  And based on those observations, how did I perform in that regard?

A.  Well, I was very happy with that.  I don't remember a time that I was unhappy with that.  But, again, I would not have called you if I needed to resolve something with a reasonable person.

Q.  Gotcha.

MR. GRANT:  I have no further questions.

MS. BRODIE:  Thank you, Your Honor.  I don't have any questions.  Thank you.

THE COURT:  Mr. Fenley?

MR. FENLEY:  I just have a couple in terms